**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **LUMINAR TECHNOLOGIES, INC.,** | § | **Case No. 25-90807 (CML)** |
| *et al.*, | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | |
| | § | |

**DISCLOSURE STATEMENT FOR**
**THIRD AMENDED CHAPTER 11 PLAN OF LIQUIDATION OF**
**LUMINAR TECHNOLOGIES, INC. AND ITS AFFILIATED DEBTORS**

**WEIL, GOTSHAL & MANGES LLP**
Stephanie N. Morrison (24126930)
Austin B. Crabtree (24109763)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:   (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Ronit J. Berkovich (admitted pro hac vice)
Jessica Liou (admitted pro hac vice)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors and Debtors in Possession*

Dated:  February 18, 2026
          Houston, Texas

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  LAZR Technologies, LLC (8909); Luminar Technologies, Inc. (4317); Luminar, LLC (7133); Condor Acquisition Sub I, Inc. (0155); and Condor Acquisition Sub II, Inc. (8587).  The Debtors' mailing address is 2603 Discovery Drive, Suite 100, Orlando, Florida 32826.

DISCLOSURE STATEMENT, DATED FEBRUARY 18, 2026

LUMINAR TECHNOLOGIES, INC., *ET AL.*

> **THIS SOLICITATION OF VOTES (THE "SOLICITATION") IS BEING CONDUCTED TO OBTAIN SUFFICIENT VOTES TO ACCEPT THE PLAN (AS DEFINED HEREIN).**
>
> **THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. (CENTRAL TIME) ON MARCH 23, 2026 (THE "VOTING DEADLINE"), UNLESS EXTENDED BY THE DEBTORS IN WRITING.**
>
> **THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS FEBRUARY 18, 2026 (THE "RECORD DATE").**

> **RECOMMENDATION BY THE DEBTORS TO VOTE TO ACCEPT THE PLAN**
>
> The board of directors of each of Luminar Technologies, Inc., Condor Acquisition Sub I, Inc., and Condor Acquisition Sub II, Inc. and the sole member of each of LAZR Technologies, LLC and Luminar, LLC have approved the transactions contemplated by the Plan. The Debtors believe the Plan is in the best interests of all stakeholders and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan.

> **RECOMMENDATION BY THE CREDITORS' COMMITTEE TO VOTE TO ACCEPT THE PLAN**
>
> The Creditors' Committee (i) believes that the Plan is in the best interests of the Debtors' general unsecured creditors, (ii) supports confirmation of the Plan and (iii) recommends that all general unsecured creditors in Class 5 submit a ballot to accept the Plan.

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (AS MAY BE AMENDED, SUPPLEMENTED, OR MODIFIED FROM TIME TO TIME, THE "DISCLOSURE STATEMENT") IS INCLUDED HEREIN FOR THE PURPOSES OF SOLICITING VOTES ON THE *THIRD AMENDED CHAPTER 11 PLAN OF LIQUIDATION OF LUMINAR TECHNOLOGIES, INC. AND ITS AFFILIATED DEBTORS*, DATED FEBRUARY 18, 2026 (THE "PLAN"),[2] AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  A COPY OF THE PLAN IS ANNEXED HERETO AS EXHIBIT A.  NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE").**

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  IN PARTICULAR, ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS**

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

SET FORTH IN SECTION VI (CERTAIN RISK FACTORS AFFECTING DEBTORS) OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  THE PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN GOVERN.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THE DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.

CERTAIN STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHERMORE, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN, INCLUDING ANY PROJECTIONS, ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN. IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE THOSE FACTORS, RISKS, AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "CERTAIN RISK FACTORS AFFECTING DEBTORS" BELOW.  PARTIES ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS, AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.  THE DEBTORS DO NOT INTEND, AND UNDERTAKE NO OBLIGATION, TO UPDATE OR OTHERWISE REVISE ANY FORWARD-LOOKING STATEMENTS, INCLUDING ANY PROJECTIONS CONTAINED HEREIN, TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS OR OTHERWISE.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE LIQUIDATION ANALYSIS HEREIN.  THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.

**THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THE DISCLOSURE STATEMENT.**

**THE INFORMATION IN THE DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION.  NOTHING IN THE DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.**

**ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THE DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

**THE PLAN PROVIDES THAT THE FOLLOWING PARTIES ARE DEEMED TO GRANT THE RELEASES PROVIDED FOR THEREIN: (A) THE DEBTORS; (B) THE CREDITORS' COMMITTEE AND EACH OF ITS MEMBERS, SOLELY IN THEIR CAPACITIES AS SUCH; (C) THE AD HOC NOTEHOLDER GROUP; (D) THE FIRST LIEN NOTES AGENT AND SECOND LIEN NOTES AGENT, SOLELY IN THEIR CAPACITIES AS SUCH; AND (E) WITH RESPECT TO EACH OF THE FOREGOING PERSONS IN CLAUSES (A) THROUGH (D), ALL RELATED PARTIES; (F) THE HOLDERS OF ALL CLAIMS OR INTERESTS WHOSE VOTE TO ACCEPT OR REJECT THE PLAN IS SOLICITED BUT THAT DO NOT VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN AND DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH IN ARTICLE XI OF THE PLAN; (G) THE HOLDERS OF ALL CLAIMS OR INTERESTS THAT VOTE TO ACCEPT OR REJECT THE PLAN, ARE DEEMED TO REJECT THE PLAN, OR ARE PRESUMED TO ACCEPT THE PLAN, BUT IN EACH CASE DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH IN ARTICLE XI OF THE PLAN; (H) THE HOLDERS OF ALL CLAIMS AND INTERESTS THAT WERE GIVEN NOTICE OF THE OPPORTUNITY TO OPT OUT OF GRANTING THE RELEASES SET FORTH IN SECTION 11.6 OF THE PLAN BUT DID NOT OPT OUT.**

**HOLDERS OF CLAIMS OR INTERESTS IN VOTING CLASSES (CLASS 3 (FIRST LIEN NOTEHOLDER SECURED CLAIMS), CLASS 4 (SECOND LIEN NOTEHOLDER SECURED CLAIMS), AND CLASS 5 (GENERAL UNSECURED CLAIMS)) WILL RECEIVE A BALLOT THAT INCLUDES THE OPTION TO OPT OUT OF THE RELEASES CONTAINED IN SECTION 11.6 OF THE PLAN.  HOLDERS OF CLAIMS AND INTERESTS IN CERTAIN NON-VOTING CLASSES (CLASS 1 (OTHER PRIORITY CLAIMS), CLASS 2 (OTHER SECURED CLAIMS), CLASS 8 (SUBORDINATED CLAIMS), AND CLASS 9 (PARENT INTERESTS)) WILL RECEIVE A NOTICE OF NON-VOTING STATUS THAT (I) NOTIFIES SUCH HOLDERS OF THEIR RIGHT TO OPT OUT OF THE RELEASES CONTAINED IN SECTION 11.6 OF THE PLAN AND (II) INCLUDES A FORM PURSUANT TO WHICH SUCH HOLDERS CAN OPT OUT OF THE RELEASES CONTAINED IN SECTION 11.6 OF THE PLAN.  SEE <u>EXHIBIT D</u> FOR A DESCRIPTION OF THE RELEASES AND RELATED PROVISIONS.**

**PLEASE BE ADVISED THAT SECTIONS 11.3, 11.4, 11.5, 11.6, 11.7, 11.8, AND 11.9 OF THE PLAN CONTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS.  YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED.**

**NEITHER (A) THE ISSUANCE NOR THE DISTRIBUTION OF THE PARENT DEBTOR ADDITIONAL STOCK, NOR (B) THE ISSUANCE OF THE LIQUIDATING TRUST INTERSETS HAVE BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "*SEC*") OR BY ANY STATE SECURITIES COMMISSION OR OTHER**

iv

**PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN OR THE ISSUANCE AND THE DISTRIBUTION OF THE PARENT DEBTOR ADDITIONAL STOCK. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

---

An opt-out election form (the "**Release Opt-Out Form**") or a Ballot (as defined herein) containing an opt-out election has been or will be mailed to you.  The Release Opt-Out Form or Ballot, as applicable, will provide you with the option to opt out of granting the releases contained in Section 11.6(b) of the Plan. You must complete and timely return the Release Opt-Out Form or Ballot, as applicable, to the Voting Agent (as defined herein) by the Voting Deadline, March 23, 2026 at 4:00 p.m. (Central Time), in accordance with the instructions set forth in the Release Opt-Out Form or Ballot, as applicable, for your opt-out to be valid. OTHERWISE, EXCEPT AS EXPRESSLY SET FORTH IN THE PLAN, YOU WILL BE DEEMED TO CONSENT TO AND BE BOUND BY THE RELEASES SET FORTH IN THE PLAN. Please review the additional information set forth in this Disclosure Statement, the Plan, the Release Opt-Out Form, and the Ballot, as applicable, and any other documents related to these chapter 11 cases that you may receive from time to time. Please be advised that your decision to opt out or not opt out of the releases in Section 11.6(b) of the Plan does not affect the amount of any distribution you may receive under the Plan.

---

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ...................................................................................................... 10

    A.      OVERVIEW OF PLAN ......................................................................... 11

    B.      GLOBAL SETTLEMENT ...................................................................... 13

    C.      TREATMENT OF CLAIMS AND INTERESTS ................................... 15

           1.      Claims and Interests in Luminar Technologies, Inc. ............................. 15

           2.      Key Recovery Table Assumptions and Qualifications ......................... 17

    D.      VOTING PROCEDURES ...................................................................... 18

II. OVERVIEW OF DEBTORS' OPERATIONS ....................................................... 19

    A.      COMPANY'S BACKGROUND AND FORMATION ........................ 19

    B.      BUSINESS OPERATIONS ................................................................... 21

           1.      LiDARCo .............................................................................................. 21

           2.      LSICo .................................................................................................... 22

    C.      CORPORATE STRUCTURE AND GOVERNANCE ......................... 23

           1.      Corporate Structure ............................................................................. 23

           2.      Capital Structure .................................................................................. 24

                  a.      First Lien Notes .......................................................................... 24

                 b.      Second Lien Convertible Notes .................................................. 25

                 c.      Intercreditor Agreement .............................................................. 25

                 d.      Unsecured Convertible Notes ..................................................... 25

                 e.      Additional Financing Agreements (No Amounts Outstanding) ............ 26

                 f.      Common Stock ............................................................................ 27

           3.      Prepetition Litigation .......................................................................... 27

                 a.      Securities Class Action (2023 Action) ....................................... 27

                 b.      Securities Class Action (2025 Action) ....................................... 27

                 c.      Shareholder Derivative Suits (2023) .......................................... 28

                 d.      Shareholder Derivative Suit (2025) ........................................... 28

                 e.      SEC Investigation ....................................................................... 28

                 f.      Solfice Shareholder Suit (2025) ................................................. 28

           4.      Liquidity .............................................................................................. 29

           5.      Other Assets ......................................................................................... 29

III. KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES ............................ 29

    A.      CHALLENGES FACING THE DEBTORS' BUSINESSES .......................... 30

|  |  | 1. | Volvo Relationship Deterioration | 30 |
|  |  | 2. | Consequences of Partnership Setbacks | 31 |
|  |  | 3. | Industry Challenges | 32 |
|  | B. | FINANCIAL PERFORMANCE | | 33 |
|  | C. | LIABILITY MANAGEMENT AND CAPITAL RAISING INITIATIVES | | 33 |
|  | D. | KEY EMPLOYEE RETENTION PROGRAM | | 34 |
|  | E. | OPERATIONAL RESTRUCTURING EFFORTS | | 35 |
|  | F. | PURSUIT OF STRATEGIC AND SALE TRANSACTIONS | | 35 |
| IV. KEY EVENTS DURING CHAPTER 11 CASES | | | | 37 |
|  | A. | FIRST DAY PLEADINGS | | 37 |
|  | B. | CASH COLLATERAL | | 38 |
|  | C. | COST-SAVING MEASURES | | 39 |
|  | D. | FILING OF CONDOR ENTITIES | | 39 |
|  | E. | ADDITIONAL MOTIONS AND APPLICATIONS | | 39 |
|  | F. | TIMETABLE FOR CHAPTER 11 CASES | | 40 |
|  | G. | GLOBAL BIDDING PROCEDURES AND POSTPETITION SALE PROCESS | | 40 |
|  |  | 1. | LSI Assets Sale Process | 41 |
|  |  | 2. | LiDAR Assets Sale Process | 41 |
|  |  | 3. | Asset Sale Offer | 43 |
|  | H. | STATEMENTS AND SCHEDULES, AND CLAIMS BAR DATES | | 43 |
|  | I. | ADVERSARY PROCEEDINGS | | 44 |
|  |  | 1. | Puttagunta Adversary Proceeding | 44 |
|  |  | 2. | NEXT Semiconductor Technologies, Inc. Adversary Proceeding | 45 |
|  | J. | SIC INVESTIGATION | | 45 |
|  | K. | CREDITORS' COMMITTEE INVESTIGATION | | 46 |
|  | L. | COMMON STOCK | | 46 |
| V. SECURITIES LAWS EXEMPTIONS AND RESTRICTIONS ON TRANSFER | | | | 47 |
| VI. CERTAIN RISK FACTORS AFFECTING DEBTORS | | | | 47 |
|  | A. | CERTAIN BANKRUPTCY LAW CONSIDERATIONS | | 47 |
|  |  | 1. | Risk Related to Termination of Consensual Use of Cash Collateral | 47 |
|  |  | 2. | Risk of Non-Confirmation of Plan | 48 |
|  |  | 3. | Risk of Non-Consensual Confirmation | 48 |
|  |  | 4. | Risk of Non-Occurrence of Effective Date | 48 |
|  |  | 5. | Alternative Transactions | 48 |
|  |  | 6. | Risks Related to Possible Objections to Plan | 49 |

7.     Global Settlement May Not Be Approved .......................................................... 49

8.     Releases, Injunctions, and Exculpation Provisions May Not Be Approved ........ 49

9.     Claims Could Be More than Projected ............................................................... 49

10.    Participation in the Asset Sale Offer Could be Less Than Anticipated ............... 49

11.    Distributions ..................................................................................................... 49

12.    Administrative Insolvency ................................................................................ 50

13.    Conversion to Chapter 7 ................................................................................... 50

14.    The Debtors' Liquidity May be Exhausted and No Alternative Financing
may be Obtained Before the Effective Date ....................................................... 50

15.    Dismissal of Chapter 11 Cases ......................................................................... 50

16.    Cost of Administering Debtors' Estates ............................................................ 50

B.    ADDITIONAL FACTORS TO BE CONSIDERED ...................................................... 51

1.     Debtors Could Withdraw Plan .......................................................................... 51

2.     Debtors Have No Duty to Update ...................................................................... 51

3.     No Representations Outside This Disclosure Statement Are Authorized ............ 51

4.     No Legal or Tax Advice Is Provided to You by This Disclosure
Statement .......................................................................................................... 51

5.     No Admission Made .......................................................................................... 51

6.     No Waiver of Right to Object or Right to Recover Transfers and Assets ........... 51

7.     Ongoing Litigation Could Affect the Outcome of the Chapter 11 Cases ........... 52

8.     Objection to Amount or Classification of Claims ............................................. 52

VII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ......................................... 52

A.    CONSEQUENCES TO DEBTORS .............................................................................. 53

1.     Transfer of Assets to the Liquidation Trust; Wind Down of the Debtors ........... 54

2.     Cancellation of Debt ......................................................................................... 54

B.    CONSEQUENCES TO HOLDERS OF ALLOWED GENERAL UNSECURED
CLAIMS .................................................................................................................. 55

1.     Treatment to U.S. Holders of Allowed First Lien Noteholder Secured
Claims or Allowed Second Lien Secured Claims ............................................. 55

2.     Treatment to U.S. Holders of Allowed General Unsecured Claims ................... 56

3.     Distributions in Respect of Accrued But Unpaid Interest or OID ...................... 57

4.     Character of Gain or Loss ................................................................................. 58

C.    TAX TREATMENT OF LIQUIDATION TRUST AND ITS BENEFICIARIES .......... 58

1.     General "Liquidating Trust" Tax Reporting by the Liquidation Trust and
their Beneficiaries ............................................................................................ 59

2.      Tax Reporting for Assets Allocable to a Disputed Ownership Fund
        (including the GUC Reserve) ..................................................................... 60

D.      WITHHOLDING ON DISTRIBUTIONS AND INFORMATION REPORTING .......... 60

VIII. CONFIRMATION OF PLAN ............................................................................................ 61

A.      CONFIRMATION HEARING ..................................................................................... 61

B.      OBJECTIONS .............................................................................................................. 61

C.      REQUIREMENTS FOR CONFIRMATION OF PLAN ............................................. 62

        1.      Requirements of Section 1129(a) of Bankruptcy Code ..................... 62

        2.      Acceptance of Plan .............................................................................. 63

        3.      Cramdown ............................................................................................ 63

                a.      No Unfair Discrimination .................................................... 64

                b.      Fair and Equitable Test ....................................................... 64

        4.      Best Interests Test ............................................................................... 65

        5.      Feasibility ............................................................................................ 65

IX. RELEASES ............................................................................................................................. 65

X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN ............. 66

        1.      Alternative Plan of Liquidation .......................................................... 67

        2.      Liquidation under Chapter 7 of Bankruptcy Code ............................. 67

XI. CONCLUSION ....................................................................................................................... 67

## EXHIBITS

**EXHIBIT A**          Plan

**EXHIBIT B**          Debtors' Organizational Structure

**EXHIBIT C**          Liquidation Analysis

**EXHIBIT D**          Release, Injunction and Exculpation Provisions

**EXHIBIT E**          Solicitation and Voting Procedures

# I.

## INTRODUCTION

On December 15, 2025, and December 31, 2025, as applicable (the "**Petition Date**"), Luminar Technologies, Inc. ("**Luminar**" or "**Luminar Parent**"), LAZR Technologies, LLC, Luminar, LLC, Condor Acquisition Sub I, Inc., and Condor Acquisition Sub II, Inc. (together with Luminar, the "**Debtors**", and, the Debtors collectively with the Debtors' direct and indirect non-debtor subsidiaries, the "**Company**") commenced voluntary cases in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") pursuant to chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

On December 30, 2025, the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the chapter 11 cases (Docket No. 115). The members of the Creditors' Committee are (i) U.S. Bank Trust Company, National Association, (ii) Fujian Hitronics Technologies, Inc., (iii) Applied Intuition, Inc., (iv) Optera TPK Holding Pte., Ltd. and TPK Precision Hong Kong Co., Ltd., (v) Workday, Inc., (vi) STEER Tech LLC, and (vii) Alidade Discovery Lakes, II, LLC. The Creditors' Committee retained Paul Hastings LLP ("**Paul Hastings**") as counsel and Alvarez & Marsal Holdings, LLC (**A&M**) as financial advisor.

The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan. The Disclosure Statement contains, among other things, a summary of (i) the treatment of Claims against and Interests in the Debtors under the Plan, (ii) the Debtors' business and certain historical events, (iii) anticipated events during these chapter 11 cases, (iv) risk factors affecting the Debtors and the Plan, and (v) the standard for seeking confirmation of the Plan.

As described in more detail below, the Debtors faced certain financial difficulties prior to the Petition Date and commenced these chapter 11 cases to facilitate value-maximizing sale processes for its LiDAR business and for the equity of Luminar Semiconductors Inc. ("**LSI**") and certain of its subsidiaries (collectively, "**LSICo**").

On December 15, 2025, the Debtors entered into a Stock Purchase Agreement with Quantum Computing, Inc. ("**QCi**"), the stalking horse bidder for the LSICo equity. On December 18, 2025, the Debtors filed a motion seeking approval of bidding procedures, designation of QCi as the stalking horse bidder for the LSICo equity, and authorization to designate one or more stalking horse bidders for the LiDARCo (as defined herein) equity (Docket No. 86) (the "**Bidding Procedures Motion**"), which was entered by the Bankruptcy Court on December 30, 2025 (Docket No. 119) (the "**Bidding Procedures Order**"). The Debtors received no additional qualified bids, and the Bankruptcy Court approved the sale of the LSICo equity to QCi at a hearing held on January 27, 2026 (Docket No. 320). The LSI Sale Transaction closed on February 2, 2026.

On January 11, 2026, the Debtors entered into a purchase agreement with QCi for the LiDARCo assets and filed a notice designating QCi as the stalking horse bidder for the LiDARCo assets (Docket No. 202). The Debtors qualified an additional bid and held an auction for the LiDARCo assets on January 26, 2026. At the conclusion of the auction, the Debtors named MicroVision, Inc. ("**MicroVision**") as the successful bidder and QCi as the back-up bidder. At a hearing held on January 27, 2026, the

Bankruptcy Court approved the sale of the LiDARCo assets to MicroVision (Docket No. 329).  The LiDARCo Sale Transaction closed on February 3, 2026.

In the last several weeks, the Debtors have engaged in extensive negotiations with the Creditors' Committee and Ad Hoc Noteholder Group, culminating in the entry into a global compromise and settlement to resolve all of the Creditors' Committee's issues with the Plan, including the allocation of consideration to be distributed to holders of unsecured claims (the "**Global Settlement**").  The terms of the Global Settlement are incorporated into the Plan and described in Section I.B herein.

## A.    OVERVIEW OF PLAN

The Plan contemplates the distribution of  the proceeds from the completed sales of substantially all the Debtors' assets pursuant to section 363 of the Bankruptcy Code to QCi for LSICo and to MicroVision for LiDARCo and the efficient and orderly wind-down of the Debtors' estates in accordance with the Global Settlement.

To implement the provisions of the Plan, including making distributions to holders of Claims and Interests, the Plan contemplates the creation of a Liquidation Trust, as well as the appointment of a Liquidation Trustee, the identity of which shall be included in the Plan Supplement.  The selection of the Liquidation Trustee shall be mutually agreeable between the Ad Hoc Noteholder Group and the Creditors' Committee, and reasonably acceptable to the Debtors. The Liquidation Trustee shall carry out and implement all provisions of the Plan after the Effective Date, including the reconciliation of Claims, the monetization of the Liquidation Trust Assets, including the GUC Reserve Assets, and the winding down of the Debtors' estates.  A Liquidation Trust Oversight Board shall be established to supervise the Liquidation Trustee's reconciliation of General Unsecured Claims and its pursuit, abandonment, or liquidation of the GUC Reserve Assets.  The Liquidation Trust Oversight Board will be comprised of three (3) members, each of which will be selected by the Creditors' Committee.

On or before the Effective Date, the Debtors and the Liquidation Trustee shall take all necessary steps to establish the Liquidation Trust for the benefit of Holders of Claims against the Debtors, including executing the Liquidation Trust Agreement and the Liquidation Trust Transfer Agreement, each of which shall be in form and substance reasonably acceptable to the Debtors, the Required Senior Secured Holders, and the Creditors' Committee, and all of the Assets of the Debtors as of the Effective Date will vest with the Liquidation Trust.

The Plan further provides for, on the Effective Date, certain distributions to be made and reserves to be established, including (i) initial funding of the Senior Claims Reserve on account of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims, (ii) funding of the Wind Down Reserve with the Wind Down Amount ($3,000,000) in accordance with the Wind Down Budget, (iii) funding of the First Lien Reserve, (iv) funding of the GUC Reserve, and (v) funding of the Professional Fee Escrow Account and payment of Professional Fee Claims therefrom. In addition to the Professional Fee Escrow Account, the Liquidation Trustee will establish a separate account for each of the Senior Claims Reserve, Wind Down Reserve, GUC Reserve, First Lien Reserve, and Second Lien Reserve, each to be maintained by the Liquidation Trustee in accordance with the Plan.

The Liquidation Trustee shall make Plan Distributions, as applicable, in the frequency determined in the Liquidation Trustee's discretion, in accordance with the Plan:

Holders of Other Secured Claims will either receive (i) payment in full in Cash of their Allowed Claims, (ii) other treatment to render them unimpaired, or (iii) such other recovery to satisfy section 1129 of the Bankruptcy Code.

Holders of First Lien Noteholder Secured Claims will receive their pro rata share of First Lien Liquidation Trust Interests, which beneficial interests will entitle them to the Excess Cash to be allocated pursuant to the Waterfall, until they receive the allowed amount of their Claims.

Holders of Second Lien Noteholder Secured Claims will receive their pro rata share of Second Lien Liquidation Trust Interests, which beneficial interests will entitle them to the Excess Cash remaining after all First Lien Noteholder Secured Claims are satisfied in full pursuant to the Waterfall.

Holders of General Unsecured Claims, including any deficiency claims of the First Lien Noteholders and the Second Lien Noteholders, as well as the claims of the Unsecured Noteholders, will receive their pro rata share of the GUC Liquidation Trust Interests, which beneficial interests will entitle them to share in a GUC Reserve that consists of (i) the GUC Residual Amount,[1] if any, (ii) the GUC Reserve Funding Amount of $1,500,000.00, (iii) the Retained Causes of Action belonging to each of the Debtors and the Debtors' Estates and the proceeds thereof (including any D&O Policy proceeds payable to the Estate on account of settlements or judgments from Commercial Tort Claims and other non-released claims and Causes of Action), and (iv) the Unencumbered Assets, and (v) the proceeds of each of the foregoing clauses (i)-(iv), which in the case of clauses (ii), (iii), and (iv) shall be transferred to the Liquidation Trust on the Effective Date, and in the case of clauses (i) and (v) shall be transferred to the Liquidation Trust on the Effective Date or as soon as reasonably practicable thereafter in accordance with the Plan, free and clear of all Claims, Liens, and encumbrances.

For purposes of making distributions under the Plan to Holders of General Unsecured Claims, the Debtors' assets and liabilities will be substantively consolidated, and as such, treated as if they belonged to a single combined entity. As a result, a General Unsecured Claim against any one Debtor will be treated as a single General Unsecured Claim against the combined Debtors, rather than as separate claims against each individual Debtor.

After the Effective Date, pursuant to the Plan, the Liquidation Trustee shall, in an expeditious but orderly manner, wind down, sell, and otherwise liquidate and convert to Cash the remaining assets of the Debtors, with no objective to continue or conduct a trade or business except to the extent reasonably necessary to, and consistent with, the liquidation and orderly wind down of the Debtors and shall not unduly prolong the duration of the liquidation and the wind down.

To the extent the Liquidation Trustee generates Excess Cash after the Effective Date from monetizing the Liquidation Trust Assets, including the receipt of any Surplus Reserved Cash, Surplus Senior Claims Reserve Cash, and Surplus Professional Fee Escrow Account, such proceeds shall be allocated pursuant to the Waterfall as set forth below.

For cash remaining after the initial funding of reserves on the Effective Date, derived from the monetization of non-GUC Reserve Assets of the Liquidation Trust, or received from surplus reserve amounts, such proceeds shall be distributed through the Waterfall in the following order:

1. to fund any deficits in the Senior Claims Reserve;

2. to fund the First Lien Reserve for the benefit of First Lien Noteholders;

---

[1]   The "GUC Residual Amount" means any Excess Cash remaining after (i) any deficits in the Senior Claims Reserve are satisfied in accordance with the Plan, (ii) Holders of First Lien Liquidation Trust Interests receive an amount equal to their Allowed First Lien Noteholder Secured Claims, and (iii) Holders of Second Lien Liquidation Trust Interests receive an amount equal to their Allowed Second Lien Noteholder Secured Claims.

3.    to fund the Second Lien Reserve for the benefit of Second Lien Noteholders; and

4.    as the GUC Residual Amount, if any, to be distributed to Holders of General Unsecured Claims.

For cash (i) derived from the monetization of GUC Reserve Assets of the Liquidation Trust or (ii) remaining as GUC Residual Amount, such proceeds shall be applied in the following order:

1.    to fund up to $200,000.00 of the Creditors' Committee Fees in excess of the Creditors' Committee Fee Cap;

2.    to fund the GUC Reserve for the benefit of Holders of General Unsecured Claims.

Furthermore, the Office of Foreign Assets Control ("**OFAC**") has issued a blocking order for 5% of Luminar Parent shares (the "**Blocked Parent Interests**").  As a result, pursuant to OFAC regulations, the Debtors are prohibited from dealing in, or otherwise affecting, the Blocked Parent Interests prior to obtaining an OFAC License.  The Debtors are preparing to apply for such an OFAC License, but the timing of obtaining such license is to be determined.  Therefore, the Debtors' Plan provides that on the Effective Date, to the extent the Debtors have not secured an OFAC License, (i) all Parent Interests, other than the Blocked Parent Interests, will be cancelled and (ii) substantially contemporaneously, new common stock in the Parent Debtor of the same number, class, and series as the Unblocked Parent Interests that are cancelled pursuant to section 4.9 of the Plan will be issued to the Liquidation Trust.  The Parent Debtor Additional Stock shall be held only (and not transferred by) the Liquidation Trust and, once the Debtors have secured the OFAC License and can cancel the Blocked Parent Interests, the Liquidation Trust will be entitled to subsequently cancel all remaining Interests (including the Blocked Parent Interests) and wind down Luminar Technologies, Inc.

Any right to receive a Distribution from the Liquidation Trust will not, and is not intended to, constitute "securities" and, accordingly, will not be registered pursuant to the Securities Act or any applicable state or local securities law.  However, if it should be determined that any such right to receive such Distributions constitute "securities," the exemption provisions of section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of such right will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.  Any such right to receive such Distributions (and the underlying Claim giving rise thereto) shall not: (a) be voluntarily or involuntarily, directly or indirectly, assigned, conveyed, hypothecated, pledged, or otherwise transferred or traded; (b) be evidenced by a certificate or other instrument; and (c) possess any voting rights with respect to the Liquidation Trust or otherwise, except as otherwise provided in the governing documents thereof.

The Debtors believe the Plan maximizes value for all stakeholders.

## B.    <u>GLOBAL SETTLEMENT</u>

The Debtors, the Ad Hoc Noteholder Group, and the Creditors' Committee have engaged in good faith and arm's length negotiations, culminating in the parties' entry into the Global Settlement. The Global Settlement is incorporated into the Plan and provides for the resolution of all disputes, claims, and controversies between the parties, including those related to the Plan and treatment of general unsecured claims, among other issues.

The Global Settlement includes, among others, the following material terms and conditions (each as set forth in the Plan):

- Holders of General Unsecured Claims (including First Lien Noteholder Deficiency Claims, if any, and Second Lien Noteholder Deficiency Claims) shall receive GUC Liquidation Trust Interests entitling them to their Pro Rata Share of Cash consisting of the GUC Reserve Assets and any proceeds thereof, net of any costs and expenses incurred by the Liquidation Trust (including fees of the Liquidation Trustee and any taxes incurred by the Liquidation Trustee, whether such taxes are incurred directly by the Liquidation Trustee in his or her role as such, or on account of those taxes attributed proportionately to each Holders' share of GUC Liquidation Trust Interests) in connection with the pursuit, abandonment, or liquidation of all GUC Reserve Assets;

- GUC Reserve Assets shall include (i) the GUC Residual Amount, if any, (ii) the GUC Reserve Funding Amount of $1,500,000.00, (iii) the Retained Causes of Action belonging to each of the Debtors and the Debtors' Estates and the proceeds thereof (including any D&O Policy proceeds payable to the Estate on account of settlements or judgments from Commercial Tort Claims and other non-released claims and Causes of Action), and (iv) the Unencumbered Assets, and (v) the proceeds of each of the foregoing clauses (i)-(iv);

- The appointment of the Liquidation Trustee shall be mutually agreeable between the Ad Hoc Noteholder Group and the Creditors' Committee and reasonably acceptable to the Debtors; the Creditors' Committee shall select each of the three members of the Liquidation Trust Oversight Board;

- The Debtors shall be deemed substantively consolidated for purposes of distributions to Holders of General Unsecured Claims;

- All Preference Actions against the Debtors' trade vendors shall be deemed released on the Effective Date;

- The Ad Hoc Noteholder Group consents to permit the Debtors to use Cash Collateral through the Effective Date;

- The sum of the Allowed Professional Fee Claims of the Creditors' Committee Advisors and the Restructuring Fees and Expenses due to the Unsecured Notes Trustee shall be capped at $4.225 million; *provided* that any amounts up to $200,000 incurred in excess of $4.025 million shall be payable from the first dollars to be distributed as Post Effective Date Available Cash (GUC Reserve Assets); and

- Only if the Effective Date of the Plan occurs on or before April 14, 2026, the aggregate Allowed Professional Fee Claims of the Debtors' Advisors (excluding any amounts paid pursuant to the Ordinary Course Professionals Retention Order) shall not exceed $26.471 million.

The Debtors, the Ad Hoc Noteholder Group, and the Creditors' Committee believe that the Global Settlement avoids potentially costly, time-consuming, and wasteful litigation and any related delays in distributions to creditors. The Debtors, the Ad Hoc Noteholder Group, and the Creditors' Committee likewise believe the Global Settlement balances the desires of the key constituents in these cases and provides an equitable solution that is reasonable, fair and efficient. For these and other reasons described above, the Creditors' Committee recommends that creditors in class 5 vote to ACCEPT the Plan.

**C.** **TREATMENT OF CLAIMS AND INTERESTS**

The following table summarizes (i) the type of Claims and Interests under the Plan, (ii) which Classes are impaired by the Plan, and (iii) which Classes are entitled to vote on the Plan.  The table is qualified in its entirety by reference to the full text of the Plan.

1.    *Claims and Interests in Luminar Technologies, Inc.*

| Class Designation | Plan Treatment[2] | Impairment | Entitlement to Vote | Total Est. Claims[3] | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| Class 1: Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on or as soon as reasonably practicable after the later of the Effective Date and the date that is thirty (30) calendar days after the date such Other Priority Claim becomes an Allowed Claim, at the option of the Debtors or Liquidation Trustee (as applicable), either (i) payment in full in Cash or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired | No (Presumed to Accept) | $0.8M | 100% |
| Class 2: Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of such Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors or the Liquidation Trustee, as applicable, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter: (i) payment in full in Cash in an amount equal to the Allowed amount of such Other Secured Claim; (ii) such other treatment sufficient to render such Holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy | Unimpaired | No | $8.0M | 100% |

---

[2]    Nothing in the Plan or Confirmation Order shall grant the Debtors a discharge pursuant to section 1141(d) of the Bankruptcy Code.

[3]    The total estimated claim amounts are based on preliminary claims estimates and are subject to material change, including on account of any additional claims that may be Filed and Allowed, such as rejection damages claims. Additional information regarding the assumptions and qualifications regarding this recovery table is set forth in Section I.C.2.

| Class Designation | Plan Treatment[2] | Impairment | Entitlement to Vote | Total Est. Claims[3] | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| | Code; or (iii such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. | | | | |
| Class 3: First Lien Noteholder Secured Claims | Except to the extent that a Holder of a First Lien Noteholder Secured Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, such Holder's Pro Rata Share of the First Lien Liquidation Trust Interests. | Impaired | Yes | $24.0M | 100% |
| Class 4: Second Lien Noteholder Secured Claims | Except to the extent that a Holder of a Second Lien Noteholder Secured Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, such Holder's Pro Rata Share of the Second Lien Liquidation Trust Interests. | Impaired | Yes | $14.0M | 48–100% |
| Class 5: General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, such Holder's Pro Rata Share of the GUC Liquidation Trust Interests. | Impaired | Yes | $518.8M | 0–1% |
| Class 6: Intercompany Claims | On or before the Effective Date or as soon as reasonably practicable thereafter, all Intercompany Claims shall be adjusted, Reinstated, or discharged (each without any distribution) to the extent reasonably determined to be appropriate by the Debtors or Liquidation Trustee (as applicable). | Impaired | No (Deemed to Reject) | $6.8M | None. |
| Class 7: Intercompany Interests | On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any member, board of directors, board of managers, managers, management, or Security Holders of any Debtor, all Intercompany Interests shall be cancelled, released, and extinguished, by distribution, contribution or otherwise, as determined by the Debtors or the Liquidation Trustee (as applicable); | Unimpaired / Impaired | No (Deemed to Reject) | N/A | None. |

| Class Designation | Plan Treatment[2] | Impairment | Entitlement to Vote | Total Est. Claims[3] | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| | *provided* that no Plan Distributions shall be made to Holders of an Intercompany Interest on account of such Intercompany Interest under the Plan. | | | | |
| Class 8: Subordinated Claims | All Subordinated Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Subordinated Claims will not receive any distribution on account of such Claims. | Impaired | No (Deemed to Reject) | N/A | None. |
| Class 9: Parent Interests | Without the need for any further corporate or limited liability company action or approval of any board of directors, management, or Security Holders of any Debtor, as applicable, all Parent Interests shall be cancelled (i) on the Effective Date, with respect to all Unblocked Parent Interests and (ii) after OFAC issues the OFAC License, with respect to all Blocked Parent Interests, and the Holders of Parent Interests will not receive or retain any property on account of such Parent Interests under the Plan. | Impaired | No (Deemed to Reject) | N/A | None. |

2.     *Key Recovery Table Assumptions and Qualifications*

The recovery table above estimates ~$32.2 to $39.4 million of net proceeds are available for recovery to creditors, after the Asset Sale Offer (as defined and described below), and the funding of the Wind Down Trust ($3.0 million) and Liquidation Trust, and include (i) estimated cash and cash equivalents based on the Approved Budget under the Final Cash Collateral Order and includes estimated proceeds from the LiDAR Sale Transaction, (ii) estimated recoveries on accounts receivables, (iii) a 50–100% recovery of the $11.0 million LSI Post Closing Indemnity Escrow; and (iv) other assets and PP&E, including estimated recoveries on the NEXT Note and SAFE Note, proceeds from the sale of real property in Florida, and any remaining value distributed from or liquidated at the international or other non-debtor subsidiaries.

The calculations in the recovery table assume (i) that $89.35 million of proceeds from the LSI Sale Transaction are used to redeem at least 80% of the First Lien Noteholders Secured Claims at 103% plus accrued interest on or about March 11, 2026 pursuant to an Asset Sale Offer made in accordance with section 3.12 of, and as defined in, the 1L Notes Indenture (as defined below) (ii) the remaining First Lien Noteholder Secured Claims (estimated at $24.0 million) are paid in full pursuant to the distributions made pursuant to the Plan at a redemption price of 111% plus accrued interest through the payment date. Additional information regarding the Asset Sale Offer is set forth in Section IV.G.3. hereof.

Based on the estimated proceeds available for distribution and estimated participation in the Asset Sale Offer, the Debtors have estimated the Second Lien Noteholder Secured Claims at $14.0 million, which amount is the highest expected recovery for such Holders after the First Lien

Noteholder Secured Claims are satisfied under the Plan. The estimated unpaid portion of the Second Lien Noteholder Claim Amount[4] after payment on account of the Second Lien Noteholder Secured Claims is approximately $259 million, which is considered a Second Lien Deficiency Claim under the Plan and classified as General Unsecured Claims.

The Debtors have estimated approximately $519 million of General Unsecured Claims consisting of estimated Second Lien Deficiency Claims (~50%), Unsecured Notes (26%), and estimated trade accounts payable and potential rejection damages (~24%).

## D.    VOTING PROCEDURES

For each holder of a Claim or Interest entitled to vote on the Plan, the Debtors will provide each party with, among other things, a copy of the Disclosure Statement, the Plan, a Ballot, and voting instructions regarding how to properly complete the Ballot and submit a vote with respect to the Plan. For detailed voting instructions, please refer to the voting instructions and the Ballot enclosed with this Disclosure Statement.

All completed Ballots must be actually received by Omni Agent Solutions, Inc. ("**Omni**"), the Debtors' claims, noticing, and balloting agent (the "**Voting Agent**"), at the below address no later than the Voting Deadline.

| Omni's Address for Receipt of Ballots |
|---|
| **If by First Class Mail, Hand Delivery, or Overnight Mail**<br>Luminar Technologies, Inc., *et al.*  Ballot Processing<br>c/o Omni Agent Solutions, Inc.<br>5955 De Soto Avenue, Suite 100<br>Woodland Hills, California 91367 |

If you are holder of a Claim or Interest that is entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan, or the procedures for voting with respect to the Plan, please contact Omni at (888) 901-3403 (for holders of Claims or Interests in the U.S. and Canada; toll-free) or +1 (747) 293-0190 (for holders of Claims or Interests located outside of the U.S. and Canada) or via e-mail message (with "Luminar Solicitation" in the subject line) to LuminarInquiries@OmniAgnt.com.

Sections 11.3, 11.4, 11.5, 11.6, 11.7, 11.8 and 11.9 of the Plan also contain certain release, injunction, and exculpation provisions, each of which are reproduced on **Exhibit D** hereto. If you hold a Claim or Interest and do not timely, properly, and affirmatively elect to opt-out of the releases contained in

---

[4]    "Second Lien Noteholder Claim Amount" means, for each Second Lien Noteholder, the remaining outstanding principal owed, after taking into account any payments made pursuant to an Asset Sale Offer (as defined in the Second Lien Notes Indenture) before the Effective Date in accordance with section 3.12 of the Second Lien Notes Indenture, plus, without duplication, any interest (including, if applicable, Default Interest (as defined in the Second Lien Notes Indenture), unpaid fees, expenses, and indemnities of the Second Lien Notes Agent, in each case accrued and unpaid through the Petition Date, to the extent provided under the Second Lien Notes Indenture and the Bankruptcy Code, plus 50% of the Make-Whole Premium (as defined in the Second Lien Notes Indenture) that would have otherwise been included in the calculation of the Redemption Price (as defined in the Second Lien Notes Indenture) of the Second Lien Notes. For the avoidance of doubt, the Second Lien Noteholder Claim Amount shall be calculated based on the remaining balance outstanding on the Second Lien Noteholder Claims following any payments made pursuant to an Asset Sale Offer.

Section 11.6(b) of the Plan, then you shall be deemed to consent to the releases contained in Section 11.6(b) and elect to release claims against the "Released Parties".

THE VOTING AGENT WILL NOT COUNT ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE, UNLESS THE DEBTORS, SHALL HAVE GRANTED AN EXTENSION OF THE VOTING DEADLINE IN WRITING WITH RESPECT TO SUCH BALLOT OR WAIVE THE LATE SUBMISSION.

## II.

## OVERVIEW OF DEBTORS' OPERATIONS

### A.    COMPANY'S BACKGROUND AND FORMATION

Headquartered in Orlando, Florida, the Debtors are a technology company specializing in advanced Light Detection and Ranging ("**LiDAR**") hardware and software solutions to enable the world's safest and smartest vehicles.  In the last decade, the Company has been developing proprietary LiDAR hardware, core semiconductor components, and software – in-house – to meet the demanding performance, safety, reliability and cost requirements to enable next-generation safety and autonomous (self-driving) capabilities for passenger and commercial vehicles, as well as other adjacent markets.

Austin Russell founded the Company on December 12, 2012, with the goal of developing preeminent LiDAR technology that could be used in passenger and commercial vehicles (including to facilitate the autonomous operation of cars, trucks, and robotaxis), among other applications, and ultimately save lives by significantly reducing vehicle collisions.  As described below in more detail, LiDAR technology is the most advanced sensor technology available for autonomous driving and significantly improves safety functions in vehicles by providing increased situational awareness in a broad range of driving environments through improved and higher confidence detection and planning at all vehicle speeds. Yet, prior to the Company's founding, LiDAR technology was primarily used in defense and aerospace applications and was virtually absent from the civilian automotive market.  Given the complexities attendant to integrating LiDAR technology into the multifaceted automotive systems embedded in autonomous cars, no company had successfully integrated LiDAR into consumer vehicles at the time the Company was founded.

The Company distinguished itself in the industry by (i) focusing its business primarily on applying LiDAR technology in the automotive industry through partnerships with major original equipment manufacturers ("**OEMs**") (as opposed to other smaller, at the time, markets like robotics and drones), (ii)  using a higher wavelength laser, which provides superior performance, and (iii) building its LiDAR technology in-house (as opposed to a product composed of unaffiliated off-the-shelf parts), facilitated through a series of strategic acquisitions.  In so doing, the Company offered its customers best-in-class LiDAR systems.  These efforts required significant investment to develop groundbreaking LiDAR technology while simultaneously integrating multiple businesses and their associated products into the Company's business model.

In its first few years, the Company generally operated out of the public eye to protect its intellectual property and develop its business.  Over time, the Company made several acquisitions, entered into multiple partnerships to grow its business while continuing to develop its technology, and went public to raise more capital for these initiatives.

<u>BFE Acquisition.</u>  The Company's first strategic acquisition was its 2018 acquisition of BFE Acquisition Sub II, LLC d/b/a Black Forest Engineering ("**BFE**"), a provider of advanced photonic

hardware and firmware solutions. This transaction was the Company's initial step in executing on its growth strategy of being able to develop the chip technology necessary to build LiDAR units wholly in-house and scale its business to meet growing customer demand.

LSI Acquisitions. In August 2021, the Company acquired OptoGration, Inc. ("**OptoGration**"), a manufacturer of photodetectors (*i.e.*, electronic devices that convert light into an electrical signal, such as a current or voltage), including photodiodes, quadrant detectors, focal plane arrays, and short-wave infrared single-photon avalanche diodes. In April 2022, the Company acquired Freedom Photonics LLC ("**Freedom Photonics**"), a designer and manufacturer of high-performance lasers and related photonic products exclusively for external customers. In 2023, the Company began to refer to OptoGration and Freedom Photonics as the LSI side of the business, or LSICo. On March 18, 2024, the Company further augmented LSICo by acquiring EM4, LLC ("**EM4**"), a designer, manufacturer, and seller of packaged photonic components and sub-systems for aerospace and industrial markets.

Public Listing. In December 2020, the Company went public in a de-SPAC transaction, and its Class A common stock of the Company began trading on the Nasdaq Global Select Market under the ticker symbol "LAZR".[5] The de-SPAC transaction enabled the Company to raise over $500 million cash.

Key Partnerships. The Company entered into several key partnerships over the years, as described below:

- *Volvo Partnership*. In March 2020, the Company signed the automotive industry's first deal for LiDAR production for autonomous consumer vehicles through a contract with Volvo. At the time of the agreement, Volvo was expected to make the Company's LiDAR technology part of the standard safety package on its next generation electric SUV, the EX90. After several years of development under the contract, Volvo required the Company to demonstrate that it could make enough LiDAR components to represent a full year's production. To meet these demands, the Company continued to expand and invest in its business and demonstrated it could produce the required 100,000+ LiDAR components in 2024. This investment did not yield the intended results, as Volvo only purchased less than 10,000 LiDAR components over the next eighteen (18) months.

- *Polestar Partnership*. In September 2021, Polestar Automotive Holding UK PLC ("**Polestar**") disclosed that it would integrate the Company's technology into certain of its future production vehicles. In October 2022, Polestar unveiled the Polestar 3 electric performance SUV and announced that Luminar LiDAR would be an optional feature available for customers in the second quarter of 2023. However, after repeated project delays, Polestar discontinued the offering because the vehicle's software ultimately could not use the LiDAR features, and the contract terminated.

- *Mercedes Partnership*. In January 2022, the Company announced a partnership with Mercedes-Benz ("**Mercedes**") to accelerate the development of future automated driving

---

[5] Specifically, the Company's predecessor, Gores Metropoulos, Inc. ("**Gores Metropoulos**"), a special purpose acquisition company, and Dawn Merger Sub, Inc. ("**Merger Sub I**") and Dawn Merger Sub II, LLC ("**Merger Sub II**"), each a wholly-owned direct subsidiary of Gores Metropoulos, consummated a merger with pre business-consummation Luminar Technologies, Inc. ("**Legacy Luminar**" and, such transaction the "**Merger**") whereby Gores Metropoulos, Merger Sub I, and Merger Sub II merged with and into Legacy Luminar, with Gores Metropoulos being the surviving corporation. Upon the closing of the Merger, Gores Metropoulos changed its name to Luminar Technologies, Inc.

technologies for Mercedes passenger cars.  In the first quarter of 2023, Mercedes indicated it planned to integrate the Company's LiDAR across a broad range of its next-generation production vehicle lines, as optional equipment, by mid-decade.  However, after the Company failed to meet ambitious requirements, Mercedes terminated the development and supply agreement for breach in November of 2024.  The Company and Mercedes entered into a non-exclusive development agreement for Halo in March of 2025, however, at this time, the Company has no go-forward projects with Mercedes.

## B.    BUSINESS OPERATIONS

The Company operated two distinct, but interconnected, business segments, each under a separate vertical of the Company's organizational structure: (i) autonomy solutions, which is housed at Luminar Parent, Luminar, LLC, and certain of their subsidiaries (collectively, "**LiDARCo**"); and (ii) advanced technologies and services ("**ATS**"), which is housed in LSICo.  Together, LiDARCo and LSICo developed proprietary LiDAR hardware, core semiconductor components, and software to meet demanding performance, safety, reliability, and cost requirements to enable next-generation safety and autonomous capabilities for passenger and commercial vehicles and other adjacent markets.  The LSICo entities are not Debtors in these chapter 11 cases.  Instead, as described below, the Debtors prosecuted these cases, in part, to sell their equity interests in LSICo pursuant to section 363 of the Bankruptcy Code.

1.    *LiDARCo*

Luminar Parent oversees the Company's LiDARCo autonomy solutions business and, together with certain of its subsidiaries, houses, develops, and markets the Company's LiDAR sensors. Specifically, LiDARCo manufactures and sells LiDAR sensors, with a focus on OEMs in the automotive industry, robotaxis, and adjacent industries.  Additional supporting functions within this segment include (i) non-recurring engineering ("**NRE**") services related to the Company's LiDAR products, (ii) the development of related software products, packaged as SentinelTM (an autonomous driving and safety software, which combines the Company's LiDAR, perception software, and HD mapping), and (iii) the licensing of certain data and information.

The Company pioneered the use of LiDAR technology in vehicles.  It was the first company to build a LiDAR sensor for use in the roofline of vehicles—a practice that has now become the global standard.  Moreover, the Company's LiDAR technology enables higher speed highway autonomy as compared to its competitors because it operates with a higher wavelength laser that detects critical objects further away.  The Company's LiDAR sensors measure distance using pulsed laser light to generate a 3D model of the surrounding environment.  Unlike cameras and radar, the Company's LiDAR sensors provide precise, three-dimensional sight in all lighting conditions, even in blinding light or of dark objects at night up to 300 meters away.

The first LiDAR model the Company successfully brought to the consumer vehicle market, Iris LiDAR ("**Iris**"), is a high performance, long-range sensor, built from the chip-up, that unlocks safety and autonomy for vehicles.  Iris and its variants feature the Company's vertically integrated receiver, detector, and application-specific integrated circuit (ASIC) solutions developed by LSICo.  The Company announced Iris's launch shortly after partnering with Volvo in 2020, and it achieved start of production ("**SOP**") in April 2024.

Luminar Halo ("**Halo**"), which the Company unveiled in 2024, is the Company's next-generation and most technologically-advanced model of LiDAR technology.  Halo is designed to combine unmatched performance in a pocket-sized package for high-volume production vehicles.  Halo offers step-function improvements in performance, integration, and cost, as compared to Iris.  Despite its smaller size,

Halo can see faster, farther, and more precisely than any of today's LiDAR solutions, and its advancements are expected to enable a 2x improvement in performance, a 3x reduction in size, and a more than 2x improvement in cost.  The Company is currently targeting SOP of Halo by 2027.

A key differentiator of the Company's LiDAR technology, as compared to its competitors, is its use of a 1550nm laser, as opposed to the 905nm laser.  The 1550nm laser allows for the detection of objects from longer distances, at higher speeds, and in more challenging conditions compared to the 905nm laser.  In addition, the Company's technology is the only LiDAR product on the market that (i) meets OEM specifications to enable highway autonomy for consumer series production and (ii) was made standard on a global production vehicle (the Volvo EX90).

2.    *LSICo*

LSI and its subsidiaries oversee the Company's ATS businesses, developing components that can be used in the Company's LiDAR sensors, as well as other applications.  Specifically, LSICo is a vertically integrated photonics company that supplies critical components, subsystems (including semiconductor lasers and photodetectors), and systems to Luminar and third parties.  The operations of OptoGration, Freedom Photonics, and EM4 fall within the LSICo segment and together provide advanced hardware and custom developed components to power the Company's LiDAR technology, as well as design, testing, and consulting services to LiDARCo and third-party customers.  In particular, OptoGration is a critical supplier to LiDARCo as well as to external customers in other industries, including energy, military, and space.

Photonics is the science and technology of generating, manipulating, and detecting photons (or light).  LSICo offers the full vertical stack of photonics solutions enabling the Company to utilize its own supply chain to build best-in-class LiDAR technology.  LSICo's products and capabilities (which span photon generation, interaction, and detection) are also applicable to a wide range of rapidly growing industries, including aerospace and defense, quantum sensing and networking, and telecommunications.  Third parties to which LSICo's diverse range of photonics solutions are deployed include government agencies and contractors in a range of applications, including missile defense, quantum sensing and networking, directed energy, and autonomous systems, among others.

LSICo operates four (4) facilities across the United States: Boston, Massachusetts (two (2) facilities); Princeton, New Jersey; and Santa Barbara, California.  In those facilities, LSICo performs end-to-end capabilities from wafer fabrication to subsystem integration; in-house research and development and low-volume wafer production; space-grade and other advanced packaging functions; optical component qualification and reliability testing; and design and assembly functions for their subsystems; optical component qualification and reliability testing; and design and assembly of complex micro-optic subsystems.

Because LSICo's capabilities span photon generation, interaction, and detection, LSICo provides a unified photonics architecture, delivering full-stack photonics solutions for defense and enterprise applications.  In addition, LSICo's advanced packaging expertise allows it to produce integrated systems that meet U.S. Department of Defense and enterprise specifications.  Moreover, LSICo's photonics solutions address significant capability gaps critical to technologies of the Department of Defense.  LSI is a secure 100% domestic supplier for national security purposes.

C.      **CORPORATE STRUCTURE AND GOVERNANCE**

1.      *Corporate Structure*

A chart summarizing the Debtors' corporate organization structure, as of the date hereof, is annexed hereto as **Exhibit B**. The Company consists of nineteen (19) legal entities organized in multiple jurisdictions, of which five (5) are Debtors. Luminar Parent directly or indirectly owns the other Debtors.[6]

On May 14, 2025, following a code of business conduct and ethics inquiry by the Board's audit committee, Mr. Russell, who had been the Company's Chief Executive Officer ("**CEO**") since its founding, resigned as the Company's President and CEO and as Chairperson of the Board. That day, the Board appointed Paul Ricci as the Company's CEO, effective on or about May 21, 2025, and to the Board. The Company chose Mr. Ricci, a seasoned executive with decades of experience leading technology companies, to help navigate institutional challenges and guide the business in a positive direction.

On October 31, 2025, the Company announced that Thomas J. Fennimore would step down as the Company's Chief Financial Officer (the "**CFO**"), effective November 13, 2025, to pursue other career opportunities. On November 7, 2025, the Company appointed Thomas Beaudoin as its CFO, effective November 13, 2025.

As of the Petition Date, Luminar Parent's board of directors (the "**Board**") consisted of eleven (11) directors: Elizabeth Abrams, Patricia Ferrari, Alec E. Gores, Dr. Mary Lou Jepsen, Dr. Shaun Maguire, Katharine A. Martin, Paul Ricci, Austin Russell, Dominick Schiano, Matthew J. Simoncini, and Daniel D. Tempesta. Ms. Abrams and Ms. Ferrari, who both have substantial restructuring experience, were appointed to the Board as independent directors on November 12, 2025.

The Company's senior management team consists of the following individuals: Paul Ricci, Thomas Beaudoin, and Alexander Fishkin.

On November 12, 2025, the Board established a special investigation committee comprised of Ms. Abrams and Ms. Ferrari (the "**Special Investigation Committee**" or "**SIC**"). The Special Investigation Committee is authorized to, among other things, review, evaluate, pursue, negotiate, approve, and authorize any disposition of any potential claims or causes of action against any of the Board's current, former, or future director, officer, insider, affiliate, or other related party. Before the Petition Date, the SIC retained King & Spalding LLP ("**K&S**") to assist the SIC and Weil with an investigation of certain acts, omissions, transactions and potential claims and causes of action involving or related to certain current and former directors and officers of Luminar Technologies, Inc. and its affiliates.

On November 24, 2025, the Board (i) renamed a pre-existing special committee[7] the Special Transactions Committee ("**STC**"), (ii) changed the composition of the STC, including to add Ms. Abrams and Ms. Ferrari, and (iii) updated the STC's mandate. The STC is authorized to, among other things, evaluate potential transactions that may involve Luminar Parent and one or more of its subsidiaries, on the one hand, and Mr. Russell, on the other hand (each, a "**Covered Transaction**"), recommend that the

---

[6]     On February 2, 2026, Luminar Technologies, Inc. sold its equity interests in Luminar Semiconductor, Inc. and indirectly in certain of its subsidiaries (OptoGration, Inc., Freedom Photonics, LLC, EMFOUR Acquisition Co., LLC, and EM4, LLC). In connection with the LSI Sale Transaction, BFE Acquisition Sub II, LLC became owned directly by Luminar Technologies, Inc.

[7]     On October 2, 2024, the Board approved the formation of a special committee to consider a potential acquisition of the Company as well as certain other transactions.

Board authorize the Company to enter into a Covered Transaction, oversee Company management and its advisors with respect to discussions and negotiations concerning a Covered Transaction, and oversee the implementation and execution of a Covered Transaction. On December 8, 2025, the Board further expanded the STC's mandate to include the evaluation of and ability to make a recommendation on certain other transactions. The current members of the STC are Ms. Abrams, Ms. Ferrari, Dr. Jepsen, Ms. Martin, Mr. Simoncini, and Mr. Tempesta.

   2.   *Capital Structure*

       As of the Petition Date, the Debtors had approximately $488 million in funded debt obligations comprised of the Company's obligations under the (i) 1L Notes Indenture (as defined below), (ii) 2L Notes Indenture (as defined below), and (iii) Unsecured Notes Indenture (as defined below). A summary of the Debtors' outstanding funded debt obligations as of the Petition Date is set forth below:

| Category of Debt | Approximate Amount Outstanding as of Petition Date[(1)] |
|---|---|
| **Secured Funded Debt** | |
| Floating Rate Senior Secured Notes due 2028 | $104.4 million |
| 9.0% Convertible Second Lien Senior Secured Notes due 2030 | $57.3 million |
| 11.5% Convertible Second Lien Senior Secured Notes due 2030 | $189.7 million |
| **Unsecured Funded Debt** | |
| 1.25% Convertible Senior Notes due 2026 | $135.7 million |
| **Total Funded Debt** | **$487.1 million** |

(1)  Includes estimated accrued interest through December 15, 2025.

   a.   <u>First Lien Notes</u>

       On August 8, 2024, certain of the Debtors entered into that certain first lien indenture (the "**1L Notes Indenture**"), by and among Luminar, as issuer, certain subsidiaries of the Company, as guarantors (in such capacity, the "**Notes Guarantors**"), and GLAS Trust Company LLC, as trustee and collateral agent (in such capacity, the "**1L Collateral Agent**"), pursuant to which the Company issued $100.0 million in aggregate principal amount of Floating Rate Senior Secured Notes due 2028 (the "**1L Notes**"). The 1L Notes bear interest at a floating rate equal to Term secured overnight financing rate ("**SOFR**") plus 9.0%, subject to a Term SOFR floor of 3.0%, resulting in an effective interest rate of 14.8% as of September 30, 2025. Interest is payable quarterly in arrears on February 15, May 15, August 15, and November 15 of each year. The 1L Notes mature on the earlier of (i) August 15, 2028 or (ii) September 15, 2026 if, as of June 30, 2026, more than $100.0 million of Unsecured Convertible Notes remain outstanding. As of the Petition Date, the aggregate principal amount of 1L Notes outstanding was approximately $104.4 million including accrued and unpaid interest. As described in Section IV.G.3. herein, the Debtors launched an Asset Sale Offer, in compliance with the 1L Notes Indenture, on February 6, 2026.

       The obligations under the 1L Notes Indenture are secured pursuant to that certain First Lien Security Agreement, dated as of August 8, 2024 (the "**1L Security Agreement**" and, together with any other collateral documents purporting to secure the obligations under the 1L Notes Indenture, the "**1L Collateral Agreements**"), by and among Luminar, the Notes Guarantors and the 1L Collateral Agent. Pursuant to such 1L Collateral Agreements, the 1L Notes are secured by a first lien security interest in

substantially all of the Company's and the Notes Guarantors' assets.[8]  Additional information regarding the liability management and capital raising initiatives that resulted in the entry to the 1L Notes Indenture and 1L Collateral Agreements is set forth in Section III.C.

      b.     Second Lien Convertible Notes

On August 8, 2024, certain of the Debtors entered into that certain second lien indenture (the "**2L Notes Indenture**"), by and among Luminar, as issuer, the Notes Guarantors, as guarantors, and GLAS Trust Company LLC, as trustee and collateral agent (in such capacity, the "**2L Collateral Agent**"), pursuant to which the Company issued (i) $82.3 million in aggregate principal amount of 9.0% Convertible Second Lien Senior Secured Notes due 2030 (the "**Series 1 Notes**") and (ii) $192.0 million in aggregate principal amount of 11.5% Convertible Second Lien Senior Secured Notes due 2030 (the "**Series 2 Notes**" and, together with the Series 1 Notes, the "**2L Notes**").  The Series 1 Notes bear interest at a rate of 9.0% per annum and the Series 2 Notes bear interest at a rate of 11.5% per annum. Interest is payable on the 2L Notes quarterly in arrears on January 15, April 15, July 15, and October 15 of each year.  The 2L Notes mature on the earlier of (i) January 15, 2030, or (ii) September 15, 2026 if, as of June 30, 2026, more than $100.0 million of Unsecured Convertible Notes remain outstanding.  As of the Petition Date, approximately $247.1 million in aggregate principal amount of 2L Notes were outstanding, comprised of (x) $57.3 million of outstanding Series 1 Notes and (y) $189.7 million of outstanding Series 2 Notes, in each case including accrued and unpaid interest.

The obligations under the 2L Notes Indenture are secured pursuant to that certain Second Lien Security Agreement, dated as of August 8, 2024 (the "**2L Security Agreement**" and, together with any other collateral documents purporting to secure the obligations under the 2L Notes Indenture, the "**2L Collateral Agreements**"), by and among Luminar, the Notes Guarantors and the 2L Collateral Agent.  Pursuant to the 2L Collateral Documents, the 2L Notes are secured by a second lien security interest in the Notes Collateral.  Additional information regarding the liability management and capital raising initiatives that resulted in the entry to the 2L Notes Indenture and 2L Collateral Agreements is set forth in Section III.C.

      c.     Intercreditor Agreement

The relative priorities of the 1L Collateral Agent and the 2L Collateral Agent with respect to the Notes Collateral are set forth in that certain First Lien/Second Lien Intercreditor Agreement, dated as of August 8, 2024 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Intercreditor Agreement**"), by and between the 1L Collateral Agent and the 2L Collateral Agent and acknowledged and agreed to by Luminar and the Notes Guarantors.

      d.     Unsecured Convertible Notes

On December 17, 2021, the Company entered into that certain indenture (the "**Unsecured Notes Indenture**"), by and between the Company, as issuer, and U.S. Bank National Association, as trustee

---

[8]    This includes accounts, equipment, goods, inventory, fixtures, documents, instruments, chattel paper, letter-of-credit rights, securities collateral, investment property and deposit accounts, intellectual property collateral, commercial tort claims, general intangibles, money, supporting obligations, all books and records pertaining to any and/or all of the foregoing, all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable from time to time with respect to any of the foregoing, other than "Excluded Assets" (as defined under the applicable security agreement) (the "**Notes Collateral**").

(in such capacity, the "**Unsecured Notes Trustee**"), pursuant to which the Company issued $625.0 million in aggregate principal amount of 1.25% Convertible Senior Notes due 2026 (the "**Unsecured Notes**"). The Unsecured Notes bear interest at a rate of 1.25% per annum. Interest is payable on the Unsecured Notes semi-annually in arrears on June 15 and December 15 of each year. The Unsecured Notes mature on December 15, 2026. As of the Petition Date, the aggregate principal amount of Unsecured Notes outstanding was approximately $135.7 million, including accrued and unpaid interest. A portion of the Unsecured Notes was refinanced by the issuance and exchange of 2L Notes in 2024 as described above.

e.     <u>Additional Financing Agreements (No Amounts Outstanding)</u>

In addition to the foregoing, which comprise the Debtors' capital structure, the Debtors were parties to different financing agreements which were available to them at various times, but under which no amounts remain outstanding as of the Petition Date.

(i)     ATM Facility

On February 28, 2023, the Company entered into an agreement (the "**2023 Sales Agreement**") with Virtu Americas LLC ("**Virtu**"), under which the Company could offer and sell, from time to time in its sole discretion, shares of the Company's Class A common stock with aggregate gross sales proceeds of up to $75.0 million through an equity offering program under which Virtu will act as sales agent (the "**Equity Financing Program**"). The Company completed sales of common stock under the 2023 Sales Agreement in March 2024. On May 3, 2024, the Company entered into an agreement (the "**2024 Sales Agreement**"), which extended the Equity Financing Program under the 2023 Sales Agreement and increased the size of the Equity Financing Program by an additional $150.0 million. In August 2024, the Company increased the size of the Equity Financing Program by an additional $50.0 million. In March 2025, the Company increased the size of the Equity Financing Program by an additional $75.0 million which brought the total aggregate amount the Company could issue and sell to $350 million of Class A common stock (the "**ATM Facility**"). In total, the Company issued $177.5 million under the ATM Facility.

(ii)     St. James Bank Facilities

On February 23, 2024, certain of the Debtors entered into two facilities by and among Luminar, as the borrower, and The St. James Bank & Trust Company Ltd. ("**St. James Bank**"), as lender: (i) that certain Non-Recourse Loan and Securities Pledge Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**LAZR Non-Recourse Loan Agreement**"), and (ii) that certain Non-Recourse Loan and Securities Pledge Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**ECX Non-Recourse Loan Agreement**" and together with the LAZR Non-Recourse Loan Agreement, the "**St. James Bank Facilities**"). The St. James Bank Facilities provide for loans to Luminar in the principal amount of (i) up to $45.0 million (the "**LAZR Loan**") and (ii) up to $5.0 million (the "**ECX Loan**"), each at an interest rate of 8.0% per annum. The obligations under each of the St. James Bank Facilities are secured by a security interest, to and in favor of St. James Bank, in a certain amount of the securities which Luminar delivers into a securities account at St. James Bank – Luminar securities for the LAZR Loan and ECARX Holding Inc. securities for the ECX Loan. As of the Petition Date, no amounts are outstanding under the LAZR Loan or the ECX Loan and no securities are in the St. James Bank securities accounts.

(iii)     Yorkville Facility

On May 19, 2025, the Company entered into a securities purchase agreement (the "**Preferred SPA**") with certain institutional accredited investors, pursuant to which the Company may, at its option, issue and sell in a series of registered direct offerings up to an aggregate of 200,000 shares of

26

Series A Convertible Preferred Stock, par value $0.0001 per share, with a stated value of $1,000 per share (the "**Series A Preferred Stock**"), to the investors at a purchase price of $960.00 per share.  Each closing under the Preferred SPA is at the option of the Company upon notice to the investors and subject to the satisfaction or waiver of certain closing conditions set forth in the Preferred SPA.  The initial offering for 35,000 shares of Series A Preferred Stock was closed on May 22, 2025, and resulted in net proceeds to the Company of $33.6 million, before deducting placement agent fees and other offering expenses.  The Company is under no obligation to sell any securities to the investors under the Preferred SPA.

        f.      <u>Common Stock</u>

As of January 23, 2026, Luminar Parent had approximately 75,153,311 shares of Class A common stock and 4,872,578 shares of Class B common stock outstanding.

        3.      *Prepetition Litigation*

The Debtors are subject to several pending class-action claims and shareholder complaints, as well as an Securities and Exchange Commission ("**SEC**") investigation.

        a.      <u>Securities Class Action (2023 Action)</u>

In May 2023, a putative class action complaint was filed against Luminar and an employee in the United States District Court for the Middle District of Florida.  The suit asserts purported claims on behalf of purchasers of the Company's securities between February 28, 2023 and March 17, 2023 under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "**Exchange Act**") for allegedly misleading statements regarding the Company's photonic integrated circuit ("PIC") technology.  The court appointed a lead plaintiff on August 29, 2023. On October 30, 2023, the plaintiff filed an amended complaint against Luminar and certain of its employees.  Luminar and certain of its employees, as defendants, filed their motion to dismiss the amended complaint, which the court granted on May 31, 2024.  On July 8, 2024, the plaintiff filed a second amended complaint against Luminar and its employee.  The defendants filed their motion to dismiss the second amended complaint, which the court granted on December 12, 2024.  On January 10, 2025, the plaintiff filed a third amended complaint, which alleges that Luminar had misappropriated an image of another company's PIC chip during an investor presentation.  On February 24, 2025, the defendants filed their motion to dismiss the third amended complaint, which the court denied on September 10, 2025.  The defendants filed their answer and affirmative defenses on October 24, 2025.   On December 30, 2025, the Court issued an order staying the claims against Luminar and requiring the parties to file a joint status report indicating whether the case should be stayed in its entirety. On January 16, 2026, the parties filed a joint status report and stipulation requesting the Court enter an order staying the action as it pertains to the individual defendant to allow the parties to pursue private mediation of the claims against that individual, which the Court granted on January 22, 2026.

        b.      <u>Securities Class Action (2025 Action)</u>

In July 2025, a plaintiff, an acquirer of Luminar securities, filed a putative class action complaint against Luminar and certain current and former employees in the United States District Court for the Middle District of Florida.  The suit asserts purported claims on behalf of purchasers of Luminar's securities between March 20, 2025 and May 14, 2025 under Sections 10(b) and 20(a) of the Exchange Act for allegedly misleading statements regarding the former CEO's conduct and seeks compensatory damages. The court appointed two co-lead plaintiffs on November 12, 2025.  On January 26, 2026, the plaintiffs filed an amended complaint, which extended the putative class period to March 1, 2022 through October 31, 2025, and removed Luminar Technologies, Inc. as a named defendant.  The purported claims are predicated on alleged misstatements regarding (a) the Company's "Iris" LiDAR technology and (b) the defendants'

ethics commitments and the perquisites given to the former CEO. The defendants' answer or response to the amended complaint is due March 27, 2026.

        c.      <u>Shareholder Derivative Suits (2023)</u>

On October 21, 2023, a shareholder derivative suit was filed in the United States District Court for the Middle District of Florida against certain directors of Luminar and an employee (the "**Florida 2023 Derivative Action**"). The Florida 2023 Derivative Action avers claims for purported breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste, aiding and abetting, and contribution under Sections 10(b) and 21D of the Exchange Act on the basis of the same purported wrongdoing alleged in the 2023 Securities Action described above. On February 8, 2024, the court stayed the Florida 2023 Derivative Action pending the resolution of a motion to dismiss in the 2023 Securities Action. The court lifted the stay on December 19, 2025 in light of the parties' notice that a ruling on the motion to dismiss had been issued in the 2023 Securities Action.

In November 2023, three additional shareholder derivative suits asserting claims similar to the Florida 2023 Derivative Action were filed in the United States District Court for the District of Delaware (the "**Delaware Derivative Actions**"). On February 8, 2024, the Delaware Derivative Actions were consolidated, and on March 5, 2024, the court administratively closed the Delaware Derivative Actions pending the resolution of the motion to dismiss in the 2023 Securities Action and instructed the parties to promptly notify the court when that motion has been resolved. The Delaware Derivative Actions remain administratively closed.

        d.      <u>Shareholder Derivative Suit (2025)</u>

In August 2025, a shareholder derivative suit was filed in the United States District Court for the Middle District of Florida against the Board and current and former employees alleging claims for breach of fiduciary duties, and for violations of Sections 10(b), 20(a), and 21D of the Exchange Act based on the same alleged facts and circumstances in the first complaint in the 2025 Securities Action described above. In September 2025, two other shareholder derivative lawsuits averring similar claims were filed in the United States District Court for the Middle District of Florida. On October 3, 2025, the plaintiffs in these three shareholder derivative suits filed a motion to consolidate the three actions. On November 5, 2025, the magistrate judge recommended that the actions be consolidated and stayed pending resolution of the expected motion to dismiss in the 2025 Securities Action.

        e.      <u>SEC Investigation</u>

As disclosed in recent public filings, the Company received two subpoenas in September 2025 from the SEC for documents in connection with an investigation the SEC is conducting to determine whether there has been a violation of federal securities laws. The Company is cooperating with the investigation. The SEC informed the Company that its investigation does not mean that it has concluded that anyone has violated the law and that receipt of the subpoena does not mean that the SEC has a negative opinion of any person, entity, or security.

        f.      <u>Solfice Shareholder Suit (2025)</u>

In November 2025, a shareholder of Solfice Research, Inc. ("**Solfice**") filed a complaint in the Delaware Court of Chancery against Solfice, Condor Acquisition Sub I, Inc. ("**Condor I**"), Condor Acquisition Sub II, Inc. ("**Condor II**" and, together with Condor I, the "**Condor Subsidiaries**"), Luminar Technologies, Inc., and certain directors and officers of Solfice regarding the 2022 asset sale of Solfice to Luminar Technologies, Inc. (the "**Solfice Transaction**"). The Condor Subsidiaries are wholly-owned

subsidiaries of Luminar Technologies, Inc. that were established in connection with the Solfice Transaction. Plaintiff seeks a finding that the Solfice Transaction (including the transfer of assets to the Debtors or its subsidiaries thereunder) was void ab initio. The complaint further asserts Luminar Technologies, Inc. and the Condor Subsidiaries aided and abetted in the breach of fiduciary duties. The Debtors dispute the assertions in the complaint. The Condor Subsidiaries filed voluntary chapter 11 petitions on December 31, 2025. As described in Section IV.I.1. hereof, Plaintiff commenced an adversary proceeding with the Bankruptcy Court on January 13, 2026. The Bankruptcy Court dismissed the adversary proceeding on January 27, 2026. As of the date hereof, the matter is stayed in the Delaware Court of Chancery.

4.      *Liquidity*

The Company's principal sources of liquidity have been proceeds received from issuances of debt and equity. As of September 30, 2025, the Company had cash and cash equivalents totaling $54.5 million and marketable securities of $19.5 million, totaling $74 million of total liquidity. For the nine months ending September 30, 2025, $173.2 million of cash was used in operations. As of the Petition Date, the Company had cash and marketable securities on hand equal to approximately $25 million.

5.      *Other Assets*

In August 2023, the Debtors made an investment in a Simple Agreement for Future Equity ("**SAFE**") of Plus Automation, Inc. ("**Plus Automation**"), pursuant to which the Debtors are entitled to redeem their investment for cash or, under certain conditions, for equity in Plus Automation (the "**SAFE Note**"). The Debtors exercised their redemption right under the SAFE Note on December 19, 2025. Under the terms of the SAFE Note, Plus Automation was required to pay $10 million in cash (the "**Redemption Payment**") no later than Friday, February 6, 2026. After discussions between the parties, Plus Automation notified the Debtors on January 20, 2026 that it intends to comply with its obligations under the terms of the SAFE Note. However, on February 4, 2026, Plus Automation informed the Debtors that there would be a delay in paying the Redemption Payment.

As described further in Section IV.I.2. herein, the Debtors filed an adversary proceeding against NEXT (as defined therein), requesting payment of amounts owed pursuant to a note, including $2.2 million in principal and additional amounts owed as a result of accrued interest and accrued default interest on the note.

The Debtors held equity interests of ECARX Holdings, Inc ("**ECARX**"), which the Debtors sold in compliance with the Cash Management Motion and Order (Docket Nos. 5 and 284). The proceeds were approximately $2.5 million.

# III.

# KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES

The Debtors commenced these chapter 11 cases with the support of a substantial majority of their senior secured creditors (the Ad Hoc Noteholder Group) for the sale of LSICo with QCi as the stalking horse bidder, as well as through those creditors' consent to the Debtors' use of cash collateral. Moreover, the Debtors entered chapter 11 with the intention to continue marketing LiDARCo and identify a buyer during the chapter 11 cases.

A.      **CHALLENGES FACING THE DEBTORS' BUSINESSES**

The Company has faced serious challenges stemming from (i) lower than anticipated demand for LiDAR-enabled autonomous cars from OEMs, including fewer LiDAR technology purchases from Volvo, Polestar, and Mercedes, (ii) various partnership setbacks, including with Volvo, which led to a recurring loss from the development and sale of products, and (iii) various market obstacles, including growing price pressure from Chinese LiDAR development companies, which are able to produce LiDAR more cost effectively.   Each of these challenges significantly strained the Company's businesses, operations, and liquidity, as described in more detail below.

1.      *Volvo Relationship Deterioration*

In March 2020, the Company entered into a Framework Purchase Agreement (the "**FPA**") with Volvo to equip Luminar products into Volvo's next-generation vehicle platform ("**SPA2**"), with the SPA2 program intended to serve as a model for future Volvo and Polestar vehicle lines.   SPA2's primary aim was to enable highway autonomous drive capability as an option on consumer vehicles, with series production expected to start in 2022.   In addition, the program presented a simultaneous opportunity to enable next-generation proactive safety systems in a more widespread capacity at lower cost than autonomous drive upgrades.

Volvo and the Company each agreed in the FPA to make certain investments to ensure the greatest possible success of the program.   Pursuant to the FPA, the Company and Volvo's teams worked collaboratively to produce high quality products on faster-paced timelines than traditionally associated with automotive companies.   Indeed, as described below, Volvo's demanded pace required (i) more rapid employee ramp-up, (ii) significant capital expenditures, and (iii) the use of costly external contractors and service vendors.

The FPA contained minimum volume targets for several geographic locations for specified periods and specific vehicle models.   When the parties signed the FPA in March 2020, the FPA estimated that Volvo would purchase 39,500 lifetime units of Iris LiDAR.   In March of 2021, Volvo increased the expected volumes significantly—by over 1,700%—to approximately 673,000 lifetime units.   Eleven (11) months later, in February of 2022, Volvo again increased its expected volumes, this time to 1.1 million units.

To ensure it could meet Volvo's requested volumes and performance requirements, the Company incurred significant capital expenditures to make substantial up-front investments in equipment, facilities, and workforce.   These included NRE costs essential to customizing and industrializing the Company's products for Volvo's platforms, as well as capital expenditures for site construction, tooling, and production equipment.   In particular, the Company needed to expand its manufacturing footprint and did so, most notably through the launch of a high-volume production facility in Monterrey, Mexico, which was built to support Volvo's EX90 production ramp.

The Company made these investments and expansions anticipating that the Volvo EX90 relationship would serve as a steppingstone for it to introduce Iris to the broader automotive industry, paving the path for the Company to develop the product further and start producing it in mass for other OEMs.   As part of the Company's broader strategy to support Volvo's safety vision and accelerate mass adoption of its technology, the Company also invested in the development of its next-generation LiDAR system, Halo.

These sizable investments allowed the Company to increase its production capacity quickly.   Specifically, from the March 2020 FPA signing through early 2024, the Company increased

production capacity by almost 2,833% from approximately 4,800 units per annum to approximately 136,000 units per annum, costing the Company approximately $52 million.

The Company's problems with Volvo began in 2022. The SOP (start of production), initially targeted for 2022, was delayed until 2024 due to complex software development and testing issues as Volvo worked to integrate a variety of complex technologies, including the Company's LiDAR, into its vehicle systems. In the interim period, the Company's operating expenses continued to grow.

Compounding the problem, in early 2024, without any prior notice, Volvo informed the Company it was reducing its expected volume of Iris LiDAR units for 2024 by approximately 75%. At the time, Volvo reassured the Company that despite the substantial reduction in estimated 2024 units, it still expected to meet its lifetime volume estimates under the FPA by increasing its purchases of Iris and Halo in the future. Based on these representations, the Company continued producing Iris and developing Halo to ensure it could meet Volvo's estimated lifetime volumes.

In September 2025, Volvo informed the Company that beginning in April 2026, it would offer the Company's Iris only as a vehicle *option*, as opposed to it being standard on vehicles, as Volvo had previously represented. This change reduced Volvo's estimated lifetime volumes by approximately 90%. Volvo also informed the Company that it would not be using any LiDAR, including Halo, in Volvo's next generation of vehicles as it was shelving the initiative as a cost-cutting measure due to Volvo's own financial challenges.

On October 3, 2025, the Company notified Volvo that Volvo had breached the FPA by failing to purchase anywhere near the estimated volumes it provided the Company and by failing to comply with its obligations to negotiate in good faith. On October 31, 2025, the Company disclosed in a public filing that it was suspending further Iris product shipments to Volvo pending resolution of the dispute.

On November 14, 2025, Volvo sent the Company a notice purporting to terminate the FPA, including the supply of Iris for Volvo's SPA2 program, alleging breach of contract. Notwithstanding the termination, Volvo's engineering division requested that the Company provide additional software and firmware releases (under a new, NRE funded agreement) to complete the validation and certification of functional safety. The future of the Company's collaboration with Volvo remains uncertain.

Volvo's abrupt 90% reduction in lifetime volumes and complete reversal regarding the standardization of LiDAR in its vehicles have significantly impacted the Company's projected revenue. Indeed, the Company's total expected revenue from the Volvo contract has cratered to $53 million, only approximately 27% of the almost $200 million in costs (inclusive of NRE costs and capital expenditures) the Company incurred based on Volvo's initial representations. In addition, the Company lost over $10 billion in market capitalization, much of which is directly attributable to the decrease in expected revenue from Volvo compared to projections based on Volvo's representations.

2.     *Consequences of Partnership Setbacks*

When the Company was in growth mode, it secured key partnerships with Volvo, as well as other major OEMs. During that time, the Company continued developing its LiDAR technology while tailoring it to meet the specifications and needs of particular customer mandates, a task that required significant resources and funding. The Company secured the required funding and dedicated enormous resources to these OEM partnerships because they were significant, promising projects that the Company believed would revolutionize autonomous driving capabilities and ultimately yield profits. With Volvo in particular, the Company was willing to take on debt and lose money with the sale of each Iris LiDAR unit, because it believed that once this life-saving technology became standard in the Volvo EX90 and the

automotive industry saw its impact, the market demand would follow and the Company would eventually make money on its products. But when these partnerships did not succeed, the Company suffered serious consequences.

For example, as described above, the Volvo relationship did not result in significant sales or lead the automotive market to witness the successful, large-scale deployment of the Company's LiDAR units in a series of consumer cars as the Company had expected. In fact, although installed and activated on the EX90, Volvo never allowed the consumers to experience the benefits of the Company's LiDAR. In addition, because the Company's LiDAR technology had not been adopted more broadly in the automotive market, allowing economies of scale and/or more economically favorable contracts, the Company incurred a loss with each sale of the Iris product to Volvo as, among other reasons, the price point of Iris did not account for the millions of dollars of developed, but unpurchased, product. Once Volvo reduced its expected volume, the Company produced more Iris units than it had the ability to sell to other customers. The Company began selling the LiDAR sensors it had produced to sell to Volvo to adjacent markets in an effort to recover its sunk costs.

Other significant OEM partners with which the Company went into development cancelled their agreements as well, due to their inability to integrate LiDAR technology into their vehicle platforms successfully, resulting in additional losses. While the Company presently has other customers for which it is in development or production, the setbacks from the loss of these major OEMs have had a detrimental impact on the trajectory of the Company's business.

As its relationship with Volvo deteriorated, the Company worked tirelessly to identify new customers, but was ultimately unable to enter into production with any new customers in a timely fashion. The public Volvo dispute also resulted in a decline in sales due to broader market concerns over Luminar's financial future. Without substantial customer demand and the broader market adoption that was anticipated, the investments the Company made into its top-of-the-line product are currently left with no foreseeable means of generating a return sufficient to meet the Company's existing debt repayment terms.

In the months leading up to the filing, the Company struggled to access additional liquidity to fund its losses. While the Company's stock began declining in early 2025, public disclosures in late October that the Volvo relationship was deteriorating resulted in an additional steep decline. The declining stock prices, particularly the drop after the Company issued its August 2025 10-Q, made it harder for the Company to access its ATM and Yorkville facilities.

3.     *Industry Challenges*

As a general matter, the LiDAR market has been subject to several industry-wide challenges, including (i) the complexity inherent in integrating LiDAR into a vehicle's technology system, (ii) pressure to reduce costs due to lower price points of China-based competitors, and (iii) a fluctuating domestic market demand for the technology.

LiDAR technology is particularly difficult for OEMs to integrate into autonomous vehicles, as the technology is still new and the automotive industry generally takes significant time to integrate new features. To facilitate successful implementation of LiDAR, new hardware and software architectures need to be identified, created, tested, and then validated. The process is iterative and takes significant time and resources. Each time the Company partners with a new OEM, it must adjust its LiDAR technology to ensure it is compatible with the OEM's vehicles (and to ensure it meets any other specifications the OEM may require, such as size or capabilities) and the OEM must put in significant work to integrate the LiDAR technology successfully into its systems. As the technology systems in place in many vehicles produced today are already complicated, incorporating LiDAR technology is a complex

endeavor. Few attempts to introduce LiDAR into the domestic automotive market have gained traction, which is what made the Company's initial relationship with Volvo, the industry's first global standard equipment series production win for self-driving vehicles on highways, groundbreaking.

While the majority of OEMs have expressed (and continue to express) interest in integrating LiDAR into their vehicles, as demonstrated by the development contracts the Company has successfully secured with major OEMs (described above), OEMs have been unwilling to make the effort required to implement the Company's technology into their vehicle lines, in part because the cost to produce consumer vehicles has continued to increase, interfering with OEM profitability. Indeed, on several occasions, the Company's OEM partners have effectively or explicitly terminated projects at the transition to production phase because the OEMs could not deliver vehicles with LiDAR at a reasonable price point due to the added cost and complexity of integrating the technology. Without substantial consumer demand for LiDAR technology, once an OEM understands the amount of work, time, and testing required to integrate the LiDAR technology into its vehicle systems for the first time, there is little incentive to follow through on development or production requests.

As with any complex, life-saving technology, LiDAR is costly to develop and implement, and will remain so until it is produced at scale. LiDAR companies based in China have changed the market landscape as they benefit from significant government subsidies that mitigate the sale, production, and software integration costs of LiDAR technology. Consequently, China-based LiDAR companies have been able to implement the technology into substantially more vehicles at lower price points as compared to LiDAR companies based in the United States or Europe. Indeed, millions of cars are sold in China with LiDAR-enabled features while OEMs in the United States are waiting for the cost of LiDAR technology to decrease or may consider purchasing the technology directly from China in the future.

The macroeconomic condition of the automative market has also proved challenging, as OEMs are pushing new contracts out to the end of the decade. The advent of U.S. tariff policies in 2025 introduced additional volatility into the market generally. Finally, the domestic stock market's demand for companies focused on LiDAR technology and autonomous vehicles remains in flux.

## B.   FINANCIAL PERFORMANCE

The Company has incurred net losses on an annual basis since inception. For the years ended December 31, 2024, 2023, and 2022, the Company incurred net losses of $273.1 million, $571.3 million, and $445.9 million, respectively. As of December 31, 2025, the Company had an accumulated deficit of $2.4 billion. The Company expects to incur operating losses for the foreseeable future due to low expected sale volumes of LiDAR technology,[9] continued investments in product and software development, efforts to build customer relations, expansion into additional markets, and investments in developing advanced manufacturing capabilities, including contract manufacturing partners.

## C.   LIABILITY MANAGEMENT AND CAPITAL RAISING INITIATIVES

In the face of dwindling liquidity, looming debt maturities, and an insufficient revenue model, the Company executed multiple transactions to address its balance sheet and enhance liquidity.

As of mid-2024, the Company faced over $600 million in Unsecured Notes maturing in December 2026. As of Q2 2024, the Company had $211.3 million of available cash and liquidity

---

[9]   While all sales of LiDAR products outside of sales to Volvo are profitable on a gross margin basis, sale volumes are not high enough to achieve net profitability.

(collectively, "**Cash & Liquidity**"), including cash and cash equivalents, marketable securities and up to $50 million of borrowings available under the St. James Bank Facilities that was not drawn upon. To extend its maturity runway and raise more capital, the Company entered into discussions with certain holders of Unsecured Notes. On August 6, 2024, Luminar, the Notes Guarantors, and certain holders of the Unsecured Notes entered into an exchange agreement (the "**Exchange Transaction**"), pursuant to which Luminar exchanged $421.9 million in aggregate principal amount of Unsecured Notes for $274.3 million in aggregate principal amount of 2L Notes, specifically (i) $82.3 million in aggregate principal amount of Series 1 Notes and (ii) $192.0 million in aggregate principal amount of Series 2 Notes. Concurrently with the Exchange Transaction, the Company issued $100 million in aggregate principal amount of 1L Notes for $97 million of cash consideration. The Company's costs related to the Exchange Transaction included, but were not limited to, accrued interest payable to holders of Unsecured Notes who participated in the Exchange Transaction. The Exchange Transaction and the 1L Notes financing together lowered the Company's total debt amount, pushed out near-term maturities, and raised additional capital. Following the completion of the  Exchange Transaction and the 1L Notes financing, the Company increased its guidance for year-end 2024 Cash & Liquidity from greater than $150 million to greater than $240 million. More information on the Exchange Transaction is publicly available in the Company's 8-K filed on August 6, 2024.

To address its maturity and liquidity needs further, the Company entered into a series of private transactions with individual noteholders to address a portion of the remaining outstanding Unsecured Notes in advance of the relevant maturity date. To that end, on March 23, 2025, Luminar entered into separate, individually negotiated private exchange agreements with certain holders of Unsecured Notes, pursuant to which the holders exchanged $18.2 million in aggregate principal amount of Unsecured Notes for shares of Luminar's Class A common stock, plus, in certain circumstances, cash in respect of accrued and unpaid interest on the exchanged Unsecured Notes. Then on May 22, 2025, Luminar entered into separate, individually negotiated private exchange agreements and private repurchase agreements with certain holders of Unsecured Notes, pursuant to which (i) the holders exchanged $6.2 million in aggregate principal amount of Unsecured Notes for shares of Luminar's Class A common stock and (ii) Luminar repurchased $43.8 million in aggregate principal amount of Unsecured Notes for an aggregate of $30.2 million in cash consideration.

As a result of these transactions, the Company was able to reduce the principal on its Unsecured Notes maturing in 2026 by hundreds of millions of dollars. The Company also raised significant equity capital under its Yorkville and ATM facilities. However, these efforts proved insufficient in the long term to fix the Company's balance sheet issues and overcome the industry and operational challenges it faced.

## D. KEY EMPLOYEE RETENTION PROGRAM

Prior to the Petition Date, the Company faced concerns about key employee attrition and alignment of incentives given the enormous additional burdens on Company's senior management team and other key employees in connection with the comprehensive exploration of out-of-court options, the ongoing sale and marketing process, and the preparation for a chapter 11 filing, and the likely continued demand on such key employees during these chapter 11 cases. In response, the Company implemented a key employee retention program ("**KERP**") for fifteen (15) key employees (the "**KERP Participants**"), to ensure that such employees remain with the Company and align their interests with the Company to facilitate value maximization in these chapter 11 cases. The KERP collectively provided for the payment of approximately $4.0 million in the aggregate, which amount was paid in full on December 5, 2025 to the KERP Participants. The payments to the KERP Participants are subject to claw-back, should a KERP Participant (i) voluntarily terminate their employment (as described in each KERP agreement) prior to the earlier of (a) twelve (12) months following the effective date of the applicable KERP agreement and (b) the

date of consummation of a sale of all or substantially all of the assets or a recapitalization or restructuring of all or substantially all of the equity and/or debt of the Company and its subsidiaries, including under chapter 11, or (ii) be terminated by the Company for cause.

## E.     OPERATIONAL RESTRUCTURING EFFORTS

In addition to these balance sheet initiatives, the Company took active steps throughout 2024 to decrease operating costs, including implementing an internal restructuring and cost reduction plan that, among other things, reduced the Company's workforce and sub-leased certain facilities.  On October 29, 2025, the Company implemented another plan to decrease its workforce by approximately 25% to reduce operating costs further.  In addition, as liquidity became tighter, the Company made the difficult decision to stop payments to some suppliers, leading some to terminate contracts and assert claims, including Celestica, as described herein.

In parallel to these chapter 11 cases, the Debtors and their Advisors have been evaluating and planning for the ultimate wind down of their non-Debtor subsidiaries, including certain foreign subsidiaries.  As part of the Debtors' $3.0 million Wind Down Budget, the Debtors have allocated an estimated $450,000 to costs associated with winding down non-Debtor subsidiaries.  Any residual value at these entities is assumed to be distributed to Luminar and made available for distribution under the Plan. In addition to the wind down costs for the non-Debtor subsidiaries, the Debtors' Wind Down Budget contemplates costs for counsel, the liquidating agent, claims agent, tax preparation, U.S. Trustee fees, and other costs.

## F.     PURSUIT OF STRATEGIC AND SALE TRANSACTIONS

In January 2025, the Company retained Jefferies LLC ("**Jefferies**") to respond to an unsolicited acquisition proposal and assist the Company as it considered various strategic alternatives.  As additional unsolicited inbounds expressing interest in acquiring the Company surfaced over the spring and summer of 2025, the Company and Jefferies worked with the various counterparties to advance a potential transaction, including management meetings and the facilitation of diligence.  No actionable transaction arose from these efforts.

In September 2025, Jefferies initiated a process to explore a potential business combination for the Company or LiDARCo.  That same month, the Company began to explore options for a comprehensive restructuring solution and engaged Weil, Gotshal and Manges ("**Weil**") and Triple P TRS, LLC ("**Portage Point**") to assist with those efforts along with Jefferies.  In October 2025, the Company expanded the scope of Jefferies' engagement to include the exploration of various restructuring alternatives, including a divestiture of LSICo.

Facing the likely need to restructure the Company's balance sheet, in the months leading up to these cases, the Company and its Advisors approached certain of its secured noteholders to form a group and retain advisors to engage in discussions with the Company regarding potential solutions to the Company's balance sheet and liquidity issues.  This outreach resulted in the formation of an ad hoc group of secured noteholders (the "**Ad Hoc Noteholder Group**"), which currently consists of holders of approximately 91.3% of the Company's 1L Notes and approximately 85.9% of the Company's 2L Notes. The Ad Hoc Noteholder Group engaged Ropes & Gray LLP and Ducera Partners LLC as its legal and financial advisors (the "**Ad Hoc Noteholder Group Advisors**").  Since then, the Company and its Advisors have coordinated closely with the Ad Hoc Noteholder Group and the Ad Hoc Noteholder Group Advisors regarding potential in-court and out-of-court options.

In October 2025, the Company began engaging with the newly formed Ad Hoc Noteholder Group through the Ad Hoc Noteholder Group Advisors, providing them with extensive diligence concerning the Company, its operations, and the strategic alternatives it was exploring. Subsequently, the members of the Ad Hoc Noteholder Group executed non-disclosure agreements and became restricted to negotiate a restructuring transaction.

Early in these discussions, the Company presented the Ad Hoc Noteholder Group Advisors with a "liquidity maximization forecast" to demonstrate the potential liquidity savings that could be realized from an early November chapter 11 filing. In response, the Ad Hoc Noteholder Group Advisors encouraged the Company to continue exploring out-of-court solutions, while also seeking a stalking horse purchaser for a potential chapter 11 sale process. The Company likewise recognized that an out-of-court transaction, if a viable one could be found, could provide the greatest benefit to its stakeholders and that filing chapter 11 with a stalking horse bidder was preferable to filing without one.

To preserve liquidity while providing additional time to negotiate a restructuring transaction and explore other strategic transactions, the Board authorized the Company to elect not to make interest payments due on its 1L and 2L Notes in October and November. To avoid the exercise of remedies upon the occurrence of events of default for failing to make such interest payments when due after the respective applicable grace periods, the Company entered into a series of forbearance agreements with the Ad Hoc Noteholder Group. The negotiations with respect to one of the forbearance extensions resulted in the appointment of Ms. Robin Chiu from Portage Point as Chief Restructuring Officer.

In its efforts to find buyers or partners, Jefferies contacted over 100 strategic and financial prospective buyers and received a number of proposals. One such proposal was an October 14, 2025, non-binding proposal from Russell AI Labs ("**Russell AI**") to acquire the Company and combine it with a larger global automotive technology company (the "**Russell Proposal**"). On October 16, 2025, Mr. Russell filed a Schedule 13D with the SEC, disclosing high level details of the Russell Proposal. The Company and its Advisors carefully considered the Russell Proposal, provided feedback to Mr. Russell and his advisors, and continued to engage with them until just a few days before the Petition Date. In its various iterations, the Russell AI proposals involved substantial execution risk, including requiring near unanimous consent of all noteholders, a shareholder vote, and capital to bridge the Company to a closing, as well as regulatory risk.

In early October 2025, Jefferies contacted Quantum Computing Inc. ("**QCi**) to discuss LSICo as part of its marketing process. On October 31, 2025, QCi submitted an indication of interest to acquire the equity of LSICo on an out-of-court basis for $100 million and expressed that, with focused dedication from QCi and LSICo, the deal could be signed within two weeks.

On November 2, 2025, in exchange for QCi raising its purchase price to $110 million, the Company and QCi entered into an exclusivity agreement with a November 14, 2025 deadline. While the Company, QCi, and their Advisors worked to resolve issues and finalize documentation, they were unable to enter into a binding agreement by the deadline. As a result, the Company terminated the exclusivity agreement and continued marketing LSICo while still negotiating and trying to execute a binding definitive agreement with QCi.

QCi initially indicated it would be willing to consummate the transaction out-of-court, and later clarified that it was unwilling to do so without the Company (the seller) demonstrating a comprehensive solution for its over-levered balance sheet.

Over the month and a half leading up to the Petition Date, the Company, the Ad Hoc Noteholder Group, and their respective advisors dedicated their efforts to signing the QCi deal, as well as pursuing a solution for LiDARCo that would enable the Company to avoid chapter 11. In consultation with

the Ad Hoc Noteholder Group, the Company and its Advisors engaged multiple interested parties regarding alternative paths in the months leading up to the Petition Date.  During this time, the Company received several proposals to acquire the Company's assets or invest in its capital structure and the Company and its Advisors exchanged non-binding term sheets with various parties in an attempt to reach a feasible out-of-court transaction.  Each of those transactions would have required nearly unanimous creditor consent, including significant debt reduction or equitization of its 2L Notes and Unsecured Notes, and several of those proposals would have required shareholder consent and/or regulatory approvals.  The processes to achieve those consents would have been time-consuming and the results uncertain.  Moreover, those transactions would not have provided a solution for the Company's significant unsecured trade and litigation debt.

Ultimately, the Company and QCi agreed the parties would consummate the transaction through a chapter 11 filing (with the stock of LSICo being sold as a Luminar Parent asset in a section 363 sale).  QCi expressed that keeping LSICo itself out of chapter 11 was an important consideration, without which QCi would potentially not be interested in the transaction or offer a substantially lower purchase price.  To keep the economics of the QCi deal, the Ad Hoc Noteholder Group entered into a Forbearance and Transaction Support Agreement, dated December 15, 2025 (the "**LSICo Transaction Support and Forbearance Agreements**"), pursuant to which the Ad Hoc Noteholder Group agreed, in their capacities as holders of the 1L Notes and 2L Notes, to forbear from exercising remedies against the non-Debtor LSI entities prior to the sale and to take the necessary actions to ensure that the 1L Notes' and 2L Notes' liens and claims against the LSI entities would be released upon consummation of the sale.  Such arrangement requires using the net proceeds of the QCi deal to make an offer to pay down the 1L Notes.  In conversations with the Company's Advisors, the Ad Hoc Noteholder Group Advisors also confirmed that the Ad Hoc Noteholder Group understood that to gain the benefit of maximizing the value of its collateral through a chapter 11 case, it would have to fund the costs of chapter 11 through cash collateral, the LSI proceeds, or otherwise.

The Company's arm's length negotiations with QCI successfully culminated in the signed Stock Purchase Agreement, dated December 15, 2025, pursuant to which QCi served as a stalking horse for LSICo in the Debtors' chapter 11 process.

## IV.

## KEY EVENTS DURING CHAPTER 11 CASES

### A.    FIRST DAY PLEADINGS

On or around the Petition Date, the Debtors filed motions seeking various relief from the Bankruptcy Court to enable the Debtors to facilitate a smooth transition into chapter 11, minimize any disruptions to the Debtors' operations, and aid in the ongoing sale and marketing efforts (collectively, the "**First Day Pleadings**").  A description of the First Day Pleadings is set forth in the *Declaration of Robin Chiu in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (Docket No. 20).

On an interim basis, the Bankruptcy Court authorized the Debtors to continue to use the Prepetition Secured Parties' (as defined herein) cash collateral; use their existing cash management system, maintain existing business forms and intercompany arrangements, continue intercompany transactions, continue utilizing employee credit cards, and monetize or redeem investment assets; pay critical vendor claims, non-U.S. vendor claims, lien claims, and 503(b)(9) claims; and honor certain prepetition obligations to customers and continue customer programs in the ordinary course of business (Docket Nos. 42, 44, 47, and 48).

The Bankruptcy Court entered various orders authorizing the Debtors to, among other things:

- pay certain prepetition taxes, fees, and assessments (Docket No. 46);

- continue insurance programs and customs bonds, pay all obligations with respect thereto, and continue the processing of workers' compensation claims (Docket No. 45);

- pay prepetition wages, salaries, employee benefits, other compensation, and employee expenses and maintain employee benefits programs (Docket No. 43); and

- establish notification procedures and approve restrictions on certain transfers of interest in and claims against the Debtors and certain worthless stock deduction claims (Docket No. 52).

On January 20, 2026, the Bankruptcy Court entered an order approving the relief requested with respect to existing customer programs on a final basis (Docket No. 247).  On that same date, the Bankruptcy Court also entered an order approving the relief requested with respect to payment of certain prepetition vendor claims on a final basis (Docket No. 248) (the "**Final Vendor Order**").  As January 30, 2026, the Debtors have made approximately $71,800 in payments to vendors pursuant to the Final Vendor Order.  On January 26, 2026, the Bankruptcy Court entered an additional order granting the Debtors authority to maintain the existing cash management system and the ability to monetize or redeem investment assets on a final basis (Docket No. 284).

## B.    CASH COLLATERAL

On the Petition Date, the Debtors filed the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors' Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying The Automatic Stay, (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(B), and (V) Granting Related Relief* (the "**Cash Collateral Motion**") (Docket No. 21), which was approved by the Bankruptcy Court on an interim basis on December 16, 2025 (Docket No. 42).   Following a hearing on January 27, 2026, the Bankruptcy Court approved the Cash Collateral Motion on a final basis (Docket No. 319) (the "**Final Cash Collateral Order**"), overruling the Creditors' Committee's objection to the budget.  The budget approved in connection with the Final Cash Collateral Order was negotiated and agreed to by and between the Debtors and the Ad Hoc Noteholder Group.  The Final Cash Collateral Order includes, as Exhibit 1 thereto, the current approved budget.

As set forth more fully in the Cash Collateral Motion, to support the sale process, the Debtors and Ad Hoc Noteholder Group, including the requisite Senior Secured Holders under the Senior Secured Notes Indentures (as defined in the Cash Collateral Motion), agreed to the terms under which the Debtors could continue to use cash on hand, substantially all of which constitutes the holders' Cash Collateral, to operate in the ordinary course of business while marketing their businesses to obtain the highest and best bid and the most value-maximizing outcome possible for the Debtors and their stakeholders.  The use of Cash Collateral provided the Debtors with the necessary liquidity to maintain their operations, pursue a sale of all or substantially all of their assets under section 363 of the Bankruptcy Code, and seek confirmation of a chapter 11 plan that provides an orderly wind down.  In connection with the Global Settlement, the Ad Hoc Noteholder Group has consented to the Debtors' continued use of Cash Collateral through the Effective Date.

C.      **COST-SAVING MEASURES**

Since the commencement of these chapter 11 cases, the Debtors have continued to evaluate opportunities to minimize their operating costs and expenses, and right size their selling, general, and administrative expenses.  This includes (i) a significant reduction in workforce to reduce operating costs, (ii) initial steps to wind down foreign operations, and (iii) other operational cost-cutting measures.

D.      **FILING OF CONDOR ENTITIES**

On December 31, 2025, Condor Subsidiaries each commenced voluntary cases under chapter 11 of the Bankruptcy Code.  On January 7, 2026, the Debtors filed the *Emergency Motion of Debtors Requesting (I) Joint Administration of Additional Chapter 11 Cases and (II) That Certain Orders in the Chapter 11 Cases of Luminar Technologies, Inc., et al. Be Made Applicable to New Debtors* (Docket No. 158) and simultaneously submitted the *Declaration of Robin Chiu in Support of the Emergency Motion of Debtors Requesting (I) Joint Administration of Additional Chapter 11 Cases and (II) That Certain Orders in the Chapter 11 Cases of Luminar Technologies, Inc., et al. Be Made Applicable to New Debtors* (Docket No. 159), requesting that the Bankruptcy Court (i) jointly administer the chapter 11 cases of the Condor Subsidiaries with those chapter 11 cases filed on December 15, 2025 (the "**Initial Debtors' Cases**") and (ii) direct all generally applicable (a) orders previously entered by the Court in the Initial Debtors' Cases and (b) proposed orders sought in the Initial Debtors' Cases, including any final orders with respect to preexisting orders that were currently pending before the Bankruptcy Court in the Initial Debtors' Cases. Following a hearing on January 9, 2026 on the relief requested, the Bankruptcy Court entered an order directing joint administration and making certain orders applicable to the Condor Subsidiaries (Docket No. 176) (the "**Condor Joint Administration Order**").

E.      **ADDITIONAL MOTIONS AND APPLICATIONS**

On the Petition Date, the Debtors filed an application to retain Omni as claims, noticing, and solicitation agent (Docket No. 4).  On December 16, 2025, the Bankruptcy Court approved the Debtors' retention of Omni as claims, noticing and solicitation agent (Docket No. 36).

The Debtors filed various other motions to further facilitate the smooth and efficient administration of the chapter 11 cases and reduce the administrative burdens associated therewith, including:

- SOFAs and Schedules Extension Motion.  The Debtors filed a motion and obtained authority from the Bankruptcy Court to extend the deadline to file (i) the statement of financial affairs ("**SOFAs**") and schedule of assets and liabilities ("**Schedules**") for each of the Debtors to January 12, 2026, and (ii) the 2015.3 Reports until February 7, 2026 (Docket Nos. 16, 54).  The Debtors filed their SOFAs and Schedules on January 9, 2026 (Docket Nos. 181–190).

- Ordinary Course Professionals Motion.  The Debtors filed a motion and obtained authority to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course of their business (Docket Nos. 201, 381).

- Retention Applications and Interim Compensation.  The Debtors filed several applications and received authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during these chapter 11 cases.  These professionals include: (i) Weil, as restructuring counsel

to the Debtors (Docket Nos. 197, 392), (ii) Portage Point, as restructuring advisor to the Debtors (Docket Nos. 198, 372), (iii) Jefferies, as investment banker to the Debtors (Docket Nos. 199, 383), and (iv) K&S, as special investigation co-counsel to the SIC (Docket Nos. 200, 380).  In connection with such retentions, the Debtors filed a motion and received authority to establish procedures for the interim compensation and reimbursement of expenses of chapter 11 professionals (Docket Nos. 196, 373).

**F.      TIMETABLE FOR CHAPTER 11 CASES**

In light of the Debtors' severely constrained liquidity and as a condition to their ability to use the Prepetition Secured Parties' cash collateral, the Debtors have agreed to proceed on an expedited timeline to market their assets for sale and to confirm a Plan.  The Final Cash Collateral Order established certain outside deadlines for certain key events to occur (the "**Milestones**").  On February 5, 2026 and February 13, 2026, the Ad Hoc Noteholder Group extended certain Milestone dates pursuant to the Final Cash Collateral Order in furtherance of the Global Settlement negotiations.  The extended Milestones are as follows:

| Event | Governing Milestone |
|---|---|
| **Approval of Disclosure Statement** | February 19, 2026 |
| **Commencement of Plan Solicitation** | February 24, 2026 |
| **Voting Deadline** | March 24, 2026 |
| **Entry of Confirmation Order** | April 3, 2026 |

**G.      GLOBAL BIDDING PROCEDURES AND POSTPETITION SALE PROCESS**

The Debtors have marketed for the sale of substantially all of their assets, including:

(i) Assets related to the Debtors' Light Detector and Ranging-related business segment (collectively, the "**LiDAR Assets**");

(ii) Equity interests in Luminar Semiconductor, Inc., the Debtors' Advanced Technologies and Services business segment, which includes LSI's chip design subsidiary companies, including OptoGration, Inc., Freedom Photonics LLC, and EM4, LLC (collectively the "**LSI Assets**"); and

(iii) Certain other assets of the Debtors as determined by the Debtors in their sole discretion.

Under the Bidding Procedures Order, parties were permitted to submit bids for any individual asset (or combination of assets), in accordance with the terms and provisions of the Global Bidding Procedures (as defined herein).

On December 18, 2025, the Debtors filed their proposed global bidding procedures (Docket No. 86-1) for the Debtors' assets, including the equity of LSICo.  On December 18, 2025, the Debtors filed the Bidding Procedures Motion (Docket No. 86), seeking (i) approval of (a) the Debtors' global bidding procedures, (b) designation of stalking horse bid and stalking horse bidder, (c) form and manner of notice of sale, auction, and sale hearing, and (d) assumption and assignment procedures; (ii) authorization of the entry into the stalking horse agreement with QCi; (iii) authorization of the sale of the Debtors' assets free and clear of liens, claims, interests, and encumbrances; (v) approval of compliance with indenture in

connection with sale including the use of net sale proceeds to pay down prepetition relief; and (vi) related relief. A hearing on the Bidding Procedures Motion was held on December 30, 2025, and the Bankruptcy Court entered the Bidding Procedures Order on the same date, approving the global bidding procedures contained therein (the "**Global Bidding Procedures**").

The Bidding Procedures Order set forth key dates and deadlines for the sale process, which the Debtors adjusted from time to time, in accordance with the Global Bidding Procedures, to maximize value.

1.   *LSI Assets Sale Process*

Prior to the Petition Date, QCi submitted a binding stalking horse bid (the "**LSI Stalking Horse Bid**"). The Company, in consultation with the Ad Hoc Noteholder Group, determined that the LSI Stalking Horse Bid presented the most value-maximizing transaction available for LSICo. On December 15, 2025, after a month and a half of negotiations, the Debtors executed the Stock Purchase Agreement with QCi (the "**LSI Stalking Horse Agreement**") for the purchase of the LSI Assets. On the Petition Date, the Debtors filed the *Notice of Filing of Stock Purchase Agreement, Bidding Procedures, and Related Documents* (Docket No. 23), which attached, among other things, the signed Stock Purchase Agreement, pursuant to which QCi served as the stalking horse bidder for the purchase of the LSI Assets. As set forth in the LSI Stalking Horse Agreement, QCi's bid provides for the going-concern sale of the equity of LSICo for an aggregate purchase price of $110 million in cash, subject to adjustments. The LSI Stalking Horse Bid was subject to higher or otherwise better offers submitted in accordance with the terms and provisions of the Global Bidding Procedures (as defined herein).

The bid deadline for the LSI Assets was January 9, 2026, and no other bids were submitted for the LSI Assets. On January 14, 2026, following the bid deadline, the Debtors filed their *Notice of (I) Quantum Computing, Inc. as Successful Bidder for LSI Assets and (II) Cancellation of Auction with Respect to LSI Assets* (Docket No. 216). The LSI Stalking Horse Bid is expected to result in significant cash proceeds that the Debtors intend to use to pay down first lien debt.

On January 14, 2026, pursuant to the Global Bidding Procedures, the Debtors announced that QCi's LSI Stalking Horse Agreement was the successful bid for the LSI Assets and would be presented for approval at the January 27, 2026 sale hearing. The Debtors received no formal or informal objections by the January 20, 2026 sale objection deadline. At the January 27, 2026 sale hearing, the Bankruptcy Court approved the Debtors' entry into the LSI Stalking Horse Agreement with QCi (the "**LSI Sale Transaction**").

In furtherance of the closing of the LSI Sale Transaction, on February 2, 2026, Luminar and LSI entered into that certain Transition Services Agreement (the "**TSA**"), pursuant to which Luminar, as service provider, agreed to provide or cause to be provided certain services and other assistance to LSI, as service recipient, on a transitional basis and in accordance with the terms thereof. Notwithstanding the occurrence of the Effective Date or any provisions of the Plan or Confirmation Order, any obligations of LTI under the TSA shall remain in full force and effect in accordance with its terms and the LSI Sale Order. For the avoidance of doubt, the TSA shall not be deemed rejected as of the Effective Date.

2.   *LiDAR Assets Sale Process*

Shortly before the initial bid deadline, the Debtors received a bid from QCi for the LiDAR Assets, which bid was separate from QCi's LSI Stalking Horse Bid. The Debtors and their advisors began negotiating the terms of a qualified bid for the LiDAR Assets with QCi, but were unable to reach an executed agreement by the initial bid deadline. On January 8, 2026, the Debtors extended the bid deadline

for the LiDAR Assets from January 9, 2026 to January 12, 2026 at 5:00 p.m. (Central Time) (the "**LiDAR Assets Bid Deadline**").

On January 11, 2026, the Debtors designated QCi as the stalking horse bidder (the "**LiDAR Stalking Horse Bidder**," and the bid submitted by QCi, the "**LiDAR Stalking Horse Bid**") for the LiDAR Assets pursuant to and as set forth in that certain *Purchase Agreement* (the "**LiDAR Stalking Horse Agreement**") by and between Luminar Technologies, Inc. and QCi, dated January 11, 2026. The LiDAR Stalking Horse Agreement provided for cash consideration in the amount of $22 million, adjusted in accordance with the terms of the LiDAR Stalking Horse Agreement. The LiDAR Stalking Horse Bid was subject to higher or better offers in accordance with the Bidding Procedures Order and the Global Bidding Procedures. Additionally, the LiDAR Stalking Horse Agreement further obligated the LiDAR Seller to pay QCi a break-up fee in an amount equal to (i) three percent (3%) of the Closing Cash Consideration plus (ii) the amount of the reasonable, out-of-pocket and documented expenses of QCi incurred in connection with the transaction contemplated by the LiDAR Stalking Horse Agreement for the LiDAR Assets up to an aggregate amount of $500,000 in the event that the LiDAR Stalking Horse Agreement was validly terminated by the LiDAR Seller and the LiDAR Seller consummates an alternative transaction. The Debtors received two additional bids for the LiDAR Assets by the LiDAR Assets Bid Deadline. Following the submission of these bids, the Debtors and their advisors worked with the bidders to improve the bids such that they would become "Qualified Bids". At the same time, the Debtors received communications from other parties that expressed an interest in the LiDAR Assets. As a result, the Debtors extended the Bid Deadline to Friday, January 23, 2026 at 5:00 p.m. (Central Time) and moved the auction to January 26, 2026.

The Debtors held an auction for the LiDAR Assets on January 26, 2026. At the auction, the Debtors determined that the highest or best offer was submitted by MicroVision for the purchase of all or substantially all of the Debtors' LiDAR Assets for an aggregate cash purchase price of $33 million plus certain assumed liabilities (subject to certain purchase price adjustments (the "**Successful Bid**"), and the second highest or best offer was submitted by QCi for the sale of all of the Debtors' LiDAR Assets for an aggregate cash purchase price of $28.78 million plus assumption of certain liabilities (subject to certain purchase price adjustments) (the "**Back-Up Bid**"). The Debtors and MicroVision subsequently entered into that certain *Purchase Agreement By and Between MicroVision, Inc. and Luminar Technologies, Inc.*, dated January 26, 2026 (the "**MicroVision Purchase Agreement**"). The Debtors filed their *Notice of Designation of Successful Bid and Back-Up Bid for LiDAR Assets* (Docket No. 286) on January 27, 2026.

At the January 27, 2026 sale hearing, the Bankruptcy Court approved the Debtors' entry into the MicroVision Purchase Agreement with MicroVision (the "**LiDAR Sale Transaction**", and, together with the LSI Sale Transaction, the "**Sale Transactions**"). On January 29, 2026, the Bankruptcy Court entered the *Order (I) Approving the Sale of the LSI Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Approving Compliance with Indenture in Connection with Sale Including Use of Net Sale Proceeds to Offer to Purchase Certain Prepetition Secured Debt from Holders Thereof in Accordance with the Asset Sale Offers; and (III) Granting Related Relief* (Docket No. 320). On January 30, 2026, the Bankruptcy Court entered the *Order (I) Approving the Sale of the LiDAR Assets Free and Clear of Liens, Claims, Interests and Encumbrances; and (II) Granting Related Relief* (Docket No. 329).

In addition, in furtherance of the closing of the LiDAR Sale Transaction, on February 3, 2026, Luminar and MicroVision entered into that certain Amendment #1 to the Purchase Agreement (the "**LiDAR Sale Amendment**"), pursuant to which the parties agreed to provide or cause to be provided certain services and other assistance to the other parties and its affiliates, on a transitional basis and in accordance with the terms thereof. Notwithstanding the occurrence of the Effective Date or any provisions of the Plan or Confirmation Order, any obligations of the parties under the LiDAR Sale Amendment shall

remain in full force and effect in accordance with its terms and the LiDAR Sale Order.  For the avoidance of doubt, the LiDAR Sale Amendment shall not be deemed rejected as of the Effective Date.

       3.    *Asset Sale Offer*[10]

       The closing of the LSI Sale Transaction on February 2, 2026 constituted an "Asset Sale" as defined in the 1L Notes Indenture and, as a result, the LSI Sale Transaction is subject to, and must comply with, Section 3.12 of the 1L Notes Indenture (the "**Asset Sale Covenant**"), which governs the application of the net proceeds from any Asset Sale. Under the Asset Sale Covenant, to the extent net proceeds exceed the specified *de minimis* threshold following the applicable reinvestment period, Luminar Parent is required to use such net proceeds to offer to purchase outstanding 1L Notes in an amount in cash equal to 103% of the principal amount so purchased, prepaid or redeemed, plus accrued and unpaid interest on such principal amount to the date of purchase (the "**Asset Sale Offer**"). Unlike the LSI Sale Transaction, the LiDAR Sale Transaction involved a sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code. Accordingly, while the LiDAR Sale Transaction would ordinarily constitute an "Asset Sale" that gives rise to an asset sale offer under both the 1L Notes Indenture and the 2L Notes Indenture, any such requirement was superseded by the applicable provisions of the Bankruptcy Code.

       In accordance with the terms of the 1L Notes Indenture and the LSICo Transaction Support and Forbearance Agreements, which provides that the Asset Sale Offer must be made within ten (10) business days following the closing of the LSI Sale Transaction, the Debtors launched the Asset Sale Offer on February 6, 2026. The Asset Sale Offer must be conducted in compliance with applicable federal and state securities laws, including the tender offer rules under the Securities Exchange Act of 1934, which require that the Asset Sale Offer remain open for a specified period and that tendering holders be paid promptly following expiration of the Asset Sale Offer. The Debtors expect to close the Asset Sale Offer on or about March 11, 2026.

## H.    STATEMENTS AND SCHEDULES, AND CLAIMS BAR DATES

       Pursuant to section 521 of the Bankruptcy Code and Rule 1007 of the Bankruptcy Rules, on December 15, 2025, the Debtors filed the *Motion of Debtors for Entry of an Order Extending Time to File (I) Schedules of Assets and Liabilities, (II) Statements of Financial Affairs, and (III) Rule 2015.3 Reports* (Docket No. 16).  On December 16, 2024, the Bankruptcy Court entered the *Extending Time to File (I) Schedules of Assets and Liabilities, (II) Statements of Financial Affairs, and (III) Rule 2015.3 Reports* (Docket No. 54).  The Debtors filed their (i) schedules of assets and liabilities and (ii) statements of financial affairs on January 9, 2026 (Docket Nos. 181–190).

       Pursuant to sections 105(a), 501, 502, 503, and 1111(a) of the Bankruptcy Code and Bankruptcy Rules 2002, 3003(c)(3), and 5005(a), on the Petition Date, the Debtors filed the *Emergency Motion of Debtors for Order (I) Establishing Deadlines to File Proofs of Claim, and (II) Approving Form and Manner of Notice Thereof* (Docket No. 15) (the "**Bar Date Motion**") setting forth proposed deadlines for filing certain proofs of claim, which was served on all known parties-in-interest in these chapter 11 cases.    A hearing on the Bar Date Motion was held on December 30, 2025.  On the same date, the Bankruptcy Court entered the *Order (I) Establishing Deadlines to File Proofs of Claim and (II) Approving Form and Manner of Notice Thereof* (Docket No. 118) (the "**Bar Date Order**").  The Bar Date Order sets forth the following deadlines in these chapter 11 cases:

---

[10]    Capitalized terms in this section IV.G.3. that are not otherwise defined herein shall have the meaning ascribed to such terms in the Bidding Procedures Motion.

- February 4, 2026 at 5:00 p.m. (Central Time) as the deadline for all persons and entities (excluding Governmental Units) holding potential claims against the Debtors or their estates that arose or are deemed to have arisen prior to the Petition Date, including secured claims, unsecured priority claims, unsecured non-priority claims, and claims arising under section 503(b)(9) of the Bankruptcy Code (the "**General Bar Date**");

- June 15, 2026 at 5:00 p.m. (Central Time) as the deadline for all Governmental Units (as defined in section 101(27) of the Bankruptcy Code) holding potential claims against the Debtors or their estate (the "**Governmental Bar Date**"). The Governmental Bar Date applies to all Governmental Units holding claims against the Debtors (whether secured, unsecured priority, or unsecured non-priority) that arose prior to the Petition Date, including Governmental Units with claims against the Debtors for unpaid taxes, whether such claims arise from prepetition tax years or periods or prepetition transactions to which the Debtors were a party;

- the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, or (ii) as applicable, (y) the date that is thirty (30) days following the filing of the Schedules or (z) the date that is thirty (30) days after service of a notice of the applicable amendment or supplement to the Schedules on such affected claimant (the "**Amended Schedule Bar Date**"); and

- the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, or (ii) thirty (30) days after entry of an order of the Court authorizing the Debtors' rejection of the applicable executory contract or unexpired lease, as the deadline by which Proofs of Claim in connection with the Rejection Damages Claims shall be filed so that they are received by Omni (the "**Rejection Bar Date**").

Pursuant to the Condor Joint Administration Order, the dates set forth in the Bar Date Order are also applicable to the Condor Subsidiaries.

The General Bar Date passed on February 4, 2026. As of the date hereof, approximately 203 Proofs of Claim have been Filed against the Debtors. The Debtors continue to review and refine its analysis of the filed Proofs of Claim.

## I.    ADVERSARY PROCEEDINGS

1.    *Puttagunta Adversary Proceeding*

In early January, Shanmukha Sravan Puttagunta, a former stockholder of Solfice commenced an adversary proceeding against Debtors Luminar, Condor I, and Condor II, captioned Adv. Proc. No. 26-03008 (the "**Puttagunta Adversary Proceeding**"). In his adversary complaint (the "**Complaint**"), Mr. Puttagunta challenged the validity of the June 2022 asset sale of the Civil Maps assets to Luminar under Delaware statutory law. Mr. Puttagunta's papers were docketed, thereby commencing the adversary proceeding, on January 13, 2026. On the same date, the Clerk of Court docketed three (3) additional filings from Mr. Puttagunta seeking emergency relief (i) from the automatic stay, (ii) for a temporary restraining order, (iii) for interim status-quo relief (Adv. Proc. Docket Nos. 2–4) (collectively, the "**Emergency Motions**").

On January 13, 2026, the Debtors filed a motion to dismiss (Adv. Proc. Docket No. 7) (the "**Motion to Dismiss**"), requesting that the Bankruptcy Court dismiss the Complaint in its entirety with

prejudice. Additionally, the Debtors filed an objection to the Emergency Motions on January 18, 2026 (Adv. Proc. Docket No. 9).

The Bankruptcy Court held a hearing on January 21, 2026 to consider the relief requested in the Emergency Motions and the Motion to Dismiss. At the conclusion of the hearing, the Bankruptcy Court denied Mr. Puttagunta's request for relief from the automatic stay. On January 27, 2026, in an oral ruling, the Bankruptcy Court granted the Debtors' Motion to Dismiss (Adv. Proc. Docket No. 48), dismissing the Puttagunta Adversary Proceeding immediately.

2.    *NEXT Semiconductor Technologies, Inc. Adversary Proceeding*

On June 20, 2025, Luminar, as lender, and NEXT Semiconductor Technologies, Inc. ("**NEXT**"), as borrower, entered into a Senior Secured Promissory Note (the "**NEXT Note**"). Pursuant to the NEXT Note, Luminar and NEXT agreed to a fixed-term loan (the "**Loan**") to NEXT in an initial aggregate principal amount of $2,200,000 with a maturity date of December 19, 2025 (the "**Maturity Date**"). The NEXT Note further provided Luminar a continuing first-priority security interest in collateral, which includes substantially all of NEXT's personal property.

On the Maturity Date, the Loan matured, triggering an obligation by NEXT to return the currently outstanding Principal Amount and accrued but uncapitalized interest to Luminar. NEXT acknowledged the occurrence of the Maturity Date and admitted that it did not remit payment as the NEXT Note required due to other disputes between the parties and the Company's bankruptcy filing. On January 7, 2026, Luminar notified NEXT that it was in default on the NEXT Note. NEXT stated it was in the process of raising funds and expected and committed to paying off the NEXT Note within 90 days. Although NEXT has repeatedly told Luminar it hopes to raise funds, Luminar has no real assurances that NEXT actually intends to pay its debt.

As a result, the Debtors commenced an adversary proceeding against NEXT, captioned Adv. Proc. No. 26-03019 (the "**NEXT Adversary Proceeding**") on January 28, 2026. In the adversary complaint, the Debtors requested turnover of the undisputed overdue and presently owing amounts under the NEXT Note, including the principal amount of the NEXT Note, accrued interest on the NEXT Note, and accrued default interest, each as pursuant to the NEXT Note.

## J.    SIC INVESTIGATION

As described herein, the Board established the SIC on November 12, 2025. The SIC is authorized to, among other things, review, evaluate, pursue, negotiate, approve, and authorize any disposition of any potential claims or causes of action against any of the Board's current, former, or future director, officer, insider, affiliate, or other related party (collectively, the "**Related Parties**"). The SIC, as advised by Weil and K&S, conducted an investigation of certain acts, omissions, transactions and potential claims and causes of action involving or related to certain Related Parties of Luminar Technologies, Inc. and its affiliates (the "**Investigation**"). Specifically, the SIC investigated any and all potential claims and causes of action the Debtors may have against any of its current directors, officers, insiders, affiliates and certain Related Parties, including claims and causes of action for breaches of fiduciary duty, corporate waste, voidable transfers and preferential transfers that the Debtors might have against the Debtors' current directors and officers.

As of the date hereof, the SIC has concluded its Investigation. The SIC and its counsel obtained nearly three million documents and reviewed nearly one million documents, including, among other things, emails and text messages, relevant public filings, Board materials and minutes (including Board committee materials and minutes), employment agreements for certain officers, and complaints filed

against current and former directors and officers of the Debtors, from the Debtors and certain current and former directors and officers. The SIC also filed a motion under Bankruptcy Rule 2004 and served a subpoena on Austin Russell in connection with the Investigation (Docket No. 132). The SIC's counsel also interviewed more than a dozen Related Parties, including the current outside directors, current officers, current and certain former advisors to the Debtors.

As a result of the Investigation, the SIC has determined that there are not colorable causes of action that the Debtors may have against their current directors and officers except for Austin Russell.

As a result of the Investigation, the SIC has further determined that the Non-Released Parties shall include (i) Austin Russell and (ii) any director or officer who was a former director or officer of a Debtor as of the Petition Date. For the avoidance of doubt, the Non-Released Parties do not include the individuals identified as the Current Directors and Officers.[11] Counsel to the SIC shared the results of its Investigation with the Ad Hoc Noteholder Group and the Creditors' Committee. In addition, the Ad Hoc Noteholder Group and the Creditors' Committee consent to the releases set forth in the Plan, including specifically the releases of the Current Directors and Officers. The Non-Released Parties Schedule is attached to the Plan at Exhibit A.

## K.   CREDITORS' COMMITTEE INVESTIGATION

The Creditors' Committee is conducting an ongoing investigation into certain of the Debtors' prepetition transactions, as well as the liens and claims asserted by the First Lien Noteholders and Second Lien Noteholders. The Creditors' Committee's investigation is ongoing and, as a result, may identify additional unencumbered property. Under the Global Settlement, the Creditors' Committee's challenge period is tolled until the Effective Date of the Plan. The Debtors, Creditors' Committee, and the Ad Hoc Noteholder Group agreed under the Final Cash Collateral Order that (i) commercial tort claims; (ii) the Debtors' Citibank investment account number ending in x04259 and the proceeds thereof; and (iii) all assets and property that constitute "Excluded Collateral" (as defined in the Prepetition SSN Documents) are carved out of the definition of "Collateral" and are thus unencumbered.

## L.   COMMON STOCK

Luminar Technologies, Inc. was publicly traded on the NASDAQ Stock Market ("**Nasdaq**") under the symbol "LAZR." Following the Petition Date, on December 17, 2025, Luminar Technologies, Inc. received written notice from the staff of Nasdaq notifying Luminar Technologies, Inc. that, as a result of the Chapter 11 Cases, Nasdaq determined that Luminar Technologies, Inc.'s Class A common stock would be delisted from Nasdaq and that trading of Luminar Technologies, Inc.'s Class A common stock would be suspended at the opening of business on December 24, 2025. Luminar Technologies, Inc.'s Class A common stock was subsequently delisted from Nasdaq. Nasdaq filed a Form 25-NSE with the SEC on January 23, 2026.

As of December 24, 2025, Luminar Technologies, Inc.'s Class A common stock trades on the OTC Market under the symbol "LAZRQ". As of January 23, 2026, Luminar Technologies, Inc. had approximately 75,153,311 shares of Class A common stock and approximately 4,872,578 shares of Class B common stock outstanding.

---

[11]   As defined in the Plan, "Current Directors and Officers" means Elizabeth Abrams, Yarden Amsalem, Thomas Beaudoin, Robin Chiu, Patricia Ferrari, Alexander Fishkin, Alec Gores, Mary Lou Jepsen, Shaun Maguire, Katharine A. Martin, Paul Ricci, Dominick Schiano, Matthew Simoncini, and Daniel Tempesta.

# V.

## SECURITIES LAWS EXEMPTIONS AND RESTRICTIONS ON TRANSFER

The offer, issuance, and distribution of the Parent Debtor Additional Stock pursuant to Section 5.4(c) of the Plan will be exempt from registration under the Securities Act pursuant to Section 4(a)(2) thereof. Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act. Such securities shall be subject to the injunction set forth in Article XI of the Plan and shall not be transferrable.

Any beneficial interest in the Liquidation Trust (including, for the avoidance of doubt, the Liquidation Trust Interests) or any right to receive a distribution from the Liquidation Trust shall not be evidenced by any certificate, security, receipt, or in any other form or manner whatsoever, except as maintained on the books and records of the Liquidation Trust by the Liquidation Trustee. Further, any beneficial interest in the Liquidation Trust (including, for the avoidance of doubt, the Liquidation Trust Interests) or any right to receive a distribution from the Liquidation Trust shall be nontransferable and non-assignable except by will, intestate, succession, or operation of law. Any beneficial interest in the Liquidation Trust (including, for the avoidance of doubt, the Liquidation Trust Interests) or any right to receive a distribution from the Liquidation Trust shall not constitute securities and shall not be registered pursuant to the Securities Act of 1933, as amended. However, if it is determined that such beneficial interests (including, for the avoidance of doubt, the Liquidation Trust Interests) or rights constitute securities, the exemption provisions of section 1145(a)(1) of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of the Liquidation Trust Interests will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

# VI.

## CERTAIN RISK FACTORS AFFECTING DEBTORS

Before voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement.

THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN.  THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION.  NEW FACTORS, RISKS, AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS, AND UNCERTAINTIES.

## A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

1.    *Risk Related to Termination of Consensual Use of Cash Collateral*

All of the Debtors' cash on hand as of the Petition Date constitutes the cash collateral of the Prepetition Secured Parties (as defined in the Final Cash Collateral Order).  In the event of a breach of one of the milestones or another occurrence of an event of default under the Final Cash Collateral Order, the Ad Hoc Noteholder Group may terminate the Debtors' right to use Cash Collateral (as defined therein) and, absent the Ad Hoc Noteholder Group's consent or the Debtors' successfully seeking a Bankruptcy Court order permitting the nonconsensual use of cash collateral, the Debtors would not have access to the liquidity needed to continue these chapter 11 cases.  In such case, the Debtors may need to seek alternative

postpetition financing, which may be difficult to obtain, and absent finding an alternative source of liquidity, the Debtors would be unlikely to confirm and consummate the Plan and may need to convert their chapter 11 cases into cases under chapter 7.

2.      *Risk of Non-Confirmation of Plan*

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court in accordance with the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.

Moreover, the Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan. Even if all holders of Claims and Interests entitled to vote in favor of the Plan vote in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejects the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for confirmation (including under section 1129 of the Bankruptcy Code) are not met. If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan.

3.      *Risk of Non-Consensual Confirmation*

In the event any Impaired Class of Claims or Interests entitled to vote on the Plan does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the proponent's request if at least one Impaired[12] Class[13] has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such Class), and as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired Classes. Should any Class vote to reject the Plan, these requirements must be satisfied with respect to such rejecting Class. The Debtors believe that the Plan satisfies these requirements, to the extent applicable.

4.      *Risk of Non-Occurrence of Effective Date*

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article X of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

5.      *Alternative Transactions*

If the Plan cannot be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Debtors thereafter will consider all available

---

[12]   "**Impaired**" means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

[13]   "**Class**" means any group of Claims or Interests classified under the Plan pursuant to section 1122(a) of the Bankruptcy Code.

restructuring alternatives, including filing an alternative chapter 11 plan or converting to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. The terms of any alternative restructuring proposal may be less favorable to holders of Claims and Interests against the Debtors than the terms of the Plan as described in this Disclosure Statement.

6.      *Risks Related to Possible Objections to Plan*

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

7.      *Global Settlement May Not Be Approved*

As described more fully above, the Plan incorporates a proposed Global Settlement among the Debtors, the Creditors' Committee, and the Ad Hoc Noteholder Group.  However, the Global Settlement remains subject to approval of the Bankruptcy Court.  Such approval may not be obtained.

8.      *Releases, Injunctions, and Exculpation Provisions May Not Be Approved*

Article XI of the Plan provides for certain releases, injunctions, and exculpations, for Claims and Causes of Action that may otherwise be asserted against the Debtors, the Exculpated Parties, or the Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

9.      *Claims Could Be More than Projected*

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.  Therefore, the actual amount of Allowed Claims may vary from the Debtors' projections and the variation may be material.

10.     *Participation in the Asset Sale Offer Could be Less Than Anticipated*

Distributions to the parties pursuant to the Plan could be less than projected.  Specifically, the estimated recoveries assume that at least 80% of the First Lien Noteholders participate in the Asset Sale Offer, described in section IV.G.3. hereof.  The actual results of the Asset Sale Offer could vary materially, in which case, actual recoveries under the Plan could materially differ.

11.     *Distributions*

While the Debtors have endeavored to project what they believe are likely distributions to be made to parties holding Allowed Claims and Interests, there can be no certainty that the projections will be accurate and that holders will receive the distributions described in the Plan.  The projections will necessarily be affected by, among other things, (i) recoveries generated in connection with the liquidation of all of the Debtors' remaining assets, (ii) the outcome of objections to Claims, and (iii) the cost and expenses of such actions and generally administering and winding down the Debtors' Estates.

12.     *Administrative Insolvency*

Section 1129(a)(9)(A) of the Bankruptcy Code states that in order for a chapter 11 plan to be confirmed, it must provide that each holder of an allowed claim brought under section 507(a)(2) or 507(a)(3) of the Bankruptcy Code (i.e., allowed administrative expense claims) receive cash equal to the full allowed amount of such claim, unless such holder agrees to different treatment.  Additionally, section 1129(a)(9)(C) of the Bankruptcy Code states that in order for a chapter 11 plan to be confirmed, it must provide that each holder of an allowed claim entitled to priority under section 507(a) of the Bankruptcy Code (i.e., allowed priority tax claims) receive regular installment payments in cash of a total value equal to the allowed amount of such claim over a period ending not later than five (5) years after the petition date, and in a manner that is not less favorable than the most favored nonpriority unsecured claim under such plan.  Finally, other priority claims may similarly be required to receive a certain treatment under section 1129(a)(9) of the Bankruptcy Code (such as cash equal to the full allowed amount of such claim).

The Debtors presently believe that they have sufficient cash to pay all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Other Priority Claims, or that they will be able to reach agreements with the holders of such Claims as to any different treatment of such Claims, as necessary.  However, if the Debtors are administratively insolvent, then the Bankruptcy Court may not confirm the Plan and the Bankruptcy Court may convert the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, either or both of which possible outcomes would likely entail significantly greater risk of delay, expense, and uncertainty to the Debtors and their Estates.

13.     *Conversion to Chapter 7*

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the Debtors, the chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to the Debtors' creditors than as provided for in the Plan, as further detailed in Section V of this Disclosure Statement.

14.     *The Debtors' Liquidity May be Exhausted and No Alternative Financing may be Obtained Before the Effective Date*

In the event the Debtors do not obtain debtor-in-possession financing or have access to other sources of liquidity, the Debtors may not be able to satisfy the Claims entitled to administrative or other priority under sections 507(a) or (3) of the Bankruptcy Code in the chapter 11 cases.  Additionally, if the Plan is not confirmed before the Debtors' liquidity is exhausted and the Debtors are unable to obtain additional liquidity, creditor recoveries may be materially adversely affected.

15.     *Dismissal of Chapter 11 Cases*

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the Debtors, one or more of the chapter 11 cases may be dismissed by order of the Bankruptcy Court.

16.     *Cost of Administering Debtors' Estates*

Liquidation of the Debtors' remaining assets and the disbursement of the proceeds of such liquidation, as well as the wind-down of the Debtor entities (and the related costs for counsel, the

Liquidating Agent, Claims Agent, tax preparation U.S. Trustee fees, etc.), will require certain administrative costs that may vary based on a variety of factors, including many out of the Debtors' control. Such administrative costs cannot be predicted with certainty and may affect recoveries under the Plan.

## B.    ADDITIONAL FACTORS TO BE CONSIDERED

1.    *Debtors Could Withdraw Plan*

The Plan may be revoked, or withdrawn prior to the Confirmation Date by the Debtors, with the prior written consent (email being sufficient) of the Required Senior Secured Noteholders.

2.    *Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

3.    *No Representations Outside This Disclosure Statement Are Authorized*

No representations concerning or related to the Debtors, these chapter 11 cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

4.    *No Legal or Tax Advice Is Provided to You by This Disclosure Statement*

The contents of this Disclosure Statement should **not** be construed as legal, business, or tax advice.  Each holder of a Claim or Interest should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Interest.  This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

5.    *No Admission Made*

Nothing contained in the Plan will constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

6.    *No Waiver of Right to Object or Right to Recover Transfers and Assets*

The vote by a holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any Claims, Causes of Action, or rights of the Debtors (or any entity, as the case may be) to object to that holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

7.     *Ongoing Litigation Could Affect the Outcome of the Chapter 11 Cases*

The outcome of certain pending litigation could impact the availability of certain assets currently for sale, or impact the timing for such sale.  An adverse outcome in any litigation on which asset sales contemplated under the Plan depend could materially affect the recovery of creditors or the Debtors' ability to confirm the Plan.

8.     *Objection to Amount or Classification of Claims*

The Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimate set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection.  Any holder of any Claim whose Claim is or may be subject to an objection may not receive its specified share of the estimated distributions described in this Disclosure Statement.

# VII.

# CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Allowed Claims.  This discussion does not address the U.S. federal income tax consequences to (i) holders whose Claims are unimpaired or otherwise entitled to payment in full in cash under the Plan, (ii) public entities or Governmental Units, including the U.S. Government, states, municipalities and Native American Tribes, nor (iii) holders of Claims or Interests who are not entitled to vote or deemed to reject the Plan, such as holders of Parent Interests.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), U.S. Treasury regulations (the "**Treasury Regulations**"), judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect).  The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties.  The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or any court.  No assurance can be given that the IRS will not assert, or that a court will not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (e.g., non-U.S. taxpayers, controlled foreign corporations, passive foreign investment companies, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt entities or organizations, governmental authorities or agencies, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion

transaction).  In addition, this discussion does not address the Foreign Account Tax Compliance Act or U.S. federal taxes other than income taxes.

This discussion assumes that:  (i) the various debt and other arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form and (ii) except where otherwise indicated, the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON INDIVIDUAL CIRCUMSTANCES.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

## A.    CONSEQUENCES TO DEBTORS

Each of the Debtors is either a member of an affiliated group of corporations that files consolidated U.S. federal income tax returns with Luminar Technologies, Inc., as the common parent (such group, the "**Tax Group**") or an entity disregarded as separate from its owner for U.S. federal income tax purposes whose business activities and operations are reflected on the consolidated U.S. federal income tax returns of the Tax Group.  The Debtors estimate that, as of December 31, 2024, the Tax Group had U.S. federal net operating loss ("**NOL**") carryforwards of approximately $832 million (most of which are post-2017 NOLs that are subject to an 80% taxable income limitation), approximately $28.5 million in federal research and development tax credits, and certain other favorable tax attributes, including approximately $1 billion in consolidated state NOLs, and approximately $6.7 million in state research and development tax credits.  The Debtors expect the amount of the Tax Group's NOLs to increase as a result of operations for its 2025 and 2026 taxable years (before taking into account pre-Effective Date sale of assets and the implementation of the Plan).

The Tax Group's ability to utilize its NOLs and certain other tax attributes could be subject to limitation if the Tax Group underwent or were to undergo an ownership change within the meaning of section 382 of the Tax Code after the Petition Date.  The Debtors do not believe that the Tax Group's ability to utilize its NOL carryforwards and other tax attributes is currently subject to any significant limitation under section 382 of the Tax Code.  However, certain equity trading activity and other actions could result in an ownership change of the Tax Group independent of the Plan, which could adversely affect the ability of the Debtors to utilize their tax attributes.  In an attempt to minimize the likelihood of such an ownership change occurring prior to the Effective Date of the Plan, the Debtors obtained an interim order from the Bankruptcy Court authorizing certain protective equity trading and worthless stock deduction procedures (Docket No. 25-90807).  The amount of the Tax Group's NOL carryforwards and other tax attributes, and the extent to which any limitations might apply, remain subject to audit and adjustment by the IRS and entry of a final order from the Bankruptcy Court authorizing certain protective equity trading and worthless stock deduction procedures.

The Tax Code generally imposes a 15% corporate alternative minimum tax on corporations with book net income (subject to certain adjustments) exceeding on average $1 billion over any three-year testing period.  The Debtors do not believe they are currently subject to the corporate alternative minimum tax.

1.      *Transfer of Assets to the Liquidation Trust; Wind Down of the Debtors*

Prior to the Effective Date, the Debtors expect to sell all or substantially all of their assets under section 363 of the Bankruptcy Code.  Pursuant to the Plan, a Liquidation Trust will be established. On the Effective Date, the Debtors will transfer all of the Liquidation Trust Assets (comprising all of the then assets of the Debtors not otherwise transferred or disposed of on or prior to the Effective Date) to the Liquidation Trust, to be administered by the Liquidation Trustee in accordance with the Plan and the Liquidation Trust Agreement.  Pursuant to the Plan, the Debtors will thereafter be dissolved as soon as practicable after the Effective Date.

For U.S. federal income tax purposes, the transfer of Liquidation Trust Assets to the Liquidation Trust (including any portion treated as a "disputed ownership fund") is expected to be treated as a taxable sale of such assets at their then fair market value.  Although the Debtors may recognize taxable gain as a result of such transactions and their consequent liquidation, the Debtors expect the Tax Group to have other deductions and losses, available NOL carryforwards and/or other tax attributes sufficient to avoid any material U.S. federal, state or local income tax liability from such transactions.

As discussed below, the Liquidation Trust is intended to qualify as "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d) (except in respect of any portion treated as a "disputed ownership fund," including as discussed below, the GUC Reserve). *See* Section VII.C of this Disclosure Statement ("Tax Treatment of the Liquidation Trust and its Beneficiaries").  For U.S. federal income tax purposes, the Plan provides that all parties shall treat any transfer of assets to the Liquidation Trust (other than any assets allocable to any portion treated as a disputed ownership fund) as (i) a first-step transfer of such assets directly to the Liquidation Trust beneficiaries in satisfaction of their respective Allowed Claims in accordance with the Plan, immediately followed by (ii) a second-step transfer by such beneficiaries of their interest in such assets to the Liquidation Trust.  Pursuant to applicable Treasury Regulations, any assets treated as transferred to a "disputed ownership fund" is similarly treated as a taxable sale of such assets by the Debtors.

2.      *Cancellation of Debt*

In general, absent an applicable exception, a debtor must recognize COD income from the satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD income is generally the excess of (a) the "adjusted issue price" (within the meaning of the Treasury Regulations) of the indebtedness satisfied over (b) the sum of the amount of cash paid, the issue price of any new indebtedness issued, and the fair market value of any other non-cash consideration, given in satisfaction of such indebtedness at the time of the exchange.

However, if the debtor is under the jurisdiction of a court in a case under title 11 of the Bankruptcy Code and the cancellation or discharge of debt occurs pursuant to a bankruptcy court order or confirmed plan, any resulting COD income is excluded from gross income.  As a consequence of such exclusion, a debtor must reduce certain of its tax attributes by up to the amount of the excluded COD income.  Tax attributes are generally reduced in the following order: (a) current year NOLs and NOL carryforwards, (b) general business credit carryovers, (c) current year net capital losses and capital loss carryovers, (d) tax basis in assets (but not below the amount of liabilities to which the taxpayer remains subject immediately after the discharge), (e) passive activity loss and credit carryovers, and (f) foreign tax credit carryovers.  Alternatively, if advantageous, the debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOLs or other tax attributes. In the absence of contrary guidance, it appears that disallowed business interest expense carryovers under section 163(j) of the Tax Code are not subject to reduction under these rules.  Where the debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that the tax attributes

of the other members of the tax consolidated group also be reduced.  In general, any reduction in tax attributes under the COD rules does not occur until the end of the tax year, after such attributes have been applied to determine the tax for the year.

The Debtors expect to incur a substantial amount of excluded COD income and related attribute reduction as a result of the implementation of the Plan.  However, as discussed above, as a result of pre-Effective Date sales of assets and the transfer to the Liquidation Trust of any then remaining assets not otherwise distributed pursuant to the Plan, the Debtors expect to have sold all their assets in fully taxable transactions for U.S. federal income tax purposes prior to the end of the tax year in which the Plan goes effective.  As a result, the Debtors do not expect the attribute reduction to affect the U.S. federal income tax treatment of the foregoing transactions, including the computation of gain or loss.  Following the transfer to the Liquidation Trust, any remaining Tax Attributes of the Debtors (including any losses recognized as a result of such transactions) will be eliminated by reason of the COD attribute reduction and the resulting liquidation of the Debtors for U.S. federal income tax purposes.

## B.    CONSEQUENCES TO HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS

This summary discusses the U.S. federal income tax consequences to holders of Allowed First Lien Noteholder Secured Claims, Allowed Second Lien Noteholder Secured Claims and Allowed General Unsecured Claims who are U.S. Holders and does not discuss tax consequences for those who are not U.S. Holders.  As used herein, the term "**U.S. Holder**" means a beneficial owner of an Allowed Claim that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds an Allowed Claim the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership.  If you are a partner in a partnership holding an Allowed Claim, you are urged to consult your own tax advisor.

In addition, the following discussion generally assumes that a particular underlying obligation only falls into one Class.  Any holder of an underlying obligation that falls into multiple Classes is urged to consult its tax advisor as to its particular tax consequences.

1.    *Treatment to U.S. Holders of Allowed First Lien Noteholder Secured Claims or Allowed Second Lien Secured Claims*

Pursuant to the Plan, each holder of an Allowed First Lien Noteholder Secured Claim or Allowed Second Lien Secured Claim will receive, in full and final satisfaction of its applicable claim, an

interest in the Liquidation Trust representing such holder's right to receive its share of the proceeds of distributable Liquidation Trust Assets. As discussed below, holders that receive a beneficial interest in the Liquidation Trust will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, an undivided interest in the assets transferred to the Liquidation Trust consistent with their relative interest in the Liquidation Trust (other than any portion(s) of the Liquidation Trust treated as a "disputed ownership fund" for U.S. federal income tax purposes). For a further discussion of the U.S. federal income tax treatment of receiving and owning a beneficial interest in the Liquidation Trust, see Section VII.C of this Disclosure Statement ("Tax Treatment of Liquidation Trust and its Beneficiaries").

In general, a U.S. Holder of an Allowed First Lien Noteholder Secured Claim and/or Second Lien Noteholder Secured Claim will recognize gain or loss with respect to its Allowed Claim in an amount equal to the difference, if any, between (i) the sum of the amount of any Cash and the fair market value of any other property received or deemed received by reason of its undivided interest in the assets transferred to the Liquidation Trust (other than any consideration attributable to accrued but unpaid interest and possibly amortized original issue discount ("**OID**")) and (ii) the U.S. Holder's adjusted tax basis in such Allowed Claim (other than basis attributable to accrued but unpaid interest previously included in the U.S. Holder's taxable income and possibly amortized OID). *See* Section VII.B.4 of this Disclosure Statement ("Character of Gain or Loss"). As discussed below, the amount of Cash or other property received in respect of accrued but unpaid interest or accrued OID will be taxed as ordinary income, except to the extent previously included in income by a U.S. Holder under its method of accounting. *See* Section VII.B.3 of this Disclosure Statement ("Distributions in Respect of Accrued But Unpaid Interest or OID").

Pursuant to the Plan, the Liquidation Trustee will determine the value of the Liquidation Trust Assets, and all parties to the Liquidation Trust (including U.S. Holders of Allowed Claims receiving interests therein) must consistently use such valuation for all U.S. federal income tax purposes. The Liquidation Trustee will inform the holders of beneficial interests and other applicable parties of such valuations, as may be relevant from time to time.

Because a holder of a beneficial interest in a liquidating trust is treated as a direct owner of an undivided interest in the underlying assets of the trust, any income or loss of the Liquidation Trust will be treated as income or loss of the beneficiary. In general, a distribution of cash by the Liquidation Trust to the Liquidation Trust beneficiaries will not be separately taxable since the beneficiary is already regarded for U.S. federal income tax purposes as owning an undivided interest in the underlying assets. For a further discussion, see Section VII.C of this Disclosure Statement ("Tax Treatment of the Liquidation Trust and its Beneficiaries").

The aggregate tax basis of a U.S. Holder of an Allowed Claim in its undivided interest in the assets of the Liquidation Trust (subject to any portion(s) of the Liquidation Trust being treated as a "disputed ownership fund" for U.S. federal income tax purposes) will equal the fair market value of such interest increased by its share of Debtors' liabilities to which such assets remain subject upon transfer to the Liquidation Trust, and such U.S. Holder's holding period generally will begin on the day following the date of transfer of such assets to the Liquidation Trust.

2.      *Treatment to U.S. Holders of Allowed General Unsecured Claims*

Pursuant to the Plan, each holder of an Allowed General Unsecured Claim will receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, such U.S. Holder's Pro Rata Share of the GUC Liquidation Trust Interests. The GUC Liquidation Trust Interests represent the holders' right to share in any Cash remaining in the GUC Reserve (net of costs and expenses) after (i) all Disputed General Unsecured Claims have

become Allowed General Unsecured Claims or have been Disallowed by Final Order and (ii) the Liquidation Trustee completes the pursuit, abandonment, or liquidation of all Retained Causes of Action and Unencumbered Assets.

In view of the function and operation of the GUC Reserve, the Plan provides, subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, that the GUC Reserve will be treated as a "disputed ownership fund" governed by section 1.468B-9 of the Treasury Regulations and, to the extent permitted by applicable law, treated consistently by all parties, including for state and local income tax purposes. *See* discussion below at Section VII.C.2 of this Disclosure Statement ("Tax Reporting for Assets Allocable to a Disputed Ownership Fund (including the GUC Reserve)"). So treated, holders of Allowed General Unsecured Claims generally will continue to be treated for U.S. federal income tax purposes as holding their Claims and will not be treated as receiving a distribution from the Debtors until such time or times as the Liquidation Trustee distributes Cash from the GUC Reserve, if any. In the event of Interim Cash Distributions from the GUC Reserve, it is possible that holders receiving such distributions may also be deemed to receive for U.S. federal income tax purposes a direct interest in the remaining assets of the GUC Reserve.

At such time, the holders generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the amount of any Cash received and other consideration deemed received (other than any consideration attributable to accrued but unpaid interest and possibly amortized OID) and (ii) the U.S. Holder's adjusted tax basis in such Allowed Claim (other than basis attributable to accrued but unpaid interest previously included in the U.S. Holder's taxable income and possibly amortized OID). *See* Section VII.B.4 of this Disclosure Statement ("Character of Gain or Loss"). As discussed below, the amount of Cash or other property received in respect of accrued but unpaid interest or accrued OID will be taxed as ordinary income, except to the extent previously included in income by a U.S. Holder under its method of accounting. *See* Section VII.B.3 of this Disclosure Statement ("Distributions in Respect of Accrued But Unpaid Interest or OID").

3.      *Distributions in Respect of Accrued But Unpaid Interest or OID*

Pursuant to Section 7.15 of the Plan, all distributions with respect to an Allowed Claims generally are required to be allocated first to the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) unless otherwise required by law (as reasonably determined by the Liquidation Trustee) or otherwise provided in the Plan and, thereafter, to the remaining portion of such Allowed Claim, if any, including accrued but unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes.

In general, to the extent any amount received (whether stock, cash, or other property) by a U.S. Holder of a debt instrument is received in satisfaction of accrued interest or OID during its holding period, such amount will be taxable to the holder as ordinary interest income (if not previously included in the U.S. Holder's gross income under the U.S. Holder's normal method of accounting). Conversely, a U.S. Holder generally recognizes a deductible loss to the extent any accrued interest or amortized OID claimed was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a U.S. Holder of a Claim in an otherwise tax-free exchange could not claim a current deduction with respect to any unpaid OID. Accordingly, it is also unclear whether, by analogy, a U.S. Holder of a Claim in a fully taxable exchange would be viewed by the IRS as required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full. Each U.S. Holder of an Allowed Claim is urged to consult its own tax advisors regarding the allocation of consideration received under the Plan and the taxation or deductibility of accrued unpaid interest (including OID) as well as the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in gross income for U.S. federal income tax purposes.

4.      *Character of Gain or Loss*

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder and how long it has been held, whether such Claim was acquired at a market discount, and whether and to what extent the U.S. Holder previously claimed a bad debt deduction or worthless security deduction with respect to such Claim.

A U.S. Holder that purchased its Claim from a prior holder at a "market discount" (relative to the principal amount of such Claim at the time of acquisition) may be subject to the market discount rules of the Tax Code unless an exception applies.  A U.S. Holder that purchased its Claim from a prior holder will be considered to have purchased such Claim with "market discount" if the U.S. Holder's adjusted tax basis in its Claim immediately after its acquisition is less than the adjusted issue price of such Claim (or, in the case of a Claim issued without OID, the sum of all remaining payments to be made on the Claim, excluding "qualified stated interest") by at least a statutorily defined *de minimis* amount. Under these rules, gain recognized on the taxable disposition of a Claim that is subject to the market discount rules generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include the market discount in income as it accrued.

## C.     TAX TREATMENT OF LIQUIDATION TRUST AND ITS BENEFICIARIES

The Liquidation Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes (other than in respect of any portion of the assets of the Liquidation Trust allocable to a "disputed ownership fund," including as discussed below, the GUC Reserve).  In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity).  The IRS, in Revenue Procedure 94-45, 1994-2 C.B.  684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  The Liquidation Trust will be structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, holders of Allowed Claims, the Liquidation Trustee and beneficiaries of the Liquidation Trust) must treat the transfer of Assets to the Liquidation Trust as (1) a transfer of such Assets (subject to any liabilities and obligations relating to those assets) directly to recipients of beneficial interests in the Liquidation Trust (other than in respect of any portion of the Assets allocable to the GUC Reserve or any other portion also treated as a "disputed ownership fund"), immediately followed by (2) a transfer by such beneficiaries to the Liquidation Trust of such Assets in exchange for beneficial interests in the Liquidation Trust.  Accordingly, except in the event of contrary definitive guidance, holders of beneficial interests in the Liquidation Trust shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the assets transferred by the Debtors to the Liquidation Trust (other than such assets as are allocable to the GUC Reserve or any other portion also treated as a "disputed ownership fund").

No ruling is currently being requested from the IRS concerning the tax status of the Liquidation Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidation Trust as a grantor trust.  If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Liquidation Trust and the U.S. Holders of Claims could vary from those discussed herein.  Certain U.S. federal income tax consequences of the Liquidation Trust or portions thereof being treated as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-9 (such as the GUC Reserve) are also discussed below.

1.     *General "Liquidating Trust" Tax Reporting by the Liquidation Trust and their Beneficiaries*

Because the Liquidation Trust is structured to qualify as a "liquidating trust" for U.S. federal income tax purposes, the Plan provides that, for all U.S. federal income tax purposes, all parties must treat the Liquidation Trust as a grantor trust of which the holders of beneficial interests in the Liquidation Trust are the owners and grantors, and treat such beneficiaries as the direct owners of an undivided interest in the Liquidation Trust Assets consistent with their relative share therein (other than in respect of any portion of the Assets transferred to the Liquidation Trust and are allocable to the GUC Reserve or any other portion also treated as a "disputed ownership fund"). The Liquidation Trustee will file tax returns for the Liquidation Trust treating the Liquidation Trust as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations. The Liquidation Trustee also will annually send to each holder of record of a beneficial interest in the Liquidation Trust a separate statement regarding the receipts and expenditures of the Liquidation Trust as relevant for U.S. federal income tax purposes.

Allocations of taxable income of the Liquidation Trust among the Liquidation Trust beneficiaries (with the exception of any taxable income and loss allocable to the GUC Reserve or any other portion of the Liquidation Trust also treated as a "disputed ownership fund," which should be separately taxable to such fund, see Section VII.C.2 of this Disclosure Statement ("Tax Reporting for Assets Allocable to a Disputed Ownership Fund (including the GUC Reserve)")) will be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidation Trust had distributed all its assets (valued at their tax book value) to the Liquidation Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidation Trust. Similarly, taxable loss of the Liquidation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets of the Liquidation Trust. The tax book value of the Liquidation Trust's assets for purposes of allocating taxable income and loss shall equal their fair market value on the date of the transfer of such assets to the Liquidation Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

Taxable income or loss allocated to a Liquidation Trust beneficiary will be treated as income or loss with respect to such Liquidation Trust beneficiary's undivided interest in the Liquidation Trust's assets, and not as income or loss with respect to its prior Allowed Claim. The character of any income and the character and ability to use any loss would depend on the particular situation of the holder of such beneficial interest in the Liquidation Trust. The U.S. federal income tax consequences to U.S. beneficiaries of U.S. grantor trusts with foreign corporate subsidiaries is not entirely clear. Holders of beneficial interests in the Liquidation Trust may be taxed on certain income of foreign corporate subsidiaries of the Liquidation Trust, but the amount of such income, if any, is not expected to be material.

As soon as reasonably practicable after the transfer of Debtors' assets to the Liquidation Trust, the Liquidation Trustee shall make a good faith valuation of the fair market value of such assets. All parties to the Liquidation Trust (including, without limitation, the Debtors, Liquidation Trustee, holders of Allowed Claims, and the beneficiaries of the Liquidation Trust) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

The U.S. federal income tax obligations of a holder with respect to its beneficial interest in the Liquidation Trust are not dependent on the Liquidation Trust distributing any cash or other proceeds (other than with respect to the GUC Reserve or any other portion of the trust also treated as a disputed

ownership fund). Thus, a U.S. Holder may incur a U.S. federal income tax liability with respect to its allocable share of the Liquidation Trust's income even if the Liquidation Trust does not make a concurrent distribution to the holder. In general, other than in respect of the GUC Reserve, a distribution of cash by the Liquidation Trust will not be separately taxable to a beneficiary of the Liquidation Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Liquidation Trust). Holders are urged to consult their own tax advisor regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of cash from the Liquidation Trust.

The Liquidation Trust will comply with all applicable governmental withholding requirements. *See* <u>Section VII.D</u> of this Disclosure Statement ("Withholding on Distributions and Information Reporting").

2.     *Tax Reporting for Assets Allocable to a Disputed Ownership Fund (including the GUC Reserve)*

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidation Trustee of a private letter ruling if the Liquidation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), the Liquidation Trustee shall timely elect to treat the GUC Reserve as a "disputed ownership fund" governed by Treasury Regulation Section 1.468B-9 and may timely elect to treat any other portion of the Liquidation Trust allocable to, or retained on account of, Disputed Claims as a "disputed ownership fund" governed by section 1.468B-9 of the Treasury Regulations, if applicable.

A "disputed ownership fund" generally is treated as a separate taxable entity for U.S. federal income tax purposes and is subject to tax annually any net income earned with respect to the assets allocable thereto, or retained on account thereof (including any gain recognized upon the transfer, resolution, distribution or other disposition of fund assets). All distributions from such fund (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by holders in respect of their Claims as if distributed by the applicable Debtor to which such holder's Claim relates. All parties (including, without limitation, Debtors, holder's Allowed Claim, the Liquidation Trustee and the beneficiaries of the Liquidation Trust) will be required to report for tax purposes consistently with the foregoing.

A reserve or fund treated as a "disputed ownership fund" will be responsible for payment, out of the assets of the reserve or fund, of any taxes (including any taxes attributable to any income that may arise upon the actual or deemed distribution of the assets) imposed on the fund or its assets. In the event any cash in such reserve or fund is insufficient to pay the costs and expenses of the reserve or fund, assets of the reserve or fund may be sold to pay such costs and expenses.

D.     <u>WITHHOLDING ON DISTRIBUTIONS AND INFORMATION REPORTING</u>

All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Payments of interest or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the exchange consideration, may be subject to "backup withholding" (currently at a rate of 24%) if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld generally should be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed

by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. You should consult your own tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

In addition, a Liquidation Trust beneficiary that is a not a U.S. person may be subject to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate. **A non-U.S. Holder may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders of Allowed Claims.**

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

## VIII. CONFIRMATION OF PLAN

### A.    CONFIRMATION HEARING

SECTION 1128(A) OF THE BANKRUPTCY CODE REQUIRES THE BANKRUPTCY COURT TO HOLD A CONFIRMATION HEARING UPON APPROPRIATE NOTICE TO ALL REQUIRED PARTIES. NOTICE OF THE CONFIRMATION HEARING WILL BE PROVIDED TO ALL KNOWN CREDITORS AND EQUITY HOLDERS OR THEIR REPRESENTATIVES. THE CONFIRMATION HEARING MAY BE ADJOURNED OR CONTINUED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE OTHER THAN BY A COURT ANNOUNCEMENT PROVIDING FOR SUCH ADJOURNMENT OR CONTINUATION ON ITS AGENDA.

Pursuant to 1128(a) of the Bankruptcy Code, the Confirmation Hearing (as defined in the Plan) will be held on April 1, 2026 at 9:30 a.m. (Central Time) before the Honorable Judge Christopher Lopez at the United States Bankruptcy Court for the Southern District of Texas, Courtroom 402, 515 Rusk Street, Houston, Texas 77002.

### B.    OBJECTIONS

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas, must set forth the name of the objector, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the chapter 11 cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order.

Objections and responses to confirmation of the Plan, if any, must be served and filed as to be received on or before the objection deadline to the Plan, March 23, 2026 at 4:00 p.m. (Central Time) in the manner described in any order scheduling the Confirmation Hearing.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## C.    REQUIREMENTS FOR CONFIRMATION OF PLAN

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (i) accepted by all impaired Classes of Claims and Interests entitled to vote or, if the Plan is rejected or deemed rejected by an impaired Class, at least one impaired Class has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) in the "best interests" of the holders of Claims and Interests impaired under the Plan, and (iii) feasible.

1.    *Requirements of Section 1129(a) of Bankruptcy Code*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied, including whether:

(a)    the Plan complies with the applicable provisions of the Bankruptcy Code;

(b)    the Debtors have complied with the applicable provisions of the Bankruptcy Code;

(c)    the Plan has been proposed in good faith and not by any means forbidden by law;

(d)    any payment made or promised by the Debtors, for services or for costs and expenses in or in connection with these chapter 11 cases, or in connection with the Plan and incident to these chapter 11 cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(e)    the Debtors have disclosed, to the extent known, the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests holders of Claims and Interests and with public policy;

(f)    with respect to each Class of Claims or Interests, each holder of an Impaired Claim or Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were

liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(g)      except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims or Interests either accepted the Plan or is not impaired under the Plan;

(h)      except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims and other priority claims will be paid in full on the Effective Date, or receive such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code;

(i)      at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(j)      confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation is proposed in the Plan; and

(k)      all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Plan Effective Date of the Plan.

The Debtors believe the Plan meets all the applicable requirements of Section 1129 of the Bankruptcy Code.

2.    *Acceptance of Plan*

As stated herein, under the Bankruptcy Code, a Class accepts a chapter 11 plan if (i) holders of two-thirds (2/3) in amount and (ii) with respect to holders of Claims, more than a majority in number of the Allowed Claims in such Class (other than those designated under section 1126(e) of the Bankruptcy Code) vote to accept such plan. Holders of Claims that fail to vote are not counted in determining the thresholds for acceptance of such plan.

3.    *Cramdown*

If any Impaired Class of Claims or Interests does not accept the Plan (or is deemed to reject the Plan), the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, at least one Impaired Class has voted to accept the Plan and as to each Impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cramdown" provisions set forth in section 1129(b) of the Bankruptcy Code.

a.      No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority but are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors believe that, under the Plan, all Impaired Classes of Claims and Interests are treated in a manner that is fair and consistent with the treatment of other Classes of Claims and Interests having the same priority.  Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

b.      Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards that must be satisfied for the Plan to be confirmed, depending on the type of claims or interests in such class.  The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the Plan:

- **Secured Creditors**.  Each holder of an impaired secured claim either (i) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (ii) has the right to credit bid, subject to section 363(k) of the Bankruptcy Code, the amount of its claim if its property on which it has a lien is sold and retains its lien on the proceeds of the sale, or (iii) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors**.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- **Interests**.  Either (i) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such equity interest and (b) the value of the equity interest or (ii) the holders of interest that are junior to the interest of the dissenting class will not receive or retain any property under the plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any rejecting Class.

IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.

4.      *Best Interests Test*

As noted above, with respect to each impaired class of claims and interests, confirmation of a plan requires that each such holder either (i) accept such plan or (ii) receive or retain under such plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests test."

This test requires the Bankruptcy Court to determine what holders of allowed claims and allowed interests in each impaired class would receive from a liquidation of the relevant Debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from proceeds of the liquidation of the Debtor's assets and properties (after subtracting amounts attributable to the aforesaid claims) is compared with the value offered to such classes of claims and interests under the plan.

The Debtors believe that under the Plan all holders of Impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors' belief is based primarily on:  (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests and (ii) the Liquidation Analysis attached hereto as **Exhibit C**.

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates that are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors.  The Liquidation Analysis is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

5.      *Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  Section VI hereof sets forth certain risk factors that could impact the feasibility of the Plan.

## IX.

## RELEASES

Sections 11.3, 11.4, 11.5, 11.6, 11.7, 11.8 and 11.9 of the Plan also contain certain release, injunction, and exculpation provisions, each of which are reproduced on **Exhibit D** hereto.  If you hold a Claim or Interest and do not timely, properly, and affirmatively elect to opt-out of the releases contained in Section 11.6(b) of the Plan, then you shall be deemed to consent to the releases contained in Section 11.6(b) and elect to release claims against the "Released Parties".  Specifically,  those (i) whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth in the Plan; (ii) that vote to accept or reject the Plan, are deemed to reject the Plan, or are presumed to accept the Plan, but in each case do not opt out of granting the releases set forth in the Plan; and (iii) that were given notice of the opportunity to opt out of granting the releases set forth in

the Plan but did not opt out will be deemed to have granted the releases set forth in Section 11.6 of the Plan and to be "Releasing Parties" under the Plan.

As defined in Section 1.135 of the Plan, the Released Parties are: (i) the Debtors; (ii) the Creditors' Committee and each of its members, solely in their capacities as such; (iii) the members of the Ad Hoc Noteholder Group; (iv) the First Lien Notes Agent and Second Lien Notes Agent, solely in their capacities as such; (v) the Unsecured Notes Trustee and its counsel and agents, and (vi) with respect to each of the foregoing Persons in clauses (i) through (v), all Related Parties. Notwithstanding the foregoing, any Person that opts out of the releases set forth in Section 11.6(b) of the Plan shall not be deemed a Released Party thereunder. For the avoidance of doubt, no Person on the Non-Released Parties Schedule shall be deemed a Released Party.

Related Parties are, with respect to a Person, (i) that Person's current and former Affiliates, and such Person's and its current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, and subsidiaries, (ii) with respect to such Person and each of the foregoing in clause (i), such Person's respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, fiduciaries, trustees, financial advisors, partners, limited partners, general partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, and (iii) with respect to each Person and each of the foregoing in clauses (i)–(ii), such Person's respective heirs, executors, estates, and nominees, and, with respect to each Person and each of the foregoing in clauses (i)–(iii), each in their capacity as such, and any and all other Persons or Entities that may purport to assert any Cause of Action derivatively, by or through the foregoing entities. For the avoidance of doubt, the Debtors' Related Parties include the Current Directors and Officers. Notwithstanding the foregoing or anything else contained herein or in the Plan, no Persons listed on the Non-Released Parties Schedule shall be a Related Party.

Releasing Parties means collectively, and in each case solely in their capacity as such, (i) the Released Parties; (ii) the Holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth herein; (iii) the Holders of all Claims or Interests that vote to accept or reject the Plan, are deemed to reject the Plan, or are presumed to accept the Plan, but in each case do not opt out of granting the releases set forth therein; and (iv) the Holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out.

Nothing in the Plan or Confirmation Order shall grant the Debtors a discharge pursuant to section 1141(d) of the Bankruptcy Code.

# X.

## ALTERNATIVES TO CONFIRMATION
## AND CONSUMMATION OF PLAN

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative chapter 11 plan or (ii) a liquidation under chapter 7 of the Bankruptcy Code.

1.    *Alternative Plan of Liquidation*

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan.  Such a plan would involve an orderly liquidation of their assets.  The Debtors, however, believe that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

2.    *Liquidation under Chapter 7 of Bankruptcy Code*

If no plan can be confirmed, these chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The effect that the Debtors expect a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit C**.

The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the chapter 11 cases, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the chapter 11 cases, and the loss in value attributable to a considerably expeditious liquidation of the Debtors' assets as required by chapter 7.

# XI.

## CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urges holders of Impaired Claims and Interests in Classes 3, 4, and 5 to vote to accept the Plan.

Dated:  February 18, 2026
New York, New York

Respectfully submitted,

LUMINAR TECHNOLOGIES, INC., on behalf of itself and CONDOR ACQUISITION SUB I, INC., CONDOR ACQUISITION SUB II, INC., LAZR TECHNOLOGIES, LLC, and LUMINAR, LLC

By:  */s/ Robin Chiu*
Name:  Robin Chiu
Title:  Chief Restructuring Officer

**EXHIBIT A**

**Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| **LUMINAR TECHNOLOGIES, INC.**, *et al*., | § | Case No. 25-90807 (CML) |
| | § | |
| | § | |
| Debtors[1] | § | (Jointly Administered) |
| | § | |

**THIRD AMENDED CHAPTER 11 PLAN OF LIQUIDATION OF**
<u>**LUMINAR TECHNOLOGIES, INC. AND ITS AFFILIATED DEBTORS**</u>

**WEIL, GOTSHAL & MANGES LLP**
Stephanie N. Morrison (24126930)
Austin B. Crabtree (24109763)
700 Louisiana Street, Suite 3700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Ronit J. Berkovich (admitted *pro hac vice*)
Jessica Liou (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for the Debtors*
*and Debtors in Possession*

Dated:  February 18, 2026
          Houston, Texas

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: LAZR Technologies, LLC (8909); Luminar Technologies, Inc. (4317); Luminar, LLC (7133), Condor Acquisition Sub I, Inc. (0155), and Condor Acquisition Sub II, Inc. (8587).  The Debtors' mailing address is 2603 Discovery Drive, Suite 100, Orlando, Florida 32826.

Table of Contents

Page

**ARTICLE I.    DEFINITIONS AND INTERPRETATION** ................................................ 1

(A)    Definitions ............................................................................................................... 1

(B)    Interpretation; Application of Definitions and Rules of Construction............................ 20

(C)    Reference to Monetary Figures ................................................................................ 21

(D)    Controlling Document ............................................................................................. 21

(E)    Computation of Time. .............................................................................................. 21

**ARTICLE II.    ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL FEE
CLAIMS, AND PRIORITY TAX CLAIMS** ................................................ 21

2.1    Administrative Expense Claims.......................................................................... 21
2.2    Professional Fee Claims..................................................................................... 22
2.3    Priority Tax Claims............................................................................................ 22
2.4    Restructuring Fees and Expenses....................................................................... 23
2.5    Professional Fee Escrow Account. .................................................................... 23
2.6    Professional Fee Claims Estimate..................................................................... 24

**ARTICLE III.    CLASSIFICATION OF CLAIMS AND INTERESTS** ......................... 24

3.1    Classification in General.................................................................................... 24
3.2    Summary of Classification of Claims and Interests........................................... 24
3.3    Special Provision Governing Unimpaired Claims.............................................. 24
3.4    Elimination of Vacant Classes........................................................................... 25
3.5    Voting Classes; Presumed Acceptance by Non-Voting Classes......................... 25
3.6    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code. ................ 25
3.7    No Waiver. ........................................................................................................ 25

**ARTICLE IV.    TREATMENT OF CLAIMS AND INTERESTS**................................... 25

4.1    Other Priority Claims (Class 1)......................................................................... 25
4.2    Other Secured Claims (Class 2)......................................................................... 26
4.3    First Lien Noteholder Secured Claims (Class 3). .............................................. 26
4.4    Second Lien Noteholder Secured Claims (Class 4)........................................... 27
4.5    General Unsecured Claims (Class 5). ................................................................ 27
4.6    Intercompany Claims (Class 6). ........................................................................ 27
4.7    Intercompany Interests (Class 7). ...................................................................... 28
4.8    Subordinated Claims (Class 8)........................................................................... 28
4.9    Parent Interests (Class 9). ................................................................................. 28

**ARTICLE V.    MEANS FOR IMPLEMENTATION** ...................................................... 29

5.1    Plan Settlement. ................................................................................................ 29
5.2    Global Settlement............................................................................................... 30
5.3    Sources of Consideration for Plan Distribution. ............................................... 30
5.4    Liquidation Trustee............................................................................................ 30
5.5    Liquidation Trust. .............................................................................................. 34
5.6    Exemption from Securities Laws........................................................................ 39
5.7    Implementation. ................................................................................................ 39

Table of Contents
(continued)

Page

5.8     Compromise and Settlement of Claims, Interests, and Controversies. ................ 40
5.9     Corporate Action. .................................................................................... 41
5.10    Cancellation of Existing Securities, Agreements, and Liens. ........................... 41
5.11    Vesting of Liabilities in the Liquidation Trust. ............................................ 42
5.12    Effectuating Documents; Further Transactions. ........................................... 42
5.13    Wind Down. .............................................................................................. 42
5.14    Closing of the Chapter 11 Cases. ................................................................ 43

**ARTICLE VI.   GOVERNANCE** ............................................................................. 43

6.1     Boards of Directors and Officers. ............................................................... 43
6.2     Governing Documents. ............................................................................... 43

**ARTICLE VII.  DISTRIBUTIONS** .......................................................................... 43

7.1     Distributions Generally. ............................................................................. 43
7.2     No Postpetition Interest on Claims. ............................................................ 43
7.3     Distribution Record Date. .......................................................................... 44
7.4     Date of Distributions. ................................................................................ 44
7.5     Distributions after Effective Date. .............................................................. 45
7.6     Plan Distributions Made by Liquidation Trustee. ......................................... 45
7.7     Delivery of Distributions. ........................................................................... 45
7.8     Delivery of Distributions to First Lien Noteholders and Second Lien
        Noteholders. ............................................................................................. 45
7.9     Unclaimed Property. .................................................................................. 46
7.10    Satisfaction of Claims. ............................................................................... 46
7.11    Manner of Payment under Plan. ................................................................. 46
7.12    Minimum Cash Distributions. .................................................................... 46
7.13    No Distribution in Excess of Amount of Allowed Claim. ............................... 46
7.14    Allocation of Distributions between Principal and Interest. ........................... 47
7.15    Setoffs and Recoupments. .......................................................................... 47
7.16    Expenses of Liquidation Trustee. ............................................................... 47
7.17    Withholding and Reporting Requirements. .................................................. 47

**ARTICLE VIII. PROCEDURES FOR DISPUTED CLAIMS** ........................................... 48

8.1     Disputed Claims Generally. ........................................................................ 48
8.2     Resolution of Claims. ................................................................................. 48
8.3     Estimation of Claims. ................................................................................. 49
8.4     Claim Resolution Procedures Cumulative. ................................................... 49
8.5     Adjustment to Claims Register Without Objection. ....................................... 49
8.6     No Distributions Pending Allowance. .......................................................... 49
8.7     Distributions after Allowance. .................................................................... 49
8.8     Single Satisfaction of Claims and Interests. ................................................. 50
8.9     Amendments to Claims. ............................................................................. 50
8.10    Reservation of Rights to Object to Claims ................................................... 50
8.11    Disallowance of Claims. ............................................................................. 50

**ARTICLE IX.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .................. 51

9.1     General Treatment. .................................................................................... 51

Table of Contents
(continued)

Page

    9.2    Determination of Assumption and Cure Disputes and Deemed Consent. ........... 51
    9.3    Rejection Claims. ................................................................................................. 53
    9.4    Insurance Policies/Claims Payable By Third Parties. ......................................... 53
    9.5    Assignment. ......................................................................................................... 54
    9.6    Modifications, Amendments, Supplements, Restatements, or Other
          Agreements. ......................................................................................................... 55
    9.7    Reservation of Rights. ......................................................................................... 55
    9.8    Intellectual Property Licenses and Agreements. ................................................. 55

**ARTICLE X.**    **CONDITIONS PRECEDENT TO EFFECTIVE DATE** ....................... 56

    10.1   Conditions Precedent to the Effective Date. ....................................................... 56
    10.2   Waiver of Conditions Precedent. ........................................................................ 57
    10.3   Effect of Failure of a Condition. ......................................................................... 57

**ARTICLE XI.**    **EFFECT OF CONFIRMATION OF PLAN** ......................................... 58

    11.1   Binding Effect. .................................................................................................... 58
    11.2   Vesting of Assets. ................................................................................................ 58
    11.3   Term of Injunctions or Stays. ............................................................................. 58
    11.4   Injunction Against Interference with Plan. ......................................................... 58
    11.5   Injunction. ........................................................................................................... 58
    11.6   Releases. .............................................................................................................. 60
    11.7   Exculpation. ........................................................................................................ 62
    11.8   Waiver of Statutory Limitation on Releases. ...................................................... 63
    11.9   Injunction Related to Releases and Exculpation. ................................................ 63
    11.10  Subordinated Claims. .......................................................................................... 63
    11.11  Retention of Causes of Action/Transfer of Causes of Action and
          Reservation of Rights. ......................................................................................... 64
    11.12  Debtors are Not Entitled to a Discharge. ............................................................ 64
    11.13  Ipso Facto and Similar Provisions Ineffective. .................................................. 64
    11.14  Solicitation of Plan. ............................................................................................ 64
    11.15  No Successor Liability. ........................................................................................ 65

**ARTICLE XII.**  **RETENTION OF JURISDICTION** ..................................................... 65

    12.1   Retention of Jurisdiction. .................................................................................... 65
    12.2   Courts of Competent Jurisdiction. ...................................................................... 67

**ARTICLE XIII. MISCELLANEOUS PROVISIONS** ....................................................... 67

    13.1   Payment of Statutory Fees. ................................................................................. 67
    13.2   Exemption from Certain Transfer Taxes. ........................................................... 67
    13.3   Dissolution of Creditors' Committee. ................................................................. 67
    13.4   Request for Expedited Determination of Taxes. ................................................. 68
    13.5   Dates of Actions to Implement Plan ................................................................... 68
    13.6   Amendments. ....................................................................................................... 68
    13.7   Revocation or Withdrawal of the Plan. ............................................................... 68
    13.8   Governing Law. ................................................................................................... 69
    13.9   Immediate Binding Effect. .................................................................................. 69
    13.10  Waiver of Stay. ................................................................................................... 69

Table of Contents
(continued)

Page

13.11   Successors and Assigns......................................................................... 69
13.12   Entire Agreement. .................................................................................. 69
13.13   Exhibits to Plan. ..................................................................................... 70
13.14   Computing Time. .................................................................................... 70
13.15   Notices. ................................................................................................... 70
13.16   Reservation of Rights............................................................................. 71

Each of Luminar Technologies, Inc.; LAZR Technologies, LLC; Luminar LLC; Condor Acquisition Sub I, Inc.; and Condor Acquisition Sub II, Inc. (each, a "***Debtor***" and, collectively, the "***Debtors***") proposes the following joint chapter 11 plan of liquidation pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in Article I(A). Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan, the settlements and transactions contemplated thereby, and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.   DEFINITIONS AND INTERPRETATION.

(A)   **Definitions.**  The following terms shall have the respective meanings specified below:

1.1   "***Ad Hoc Noteholder Group***" means the ad hoc group of certain First Lien Noteholders and Second Lien Noteholders, or investment advisors, subadvisors, or managers of discretionary accounts that hold First Lien Notes and/or Second Lien Notes, which is represented by the Ad Hoc Noteholder Group Advisors.

1.2   "***Ad Hoc Noteholder Group Advisors***" means (i) Ropes & Gray LLP and (ii) Ducera Partners LLC.

1.3   "***Administrative Expense Claim***" means any Claim against any Debtor for a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under sections 327, 328, 330, 365, or 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors and (ii) Professional Fee Claims.

1.4   "***Administrative Expense Claims Bar Date***" means the first Business Day that is sixty (60) calendar days following the Effective Date, except as otherwise specifically set forth in the Plan.

1.5   "***Affiliate***" shall, with respect to an Entity, have the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity were a debtor in a case under the Bankruptcy Code.

1.6   "***Allowed***" means, with respect to any Claim, except as otherwise provided herein: (i) a Claim (or any portion thereof) that is evidenced by a Proof of Claim Filed by the applicable Bar Date established in the Chapter 11 Cases; (ii) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed that asserts a Claim different in amount or priority from that listed in the Schedule (unless otherwise agreed by stipulation between the Debtors and the applicable Holder); or (iii) a Claim Allowed pursuant to the Plan or a Final Order; *provided* that with respect to a Claim described in clause (i) above, such Claim shall be considered Allowed only if and to the extent that (A) with respect to such Claim, no objection to the allowance thereof, and no request for estimation or other challenge, including pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn by the Claim Objection Deadline, (B) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a Final Order, or (C) such Claim is settled pursuant to a Final Order; *provided*, *further* that notwithstanding the foregoing,

(x) unless expressly waived by the Plan, the Allowed amount of Claims shall be subject to and shall not exceed the limitations under or maximum amounts permitted by the Bankruptcy Code, including sections 502, 503, 506, or 507 of the Bankruptcy Code, to the extent applicable, and (y) the Debtors and the Liquidation Trustee, as applicable, shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan. If a Claim is Allowed only in part, any provisions hereunder with respect to Allowed Claims are applicable solely to the Allowed portion of such Claim. For the avoidance of doubt, a Proof of Claim Filed after the Bar Date shall not be Allowed for any purpose whatsoever absent entry of a Final Order allowing such late-Filed Claim, and a Claim that has been Disallowed by a Final Order or settlement shall not be Allowed for any purpose whatsoever. "Allow," "Allowing," and "Allowance," shall have correlative meanings.

1.7     ***"Asset"*** means all of the rights, title, and interests of a Debtor in and to property of whatever type or nature, including real, personal, mixed, intellectual, tangible, and intangible property, including any Causes of Action of the Debtors and the Estates' interests in the Escrowed Funds.

1.8     ***"Assumption Dispute"*** means an unresolved objection regarding assumption of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code, including objections based on the appropriate Cure Amount or "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or any other issue relating to assumption of an Executory Contract or Unexpired Lease.

1.9     ***"Avoidance Actions"*** means any and all actual or potential Claims and Causes of Action to avoid or recover a transfer of property or an obligation incurred by the Debtors arising under (i) chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code or (ii) applicable non-bankruptcy law, including any state or foreign law governing fraudulent or otherwise avoidable obligations, transfers, or conveyances.

1.10     ***"Ballot"*** means the form distributed to each Holder of a Claim or Interest in a Class entitled to vote on the Plan (as set forth herein), on which it is to be indicated, among other things, acceptance or rejection of the Plan.

1.11     ***"Bankruptcy Code"*** means title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

1.12     ***"Bankruptcy Court"*** means the United States Bankruptcy Court for the Southern District of Texas, Houston Division having jurisdiction over the Chapter 11 Cases, and to the extent of any reference made under section 157 of title 28 of the United States Code or if the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

1.13     ***"Bankruptcy Rules"*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

1.14     ***"Bar Date"*** means, collectively, the General Bar Date and the Governmental Bar Date.

1.15     ***"Bar Date Order"*** means the *Order (I) Establishing Deadlines to File Proofs of Claim and (II) Approving Form and Manner of Notice Thereof* (Docket No. 118).

1.16     ***"Blocked Parent Interests"*** means those Interests in the Parent Debtor that are subject to a blocking order issued by OFAC as of the Effective Date.

1.17     ***"Business Day"*** means any day other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or any other day on which banking institutions in New York, New York are authorized or required by law, executive order, or other governmental action to close.

1.18     ***"Cash"*** means legal tender of the United States of America.

1.19     ***"Cash Collateral Orders"*** means the Interim Cash Collateral Order and the Final Cash Collateral Order.

1.20     ***"Causes of Action"*** means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, recoupment right, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, reimbursement claim, license and franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, asserted or unasserted, accrued or unaccrued, assertable directly or derivatively (including on a theory of veil piercing, alter ego, vicarious liability, predecessor liability, successor liability, mere continuation, domination and control, mere instrumentality, inadequate capitalization, single business enterprise or common enterprise, equitable subordination, or recharacterization), choate or inchoate, reduced to judgment or otherwise, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory (including, without limitation, under any state or federal securities laws), and whether arising under federal law, state statutory law, common law, or any other applicable international or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise. Causes of Action also include: (i) any right of setoff; counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) the right to object to Claims or Interests; (iii) any claim pursuant to section 362 of the Bankruptcy Code; (iv) any claim or defense, including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (v) any Avoidance Actions; and (vi) any Commercial Tort Claims.

1.21     ***"Chapter 11 Cases"*** means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

1.22     ***"Claim"*** has the meaning set forth in section 101(5) of the Bankruptcy Code, as against any Debtor.

1.23     ***"Claim Objection Deadline"*** means the deadline for objecting to Filed Proofs of Claim or scheduled claims, which shall be, unless otherwise extended pursuant to the Plan (i) the one hundred eightieth (180th) day following the later of (a) the Effective Date and (b) the date that a Proof of Claim is Filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a Holder of such Claim; or (ii) such later date as may be fixed by the Bankruptcy Court; *provided*, *however*, that the Debtors and the Liquidation Trustee, as applicable, may extend the Claim Objection Deadline for an additional ninety (90) calendar days in their sole discretion upon the filing of a notice with the Bankruptcy Court, with further extensions thereafter permitted after notice and a hearing.

1.24    ***"Claims and Noticing Agent"*** means Omni Agent Solutions, Inc., the claims, noticing, and solicitation agent retained by the Debtors pursuant to the *Order Authorizing Employment and Retention of Omni Agent Solutions, Inc. as Claims, Noticing, and Solicitation Agent* (Docket No. 36).

1.25    ***"Class"*** means any group of Claims or Interests classified as set forth in Article III of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.26    ***"Collateral"*** means any Asset of an Estate that is subject to a Lien securing the payment or performance of a Claim, which Lien is not invalid and has not been avoided under the Bankruptcy Code or applicable nonbankruptcy law.

1.27    ***"Commercial Tort Claim"*** shall have the meaning ascribed in section 9-102(a)(13) of the Uniform Commercial Code as adopted by the State of New York.

1.28    ***"Confirmation"*** means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

1.29    ***"Confirmation Date"*** means the date on which the Bankruptcy Court enters the Confirmation Order.

1.30    ***"Confirmation Hearing"*** means the hearing to be held by the Bankruptcy Court to consider Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.31    ***"Confirmation Order"*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall reflect the Global Settlement and which shall otherwise be reasonably acceptable to the Debtors, the Required Senior Secured Holders, and the Creditors' Committee.

1.32    ***"Creditors' Committee"*** means the official committee of unsecured creditors of the Debtors, appointed by the U.S. Trustee in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code on December 30, 2025 (Docket No. 115), the membership of which may be reconstituted from time to time.

1.33    ***"Creditors' Committee and Trustee Advisors"*** means, collectively, (i) Paul Hastings LLP, (ii) Alvarez & Marsal North America, LLC, (iii) the Unsecured Notes Trustee and its counsel and agents, and (iv) any other advisor retained by the Creditors' Committee.

1.34    ***"Creditors' Committee Fee Cap"*** means $4,025,000.00.

1.35    ***"Cure Amount"*** means, as applicable, (i) the payment of Cash by the Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract or Unexpired Lease of the Debtors and (b) permit the Debtors to assume such Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code or (ii) the payment of Cash by the Debtors in an amount required by section 1124(2) of the Bankruptcy Code to Reinstate a Claim.

1.36    ***"Current Directors and Officers"*** means the following individuals, solely in their capacity as officers and directors of the Debtors: Elizabeth Abrams, Yarden Amsalem, Thomas Beaudoin, Robin Chiu, Patricia Ferrari, Alexander Fishkin, Alec Gores, Mary Lou Jepsen, Shaun Maguire, Katharine A. Martin, Paul Ricci, Dominick Schiano, Matthew Simoncini, and Daniel Tempesta.

1.37     **"D&O Indemnification Obligations"** means any existing or future obligation of the Debtors or the Liquidation Trust, as applicable, to indemnify the Board of Directors and current officers, members, or managers of any of the Debtors who served in such capacity with respect to or based upon such service or any act or omission taken or not taken in any of such capacities, or for or on behalf of any Debtor, whether pursuant to agreement, the Debtors' respective memoranda, articles or certificates of incorporation or formation, corporate charters, bylaws, operating agreements, limited liability company agreements, or similar corporate or organizational documents or other applicable contract or law in effect as of the Effective Date.

1.38     **"D&O Policy"** means, collectively, all insurance policies (including any "tail policy") issued or providing coverage to any of the Debtors for current or former directors', managers', and officers' liability, and all agreements, documents, or instruments related thereto.

1.39     **"Debtor or Debtors"** has the meaning set forth in the introductory paragraph of the Plan.

1.40     **"Debtors in Possession"** means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

1.41     **"Debtors' Advisors"** means (i) Weil, Gotshal & Manges LLP, (ii) Triple P TRS, LLC, (iii) Jefferies LLC, (iv) King & Spalding LLP, and (v) Omni Agent Solutions, Inc.

1.42     **"Disallowed"** means any Claim, or any portion thereof, that (i) has been disallowed by the Plan, Final Order, or settlement; (ii) is scheduled at zero or as contingent, disputed, or unliquidated on the Schedules and as to which no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including any claims bar date order, or otherwise deemed timely Filed under applicable law; (iii) is not scheduled on the Schedules and as to which no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law; (iv) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (v) has been withdrawn by the Holder thereof. "Disallow" and "Disallowance" shall have correlative meanings.

1.43     **"Disclosure Statement"** means the disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time, and which is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code and Bankruptcy Rules 3016 and 3018.

1.44     **"Disclosure Statement Approval Order"** means the *Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; and (V) Granting Related Relief* (Docket No. 430), which shall be consistent with the Global Settlement and which shall otherwise be reasonably acceptable to the Debtors, the Required Senior Secured Holders, and the Creditors' Committee.

1.45     **"Disputed"** means with respect to a Claim, (i) any Claim, which Claim is disputed under section 8.1 of the Plan or as to which the Debtors or the Liquidation Trustee, as applicable, have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order; (ii) any Claim, proof of which was required to be Filed by order of the Bankruptcy Court but as to which a Proof of Claim was not timely or properly Filed by the applicable claims bar date; (iii) any Claim that is listed in the Schedules as unliquidated, contingent, or disputed, and as to which no request for payment or

Proof of Claim has been Filed by the applicable claims bar date; or (iv) any Claim that is otherwise disputed by any of the Debtors or the Liquidation Trustee, as the case may be, in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order. To the extent the Debtors or the Liquidation Trustee, as applicable, dispute only the amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claim.

1.46    **_Distribution Record Date_** means the record date for purposes of determining which (i) Holders of Allowed Claims are eligible to receive distributions under the Plan, which, unless otherwise specified, shall be the earlier of (a) the Effective Date or such other date as is designated by the Debtors and (b) the date such Claim becomes Allowed, which, unless otherwise specified, shall be the Effective Date; _provided_, that, notwithstanding anything to the contrary herein, the Distribution Record Date shall not apply to any publicly held securities held in the name of, or by a nominee of, DTC (including, without limitation, the First Lien Notes and the Second Lien Notes), as to which distributions may be made in accordance with the applicable procedures of DTC.

1.47    **_DTC_** means the Depository Trust Company.

1.48    **_Effective Date_** means, with respect to the Plan, the date that is a Business Day selected by the Debtors on which: (i) no stay of the Confirmation Order is in effect and (ii) all conditions precedent specified in section 10.1 have been satisfied or waived (in accordance with section 10.2). Without limiting the foregoing, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

1.49    **_Effective Date Available Cash_** means Cash or cash equivalents held by the Debtors on the Effective Date.

1.50    **_Entity_** means an individual, corporation, partnership, limited liability partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, Governmental Unit or any political subdivision thereof, or other Person or other entity.

1.51    **_Escrowed Funds_** means the funds deposited with the Escrow Agent pursuant to the terms of the Escrow Agreements, each as defined in and following the execution of the LiDAR Purchase Agreement and Stock Purchase Agreement, as applicable.

1.52    **_Estate or Estates_** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code upon the commencement of each Debtor's Chapter 11 Case and all property (as defined in section 541 of the Bankruptcy Code) acquired by each Debtor after the Petition Date and before the Effective Date.

1.53    **_Excess Cash_** means (i) any Cash of the Debtors remaining on the Effective Date after funding, on or before the Effective Date, the Professional Fee Escrow Account, the Wind Down Reserve, the Senior Claims Reserve, and the GUC Reserve Funding Amount (which shall be funded on the Effective Date into the GUC Reserve), pursuant to section 5.7, (ii) Post Effective Date Available Cash (Non-GUC Reserve Assets), (iii) Surplus Professional Fees (iv) Surplus Wind Down Reserve, and (v) Surplus Senior Claims Reserve, to be allocated and distributed pursuant to the Waterfall.

1.54    **_Exculpated Parties_** means each of the following in their capacity as such and, in each case, to the maximum extent permitted by law: (i) the Debtors; and (ii) the Creditors' Committee and each of its members, solely in their capacities as such.

6

1.55     **_Executory Contract_** means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.56     **_Federal Judgment Rate_** means the interest rate of 3.64% per annum as provided under 28 U.S.C. § 1961(a), calculated as of the Petition Date.

1.57     **_File," "Filed," or "Filing"_** means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest, with the Claims and Noticing Agent.

1.58     **_Final Cash Collateral Order_** means the _Final Order (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief_ (Docket No. 319).

1.59     **_Final Order_** means as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, which (i) has not been reversed, stayed, modified, or amended, including any order subject to appeal but for which no stay of such order has been entered, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, reconsideration or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, reconsideration or rehearing has been timely taken, or (ii) as to which any appeal that has been taken or any petition for certiorari or motion for reargument, reconsideration or rehearing that has been or may be Filed has been withdrawn with prejudice, resolved by the highest court to which the order or judgment was appealed or from which certiorari could be sought, or any request for new trial, reargument, reconsideration or rehearing has been denied, resulted in no stay pending appeal or modification of such order, or has otherwise been dismissed with prejudice; _provided_, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be Filed with respect to such order or judgment.

1.60     **_First Lien Liquidation Trust Interests_** means the beneficial interests in the Liquidation Trust granted to Holders of Allowed First Lien Noteholder Secured Claims, which beneficial interests shall entitle such Holders to share in the First Lien Liquidation Trust Recovery, to be funded in accordance with the Waterfall.

1.61     **_First Lien Liquidation Trust Recovery_** means the Excess Cash to be allocated pursuant to the Waterfall until Holders of First Lien Liquidation Trust Interests receive the Allowed amount of their First Lien Noteholder Secured Claims, whether such distribution occurs on the Effective Date or at any time thereafter, until such Claims are paid in full.

1.62     **_First Lien Noteholder Claim Amount_** means, for each First Lien Noteholder, the Redemption Price (as defined in the First Lien Notes Indenture) on any remaining outstanding principal owed, after taking into account any payments made pursuant to an Asset Sale Offer (as defined in the First Lien Notes Indenture) before the Effective Date in accordance with section 3.12 of the First Lien Notes Indenture, plus, without duplication, any unpaid fees, expenses, and indemnities of the First Lien Notes Agent), in each case, accrued and unpaid through the date of payment, to the extent provided under the First Lien Notes Indenture and the Bankruptcy Code. For the avoidance of doubt, the First Lien Noteholder Claim Amount shall be calculated based on the remaining balance outstanding on the First Lien Noteholder Claims following any payments made pursuant to an Asset Sale Offer.

1.63    ***"First Lien Noteholder Claims"*** means any Claims arising under or related to the First Lien Notes Indenture.

1.64    ***"First Lien Noteholder Deficiency Claim Amount"*** means the portion of the First Lien Noteholder Claim Amount that is not a Secured Claim.

1.65    ***"First Lien Noteholder Deficiency Claims"*** means that portion of the First Lien Noteholder Claims that are not First Lien Noteholder Secured Claims.

1.66    ***"First Lien Noteholder Secured Claim Amount"*** means the portion of the First Lien Noteholder Claim Amount that is a Secured Claim.

1.67    ***"First Lien Noteholder Secured Claims"*** means First Lien Noteholder Claims secured by a Lien on Collateral to the extent of the value of such Collateral.

1.68    ***"First Lien Noteholders"*** means, with respect to the First Lien Noteholder Claims, collectively, record holders of, or owners of beneficial interests in, the First Lien Notes.

1.69    ***"First Lien Notes"*** means the floating rate senior secured notes due August 15, 2028, issued under the First Lien Notes Indenture.

1.70    ***"First Lien Notes Agent"*** means GLAS Trust Company LLC, solely in its capacity as trustee and each other capacity for which it serves under or in connection with the First Lien Notes Documents (as applicable), provided that if the context requires only certain of the foregoing capacities, then only in such capacity(ies), as applicable, and any successor in such capacity.

1.71    ***"First Lien Notes Documents"*** means the First Lien Notes Indenture, together with all other related documents, instruments, and agreements, in each case as supplemented, amended, restated, or otherwise modified from time to time.

1.72    ***"First Lien Notes Indenture"*** means that certain *First Lien Indenture*, dated as of August 8, 2024, by and among Luminar Technologies, Inc., as issuer, the Subsidiary Guarantors (as defined in the First Lien Notes Indenture) party thereto, and the First Lien Notes Agent, as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

1.73    ***"First Lien Reserve"*** means a segregated account maintained by the Liquidation Trustee, on behalf of the Liquidation Trust, that shall be used to hold the First Lien Liquidation Trust Recovery, which the Liquidation Trustee shall distribute and pay in accordance with the terms of the Plan and the Confirmation Order.

1.74    ***"Florida Property"*** means that certain real property located at Challenger Parkway, Orlando, Florida 32826 and as more particularly described as: Lot 1, Block 32, CENTRAL FLORIDA RESEARCH PARK, SECTION – IV, according to the plat thereof, as recorded in Plat Book 28, Pages 65 through 72, in the Public Records of Orange County, Florida.

1.75    ***"General Bar Date"*** means February 4, 2026, at 5:00 p.m. (Central Time), which is the deadline by which all Persons, except Governmental Units, are required to have Filed Proofs of Claim against the Debtors as established by the Bar Date Order.

1.76    ***"General Unsecured Claims"*** means any prepetition, unsecured claim against a Debtor that is not a Subordinated Claim, Priority Tax Claim, Other Priority Claim, or Intercompany Claim. For the

avoidance of doubt, General Unsecured Claims shall include the First Lien Noteholder Deficiency Claims (if any) and the Second Lien Noteholder Deficiency Claims.

1.77 ***"Global Settlement"*** means the settlement pursuant to Bankruptcy Rule 9019 among the Debtors, the Ad Hoc Noteholder Group, and the Creditors' Committee regarding, among other things, (i) the treatment of Allowed General Unsecured Claims, (ii) the funding of the GUC Reserve, (iii) the releases under the Plan, (iv) the Ad Hoc Noteholder Group's consent to permit the Debtors to use cash collateral through the Effective Date, (v) the reduction in the amount of Restructuring Fees and Expenses to be asserted by Ropes & Gray LLP and Ducera Partners LLC, and (vi) other matters related thereto.

1.78 ***"Governmental Bar Date"*** means June 15, 2026 at 5:00 p.m. (Central Time), which is the deadline by which all Governmental Units are required to File Proofs of Claim against the Debtors, as established by Bankruptcy Local Rule 3003-1 and ratified by the Bar Date Order.

1.79 ***"Governmental Unit"*** has the meaning set forth in section 101(27) of the Bankruptcy Code.

1.80 ***"GUC Liquidation Trust Interests"*** means the beneficial interests in the Liquidation Trust distributed to Holders of Allowed General Unsecured Claims, which beneficial interests shall entitle such Holders to their Pro Rata Share of the GUC Liquidation Trust Recovery.

1.81 ***"GUC Liquidation Trust Recovery"*** means any Cash consisting of the GUC Reserve Assets and any proceeds thereof, net of any costs and expenses incurred by the Liquidation Trust (including fees of the Liquidation Trustee and any taxes incurred by the Liquidation Trustee, whether such taxes are incurred directly by the Liquidation Trustee in his or her role as such, or on account of those taxes attributed proportionately to each Holders' share of GUC Liquidation Trust Interests) in connection with the pursuit, abandonment, or liquidation of all GUC Reserve Assets.

1.82 ***"GUC Reserve"*** means a segregated account maintained by the Liquidation Trustee, on behalf of the Liquidation Trust for the sole and exclusive benefit of the Holders of GUC Liquidation Trust Interests, into which the GUC Reserve Assets shall be transferred on the Effective Date or as soon as reasonably practicable thereafter, free and clear of all Claims, Liens, and encumbrances.

1.83 ***"GUC Reserve Assets"*** means the subset of Liquidation Trust Assets consisting of (i) the GUC Residual Amount, if any, (ii) the GUC Reserve Funding Amount, (iii) the Retained Causes of Action belonging to each of the Debtors and the Debtors' Estates and the proceeds thereof (including any D&O Policy proceeds payable to the Estate on account of settlements or judgments from Commercial Tort Claims and other non-released claims and Causes of Action), (iv) the Unencumbered Assets, and (v) the proceeds of each of the foregoing clauses (i)-(iv), which in the case of clauses (ii), (iii), and (iv) shall be transferred to the Liquidation Trust on the Effective Date, and in the case of clauses (i) and (v) shall be transferred to the Liquidation Trust on the Effective Date or as soon as reasonably practicable thereafter, free and clear of all Claims, Liens, and encumbrances.

1.84 ***"GUC Reserve Funding Amount"*** means $1,500,000.00, which shall be funded into the GUC Reserve on the Effective Date.

1.85 ***"GUC Residual Amount"*** means any Excess Cash remaining after (i) any deficits in the Senior Claims Reserve are satisfied in accordance with the Plan, (ii) Holders of First Lien Liquidation Trust Interests receive an amount equal to their Allowed First Lien Noteholder Secured Claims, and (iii) Holders of Second Lien Liquidation Trust Interests receive an amount equal to their Allowed Second Lien Noteholder Secured Claims.

1.86    *"Holder"* means any Person holding (including as successor or assignee pursuant to a valid succession or assignment) a Claim or an Interest, as applicable, solely in its capacity as such, and with respect to the First Lien Notes, the Second Lien Notes, and the Unsecured Notes, including the First Lien Noteholders, the Second Lien Noteholders, and the Unsecured Noteholders, respectively.

1.87    *"Impaired"* means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

1.88    *"Initial Plan Distribution"* means the first Plan Distribution that the Liquidation Trustee makes to Holders of Allowed Claims.

1.89    *"Insured Litigation Claims"* means any insured claims constituting General Unsecured Claims or Section 510(b) Claims, as applicable.

1.90    *"Intercompany Claim"* means any Claim against a Debtor held by another Debtor or non-Debtor Affiliate as of the Effective Date.

1.91    *"Intercompany Interest"* means an Interest in a Debtor (other than Parent Debtor) held by another Debtor.

1.92    *"Interests"* means any equity in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest, or other instruments evidencing an ownership interest, or equity security (as defined in section 101(16) of the Bankruptcy Code) in any of the Debtors, whether or not transferable, and whether fully vested or vesting in the future, including any restricted stock, warrant, option, or right, contractual or otherwise, including, without limitation, equity-based employee incentives, grants, stock appreciation rights, restricted stock units, performance shares/units, incentive awards, or other instruments issued to employees of the Debtors, to acquire any such interests in a Debtor that existed immediately before the Effective Date (in each case whether or not arising under or in connection with any employment agreement).

1.93    *"Interim Cash Collateral Order"* means the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (Docket No. 42).

1.94    *"LiDAR Purchase Agreement"* means that certain *Purchase Agreement*, dated as of January 26, 2026, by and among MicroVision, Inc. and Luminar Technologies, Inc (as may be amended, supplemented, or otherwise modified from time to time).

1.95    *"LiDAR Sale Order"* means the *Order (I) Approving the Sale of the LiDAR Assets Free and Clear of Liens, Claims, Interests and Encumbrances; and (II) Granting Related Relief* (Docket No. 329).

1.96    *"Lien"* has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.97    *"Liquidation Trust"* means that certain trust established pursuant to section 5.5 hereof.

1.98    *"Liquidation Trust Agreement"* means the trust agreement establishing the Liquidation Trust and delineating the terms and conditions for the management of the Liquidation Trust, as it may be amended from time to time, which shall reflect the Global Settlement and which shall otherwise be reasonably acceptable to the Debtors, the Required Senior Secured Holders, and the Creditors' Committee.

1.99    ***"Liquidation Trust Assets"*** means, collectively, all Assets of the Debtors as of the Effective Date and all assets of the Liquidation Trust from and after the Effective Date, including, but not limited to, the Retained Causes of Action, the Senior Claims Reserve, the Wind Down Reserve, the First Lien Reserve, the Second Lien Reserve, the GUC Reserve, and the ordinary shares, units, common stock, preferred stock, membership interests, or partnership interests of any non-Debtor Affiliates held by a Debtor. For the avoidance of doubt, Liquidation Trust Assets shall exclude (i) any Assets transferred, or required to be transferred (whether or not subject to any contingencies that remain to be satisfied), to each Buyer (as defined in the LiDAR Purchase Agreement and the Stock Purchase Agreement, as applicable) pursuant to, as applicable, the LiDAR Sale Order or the LSI Sale Order and, as applicable, the LiDAR Purchase Agreement or the Stock Purchase Agreement; *provided*, that, if the Debtors' obligations under the LiDAR Sale Order and the LiDAR Purchase Agreement to transfer any such Assets cease following the Effective Date such Assets shall automatically without further action by any party become Liquidation Trust Assets, (ii) Intercompany Interests, and (iii) Blocked Parent Interests.

1.100    ***"Liquidation Trust Interests"*** means, collectively, (i) the First Lien Liquidation Trust Interests, (ii) Second Lien Liquidation Trust Interests, and (iii) GUC Liquidation Trust Interests.

1.101    ***"Liquidation Trust Oversight Board"*** means the board of directors or managers with the rights and powers relating to the supervision of the Liquidation Trustee with respect to (i) the General Unsecured Claims reconciliation process, (ii) the pursuit, abandonment, monetization, prosecution, adjudication, settlement, resolution or liquidation of GUC Reserve Assets, and (iii) distributions to Holders of General Unsecured Claims pursuant to the Plan, as set forth in the Liquidation Trust Agreement.

1.102    ***"Liquidation Trust Transfer Agreement(s)"*** means one or more agreements, including the Liquidation Trust Agreement, transferring Liquidation Trust Assets from the Debtors to the Liquidation Trust, which agreements will be entered into between the Liquidation Trustee, on behalf of the Liquidation Trust, and the Debtors, on behalf of themselves, and the terms of which shall be consistent with the Plan and reflect the Global Settlement, and which shall otherwise be reasonably acceptable to the Debtors, the Required Senior Secured Holders, and the Creditors' Committee.

1.103    ***"Liquidation Trustee"*** means a Person (i) mutually agreed upon by the Ad Hoc Noteholder Group and the Creditors' Committee and (ii) reasonably acceptable to the Debtors, as trustee for the Liquidation Trust.

1.104    ***"Local Bankruptcy Rules"*** means the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas.

1.105    ***"LSI Sale Order"*** means the *Order (I) Approving the Sale of the LSI Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Approving Compliance with Indenture in Connection with Sale Including Use of Net Sale Proceeds to Offer to Purchase Certain Prepetition Secured Debt from Holders Thereof in Accordance with the Asset Sale Offers, and (III) Granting Related Relief* (Docket No. 320).

1.106    ***"Milestones"*** means the milestones set forth on Exhibit 2 to the Cash Collateral Orders.

1.107    ***"NOL Order"*** means the *Interim Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtors and Certain Worthless Stock Deduction Claims* (Docket No. 52), or any successor order.

1.108    ***"Non-Released Parties Schedule"*** means a schedule of Persons listed on **Exhibit A** attached hereto, that are excluded from the definition of "Released Party", as the same may be amended,

modified, or supplemented from time to time prior to the Confirmation Hearing; *provided* that the Debtors shall not remove any Person(s) or Entity(ies) from the Non-Released Parties Schedule absent the prior written consent (email being sufficient) of the Creditors' Committee. No Person or Entity listed on the Non-Released Parties Schedule shall be a Related Party of or an Affiliate of any Released Party for the purposes of the Plan, including any releases, injunctions, and exculpations contained in the Plan.

1.109    ***"OFAC"*** means the Office of Foreign Assets Control of the U.S. Department of Treasury.

1.110    ***"OFAC License"*** means the license to be obtained from OFAC authorizing the cancellation of the Blocked Parent Interests and the winding down of Parent Debtor pursuant to section 4.9(b), and any other transactions or activity ordinarily incident to and necessary to give effect thereto.

1.111    ***"Ordinary Course Professionals"*** means those Professionals retained pursuant to the Ordinary Course Professionals Retention Order.

1.112    ***"Ordinary Course Professionals Retention Order"*** means the *Order Authorizing Debtors to Employ Professionals Used in Ordinary Course of Business Effective as of Petition Date* (Docket No. 381).

1.113    ***"Other Priority Claim"*** means any claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

1.114    ***"Other Secured Claim"*** means any Secured Claim other than a First Lien Noteholder Secured Claim or a Second Lien Noteholder Secured Claim.

1.115    ***"Parent Debtor"*** means Luminar Technologies, Inc.

1.116    ***"Parent Debtor Additional Stock"*** means the new common stock in the Parent Debtor, of the same number, class, and series as Unblocked Parent Interests that are cancelled pursuant to section 4.9(b) of the Plan, to be issued in favor of the Liquidation Trust on the Effective Date pursuant to section 5.5(d) of the Plan.

1.117    ***"Parent Interests"*** means Blocked Parent Interests and Unblocked Parent Interests.

1.118    ***"Person"*** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

1.119    ***"Petition Date"*** means, with respect to (i) Luminar Technologies, Inc., LAZR Technologies, LLC, and Luminar, LLC, December 15, 2025 and (ii) Condor Acquisition Sub I, Inc. and Condor Acquisition Sub II, Inc, December 31, 2025.

1.120    ***"Plan"*** means this joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof, which shall be consistent with the Global Settlement and which shall otherwise be reasonably acceptable to the Debtors, the Required Senior Secured Holders, and the Creditors' Committee.

1.121   *"Plan Distribution"* means the payment or distribution of consideration to Holders of Allowed Claims under the Plan.

1.122   *"Plan Supplement"* means a supplemental appendix to the Plan containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, as may be amended, modified, or supplemented from time to time, in accordance with the terms hereof and the Bankruptcy Code and Bankruptcy Rules, which shall include, but not be limited to: (i) the Schedule of Retained Causes of Action; (ii) the Schedule of Assumed Contracts; (iii) the Wind Down Budget; (iv) the Liquidation Trust Agreement; (v) the identity of the Liquidation Trustee, which shall be (A) mutually agreed upon by the Ad Hoc Noteholder Group and the Creditors' Committee and (B) reasonably acceptable to the Debtors; (vi) the identity of the Liquidation Trust Oversight Board; and (vii) information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; *provided*, that through the Effective Date, the Debtors shall have the right to amend the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of the Plan.

1.123   *"Post Effective Date Available Cash (GUC Reserve Assets)"* means any Cash that are GUC Reserve Assets or any proceeds thereof received by the Liquidation Trust on or after the Effective Date, to be distributed pursuant to the Waterfall.

1.124   *"Post Effective Date Available Cash (Non-GUC Reserve Assets)"* means any Cash actually received by the Liquidation Trust on or after the Effective Date, including on account of the Debtors' interests in the Escrowed Funds and the proceeds from all remaining Liquidation Trust Assets (including, for the avoidance of doubt, the SAFE Note and the NEXT Note, each as defined in the Disclosure Statement), but excluding any GUC Reserve Assets and any proceeds thereof, to be allocated pursuant to the Waterfall.

1.125   *"Preference Actions"* means any and all actual or potential Claims and Causes of Action to avoid or recover a transfer of property or an obligation incurred by the Debtors arising under section 547 of the Bankruptcy Code.

1.126   *"Priority Tax Claim"* means any Secured Claim or unsecured Claim of a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.127   *"Pro Rata Share"* means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims and Disputed Claims in that Class and other Classes entitled to share in the same recovery as such Class under the Plan.

1.128   *"Professional"* means an Entity (i) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered on or after the Petition Date and before or on the Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code or (ii) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code that are not Restructuring Fees and Expenses.

1.129   *"Professional Fee Claims"* means all Claims for fees and expenses (including transaction and success fees) incurred by a Professional on or after the Petition Date and before or on the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.

1.130    ***Professional Fee Claims Estimate*** means the aggregate unpaid Professional Fee Claims through the Effective Date as estimated in accordance with section 2.6 of the Plan, which have not already been escrowed pursuant to paragraph 5(c) of the Cash Collateral Orders.

1.131    ***Professional Fee Escrow Account*** means an escrow account established pursuant to paragraph 5(c) of the Cash Collateral Order and funded pursuant to section 2.5 of the Plan.

1.132    ***Proof of Claim*** means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

1.133    ***Reinstate, Reinstated, or Reinstatement*** means, with respect to Claims and Interests, the treatment provided for in section 1124(2) of the Bankruptcy Code.

1.134    ***Related Parties*** means, with respect to a Person, (i) that Person's current and former Affiliates, and such Person's and its current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, and subsidiaries, (ii) with respect to such Person and each of the foregoing in clause (i), such Person's respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, fiduciaries, trustees, financial advisors, partners, limited partners, general partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, and (iii) with respect to each Person and each of the foregoing in clauses (i)–(ii), such Person's respective heirs, executors, estates, and nominees, and, with respect to each Person and each of the foregoing in clauses (i)–(iii), each in their capacity as such, and any and all other Persons or Entities that may purport to assert any Cause of Action derivatively, by or through the foregoing entities. For the avoidance of doubt, the Debtors' Related Parties include the Current Directors and Officers. Notwithstanding the foregoing or anything else contained herein, no Persons listed on the Non-Released Parties Schedule shall be a Related Party.

1.135    ***Released Parties*** means, collectively: (i) the Debtors; (ii) the Creditors' Committee and each of its members, solely in their capacities as such; (iii) the members of the Ad Hoc Noteholder Group; (iv) the First Lien Notes Agent and Second Lien Notes Agent, solely in their capacities as such; (v) the Unsecured Notes Trustee and its counsel and agents, and (vi) with respect to each of the foregoing Persons in clauses (i) through (v), all Related Parties. Notwithstanding the foregoing, any Person that opts out of the releases set forth in section 11.6(b) of the Plan shall not be deemed a Released Party thereunder. For the avoidance of doubt, no Person on the Non-Released Parties Schedule shall be deemed a Released Party.

1.136    ***Releasing Parties*** means collectively, and in each case solely in their capacity as such, (i) the Released Parties; (ii) the Holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth herein; (iii) the Holders of all Claims or Interests that vote to accept or reject the Plan, are deemed to reject the Plan, or are presumed to accept the Plan, but in each case do not opt out of granting the releases set forth herein; and (iv) the Holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out.

1.137    ***Required Senior Secured Holders*** means (i) prior to the Effective Date, the members of the Ad Hoc Noteholder Group that collectively beneficially own or control more than 51% of the aggregate amount of each of the First Lien Notes and Second Lien Notes held by the Ad Hoc Noteholder Group, and (ii) after the Effective Date, Holders that collectively hold more than 51% of the aggregate amount of each of the First Lien Liquidation Trust Interests and Second Lien Liquidation Trust Interests.

14

1.138   ***"Restructuring Fees and Expenses"*** means all outstanding prepetition and postpetition reasonable and documented fees and out-of-pocket expenses incurred by (i) Ropes & Gray LLP, (ii) the First Lien Notes Agent, (iii) the Second Lien Notes Agent (with respect to (ii) and (iii), solely to the extent that (x) the First Lien Notes Documents and the Second Lien Notes Documents, respectively, provide for payment of such fees and expenses by the Debtors and with the understanding that (y) to the extent such fees and expenses are paid as Restructuring Fees and Expenses, the part of the First Lien Noteholder Claim Amount and/or Second Lien Noteholder Claim Amount for such fees and expenses will be reduced accordingly, as applicable), (iv) the Unsecured Notes Trustee (solely to the extent that (x) the Unsecured Notes Indenture provides for the payment of such fees and expenses by the Debtors and (y) to the extent such fees and expenses are paid as Restructuring Fees and Expenses, the part of the Unsecured Noteholder Claim Amount for such fees and expenses will be reduced accordingly; *provided* that such fees and expenses shall not exceed $200,000.00 and shall be sourced from and reduce on a dollar-for-dollar basis the Creditors' Committee Fee Cap), and (v) Ducera Partners LLC, in accordance with that certain fee letter executed by and with Debtor Luminar Technologies, Inc. on November 6, 2025.

1.139   ***"Retained Causes of Action"*** means, collectively, all Causes of Action retained by the Debtors and transferred to the Liquidation Trust; *provided*, *however*, that neither the Debtors nor the Liquidation Trustee shall retain (whether on their own behalf or on behalf of the Estates) any Causes of Action against any Released Party that is released pursuant to section 11.6(a) of the Plan; *provided*, *further*, that all claims or Causes of Action of the Debtors existing immediately before the Effective Date and not released hereunder shall be retained by the Liquidation Trust, whether or not any particular claim or Cause of Action is specifically identified on the Schedule of Retained Causes of Action, without any further action by any party.

1.140   ***"Schedule of Assumed Contracts"*** means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan and to be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

1.141   ***"Schedule of Retained Causes of Action"*** means the schedule of Causes of Action to be retained by the Debtors and transferred to the Liquidation Trust and to be included in the Plan Supplement.

1.142   ***"Schedules"*** means any schedules of Assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as the same may have been amended, modified, or supplemented from time to time.

1.143   ***"Section 510(b) Claims"*** means any claim against any Debtor (i) arising from the rescission of a purchase or sale of a Security of any Debtor or an Affiliate of any Debtor; (ii) for damages arising from the purchase or sale of such Security; or (iii) for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a claim. For the avoidance of doubt, Section 510(b) Claims include any claims asserted or assertable against the Debtors in the Securities Class Actions.

1.144   ***"Section 510(c) Claims"*** means any claim against any Debtor that is subject to subordination under section 510(c) of the Bankruptcy Code.

1.145   ***"Second Lien Liquidation Trust Interests"*** means the beneficial interests in the Liquidation Trust granted to Holders of Allowed Second Lien Noteholder Secured Claims, which beneficial interests shall entitle such Holders to share in the Second Lien Liquidation Trust Recovery, to be funded in accordance with the Waterfall.

1.146 ***"Second Lien Liquidation Trust Recovery"*** means, until Holders of Second Lien Liquidation Trust Interests receive the Allowed amount of their Second Lien Noteholder Secured Claims, the Excess Cash to be allocated pursuant to the Waterfall after the First Lien Noteholder Secured Claims are satisfied in full pursuant to the Waterfall.

1.147 ***"Second Lien Noteholder Claim Amount"*** means, for each Second Lien Noteholder, the remaining outstanding principal owed, after taking into account any payments made pursuant to an Asset Sale Offer (as defined in the Second Lien Notes Indenture) before the Effective Date in accordance with section 3.12 of the Second Lien Notes Indenture, plus, without duplication, any interest (including, if applicable, Default Interest (as defined in the Second Lien Notes Indenture), unpaid fees, expenses, and indemnities of the Second Lien Notes Agent, in each case accrued and unpaid through the Petition Date, to the extent provided under the Second Lien Notes Indenture and the Bankruptcy Code, plus 50% of the Make-Whole Premium (as defined in the Second Lien Notes Indenture) that would have otherwise been included in the calculation of the Redemption Price (as defined in the Second Lien Notes Indenture) of the Second Lien Notes. For the avoidance of doubt, the Second Lien Noteholder Claim Amount shall be calculated based on the remaining balance outstanding on the Second Lien Noteholder Claims following any payments made pursuant to an Asset Sale Offer.

1.148 ***"Second Lien Noteholder Claims"*** means any Claims arising under or related to the Second Lien Notes Indenture.

1.149 ***"Second Lien Noteholder Deficiency Claim Amount"*** means the portion of the Second Lien Noteholder Claim Amount that is not a Secured Claim.

1.150 ***"Second Lien Noteholder Deficiency Claims"*** means that portion of the Second Lien Noteholder Claims that are not Second Lien Noteholder Secured Claims.

1.151 ***"Second Lien Noteholder Secured Claim Amount"*** means the portion of the Second Lien Noteholder Claim Amount that is a Secured Claim.

1.152 ***"Second Lien Noteholder Secured Claims"*** means Second Lien Noteholder Claims secured by a Lien on Collateral to the extent of the value of such Collateral.

1.153 ***"Second Lien Noteholders"*** means, with respect to the Second Lien Noteholder Claims, collectively, record holders of, or owners of beneficial interests in, the Second Lien Notes.

1.154 ***"Second Lien Notes"*** means the (i) 9.0% convertible second lien, senior secured notes due 2030 and (ii) 11.5% convertible second lien, senior secured notes due 2030, issued under the Second Lien Notes Indenture.

1.155 ***"Second Lien Notes Agent"*** means GLAS Trust Company LLC, solely in its capacity as trustee and each other capacity for which it serves under or in connection with the Second Lien Notes Documents (as applicable), provided that if the context requires only certain of the foregoing capacities, then only in such capacity(ies), as applicable, and any successor in such capacity.

1.156 ***"Second Lien Notes Documents"*** means the Second Lien Notes Indenture, together with all other related documents, instruments, and agreements, in each case as supplemented, amended, restated, or otherwise modified from time to time.

1.157 ***"Second Lien Notes Indenture"*** means that certain *Second Lien Indenture*, dated as of August 8, 2024, by and among Luminar Technologies, Inc., as issuer, the Subsidiary Guarantors (as defined

in the Second Lien Notes Indenture) party thereto, and the Second Lien Notes Agent, as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

1.158    *"Second Lien Reserve"* means a segregated account maintained by the Liquidation Trustee, on behalf of the Liquidation Trust, that shall be used to hold the Second Lien Liquidation Trust Recovery, which the Liquidation Trustee shall distribute and pay in accordance with the terms of the Plan and the Confirmation Order.

1.159    *"Secured Claim"* means a Claim (i) secured by a Lien on Collateral to the extent of the value of such Collateral as (a) set forth in the Plan, (b) agreed to by the Holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code to exceed the value of the Claim, or (ii) secured by the amount of any right of setoff of the Holder thereof in accordance with section 553 of the Bankruptcy Code.

1.160    *"Securities Act"* means the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder.

1.161    *"Securities Class Actions"* means those certain class actions pending in the United States District Court for the Middle District of Florida, Orlando Division, styled as (i) *Alms v. Luminar Technologies, Inc. et al.*, Case No. 6:23-cv-00982 and (ii) *Chok and Pan v. Russell and Fennimore*, Case No. 6:25-cv-01384.

1.162    *"Security"* means any Security, as such term is defined in section 101(49) of the Bankruptcy Code.

1.163    *"Senior Claims"* means any Administrative Expense Claim, Priority Tax Claim, or Other Priority Claim.

1.164    *"Senior Claims Reserve"* means the Cash reserve established pursuant to the Plan, to be held in a segregated account maintained by the Liquidation Trustee, on behalf of the Liquidation Trust, containing the amount of Cash estimated by the Debtors to be necessary to distribute and pay Holders of Allowed Senior Claims, plus the total Disputed amounts of such Claims as of the Effective Date, until final Allowance or Disallowance (excluding any amounts reserved in the Professional Fee Escrow Account).

1.165    *"SIR"* means self-insured retention or similar deductible.

1.166    *"Solicitation Materials"* means materials used in connection with the solicitation of votes on the Plan, including the Disclosure Statement, the Disclosure Statement Approval Order, and any procedures established by the Bankruptcy Court with respect to solicitation of votes on the Plan, which materials shall reflect the Global Settlement and shall otherwise be reasonably acceptable to the Debtors, the Required Senior Secured Holders, and the Creditors' Committee.

1.167    *"Statutory Fees"* means all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

1.168    *"Stock Purchase Agreement"* means that certain *Stock Purchase Agreement*, dated as of December 15, 2025, by and among Quantum Computing Inc., as buyer, Luminar Technologies, Inc., as seller of its shares of stock of Luminar Semiconductor, Inc., and Luminar Semiconductor, Inc. (as may be amended, supplemented, or otherwise modified from time to time).

1.169   **"Subordinated Claims"** means, collectively, Section 510(b) Claims and Section 510(c) Claims.

1.170   **"Surplus Professional Fees"** means a surplus in funding of the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been irrevocably paid in full, as may be released from the Professional Fee Escrow Account by the Liquidation Trustee as Excess Cash pursuant to section 2.5(b) of the Plan.

1.171   **"Surplus Senior Claims Reserve"** means a surplus in funding of the Senior Claims Reserve as may be released from the Senior Claims Reserve by the Liquidation Trustee as Excess Cash from time to time pursuant to section 5.4 of the Plan.

1.172   **"Surplus Wind Down Reserve"** means a surplus in funding of the Wind Down Reserve as may be released from the Wind Down Reserve by the Liquidation Trustee as Excess Cash from time to time pursuant to section 5.4 of the Plan.

1.173   **"Tax Code"** means the Internal Revenue Code of 1986, as amended from time to time.

1.174   **"TSA"** means that certain Transition Services Agreement dated as of February 2, 2026, between and among, Luminar Technologies, Inc., as service provider, and Luminar Semiconductor, Inc., as service recipient.

1.175   **"U.S. Trustee"** means the United States Trustee for Region 7.

1.176   **"Unblocked Parent Interests"** means those Interests in the Parent Debtor other than Blocked Parent Interests.

1.177   **"Unencumbered Assets"** means the Assets of the Debtors that were not subject to a valid and properly perfected Lien as of the Petition Date (including, but not limited to, the Florida Property, the Debtors' unencumbered vehicles, Commercial Tort Claims, the Debtors' Citibank investment account number ending in x04259 as of the Effective Date, and all assets and properties that constitute "Excluded Collateral" (as defined in the First Lien Notes Documents and the Second Lien Notes Documents)).

1.178   **"Unexpired Lease"** means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.179   **"Unimpaired"** means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.180   **"Unsecured Noteholder Claim Amount"** means the outstanding principal owed under the Unsecured Notes Indenture, plus accrued and unpaid interest (accruing at the applicable non-default rate as provided in the Unsecured Notes Indenture), fees, and other amounts arising thereunder or payable pursuant thereto through the Petition Date.

1.181   **"Unsecured Noteholders"** means, collectively, record holders of, or owners of beneficial interests in, the Unsecured Notes.

1.182   **"Unsecured Notes"** means the 1.25% convertible, senior notes due December 15, 2026, issued under the Unsecured Notes Indenture.

1.183    ***Unsecured Notes Claims"*** means all Claims arising under or related to the Unsecured Notes Indenture.

1.184    ***Unsecured Notes Documents"*** means the Unsecured Notes Indenture, together with all other related documents, instruments, and agreements, in each case as supplemented, amended, restated, or otherwise modified from time to time.

1.185    ***Unsecured Notes Indenture"*** means that certain *Indenture*, dated as of December 17, 2021, between Luminar Technologies, Inc., as issuer, and U.S. Bank Trust Company, National Association, as successor in interest to U.S. Bank National Association, as trustee, as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, pursuant to which the Unsecured Notes were issued.

1.186    ***Unsecured Notes Trustee"*** means U.S. Bank Trust Company, National Association, as successor in interest to U.S. Bank National Association, as trustee under the Unsecured Notes Indenture, and any successor in such capacity.

1.187    ***Voting Deadline"*** means the date and time as may be set by the Bankruptcy Court pursuant to the Solicitation Materials.

1.188    ***Waterfall"*** means (a) with respect to the distribution of Excess Cash, (i) first, to fund any deficits in the Senior Claims Reserve, as determined by the Liquidation Trustee, at the time such Excess Cash is being allocated pursuant to this Waterfall, (ii) second, to fund the First Lien Reserve, (iii) third, to fund the Second Lien Reserve, and (iv) fourth, as the GUC Residual Amount, if any, to be distributed pursuant to subsection (b) of the Waterfall as Post Effective Date Available Cash (GUC Reserve Assets), and (b) with respect to Post Effective Date Available Cash (GUC Reserve Assets), (i) first, to fund Creditors' Committee Fees in excess of the Creditors' Committee Fee Cap pursuant to section 2.2(c) and (ii) second, to fund the GUC Reserve.

1.189    ***Wind Down"*** means, following the Effective Date, the process to (i) sell, abandon, wind down, dissolve, liquidate, or distribute any remaining assets of the Debtors' Estates and the Liquidation Trust Assets, (ii) resolve, terminate, or wind down any remaining liabilities of the Debtors' Estates and the obligations and liabilities of the Liquidation Trust, and (iii) dissolve, liquidate, or terminate the legal existence of any non-Debtor subsidiary in which the Debtors held an Interest as of the Effective Date, in each case in accordance with the Plan, including the transfer of the Liquidation Trust Assets to the Liquidation Trust and the administration and operation of the Liquidation Trust.

1.190    ***Wind Down Amount"*** means the amount of Cash and cash equivalents, not to exceed $3,000,000.00, to be determined by the Debtors with the prior written consent (email being sufficient) of the Required Senior Secured Holders to fund the Wind Down Budget until the Wind Down Completion Date, such consent not to be unreasonably withheld.

1.191    ***Wind Down Budget"*** means a budget setting forth the estimate of costs and expenses necessary to effectuate the Wind Down through the Wind Down Completion Date, including Wind Down Expenses, which budget, after the Effective Date, may be amended, modified, or supplemented from time to time by the Liquidation Trustee with the prior written consent (email being sufficient) of the Required Senior Secured Holders, such consent not to be unreasonably withheld; *provided* that the aggregate Wind Down Budget shall not exceed the Wind Down Amount.

1.192    ***"Wind Down Completion Date"*** means the date upon which all Liquidation Trust Assets have been sold, abandoned, dissolved, liquidated, or otherwise disposed of, and all proceeds thereof or remaining assets of the Liquidation Trust have been distributed in accordance with the Plan.

1.193    ***"Wind Down Expenses"*** means costs and expenses reasonably necessary to effectuate the Wind Down, including but not limited to the fees of the Liquidation Trustee and any taxes incurred by the Liquidation Trust in furtherance of the Wind Down, as well as the costs and expenses associated with the claims reconciliation process with respect to the Senior Claims and Secured Claims and making the Plan Distributions; *provided* the Wind Down Expenses shall not include those costs and expenses associated with services rendered in connection with the reconciliation of General Unsecured Claims and the prosecution, settlement, administration, or liquidation of the GUC Reserve Assets, which costs and expenses shall be paid solely from the GUC Reserve Assets.

1.194    ***"Wind Down Reserve"*** means the Cash reserve established on the Effective Date pursuant to the Plan, consisting of the Wind Down Amount, to be held in a segregated account maintained by the Liquidation Trustee, on behalf of the Liquidation Trust, and used to administer the Wind Down pursuant to the Wind Down Budget in accordance with the terms of the Plan and the Confirmation Order.

(B)    **Interpretation; Application of Definitions and Rules of Construction**.

For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neutral gender; (ii) except as otherwise provided herein, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan and/or the Confirmation Order, as applicable; (iv) unless otherwise specified herein, all references herein to "Articles" are references to Articles of the Plan or hereto; (v) unless otherwise stated herein, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (vi) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (vii) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (viii) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan; (ix) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (x) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases; (xi) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (xii) except as otherwise provided herein, any reference to a document or agreement that is to be issued or entered into that is dependent on an election to be made pursuant to the Plan or an event occurring shall be deemed to be followed by the words "if applicable"; (xiii) any immaterial effectuating provisions may be interpreted by the Debtors, or after the Effective Date, the Liquidation Trustee, in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided*, that any effectuating provision that has an economic impact will not be considered "immaterial"; and (xiv) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter. To the extent that the treatment,

allowance, or disallowance of any Claim herein is interpreted as a claim objection, the Plan shall be deemed a Claim objection to such Claim.

(C)    **Reference to Monetary Figures**.

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

(D)    **Controlling Document**.

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or the Confirmation Order). In the event of an inconsistency between the Plan and any other instrument or document created or executed pursuant to the Plan, or between the Plan and the Disclosure Statement, the Plan shall control. The provisions of the Plan, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, that, if there is determined to be any inconsistency between any Plan provision, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan, as applicable.

(E)    **Computation of Time**.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day but shall be deemed to have been completed as of the required date.

**ARTICLE II.    ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY TAX CLAIMS.**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims (including Professional Fee Claims, Priority Tax Claims, and postpetition Intercompany Claims) have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in Article III.

2.1    *Administrative Expense Claims.*

(a)    Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims or Restructuring Fees and Expenses) shall receive from the Senior Claims Reserve, in full and final satisfaction, settlement, and release of such Claim, (i) Cash in an amount equal to the Allowed amount of such Administrative Expense Claim, on or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; *provided*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Liquidation Trustee, as applicable, in the ordinary course of business, consistent with past practice and

in accordance with the terms and subject to the conditions of any orders, course of dealing, or agreements governing, instruments evidencing, or other documents relating to such transactions.

(b)     Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court, or as provided by section 2.1 hereof, requests for payment of Administrative Expense Claims, other than requests for payment of Professional Fee Claims or Restructuring Fees and Expenses, must be Filed and served on the Debtors no later than the Administrative Expense Claims Bar Date pursuant to the procedures specified in the Confirmation Order.

(c)     **Holders of Administrative Expense Claims that are required to File and serve a request for payment of such Administrative Expense Claims and that do not File and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors or their property, and such Administrative Expense Claims shall be deemed compromised, settled, discharged, and released as of the Effective Date.**

### 2.2    *Professional Fee Claims.*

(a)     All Professionals seeking approval by the Bankruptcy Court of Professional Fee Claims shall (i) File, on or before (and no later than) the date that is forty-five (45) calendar days after the Effective Date (unless extended by the Debtors), their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Professional Fee Claims.

(b)     The Liquidation Trustee is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

(c)     Notwithstanding anything to the contrary herein, if the sum of the aggregate Allowed Professional Fee Claims and Restructuring Fees and Expenses of the Creditors' Committee and Trustee Advisors (the "**Creditors' Committee Fees**") exceed the Creditors' Committee Fee Cap, then such excess Creditors' Committee Fees shall be paid, in an amount not to exceed $200,000.00, from the first dollars to be distributed as Post Effective Date Available Cash (GUC Reserve Assets), prior to any other distributions therefrom. For the avoidance of doubt, such fees are not payable from the GUC Reserve Funding Amount.

### 2.3    *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Debtors or the Liquidation Trustee, as applicable (i) Cash in an amount equal to such Allowed Priority Tax Claim, on or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; *provided* that the Debtors and the Liquidation Trustee, as applicable, are authorized in their absolute discretion, but not directed, to prepay all or a portion of any such amounts at any time without penalty or premium. For the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such

Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

2.4     <strong><em>Restructuring Fees and Expenses.</em></strong>

The Restructuring Fees and Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid or satisfied during the course of the Chapter 11 Cases) without any requirement to File a fee application with the Bankruptcy Court or without any requirement for Bankruptcy Court review or approval. All Restructuring Fees and Expenses to be paid on the Effective Date shall be estimated before and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Fees and Expenses. On the Effective Date, or as soon as practicable thereafter, final invoices for all Restructuring Fees and Expenses incurred before and as of the Effective Date shall be submitted to the Debtors.

2.5     <strong><em>Professional Fee Escrow Account.</em></strong>

(a)     As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Claims Estimate, and no Liens, Claims, or interests shall encumber the Professional Fee Escrow Account in any way. On the date the Liquidation Trust is established or as soon as reasonably practicable thereafter, the Debtors will cause title to the Professional Fee Escrow Account to be transferred to the Liquidation Trust.

(b)     The Professional Fee Escrow Account and funds held in the escrow (i) shall not be and shall not be deemed property of the Debtors, the Debtors' Estates, or the Liquidation Trust and (ii) shall be held in trust for the Professionals; *provided* that funds remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been irrevocably paid in full shall be promptly released from such escrow and vested in the Liquidation Trust without any further action or order of the Bankruptcy Court as Surplus Professional Fees. Subject to section 2.5(b) hereof, Allowed Professional Fee Claims shall be paid in full, in Cash, to such Professionals from funds that are held in the Professional Fee Escrow Account for such Professionals when such Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' obligations with respect to Professional Fee Claims shall not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow Account, but subject to any order of the Bankruptcy Court capping the amount of any such fees.

(c)     If the amount of funds in the Professional Fee Escrow Account is insufficient to fund payment in full of all Allowed Professional Fee Claims and any other Allowed amounts owed to Professionals, such Professionals shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with section 2.1 of the Plan.

(d)     Any objections to Professional Fee Claims shall be served and Filed no later than twenty-one (21) calendar days after Filing of the final applications for compensation or reimbursement.

(e)     Notwithstanding anything to the contrary herein, the amounts funded into the Professional Fee Escrow Account on account of Professional Fee Claims of the Creditors' Committee and Trustee Advisors shall be limited to the Creditors' Committee Fee Cap.

23

2.6    *Professional Fee Claims Estimate.*

Each Professional shall estimate in good faith its unpaid Professional Fee Claim and other unpaid fees and expenses incurred in rendering services to the Debtors or the Creditors' Committee, as applicable, before and as of the Effective Date and shall deliver such reasonable, good faith estimate to the Debtors no later than five (5) Business Days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors shall estimate in good faith the unpaid and unbilled fees and expenses of such Professional.

## ARTICLE III.    CLASSIFICATION OF CLAIMS AND INTERESTS.

3.1    *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided* that a Claim or Interest is placed in a particular Class for the purpose of receiving Plan Distributions only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled before the Effective Date. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in section 3.4.

3.2    *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) presumed to accept or deemed to reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified. The classification of Claims and Interests set forth herein shall apply separately to each Debtor.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 3 | First Lien Noteholder Secured Claims | Impaired | Yes |
| 4 | Second Lien Noteholder Secured Claims | Impaired | Yes |
| 5 | General Unsecured Claims | Impaired | Yes |
| 6 | Intercompany Claims | Unimpaired / Impaired | No (Presumed to Accept / Deemed to Reject) |
| 7 | Intercompany Interests | Impaired | No (Deemed to Reject) |
| 8 | Subordinated Claims | Impaired | No (Deemed to Reject) |
| 9 | Parent Interests | Impaired | No (Deemed to Reject) |

3.3    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect, diminish, or impair the rights of the Debtors or the Liquidation Trustee, as applicable, in respect of any Unimpaired

Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims; and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately before the Petition Date, against or with respect to any Claim that is Unimpaired (including, for the avoidance of doubt, any Claim that is Reinstated) by the Plan. Except as otherwise specifically provided in the Plan, the Debtors and the Liquidation Trustee, as applicable, shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately before the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' and the Liquidation Trustee's, as applicable, legal and equitable rights with respect to any Reinstated Claim or Claim that is Unimpaired by this Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 3.4     *Elimination of Vacant Classes.*

Any Class of Claims against or Interests in a Debtor that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan of such Debtor for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether such Debtor's Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

### 3.5     *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

### 3.6     *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.*

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan to the extent, if any, confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including to implement a merger of two or more Debtor Entities, the assignment of Assets from one Debtor Entity to one or more Debtor Entities, and/or other transactions.

### 3.7     *No Waiver.*

Nothing contained in the Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Disputed Claim.

## ARTICLE IV.     TREATMENT OF CLAIMS AND INTERESTS.

### 4.1     *Other Priority Claims (Class 1).*

(a)     *Classification:*  Class 1 consists of Other Priority Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on or as soon as reasonably practicable after the later of the Effective Date and the date that is thirty (30) calendar days after the date such Other Priority Claim becomes an Allowed Claim, at the option of the Debtors or Liquidation Trustee (as applicable), either

(i) payment in full in Cash or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(c)      *Impairment and Voting*:  Class 1 is Unimpaired, and Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to such Allowed Other Priority Claims.

### 4.2      *Other Secured Claims (Class 2).*

(a)      *Classification:*  Class 2 consists of Other Secured Claims.

(b)      *Treatment:*  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of such Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors or the Liquidation Trustee, as applicable, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter:

(i)      payment in full in Cash in an amount equal to the Allowed amount of such Other Secured Claim;

(ii)      such other treatment sufficient to render such Holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code; or

(iii)      such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

(c)      *Impairment and Voting*:  Class 2 is Unimpaired, and the Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to such Allowed Other Secured Claims.

### 4.3      *First Lien Noteholder Secured Claims (Class 3).*

(a)      *Classification:*  Class 3 consists of First Lien Noteholder Secured Claims.

(b)      *Allowance:*  On the Effective Date, each First Lien Noteholder Secured Claim is Allowed pursuant to section 506(a) of the Bankruptcy Code in the amount of such Holder's First Lien Noteholder Secured Claim Amount.

(c)      *Treatment:*  Except to the extent that a Holder of a First Lien Noteholder Secured Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, such Holder's Pro Rata Share of the First Lien Liquidation Trust Interests.

(d)      *Impairment and Voting*:  Class 3 is Impaired, and the Holders of First Lien Noteholder Secured Claims in Class 3 are entitled to vote to accept or reject the Plan.

4.4    ***Second Lien Noteholder Secured Claims (Class 4).***

(a)    *Classification:*  Class 4 consists of Second Lien Noteholder Secured Claims.

(b)    *Allowance:*  On the Effective Date, each Second Lien Noteholder Secured Claim is Allowed pursuant to section 506(a) of the Bankruptcy Code in the amount of such Holder's Second Lien Noteholder Secured Claim Amount.

(c)    *Treatment:*  Except to the extent that a Holder of a Second Lien Noteholder Secured Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, such Holder's Pro Rata Share of the Second Lien Liquidation Trust Interests.

(d)    *Impairment and Voting*:  Class 4 is Impaired, and the Holders of Second Lien Noteholder Secured Claims in Class 4 are entitled to vote to accept or reject the Plan.

4.5    ***General Unsecured Claims (Class 5).***

(a)    *Allowance:*  On the Effective Date, (i) solely with respect to Holders of First Lien Noteholder Claims and Second Lien Noteholder Claims, each First Lien Noteholder Deficiency Claim and Second Lien Noteholder Deficiency Claim shall be Allowed, respectively, in an amount equal to such First Lien Noteholder's and Second Lien Noteholder's Pro Rata Share of the aggregate First Lien Noteholder Deficiency Claim Amount and Second Lien Noteholder Deficiency Claim Amount and (ii) solely with respect to Holders of Unsecured Notes Claims, each Unsecured Notes Claim shall be Allowed in an amount equal to such Unsecured Noteholder's Pro Rata Share of the aggregate Unsecured Noteholder Claim Amount.

(b)    *Classification:*  Class 5 consists of General Unsecured Claims.

(c)    *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, such Holder's Pro Rata Share of the GUC Liquidation Trust Interests.

(d)    *Impairment and Voting*:  Class 5 is Impaired, and the Holders of Allowed General Unsecured Claims in Class 5 are entitled to vote to accept or reject the Plan.

4.6    ***Intercompany Claims (Class 6).***

(a)    *Classification:*  Class 6 consists of Intercompany Claims.

(b)    *Treatment*:  On or before the Effective Date or as soon as reasonably practicable thereafter, all Intercompany Claims shall be adjusted, Reinstated, or discharged (each without any distribution) to the extent reasonably determined to be appropriate by the Debtors or Liquidation Trustee (as applicable).

(c)    *Impairment and Voting*:  Holders of Class 6 Claims are either (i) Unimpaired and such Holders are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or (ii) Impaired and such Holders are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims are not

entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Claims.

### 4.7    *Intercompany Interests (Class 7).*

(a)    *Classification:*  Class 7 consists of Intercompany Interests.

(b)    *Treatment*:  On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any member, board of directors, board of managers, managers, management, or Security Holders of any Debtor, all Intercompany Interests shall be cancelled, released, and extinguished, by distribution, contribution or otherwise, as determined by the Debtors or the Liquidation Trustee (as applicable); *provided* that no Plan Distributions shall be made to Holders of an Intercompany Interest on account of such Intercompany Interest under the Plan.

(c)    *Impairment and Voting*:  Holders of Class 7 Intercompany Interests are Impaired and such Holders are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Interests.

### 4.8    *Subordinated Claims (Class 8).*

(a)    *Classification:*  Class 8 consists of Subordinated Claims.

(b)    *Treatment*:  All Subordinated Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Subordinated Claims will not receive any distribution on account of such Claims.

(c)    *Impairment and Voting*:  Class 8 is Impaired and Holders of Subordinated Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Subordinated Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Subordinated Claims.

### 4.9    *Parent Interests (Class 9).*

(a)    *Classification:*  Class 9 consists of Parent Interests.

(b)    *Treatment*:  Without the need for any further corporate or limited liability company action or approval of any board of directors, management, or Security Holders of any Debtor, as applicable, all Parent Interests shall be cancelled (i) on the Effective Date, with respect to all Unblocked Parent Interests and (ii) after OFAC issues the OFAC License, with respect to all Blocked Parent Interests, and the Holders of Parent Interests will not receive or retain any property on account of such Parent Interests under the Plan.

(c)    *Impairment and Voting*:  Class 9 is Impaired and Holders of Parent Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Parent Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Parent Interests.

**ARTICLE V.      MEANS FOR IMPLEMENTATION.**

5.1    *Plan Settlement.*

(a)      The Plan is being proposed as a joint plan of liquidation of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor.

(b)      As a proposed compromise and settlement of inter-Estate and inter-creditor issues, including those relating to whether the liabilities and assets of the Debtors should be substantively consolidated for distribution purposes under the Plan (the "**Plan Settlement**"), the following treatment shall apply if the Plan Settlement is accepted and approved:

(i)      all Assets of the Debtors shall be consolidated and treated as Liquidation Trust Assets irrespective of which Debtor owns such Assets;

(ii)      each General Unsecured Claim against any Debtor shall be deemed a single General Unsecured Claim against, and a single obligation of, the Debtors;

(iii)      any General Unsecured Claims on account of a guarantee provided by a Debtor of the obligations of another Debtor shall be treated as eliminated so that any Claim against any Debtor and any Claim based upon a guarantee thereof by any other Debtor shall be treated as one Claim against a single consolidated Estate; and

(iv)      any joint or joint and several liability of any of the Debtors relating to a General Unsecured Claim shall be one obligation of the Debtors, and any Claims based upon such joint or joint and several liability shall be treated as one Claim against a single consolidated Estate.

(c)      The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order approving the Plan Settlement, including the Bankruptcy Court's findings that the Plan Settlement is (i) in exchange for good and valuable consideration provided by each of the Estates (including, without limitation, performance of the terms of the Plan), and a good faith settlement and compromise of the released claims, (ii) in the best interests of the Debtors, the Estates, and all holders of Claims, (iii) fair, equitable, and reasonable, and (iv) effected after due notice and opportunity for hearing. As a result of the Plan Settlement, each Class 5 General Unsecured Claim shall be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors. The Plan shall not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to distribution rights under the Plan.  The Plan Settlement shall not (other than for purposes related to funding Plan Distributions under the Plan) affect (u) the legal and organizational structure of the Debtors, (v) Executory Contracts or Unexpired Leases that were entered into during the Chapter 11 Cases or that have been or will be assumed or rejected, (w) any agreements entered into by the Liquidation Trust on or after the Effective Date, (x) the Liquidation Trustee's ability to subordinate or otherwise challenge Claims on an entity-by-entity basis, (y) any Causes of Action or Avoidance Actions or defenses thereto, which in each case shall survive entry of the Confirmation Order as if there had been no Plan Settlement, and (z) distributions to the Debtors or the Liquidation Trust from any insurance policies or the proceeds thereof.

(d)      Notwithstanding the foregoing in this section 5.1, the Debtors reserve the right to examine the Claims asserted against the various Debtors and to withdraw the Plan with respect to any particular Debtor. In the event that the Debtors elect to withdraw the Plan with respect to any Debtor prior to the Confirmation Date, the Debtors may proceed to seek confirmation of this Plan as to the remaining Debtors in accordance with section 5.1(b) above.

5.2     ***Global Settlement.***

The Plan incorporates and implements the Global Settlement, a compromise and settlement of numerous issues and disputes between and among (a) the Debtors, (b) the Creditors' Committee, and (c) Holders of First Lien Noteholder Claims and Holders of Second Lien Noteholder Claims, among others. The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order approving the Global Settlement, including the Bankruptcy Court's findings that the Global Settlement is (i) in exchange for good and valuable consideration provided by each of the Estates (including, without limitation, performance of the terms of the Plan), and a good faith settlement and compromise, (ii) in the best interests of the Debtors, the Estates, and all holders of Claims, (iii) fair, equitable, and reasonable, and (iv) effected after due notice and opportunity for hearing.  Entry of the Confirmation Order shall constitute an order authorizing and approving the Global Settlement in accordance with Bankruptcy Rule 9019.

5.3     ***Sources of Consideration for Plan Distribution.***

The Debtors and Liquidation Trustee, as applicable, shall fund Plan Distributions under the Plan as set forth herein with the (i) Effective Date Available Cash, (ii) Post Effective Date Available Cash (Non-GUC Reserve Assets), (iii) Post Effective Date Available Cash (GUC Reserve Assets), (iv) Excess Cash, (v) Senior Claims Reserve, (vi) First Lien Reserve, (vii) Second Lien Reserve, (viii) GUC Reserve, (ix) Surplus Wind Down Reserve, and (x) Surplus Senior Claims Reserve.

5.4     ***Liquidation Trustee.***

(a)     *Appointment.*  On the Effective Date, the Liquidation Trustee shall be appointed for each of the Debtors and the Liquidation Trust. The selection of the Liquidation Trustee shall be (i) mutually agreed upon by the Ad Hoc Noteholder Group and the Creditors' Committee and (ii) reasonably acceptable to the Debtors.

(b)     *Allocation of Time and Fees*.  The Liquidation Trustee shall allocate its time to the different workstreams undertaken by the Liquidation Trustee (i.e., Wind Down, Senior Claims, GUC Reserve, etc.) and the Liquidation Trustee's monthly fees and expenses shall be allocated accordingly.

(c)     *Authority.*  Subject to Article X and Article XI of the Plan, the Liquidation Trustee shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise expressly indicated), and subject to any consent or consultation rights of the Liquidation Trust Oversight Board, as set forth in the Liquidation Trust Agreement, to carry out and implement all provisions of the Plan, including, to:

(i)     except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise, or settle any and all Claims;

(ii)     make distributions to Holders of Allowed Claims in accordance with the Plan;

(iii)     withhold from the amount distributable to any Entity the maximum amount needed to pay any tax or other charge that the Liquidation Trustee has determined may be required to be withheld from such distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

(iv)      exercise its business judgment to direct and control the Wind Down, liquidation, monetization, sale, and/or abandonment of the Liquidation Trust Assets (including the GUC Reserve Assets) under the Plan and in accordance with applicable law as necessary to maximize distributions to Holders of Allowed Claims;

(v)      prosecute any Retained Causes of Action for the benefit of Holders of General Unsecured Claims, elect not to pursue any Retained Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Retained Causes of Action, as the Liquidation Trustee may determine is in the best interests of the Debtors or Estates (as applicable);

(vi)      make payments to existing Professionals that continue to perform after the Effective Date;

(vii)      protect and enforce the rights to the Liquidation Trust Assets (including any Retained Causes of Action) vested in the Liquidation Trust and the Liquidation Trustee by any method deemed appropriate, including by judicial proceedings or otherwise;

(viii)      open and maintain bank accounts on behalf of or in the name of the Liquidation Trust;

(ix)      purchase and carry all insurance policies that the Liquidation Trustee deems reasonably necessary or advisable to pay all associated insurance premiums and costs;

(x)      maintain the books and records and accounts of the Debtors or Liquidation Trust and obtain any necessary insurance;

(xi)      invest Cash of the Debtors or Liquidation Trust, as available, and any income earned thereon;

(xii)      prepare, file, and prosecute any necessary filings or pleadings with the Bankruptcy Court to carry out the duties of the Liquidation Trustee as described herein;

(xiii)      investigate any Liquidation Trust Assets, and any other potential Causes of Action;

(xiv)      marshal, market for sale, and wind down any of the remaining Liquidation Trust Assets;

(xv)      acquire litigation and other claims related to the Debtors, and prosecuting such claims;

(xvi)      develop and use creditor communication procedures, including a creditor portal (if necessary);

(xvii)      review and compel turnover of the property of the Debtors or the Liquidation Trust;

(xviii)      pursuant to any investigation related to a Retained Cause of Action, seek the examination of any person pursuant to Federal Rule of Bankruptcy Procedure 2004;

31

(xix)    incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of Professionals retained by the Liquidation Trustee;

(xx)    serve on the board of directors of any Affiliate of the Liquidation Trust; *provided*, that such Affiliate's objective is consistent with that of the Liquidation Trust;

(xxi)    administer each Debtor's tax obligations, including as provided in section 5.4(g);

(xxii)    prepare and file any and all informational returns, reports, statements, returns, or disclosures relating to the Debtors or Liquidation Trust that are required hereunder, by any Governmental Unit or applicable law;

(xxiii)    amend, modify, or supplement the Wind Down Budget, with the prior written consent (email being sufficient) of the Required Senior Secured Holders, such consent not to be unreasonably withheld;

(xxiv)    determine, from time to time, whether the amounts available in the Wind Down Reserve are in excess of the amount necessary to satisfy the purpose for which such reserve was established and amend, modify, or supplement the Wind Down Budget accordingly. If the Liquidation Trustee determines that a surplus exists in the Wind Down Reserve as of the date of such determination, the Liquidation Trustee may allocate such Surplus Wind Down Reserve pursuant to the Waterfall;

(xxv)    determine, from time to time, whether the amounts available in the Senior Claims Reserve are in excess of the amount necessary to pay Holders of Allowed Senior Claims, plus any such Disputed Claims until final Allowance or Disallowance. If the Liquidation Trustee determines that a surplus exists in the Senior Claims Reserve as of the date of such determination, the Liquidation Trustee may allocate the Surplus Senior Claims Reserve pursuant to the Waterfall;

(xxvi)    enter into any agreement or execute any document or instrument required by or consistent with the Plan or the Confirmation Order and to perform all obligations thereunder;

(xxvii)   close the Chapter 11 Cases;

(xxviii)  pay Statutory Fees on behalf of the Debtors or Liquidation Trust in accordance with section 13.1 of the Plan; and

(xxix)    perform other duties and functions that are consistent with the implementation of the Plan.

The Liquidation Trustee shall allocate its monthly fee proportionately to reflect the nature of, and time devoted to, the tasks undertaken during the applicable month, and shall be entitled to reasonable compensation and reimbursement of reasonable costs, expenses, and fees for such services in accordance with sections 5.5(h) and 5.5(i).

For the avoidance of doubt, and notwithstanding anything in the foregoing, the Liquidation Trustee's pursuit in respect of any Claim or Retained Cause of Action shall be subject in all respects to

Article XI of the Plan, and no Releasing Party may pursue any Claim or Retained Cause of Action against any Released Party. Notwithstanding anything contained herein to the contrary, the authority of the Liquidation Trustee shall be exercised in a manner consistent with the purpose of the Liquidation Trust, as set forth in section 5.5(e), and the intended qualification of the Liquidation Trust as a "liquidating trust" for U.S. federal income tax purposes as contemplated by section 5.5(v).

(d)     *Separate Accounts*.   In addition to the Professional Fee Escrow Account, the Liquidation Trustee shall establish and maintain separate segregated accounts for each of the Senior Claims Reserve, Wind Down Reserve, First Lien Reserve, Second Lien Reserve, and GUC Reserve. Except as otherwise provided for in the Plan, at all times, such accounts shall be separate accounts and no Cash and/or Liquidation Trust Assets, as applicable, from any such account shall be (i) commingled with funds from any other account, or (ii) transferred to or otherwise used to fund or satisfy any shortfall or deficit in any other account.  For the avoidance of doubt, notwithstanding anything to the contrary contained herein, in no event shall any assets, funds or proceeds held in the GUC Reserve be transferred into any other reserve or account established or maintained by the Liquidation Trustee or the Debtors.

(e)     *Indemnification*.   The Liquidation Trust shall indemnify and hold harmless the Liquidation Trustee and the Liquidation Trust Oversight Board, each in its capacity as such, for any losses incurred in such capacity, as and to the extent set forth in the Liquidation Trust Agreement.

(f)     *Replacement of the Liquidation Trustee.*  The Liquidation Trust Oversight Board may remove and replace the Liquidation Trustee (i) upon the death, incapacitation or resignation of the Liquidation Trustee, (ii) upon its determination that the Liquidation Trustee engaged in actual fraud, gross negligence or willful misconduct, (iii) for cause, or (iv) upon entry of an order of the Bankruptcy Court requiring such removal and replacement, in each case as shall be further detailed in the Liquidation Trust Agreement.

(g)     *Tax Power for Debtors.*  The Liquidation Trustee, in its capacity as the trustee of the Liquidation Trust, shall have full and exclusive authority and responsibility with respect to all taxes of the Debtors (including, without limitation, as the common parent or other agent of any consolidated, combined, or unitary tax group of which the Debtors were the agent), to the same extent as if the Liquidation Trustee were the Debtor in Possession. Without limiting the foregoing, each of the Debtors shall execute, on or before the Effective Date, a power of attorney authorizing the Liquidation Trustee, in its capacity as the trustee of the Liquidation Trust, to correspond with any taxing authority on behalf of such Debtor and to sign, collect, negotiate, settle, and administer tax payments and tax returns. In furtherance of the foregoing:

(i)     Following the Effective Date, the Liquidation Trustee shall (a) prepare and file (or cause to be prepared and filed), on behalf of the Debtors, all tax returns, informational returns, reports, statements, returns or disclosures relating to the Debtor that are required to be filed, by any Governmental Unit or applicable law or that the Liquidation Trustee otherwise deems appropriate, including the filing of amended tax returns or requests for refunds for all taxable periods; (b) request, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its Estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Petition Date through the liquidation of such Debtor as determined under applicable tax laws; and (c) represent the interest and account of each Debtor or its Estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit.

(ii)     The Liquidation Trust shall be entitled to all tax refunds of the Debtors, and the Liquidation Trust shall bear responsibility for all tax liabilities of the Debtors for

all taxable years, to the extent not satisfied or otherwise released by the Plan. For the avoidance of doubt, the Liquidation Trustee shall not be personally liable for any tax liabilities of the Debtors.

(h)     *Boards of Directors and Officers*.  Upon the Effective Date, (i) the officers and directors of the Debtors and non-Debtor subsidiaries in which the Debtors held an Interest as of the Effective Date shall be relieved of any and all duties with respect to such Debtors and non-Debtor subsidiaries, respectively, and shall be deemed to have resigned without the requirement of having to take any further action and (ii) the Liquidation Trustee shall be the sole officer, director, or manager, as applicable, of each of the Debtors and non-Debtor subsidiaries in which the Debtors held an Interest before the Effective Date without the requirement of having to take any further action.

(i)     *Dissolution*.  After the Effective Date, the Liquidation Trustee shall, subject to applicable non-bankruptcy law and consistent with the implementation of the Plan, merge, dissolve, liquidate, or take such other similar action with respect to each Debtor (including the cancellation of all Interests in each Estate and the dissolution and liquidation of each non-Debtor Affiliate, each in accordance with the terms of the Plan) and complete the winding up of such Estate as expeditiously as practicable without the necessity for any other or further actions to be taken by or on behalf of such Estate or its shareholders or members, as applicable, or any payments to be made in connection therewith subject to the filing of a certificate of cancellation or a certificate of dissolution, as applicable, with the appropriate Governmental Unit. The Liquidation Trustee may, to the extent required by applicable non-bankruptcy law, maintain a Debtor as a corporate entity in good standing until such time as such Debtor is dissolved or merged out of existence in accordance with the Plan. After (i) all Disputed Claims have been resolved, (ii) all Liquidation Trust Assets have been liquidated, (iii) all distributions from the Liquidation Trust required to be made by the Liquidation Trustee under the Plan and the Liquidation Trust Agreement have been made, and (iv) solely with respect to Debtor Luminar Technologies, Inc., the OFAC License and any and all other OFAC approvals and/or authorizations required by OFAC in connection with the Blocked Parent Interests have been obtained, the Liquidation Trustee shall expeditiously dissolve each Debtor.

(j)     *Consent Rights*.  The Liquidation Trustee shall obtain the prior written consent (email being sufficient), such consent not to be unreasonably withheld, of (x) the Required Senior Secured Holders, only to the extent that Holders of First Lien Noteholder Secured Claims and Second Lien Noteholder Secured Claims have not received payment in full in Cash on account of such Claims, for (i) any amendment, modification, supplement to, or deployment of funds in excess of, the Wind Down Budget or the Wind Down Reserve and (ii) any amendment, modification, or supplement to the Liquidation Trust Agreement, and (y) before the Effective Date, the Creditors' Committee, and after the Effective Date, the Liquidation Trust Oversight Board, for any amendment, modification, or supplement to the Liquidation Trust Agreement. The consent rights set forth in this section 5.4(j) are cumulative to those set forth in the Liquidation Trust Agreement. The consent rights provided under this section 5.4(j) shall be exercised in a manner consistent with the purpose of the Liquidation Trust, as set forth in section 5.5(e), and the intended qualification of the Liquidation Trust as a "liquidating trust" for U.S. federal income tax purposes as contemplated by section 5.5(v).

### 5.5     *Liquidation Trust.*

(a)     *Establishment of Liquidation Trust.*  On or before the Effective Date, the Debtors and the Liquidation Trustee shall take all necessary steps to establish the Liquidation Trust for the benefit of Holders of Claims against the Debtors, including executing the Liquidation Trust Agreement and the Liquidation Trust Transfer Agreement, each of which shall reflect the Global Settlement and which shall otherwise be reasonably acceptable to the Required Senior Secured Holders and the Creditors' Committee.

With respect to actions taken in this section 5.5, the Liquidation Trustee is acting solely in its capacity as trustee of the Liquidation Trust.

(b)     *Liquidation Trust Agreement.*   For the avoidance of doubt, the establishment, obligations, and governance of the Liquidation Trust, the rights, obligations, and duties of the Liquidation Trustee, and the rights of creditors, including consent rights, shall be set forth fully in the Liquidation Trust Agreement, the terms of which shall reflect the Global Settlement and which shall otherwise be reasonably acceptable to the Debtors, the Required Senior Secured Holders, and the Creditors' Committee.

(c)     *Consent Rights.*   In the event of a conflict between the consent rights set forth in section 5.4(j) of the Plan on the one hand, and the Liquidation Trust Agreement or any other document on the other, the document containing the broadest consent rights shall control. For the further avoidance of doubt, and notwithstanding anything to the contrary herein, any consent rights set forth in the Liquidation Trust Agreement shall not limit, dilute, or otherwise impair those set forth in section 5.4(j) of the Plan.

(d)     *Issuance of Parent Debtor Additional Stock to Liquidation Trust*.   On the Effective Date and substantially contemporaneously with (i) the cancellation of the Unblocked Parent Interests pursuant to section 4.9(b), and (ii) the transfer of the Liquidation Trust Assets to the Liquidation Trust pursuant to section 5.5(f) of the Plan, the Debtors and/or the Liquidation Trustee shall cause Parent Debtor to issue the Parent Debtor Additional Stock to the Liquidation Trust. Upon issuance of the Parent Debtor Additional Stock to the Liquidation Trust, the Liquidation Trust shall be the majority shareholder of Parent Debtor. For the avoidance of doubt, until all Blocked Parent Interests are cancelled in accordance with the terms of section 4.9(b), all Holders of Blocked Parent Interests shall, pursuant to section 11.4 and section 11.5 of the Plan, be enjoined from exercising any rights with respect thereto.

(e)     *Purpose of Liquidation Trust*.   The sole purpose of the Liquidation Trust is to implement the Plan on behalf, and for the benefit, of the beneficiaries of the Liquidation Trust, and to serve as a mechanism for liquidating, converting to Cash and distributing the Liquidation Trust Assets in accordance with Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust.

(f)     *Transfer of Liquidation Trust Assets to the Liquidation Trust*.   On the Effective Date, all Liquidation Trust Assets shall transfer to, and vest exclusively in, the Liquidation Trust in accordance with the terms set forth herein and the Liquidation Trust Transfer Agreement; *provided*, *however*, that to the extent certain Liquidation Trust Assets cannot be transferred to, vested in, and assumed by the Liquidation Trust on such date or otherwise are not available to be so transferred until after such date, such assets shall be automatically, and without further act or deed, transferred to, vested in, or assumed by the Liquidation Trust as soon as reasonably practicable after such date. Notwithstanding anything in the Plan to the contrary, no Liquidation Trust Assets shall be used for any purpose other than as contemplated by, and in accordance with the Plan and the Liquidation Trust Agreement. Such transfer of the Liquidation Trust Assets shall be free and clear of all Claims, Interests, Liens, other encumbrances, and liabilities of any kind.

(g)     *Funding of the Wind Down Reserve, Senior Claims Reserve, First Lien Reserve, Second Lien Reserve, and GUC Reserve*.   On the Effective Date or as soon as practicable thereafter, the Debtors shall establish and fund the Wind Down Reserve with the Wind Down Amount and transfer the Wind Down Reserve to the Liquidation Trust to satisfy the Wind Down Budget. On the Effective Date or as soon as practicable thereafter, the Debtors shall establish and fund each of the Senior Claims Reserve, First Lien Reserve, Second Lien Reserve, and the GUC Reserve.

(h)    *Wind Down Expenses*.  The Liquidation Trustee and any other Professionals engaged by the Liquidation Trust shall be entitled to reasonable compensation and reimbursement of reasonable costs, expenses, and fees, as provided in the Liquidation Trust Agreement, for (i) services rendered in connection with the Wind Down, (ii) the reconciliation of Senior Claims and Secured Claims, (iii) the administration, monetization, and/or liquidation of remaining Liquidation Trust Assets other than GUC Reserve Assets, and (iv) making Plan Distributions to Holders of Senior Claims, Other Secured Claims, First Lien Noteholder Claims, and Second Lien Noteholder Claims pursuant to Article VII of the Plan. Such compensation and reimbursement shall be paid solely from the Wind Down Reserve in the ordinary course of business, in accordance with the terms of the Plan, the Liquidation Trust Agreement, and subject to the Wind Down Budget.

(i)    *GUC Reserve Expenses.*  The Liquidation Trustee and any other Professionals engaged by the Liquidation Trust shall be entitled to reasonable compensation and reimbursement of reasonable costs, expenses, and fees, as provided in the Liquidation Trust Agreement, for services rendered in connection with (i) the reconciliation of General Unsecured Claims, (ii) the prosecution, settlement, administration, monetization and/or liquidation of the GUC Reserve Assets, and (iii) making Plan Distributions to Holders of General Unsecured Claims pursuant to Article VII of the Plan. Such compensation and reimbursement shall be paid solely from the GUC Reserve Funding Amount in the ordinary course of business, in accordance with the terms of the Plan and the Liquidation Trust Agreement.

(j)    *Interim Distributions to Holders of GUC Liquidation Trust Interests.*  At any time prior to the completion of the reconciliation of all General Unsecured Claims and the pursuit, abandonment, liquidation and/or monetization of all GUC Reserve Assets, the Liquidation Trustee may, in its reasonable discretion and subject to section 2.2(c) hereof and the approval of the Liquidation Trust Oversight Board, make one or more interim distributions of the GUC Reserve Assets and any proceeds thereof to Holders of Allowed General Unsecured Claims in accordance with their Pro Rata Share of Liquidation Trust Interests; *provided* that the Liquidation Trustee shall reserve such amounts as it determines are reasonably necessary to satisfy Disputed General Unsecured Claims and the costs and expenses, including taxes, associated with the GUC Reserve.

(k)    *Administrative Obligations and Assumption of Liabilities*.  In furtherance of the purposes of the Liquidation Trust, and subject to the Liquidation Trust Agreement and the terms of the Plan, the Liquidation Trust shall expressly (i) assume all liability for (a) all Claims against the Debtors and (b) operating expenses of the Liquidation Trust and (ii) undertake to administer and pay the foregoing with Effective Date Available Cash, Post Effective Date Available Cash (Non-GUC Reserve Assets), Post Effective Date Available Cash (GUC Reserve Assets), funds in the Professional Fee Escrow Account, Excess Cash, the Wind Down Reserve, the Senior Claims Reserve, and the GUC Reserve, each in accordance with the Plan. The Liquidation Trust shall have all defenses, cross-claims, offsets, and recoupments regarding Claims that the Debtors have, or would have had, under applicable law; *provided*, *however*, that no such claims, defenses, or rights may be asserted against the Debtors.

(l)    *Liquidation Trust Oversight Board*.  The Liquidation Trust Oversight Board shall have the rights and powers relating to the supervision of the Liquidation Trustee with respect to (i) the General Unsecured Claims reconciliation process, (ii) the pursuit, abandonment, monetization, prosecution, adjudication, settlement, resolution or liquidation of GUC Reserve Assets (including, subject to section 9.4 hereof, the enforcement of the terms and coverage under the D&O Policies in respect of any Retained Causes of Action), and (iii) distributions to Holders of General Unsecured Claims pursuant to the Plan, as set forth in the Liquidation Trust Agreement. The authority of the Liquidation Trust Oversight Board shall be exercised in a manner consistent with the purpose of the Liquidation Trust, as set forth in section 5.5(e), and the intended qualification of the Liquidation Trust as a "liquidating trust" for U.S. federal income tax purposes as contemplated by section 5.5(v).

(m)     *Composition of the Liquidation Trust Oversight Board.*  The Liquidation Trust Oversight Board shall be comprised of three (3) members, each of which shall be selected by the Creditors' Committee. The composition of the Liquidation Trust Oversight Board shall be set forth in the Plan Supplement. Members of the Liquidation Trust Oversight Board shall serve without compensation; *provided, however*, that such members shall be entitled to reimbursement of reasonable costs and expenses, which shall be paid solely from the GUC Reserve Funding Amount in the ordinary course of business.

(n)     *Governance of the Liquidation Trust Oversight Board.*  Except as otherwise provided herein or in the Liquidation Trust Agreement, decisions of the Liquidation Trust Oversight Board shall be made by majority vote. Notwithstanding the foregoing, any decision of the Liquidation Trust Oversight Board that would materially alter the treatment of the First Lien Noteholder Deficiency Claims or Second Lien Noteholder Deficiency Claims shall require the prior written consent (email being sufficient) of the Required Senior Secured Holders (or a designated representative thereof).

(o)     *Counsel to the Liquidation Trust.*  The Liquidation Trust Oversight Board, in its reasonable judgment and without Bankruptcy Court approval, shall have the right to select one law firm to serve as counsel to the Liquidation Trust, which firm shall be reasonably acceptable to the Liquidation Trustee, subject to the provisions of the Liquidation Trust Agreement. The Liquidation Trustee is otherwise authorized to retain non-legal advisors as necessary to exercise its duties set forth in the Plan, subject to the Wind Down Budget.

(p)     *Periodic Reporting.*  The Liquidation Trustee shall provide periodic reporting to the Liquidation Trust Oversight Board regarding the status of (i) the General Unsecured Claims reconciliation process and (ii) the pursuit, abandonment, or liquidation of GUC Reserve Assets, in each case as set forth in the Liquidation Trust Agreement.

(q)     *Institution and Maintenance of Legal and Other Proceedings.* As of the Effective Date, the Liquidation Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any of the Liquidation Trust Assets or liability of the Liquidation Trust. The Liquidation Trust shall be empowered to initiate, prosecute, defend, and resolve all such actions in the name of the Debtors if deemed necessary or appropriate by the Liquidation Trustee. The Liquidation Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred subsequent to the Effective Date arising from, or associated with, any legal action or other proceeding brought pursuant to this section of the Plan.  For the avoidance of doubt, the Liquidation Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, is appointed as the successor-in-interest to, and representative of, the Debtors and their Estates for the retention, enforcement, settlement, or adjustment of all Claims.

(r)     *Dissolution*. The Liquidation Trust shall be dissolved and the Liquidation Trustee and Liquidation Trust Oversight Board shall be discharged from their duties with respect to the Liquidation Trust upon completion of their duties as set forth in the Plan and the Liquidation Trust Agreement which, for the avoidance of doubt, shall be no earlier than the date on which (i) all Disputed Claims have been resolved, (ii) all Liquidation Trust Assets have been liquidated, (iii) all distributions from the Liquidation Trust required to be made by the Liquidation Trustee under the Plan and the Liquidation Trust Agreement have been made, and (iv) solely with respect to Debtor Luminar Technologies, Inc., the OFAC License and any and all other OFAC approvals and/or authorizations required by OFAC in connection with the Blocked Parent Interests have been obtained, unless dissolution on an earlier date is authorized pursuant to a Final Order of the Bankruptcy Court. Notwithstanding the foregoing, in no event shall the Liquidation Trust be dissolved later than five (5) years from the date the Liquidation Trust is established unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth (5th) anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six (6) months

37

before the end of the preceding extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidation Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Liquidation Trust Assets.

(s) *Expedited Determination of Taxes*. The Liquidation Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Liquidation Trust through the date upon which the Liquidation Trust is terminated, and for all tax returns filed by or on behalf of the Debtors for all taxable periods of the Debtors.

(t) *Exculpation of Liquidation Trust Oversight Board*. The Liquidation Trust Agreement shall provide that the Liquidation Trust Oversight Board shall be exculpated (subject to exceptions for willful misconduct, bad faith, gross negligence, or fraud) to the fullest extent allowable by applicable law with respect to the liquidating of the Liquidation Trust Assets and administration of the Liquidation Trust.

(u) *Non-Transferability of Distribution Rights*. Any beneficial interest in the Liquidation Trust (including, for the avoidance of doubt, the Liquidation Trust Interests) or any right to receive a distribution from the Liquidation Trust shall not be evidenced by any certificate, security, receipt, or in any other form or manner whatsoever, except as maintained on the books and records of the Liquidation Trust by the Liquidation Trustee. Further, any beneficial interest in the Liquidation Trust (including, for the avoidance of doubt, the Liquidation Trust Interests) or any right to receive a distribution from the Liquidation Trust shall be nontransferable and non-assignable except by will, intestate, succession, or operation of law. Any beneficial interest in the Liquidation Trust (including, for the avoidance of doubt, the Liquidation Trust Interests) or any right to receive a distribution from the Liquidation Trust shall not constitute Securities and shall not be registered pursuant to the Securities Act of 1933, as amended. However, if it is determined that such beneficial interests (including, for the avoidance of doubt, the Liquidation Trust Interests) or rights constitute Securities, the exemption provisions of section 1145(a)(1) of the Bankruptcy Code will be satisfied and the issuance under the Plan of the Liquidation Trust Interests will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

(v) *U.S. Federal Income Tax Treatment of the Liquidation Trust.* In furtherance of this section of the Plan, and subject to the next paragraph of this section, (i) the Liquidation Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684 and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the Holders of beneficial interests in the Liquidation Trust, consistent with the terms of the Plan; (ii) the sole purpose of the Liquidation Trust shall be the liquidation and distribution of the Liquidation Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including the Debtors, their Estates, Holders of beneficial interests in the Liquidation Trust, and the Liquidation Trustee) shall report consistently with such treatment (including the deemed receipt of the underlying assets, subject to applicable liabilities and obligations, by the Holders of beneficial interests in the Liquidation Trust, followed by the deemed transfer of such Liquidation Trust Assets to the Liquidation Trust); (iv) all parties shall report consistently with the valuation of the Liquidation Trust Assets transferred to the Liquidation Trust as determined by the Liquidation Trustee (or its designee); (v) the Liquidation Trustee shall be responsible for filing returns for the Liquidation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the Liquidation Trustee shall annually send to each holder of beneficial interests

in the Liquidation Trust a separate statement regarding the receipts and expenditures of the Liquidation Trust as relevant for U.S. federal income tax purposes.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidation Trustee of a private letter ruling if the Liquidation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), the Liquidation Trustee (i) shall timely elect to treat the GUC Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, (ii)  may timely elect to treat any other portion of the Liquidation Trust allocable to, or retained on account of, Disputed Claims  as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (iii) to the extent permitted by applicable law, shall report consistently with the foregoing for state and local income tax purposes.  As to the GUC Reserve and any other assets allocable to, or retained on account of, Disputed Claims treated as a "disputed ownership fund," all distributions thereof shall be net of any costs and expenses, including taxes, relating to the retention or disposition of such assets, and the Liquidation Trustee shall be responsible for payment, out of such assets, of any taxes imposed on or with respect to such assets. In the event any cash in such reserve or fund is insufficient to pay the costs and expenses of the reserve or fund (including any taxes attributable to any income that may arise upon the distribution of the assets), assets of the reserve or fund may be sold to pay such costs and expenses. All parties (including, without limitation, the Debtors, their Estates, the Liquidation Trust, and the Holders of beneficial interests in the Liquidation Trust) will be required to report for tax purposes consistently with the foregoing.

### 5.6     *Exemption from Securities Laws.*

The issuance of the Parent Debtor Additional Stock to the Liquidation Trust pursuant to the Plan is being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act or, solely to the extent section 4(a)(2) of the Securities Act is not available, another available exemption from registration under the Securities Act. Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.

### 5.7     *Implementation.*

(a)     Before the Effective Date, the Debtors shall use commercially reasonable efforts to sell their interests in all of their Assets pursuant to any applicable Court order.

(b)     On the Effective Date, the Liquidation Trust shall be established and administered pursuant to the terms of the Liquidation Trust Agreement and the Plan.

(c)     On the Effective Date, any remaining Assets shall transfer to the Liquidation Trust as Liquidation Trust Assets in accordance with the terms of the Plan automatically and without further action of the Bankruptcy Court.

(d)     On or before the Effective Date, the Professional Fee Escrow Account shall be established and funded with Effective Date Available Cash in an amount sufficient to pay Professional Fee Claims, based upon estimates provided by the Professionals, as set forth in section 2.6 of the Plan.

(e)     On the Effective Date, the Senior Claims Reserve shall be established and funded pursuant to the Plan with Effective Date Available Cash in an amount equal to the estimate to be provided by the Debtors to the Ad Hoc Noteholder Group and Creditors' Committee no later than three (3) Business Days prior to the Confirmation Hearing.

(f)      On the Effective Date, the Wind Down Reserve shall be funded with Effective Date Available Cash in accordance with the Wind Down Budget for the Wind Down process and be funded with the Wind Down Amount. An initial Wind Down Budget shall be filed with the Plan Supplement; *provided* that the Wind Down Budget may only be amended, modified, or supplemented from time to time with the prior written consent (email being sufficient) of the Required Senior Secured Holders, such consent not to be unreasonably withheld.

(g)      On the Effective Date, the First Lien Reserve shall be established and funded pursuant to the Waterfall with Excess Cash.

(h)      On the Effective Date, the Second Lien Reserve shall be established and funded pursuant to the Waterfall with Excess Cash, if any.

(i)      On the Effective Date, the GUC Reserve shall be established and funded in an amount equal to the GUC Reserve Funding Amount.

(j)      After the Effective Date, Excess Cash shall be allocated and distributed in accordance with the Waterfall.

(k)      On and after the Effective Date, the Liquidation Trust shall use commercially reasonable efforts to liquidate and distribute the value of its respective interests in the Liquidation Trust Assets, including through either prosecuting, settling, or otherwise monetizing the Liquidation Trust Assets, in accordance with the terms of the Plan and Liquidation Trust Agreement.

(l)      In accordance with section 5.4 of the Plan, the Liquidation Trustee shall allocate Surplus Wind Down Reserve pursuant to the Waterfall.

(m)      In accordance with section 5.4 of the Plan, the Liquidation Trustee shall allocate Surplus Senior Claims Reserve pursuant to the Waterfall.

(n)      The Liquidation Trustee shall allocate any GUC Residual Amount pursuant to the Waterfall.

(o)      At the conclusion of the Wind Down (or sooner as reasonably determined by the Liquidation Trustee), any residual amounts remaining in the Liquidation Trust shall be distributed to Holders of Allowed Claims in accordance with the Waterfall.

5.8      ***Compromise and Settlement of Claims, Interests, and Controversies.***

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distribution, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, equitable, and subordination rights that a Claim Holder or an Interest Holder may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Allowed Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtors, their Estates, and Holders of Allowed Claims and Interests, and is fair, equitable, and is within the range of reasonableness. Subject to the provisions of this Plan governing distributions, all Plan Distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

5.9     *Corporate Action.*

(a)     Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Liquidation Trust and/or the Liquidation Trustee) shall be deemed authorized, approved, and, to the extent taken before the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, or any other Entity or Person. All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect as of the Effective Date, without any requirement of further action by the Debtors or the Estates.

(b)     The authorizations and approvals contemplated by this section 5.9 shall be effective notwithstanding any requirements under non-bankruptcy law.

(c)     The Confirmation Order shall and shall be deemed, pursuant to sections 363, 1123, and 1142 of the Bankruptcy Code, to authorize and direct parties, as applicable, among other things, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

5.10     *Cancellation of Existing Securities, Agreements, and Liens.*

(a)     Except for the purpose of evidencing a right to a Plan Distribution and except as otherwise set forth in the Plan, on the Effective Date and without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security Holders of any Debtor, all Interests (including, for the avoidance of doubt, any warrants) other than Blocked Parent Interests, which, shall be treated in accordance with section 4.9 of the Plan, agreements, instruments, notes, certificates, mortgages, security documents, and any other instruments or documents evidencing any Claim or Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect, and the obligations of the Debtors thereunder shall be deemed fully and finally satisfied, settled, released, and discharged; *provided*, however, that the First Lien Notes Documents and Second Lien Notes Documents shall continue solely to (i) preserve the First Lien Notes Agent and Second Lien Notes Agent's rights thereunder solely against the First Lien Noteholders and Second Lien Noteholders, respectively, to assert, pursue, and be paid with respect to any lien, expense reimbursement, indemnification or similar amounts, and (ii) permit the First Lien Noteholders and Second Lien Noteholders to receive their distributions. Upon the Effective Date, the obligations of the (i) First Lien Notes Agent, under the First Lien Notes Documents, and (ii) the Second Lien Notes Agent, under the Second Lien Notes Documents, shall be discharged and its duties thereunder shall be deemed fully satisfied, except to the extent necessary to facilitate the distribution provided in the Plan to First Lien Noteholders and Second Lien Noteholders, respectively. For the avoidance of doubt, until the First Lien Noteholder Claims and Second Lien Noteholder Claims are satisfied in accordance with the terms of the Plan, nothing contained in the Plan or the Confirmation Order shall in any way limit or affect the standing of the First Lien Notes Agent or Second Lien Notes Agent to appear and be heard in the Chapter 11 Cases on and after the Effective Date.

(b)     The Unsecured Notes shall be deemed cancelled, discharged, and of no force or effect on the Effective Date, except as necessary to (a) enforce the rights, claims, and interests of the Unsecured Notes Trustee solely against the Unsecured Noteholders; (b) allow the receipt of and to make distributions under the Plan in accordance with the terms of the Unsecured Notes Indenture; and (c) preserve any rights of the Unsecured Notes Trustee and any predecessor thereof to seek compensation and reimbursement, to payment of fees, expenses, and indemnification obligations as against any property

distributable to the Unsecured Noteholders, including any rights to priority of payment and/or to exercise charging liens, and to enforce its rights, claims, and interests, vis-à-vis any party other than the Debtors.

In addition, as a condition precedent to the distributions provided for the Unsecured Notes, the Unsecured Noteholders shall be deemed to have surrendered their Unsecured Notes, book entry positions related to such notes and other documentation underlying such notes, and all such surrendered Unsecured Notes, book entry positions, and other documents shall be deemed to be cancelled in accordance with this section 5.10 of the Plan. With respect to the distribution to be made to the Unsecured Noteholders, the respective obligations of the Unsecured Notes Trustee, relating to such distribution shall be discharged and deemed satisfied upon DTC's receipt of such distribution.

(c)     After the Effective Date, the Liquidation Trustee may, in its sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other Security interests with respect to Secured Claims, including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other Security interests held by Holders of Secured Claims, including, without limitation, UCC-3 termination statements.

5.11     *Vesting of Liabilities in the Liquidation Trust.*

Except as provided in the Plan, the transfer to, vesting in, and assumption by the Liquidation Trust of the Liquidation Trust Assets, as contemplated by the Plan shall, as of the date of such transfer and assumption, bar recovery or any action against the Debtors and the Debtors' Estates for, or with respect to, all Claims. The Liquidation Trust shall, as of the date upon which the Liquidation Trust is established, assume sole and exclusive responsibility and liability for all Claims against the Debtors, and such Claims shall be liquidated, resolved, or paid by the Liquidation Trust.

5.12     *Effectuating Documents; Further Transactions.*

(a)     On and after the Effective Date, the Liquidation Trustee is authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan and subject to any consent or consultation rights of the Liquidation Trust Oversight Board, as set forth in the Liquidation Trust Agreement.

(b)     Before, on, or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the Security Holders, directors, managers, or members of the Debtors shall be deemed to have been so approved and shall be in effect before, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the Security Holders, directors, managers, or members of the Debtors, or the need for any approvals, authorizations, actions or consents.

5.13     *Wind Down.*

After the Effective Date, pursuant to the Plan, the Liquidation Trustee shall, in an expeditious but orderly manner, wind down, sell, and otherwise liquidate and convert to Cash the Liquidation Trust Assets, with no objective to continue or conduct a trade or business except to the extent reasonably necessary to, and consistent with, the liquidation and orderly wind down of the Debtors and shall not unduly prolong the duration of the liquidation and the wind down. Upon the completion of the

liquidation and wind down of the Debtors, the Liquidation Trustee shall be authorized to file a certificate of cancellation or a certificate of dissolution, as applicable, with the appropriate governmental authorities terminating the legal existence of each of the Debtors and any non-Debtor Affiliates, as determined in the sole discretion of the Liquidation Trustee, and take such other actions consistent therewith to effect the termination of the legal existence of each such Debtor and any non-Debtor Affiliate, as applicable.

### 5.14    *Closing of the Chapter 11 Cases.*

When all Disputed Claims have become Allowed Claims or have been disallowed by Final Order, all Assets have been liquidated into Cash or abandoned, and all remaining available Cash has been distributed in accordance with the Plan and the Chapter 11 Cases have been fully administered, the Liquidation Trustee shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE VI.    GOVERNANCE

### 6.1    *Boards of Directors and Officers.*

Upon the Effective Date, (i) the officers and directors of the Debtors and non-Debtor subsidiaries in which the Debtors held an Interest as of the Effective Date shall be relieved of any and all duties with respect to such Debtors and non-Debtor subsidiaries, respectively, and shall be deemed to have resigned without the requirement of having to take any further action and (ii) the Liquidation Trustee shall be the sole officer, director, or manager, as applicable, of each of the Debtors and non-Debtor subsidiaries in which the Debtors held an Interest before the Effective Date without the requirement of having to take any further action.

### 6.2    *Governing Documents.*

To the extent necessary or appropriate, as of the Effective Date, the certificate of incorporation and by-laws, or other organizational documents, as applicable, of the Debtors shall be amended to the extent necessary to carry out the provisions of the Plan.

## ARTICLE VII.    DISTRIBUTIONS.

### 7.1    *Distributions Generally.*

On or after the Effective Date, the Liquidation Trustee shall make all Plan Distributions to Holders of Allowed Claims only in accordance with the terms of the Plan, the Confirmation Order, and the Liquidation Trust Agreement, to Holders of Allowed Claims, and only to the extent that the Liquidation Trust has sufficient Liquidation Trust Assets (or income and/or proceeds realized from Liquidation Trust Assets) to make such payments in accordance with and to the extent provided for in the Plan, the Confirmation Order and the Liquidation Trust Agreement. The Liquidation Trustee shall direct the Initial Plan Distribution (including the Plan Distribution of the Liquidation Trust Interests) to Holders of Allowed Claims as set forth in Article IV. After the date of the Initial Plan Distribution, the Liquidation Trustee shall from time to time, subject to sections 5.5(v) and 7.4, determine in its sole discretion the subsequent dates for Plan Distributions.

### 7.2    *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan, the Confirmation Order, another order of the Bankruptcy Court, or the Bankruptcy Code (including postpetition interest in accordance with

sections 506(b) and 726(a)(5) of the Bankruptcy Code), interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date; *provided*, that if interest is payable pursuant to the preceding clause, and except for interest comprising part of the First Lien Noteholder Claim Amount and Second Lien Noteholder Claim Amount which, in each case, to the extent permitted pursuant to the preceding clause, shall accrue and be payable at the rates provided therefor under the First Lien Notes Indenture and Second Lien Notes Indenture, respectively, including any related Default Interest (as defined therein) and any make-whole or other premium included in the Redemption Price (as defined in the First Lien Notes Indenture or the Second Lien Notes Indenture, as applicable), interest shall accrue at the Federal Judgment Rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.

### 7.3    *Distribution Record Date.*

(a)    As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed for purposes of determining whether a Holder of such a Claim or Interest is a record holder entitled to Plan Distributions, and there shall be no further changes in the record Holders or the permitted designees of any of the Claims or Interests. The Debtors and the Liquidation Trustee shall have no obligation to recognize any transfer or designation of the Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Liquidation Trustee shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

(b)    Notwithstanding the foregoing, the Distribution Record Date shall not apply to distributions in respect of securities deposited with DTC, the Holders of which shall receive distributions, if any, in accordance with the customary exchange procedures of DTC or the Plan. For the avoidance of doubt, in connection with a distribution through the facilities of DTC (if any), DTC shall be considered a single Holder for purposes of distributions.

(c)    All distributions to First Lien Noteholders, Second Lien Noteholders, and Unsecured Noteholders shall be made to or at the direction of the First Lien Notes Agent, Second Lien Notes Agent, or Unsecured Notes Trustee, respectively, or, upon and pursuant to the prior written consent (email being sufficient) of the First Lien Notes Agent, Second Lien Notes Agent, or Unsecured Notes Trustee, as applicable, to or at the direction of the Claims and Noticing Agent. Distributions under the Plan to Unsecured Noteholders, including distributions of Cash from the Liquidation Trust to the Unsecured Noteholders, shall be subject to the Unsecured Notes Trustee's charging lien.

### 7.4    *Date of Distributions.*

(a)    In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

(b)    After the resolution of a Disputed Senior Claim, the Liquidation Trustee shall treat any amounts that were reserved on account of such Disputed Senior Claim that is either (i) Disallowed or (ii) Allowed in a lesser amount than asserted, as Surplus Senior Claims Reserve and such amounts shall be allocated pursuant to the Waterfall.

7.5     ***Distributions after Effective Date.***

(a)     Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

7.6     ***Plan Distributions Made by Liquidation Trustee.***

All Plan Distributions shall be made by the Liquidation Trustee on and after the Effective Date as provided herein. The Liquidation Trustee shall not be required to give any bond or surety or other security for the performance of its duties. The Debtors shall use all commercially reasonable efforts to provide the Liquidation Trustee with the amounts of Claims and the identities and addresses of Holders of Claims, in each case, as set forth in the Debtors' books and records.  The Debtors shall cooperate in good faith with the Liquidation Trustee to comply with the reporting and withholding requirements outlined in section 7.17 of the Plan.

7.7     ***Delivery of Distributions.***

Subject to Bankruptcy Rule 9010, the Liquidation Trustee shall make all distributions to any Holder of an Allowed Claim or Interest or its authorized designee or transferee as and when required by the Plan at (i) the address of such Holder on the books and records of the Debtors or their agents or (ii) at the address in any written notice of address change delivered to the Debtors or the Liquidation Trustee, including any addresses included on any transfers of Claim Filed pursuant to Bankruptcy Rule 3001. In the event that any distribution to any Holder is returned as undeliverable, no further distributions shall be made to such Holder unless and until the Liquidation Trustee is notified in writing of such Holder's then-current address, at which time, or as soon thereafter as reasonably practicable, all currently-due, missed distributions shall be made to such Holder without interest. Nothing herein shall require the Liquidation Trustee to attempt to locate Holders of undeliverable distributions and, if located, assist such Holders in complying with section 7.17 of the Plan.

7.8     ***Delivery of Distributions to First Lien Noteholders and Second Lien Noteholders.***

As soon as practicable after the Effective Date, and subject to the First Lien Notes Agent's rights under sections 7.11 and 10.06 of the First Lien Notes Indenture, the Debtors or the Liquidation Trustee, as applicable, shall make all distributions with respect to the First Lien Notes and the First Lien Noteholder Claim to the First Lien Notes Agent, or to DTC upon the written consent of the First Lien Notes Agent, for onward distribution to the applicable First Lien Noteholders through DTC in exchange for the First Lien Notes and any of their book entry positions relating to such notes.  As soon as practicable after the Effective Date, and subject to the Second Lien Notes Agent's rights under sections 7.11 and 10.06 of the Second Lien Notes Indenture, the Debtors or the Liquidation Trustee, as applicable, shall make all distributions with respect to the Second Lien Notes and the Second Lien Noteholder Claim to the Second Lien Notes Agent, or to DTC upon the written consent of the Second Lien Notes Agent, for onward distribution to the applicable Second Lien Noteholders through DTC in exchange for the Second Lien Notes and any of their book entry positions relating to such notes.

As a condition precedent to the distribution provided for in this section 7.8, the First Lien Noteholders and the Second Lien Noteholders, respectively, shall be deemed to have surrendered their First Lien Notes and Second Lien Notes, book entry positions related to such notes and other documentation underlying such notes, and all such surrendered First Lien Notes and Second Lien Notes, book entry positions, and other documents shall be deemed to be cancelled in accordance with section 5.10 of the Plan.

With respect to each distribution to be made to the First Lien Noteholders and Second Lien Noteholders, the respective obligations of the First Lien Notes Agent and Second Lien Notes Agent, relating to such distribution shall be discharged and deemed satisfied upon DTC's receipt of such distribution.

### 7.9    *Unclaimed Property.*

(a)    One year from the later of: (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date a Claim or Interest is first Allowed, all distributions payable on account of such Claim or Interest that are not claimed or accepted by such date shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Liquidation Trustee or its successor or assigns, and all claims of any other Entity (including the Holder of a Claim in the same Class) to such distribution shall be released and forever barred. The Liquidation Trustee shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

(b)    A distribution shall be deemed unclaimed if a Holder has not (i) accepted a particular distribution or, in the case of distribution made by check, by ninety (90) calendar days after issuance, negotiated such check, (ii) given notice to the Liquidation Trustee of an intent to accept a particular distribution, (iii) responded to the Debtors' or Liquidation Trustee's, as applicable, request for information necessary to facilitate a particular distribution, or (iv) taken any other action necessary to facilitate such distribution.

### 7.10    *Satisfaction of Claims.*

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, release, and settlement of and exchange for such Allowed Claims.

### 7.11    *Manner of Payment under Plan.*

Except as otherwise specifically provided in the Plan, at the option of the Debtors or the Liquidation Trustee, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer, or ACH transfer, or as otherwise required or provided in applicable agreements or customary practices of the Debtors or the Liquidation Trustee, as applicable, including, to the extent such distribution is being made on account of securities deposited with DTC, through the facilities of DTC in accordance with DTC's applicable customary procedures.

### 7.12    *Minimum Cash Distributions.*

The Liquidation Trustee shall not be required to make any distribution of Cash less than one hundred dollars ($100) to any Holder of an Allowed Claim; *provided*, *however*, that if any distribution is not made pursuant to this section 7.12, such distribution shall be added to any subsequent distribution to be made on behalf of such Holder's Allowed Claim.

### 7.13    *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything in the Plan to the contrary, no Holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim.

7.14    ***Allocation of Distributions between Principal and Interest.***

Except as otherwise provided in the Plan and subject to section 7.2 of the Plan or as otherwise required by law (as reasonably determined by the Liquidation Trustee), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any, including accrued but unpaid interest.

7.15    ***Setoffs and Recoupments.***

(a)    Subject to sections 11.6(a), 11.6(b), 11.7, and 11.9, the Debtors and the Liquidation Trustee, as applicable, may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made pursuant to the Plan on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors or the Liquidation Trustee may have against the Holder of such Claim; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Liquidation Trustee of any claims, rights, or Causes of Action that a Debtor or the Liquidation Trustee may possess against the Holder of such Claim.

(b)    In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of a Debtor or the Liquidation Trustee, unless (i) the Debtors, or the Liquidation Trustee, as applicable, have consented or (ii) such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise. Notwithstanding the foregoing, this paragraph does not create any new rights to setoff or recoupment that did not exist under any applicable law or agreement in existence before the Effective Date.

7.16    ***Expenses of Liquidation Trustee.***

Subject to the written agreement of the Debtors and the Liquidation Trustee, the amount of any reasonable and documented out-of-pocket fees and expenses incurred by the Liquidation Trustee on or after the Effective Date (including taxes other than any income, franchise, capital gain, or similar taxes) and any reasonable and documented compensation and out-of-pocket expense reimbursement Claims (including for reasonable and documented outside attorneys' fees and other professional fees and out-of-pocket expenses) made by the Liquidation Trustee shall be paid in Cash by the Liquidation Trustee in the ordinary course of business.

7.17    ***Withholding and Reporting Requirements.***

(a)    *Withholding Rights.*  In connection with the Plan, any Person issuing any instrument or making any distribution described in the Plan (or any other related agreement) or payment in connection therewith shall comply with all applicable withholding and reporting requirements imposed by any federal, state, local or non-U.S. taxing authority, and, notwithstanding any provision in the Plan to the contrary, any such Person shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of any distribution or payment to be made under or in connection with the Plan (or any other related agreement) to generate sufficient funds to pay applicable withholding taxes, using its own funds to pay any applicable withholding taxes and retaining a portion of the applicable distribution, withholding distributions pending receipt of information necessary or appropriate to facilitate such distributions or establishing any other mechanisms it believes are reasonable and appropriate.  Any amounts withheld shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. In the case of a non-Cash distribution that is subject

to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to, and received by, the applicable recipient for all purposes of the Plan. Any party issuing any instrument or making any non-cash distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such Holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.  Notwithstanding the foregoing, each Holder of an Allowed Claim or Interest or any other Person that receives a distribution pursuant to the Plan or payment in connection therewith shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  The Liquidation Trustee reserves the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

(b)     *Forms*.  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon reasonable request, deliver to the applicable withholding agent or such other Entity or Estate designated by the Liquidation Trustee (which Person shall subsequently deliver to the Liquidation Trustee any applicable Internal Revenue Service ("**IRS**") Form W-8 or Form W-9 received) an appropriate IRS Form W-9 or an appropriate IRS Form W-8 and/or any other forms or documents reasonably requested by the Liquidation Trustee or the applicable withholding agent to reduce or eliminate any withholding required by any federal, state, or local taxing authority.  If such request is made by a withholding agent or such other Entity or Estate as designated by the Liquidation Trustee, and such party fails to comply before the date that is 180 calendar days after the request is made, the amount of such distribution shall irrevocably revert to the Liquidation Trust and any Claim in respect of such distribution shall be forever barred from assertion against the Liquidation Trust or its property.

## ARTICLE VIII.     PROCEDURES FOR DISPUTED CLAIMS.

### 8.1     *Disputed Claims Generally.*

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or Final Order, including the Confirmation Order (when it becomes a Final Order) Allowing such Claim. For the avoidance of doubt, insofar as a Claim is Allowed under the Plan or was Allowed before the Effective Date, from and after the Effective Date, the Liquidation Trustee shall have and retain any and all rights and defenses that the Debtors had immediately before the Effective Date with respect to any Disputed Claim, including related to Causes of Action retained pursuant to the Plan. Any objections to Claims shall be served and Filed on or before the Claim Objection Deadline.

### 8.2     *Resolution of Claims.*

Except insofar as a Claim is Allowed under the Plan, on and after the Effective Date, objections to Claims against the Debtors may be interposed and prosecuted only by the Liquidation Trustee. Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Liquidation Trustee shall have the authority to (i) file, withdraw, or litigate to judgment objections to Claims, (ii) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, and (iii) administer and adjust the Debtors' claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. If the Liquidation

Trustee and a Holder of a Disputed Claim are unable to reach a settlement on the Disputed Claim, such Disputed Claim shall be submitted to the Bankruptcy Court for resolution.

### 8.3    *Estimation of Claims.*

The Liquidation Trustee shall determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Claims. The Liquidation Trustee, with respect to such Disputed Claims, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, including to establish a reserve for distribution purposes, regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Liquidation Trustee, as applicable, may pursue supplementary proceedings to object to the Allowance of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim is estimated.

### 8.4    *Claim Resolution Procedures Cumulative.*

All of the Claims, objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

### 8.5    *Adjustment to Claims Register Without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or the Liquidation Trustee, as applicable, upon stipulation or any agreement in writing, including, without limitation, email correspondence, between the parties in interest without the Debtors or the Liquidation Trustee, as applicable, having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice or action, order, or approval of the Bankruptcy Court.

### 8.6    *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim or Interest is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest unless and until (and only to the extent that) such Disputed Claim or Interest becomes an Allowed Claim or Allowed Interest.

### 8.7    *Distributions after Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.

On a date that is at least forty-five (45) calendar days after the date on which the Final Order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, or on an earlier date selected by the Liquidation Trustee in the Liquidation Trustee's sole discretion, the Liquidation Trustee shall provide to the Holder of such Claim the Plan Distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, subject to section 5.5(v) and without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

### 8.8    *Single Satisfaction of Claims and Interests.*

In no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim or Interest exceed 100 percent of the underlying Allowed Claim or Interest.

### 8.9    *Amendments to Claims.*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court, and any other new or amended Claim or Proof of Claim Filed after the Effective Date shall be deemed Disallowed in full and expunged without any further action or notice to the Bankruptcy Court.

### 8.10    *Reservation of Rights to Object to Claims*

The failure of the Liquidation Trustee to object to any Claim shall not be construed as an admission to the validity or amount of any such Claim, any portion thereof, or any other Claim related thereto, whether or not such Claim is asserted in any currently pending or subsequently initiated proceeding, and shall be without prejudice to the rights of the Debtors or the Liquidation Trustee, as applicable, to contest, challenge the validity of, or otherwise defend against any such claim in the Bankruptcy Court or non-bankruptcy forum.

### 8.11    *Disallowance of Claims.*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Liquidation Trustee.

Except as otherwise provided herein or otherwise agreed by the Debtors or the Liquidation Trustee, as applicable, any and all Proofs of Claim Filed after the applicable Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice or action, order, or approval of the Bankruptcy Court, and Holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests, unless the Bankruptcy Court shall have determined by a Final Order, on or before the Confirmation Hearing, that cause exists to extend the Bar Date as to such Proof of Claim on the basis of excusable neglect.

**ARTICLE IX.      EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

> 9.1     *General Treatment.*

(a)      As of and subject to the occurrence of the Effective Date, all Executory Contracts and Unexpired Leases (including, but not limited to, those giving rise to D&O Indemnification Obligations) to which any of the Debtors are parties shall be deemed rejected, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to assume Filed by the Debtors on or before the Confirmation Date, (iv) is specifically designated as a contract or lease to be assumed by the Debtors on the Schedule of Assumed Contracts, (v) is the subject of a pending Assumption Dispute, or (vi) is a D&O Policy or other insurance policy to which any Debtor or the Liquidation Trustee is a beneficiary or an insured.

(b)      Notwithstanding any provision of the Plan or Confirmation Order, any obligations of Debtor Luminar Technologies, Inc. under the TSA shall remain in full force and effect in accordance with its terms and the LSI Sale Order and, for the avoidance of doubt, the TSA shall not be deemed rejected upon the occurrence of the Effective Date and the Debtors and/or the Liquidation Trustee shall perform such duties required of the Debtors pursuant to the TSA in accordance with its terms.

(c)      Subject to (i) resolution of any disputes in accordance with section 9.2 of the Plan with respect to the Executory Contracts or Unexpired Leases subject to such disputes, and (ii) the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute (x) a determination by the Bankruptcy Court that the Debtors, the Liquidation Trustee, or the assignee of such Executory Contract or Unexpired Lease (as applicable) have provided adequate assurance of future performance under such Executory Contract or Unexpired Lease, and (y) approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated or provided in a separate order of the Bankruptcy Court or the Plan Supplement, rejections, assumptions, or assumptions and assignments of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by order of the Bankruptcy Court shall be assigned to the Liquidation Trust on the date such trust is established or as soon as reasonably practicable thereafter, and shall vest in, and be fully enforceable by, the Liquidation Trust in accordance with its terms, except as modified by any provision of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment, or applicable law.

(d)      To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

> 9.2     *Determination of Assumption and Cure Disputes and Deemed Consent.*

(a)      Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors or Liquidation Trustee, as applicable, may otherwise agree.

(b)      The Debtors shall File, as part of the Plan Supplement, the Schedule of Assumed Contracts.  To the extent practicable, at least fourteen (14) calendar days before the deadline to object to Confirmation of the Plan, the Debtors shall serve a notice on parties to Executory Contracts or Unexpired Leases to be assumed, or assumed and assigned to the Liquidation Trust, reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with the Plan and, where applicable, setting forth the proposed Cure Amount (if any). If a counterparty to any Executory Contract or Unexpired Lease that the Debtors intend to assume or assume and assign to the Liquidation Trust is not listed on such a notice, the proposed Cure Amount for such Executory Contract or Unexpired Lease shall be deemed to be Zero Dollars ($0). **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure Amount must be Filed, served, and actually received by the Debtors within ten (10) calendar days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court**.  Any counterparty to an Executory Contract or Unexpired Lease that does not timely object to the notice of the proposed assumption or assumption and assignment of such Executory Contract or Unexpired Lease shall be deemed to have assented to assumption or assumption and assignment of the applicable Executory Contract or Unexpired Lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor or the Liquidation Trustee, as applicable, under such Executory Contract or Unexpired Lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor or the Liquidation Trust, as applicable. Each such provision shall be deemed to not apply to the assumption of such Executory Contract or Unexpired Lease pursuant to the Plan and counterparties to assumed Executory Contracts or Unexpired Leases that fail to object to the proposed assumption or assumption and assignment in accordance with the terms set forth in this section 9.2, shall forever be barred and enjoined from objecting to the proposed assumption or assumption and assignment, or to the validity of such assumption or assumption and assignment (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)      If there is an Assumption Dispute pertaining to assumption of an Executory Contract or Unexpired Lease (other than a dispute pertaining to a Cure Amount) and such Assumption Dispute is not resolved, such dispute shall be heard by the Bankruptcy Court before such assumption being effective; *provided* that the Debtors or the Liquidation Trustee, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)      To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease before the resolution of the Assumption Dispute; *provided* that the Debtors or the Liquidation Trustee, as applicable, reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure Amount by the non-Debtor party to such Executory Contract or Unexpired Lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the applicable Debtor or the Liquidation Trustee, as applicable). The Debtors or the Liquidation Trustee, as applicable, may settle any Assumption Dispute or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(e)      Subject to resolution of any dispute regarding any Cure Amount, all Cure Amounts shall be satisfied promptly, or otherwise as soon as practicable, by payment of the Cure Amount by the Debtors or the Liquidation Trust, as the case may be, upon assumption or assumption and assignment, as

applicable, of the underlying Executory Contracts and Unexpired Leases. Assumption or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full and final satisfaction, settlement, release, and discharge of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption or assumption and assignment, as applicable. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned, as applicable, shall be deemed Disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other Entity, upon the deemed assumption of such Executory Contract or Unexpired Lease.

(f)     With respect to payment of any Cure Amounts or Assumption Disputes, neither the Debtors nor the Liquidation Trustee, as applicable, shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its cure Claim.

### 9.3     *Rejection Claims.*

Unless otherwise provided by an order of the Bankruptcy Court, Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court by the later of thirty (30) calendar days from (i) the date of entry of an order of the Bankruptcy Court approving such rejection, (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease, and (iii) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be Disallowed pursuant to the Confirmation Order or such other order of the Bankruptcy Court, as applicable, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, their Estates, the Liquidation Trust, the Liquidation Trustee, or property of the foregoing, without the need for any objection by the Debtors or the Liquidation Trustee, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary**. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and may be objected to in accordance with the provisions of section 8.2 of the Plan and applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

### 9.4     *Insurance Policies/Claims Payable By Third Parties.*

(a)     All insurance policies which were issued to the Debtors as first named insured, including any D&O Policy, shall be deemed to be and treated as Executory Contracts and shall be assumed by the applicable Debtors and shall continue in full force and effect thereafter in accordance with their respective terms, and on and after the Effective Date the Liquidation Trust shall become and remain liable in full for all of its and the Debtors' obligations under the insurance policies regardless of whether such obligations arise before, on or after the Effective Date, and all such insurance policies shall vest in the Liquidation Trust. Coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insureds" in any D&O Policy.

(b)     In addition, after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy (including any "tail" policy) for the full term of such policy, to the extent set forth in such policies.

(c)     In addition, after the Effective Date, the coverage under any D&O Policy (including any "tail policy") in effect as of the Petition Date shall not be terminated or otherwise reduced, and any current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such D&O Policy for the full term of such policy to the extent set forth in such policies. For the avoidance of doubt, nothing in this section 9.4(c) shall in any way impair the Liquidation Trustee's ability on and after the Effective Date to assert on behalf of the Liquidation Trust any claims that are not otherwise released pursuant to section 11.6(a) of the Plan and are properly asserted under and/or covered by the D&O Policies, or to seek to recover the proceeds of the applicable D&O Policies on account of such claims in accordance with and subject to the terms and conditions of the applicable D&O Policies, which shall not be altered.

In the event that the Debtors determine that an Allowed Claim is covered in full or in part under one of the Debtors' insurance policies, no distributions under the Plan shall be made on account of such Allowed Claim unless and until, and solely to the extent that, (i) the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy, and (ii) an insurer authorized to issue a coverage position under such insurance policy, or the agent of such insurer, issues a formal determination, which the Debtors in their sole discretion do not contest, that coverage under such insurance policy is excluded or otherwise unavailable for losses arising from such Allowed Claim. Any proceeds available pursuant to one of the Debtors' insurance policies shall reduce the Allowed amount of a Claim on a dollar-for-dollar basis. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court. If an applicable insurance policy has a SIR, the Holder of an Insured Litigation Claim shall have an Allowed General Unsecured Claim or a Section 510(b) Claim, as applicable, against the applicable Debtor's Estate solely up to the amount of the SIR that may be established upon the liquidation of the Insured Litigation Claim. Such SIR shall be considered satisfied pursuant to the Plan through allowance of the General Unsecured Claim or Section 510(b) Claim, as applicable, solely in the amount of the applicable SIR, if any; *provided*, however that nothing herein obligates the Debtors, the Liquidation Trust, or the Liquidation Trustee, as applicable, to otherwise satisfy any SIR under any insurance policy.  Any recovery on account of the Insured Litigation Claim in excess of the SIR established upon the liquidation of the Claim shall be recovered solely from the Debtors' insurance coverage, if any, and only to the extent of available insurance coverage and any proceeds thereof. Nothing in this Plan shall be construed to limit, extinguish, or diminish the insurance coverage that may exist or shall be construed as a finding that liquidated any Claim payable pursuant to an insurance policy. Nothing herein relieves any Entity from the requirement to timely File a Proof of Claim by the applicable claims bar date.

9.5     ***Assignment.***

To the extent provided under the Bankruptcy Code or other applicable law, any Executory Contract or Unexpired Lease transferred and assigned hereunder shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such Executory Contract or Unexpired Lease (including, without limitation, those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment. To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such Executory Contract or Unexpired Lease or that terminates or modifies such Executory Contract or Unexpired Lease or allows the counterparty to such Executory Contract or Unexpired Lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect.

9.6 **Modifications, Amendments, Supplements, Restatements, or Other Agreements.**

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each Executory Contract and Unexpired Lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract or Unexpired Lease, without regard to whether such agreement, instrument, or other document is listed in the Schedule of Assumed Contracts.

9.7 **Reservation of Rights.**

(a) The Debtors may amend the Schedule of Assumed Contracts and any cure notice until five (5) calendar days immediately before the commencement of the Confirmation Hearing in order to (i) add, delete, or reclassify any Executory Contract or Unexpired Lease or amend a proposed assumption or assumption and assignment and/or (ii) amend the proposed Cure Amount; *provided*, that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtors' right to amend such schedules and notices shall be extended to the Business Day immediately before the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing. The Debtors shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

(b) Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease or that the Debtors, the Liquidation Trust, or the Liquidation Trustee or their respective Affiliates has any liability thereunder.

(c) Except as otherwise provided in the Plan, nothing in the Plan will waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors, Liquidation Trust, or the Liquidation Trustee under any Executory or non-Executory Contract or any unexpired or expired lease.

(d) Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Liquidation Trustee, as applicable, under any Executory or non-Executory Contract or any unexpired or expired lease.

(e) If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection under the Plan, the Debtors or the Liquidation Trustee, as applicable, shall have thirty (30) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease by filing a notice indicating such altered treatment.

9.8 **Intellectual Property Licenses and Agreements.**

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed by the respective Debtors and assigned to the Liquidation Trust and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion Filed by the Debtors in accordance with the Plan. Unless otherwise noted hereunder, all other intellectual property contracts,

licenses, royalties, or other similar agreements shall vest in the Liquidation Trust and the Liquidation Trustee may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

**ARTICLE X.      CONDITIONS PRECEDENT TO EFFECTIVE DATE.**

        10.1   ***Conditions Precedent to the Effective Date.***

        The following are conditions precedent to the Effective Date of the Plan:

        (a)   the Bankruptcy Court shall have entered the Cash Collateral Orders, and the Cash Collateral Orders shall not have been modified, reversed, revoked, stayed for a period in excess of five (5) business days, rescinded, vacated, or amended in a manner adverse to the rights, interest, priorities, or entitlements of the First Lien Noteholders and Second Lien Noteholders without the express prior written consent (email being sufficient) of the Senior Secured Holders (as defined therein) and the Notes Trustees (as defined therein) (acting at the direction of the requisite Senior Secured Holders);

        (b)   no Termination Event, as defined in the Cash Collateral Orders, is continuing or has otherwise not been cured, waived, or modified, in accordance with the terms thereof;

        (c)   the Bankruptcy Court shall have entered the Disclosure Statement Approval Order, which shall reflect the Global Settlement and which shall otherwise be reasonably acceptable to the Debtors, the Required Senior Secured Holders, and the Creditors' Committee, which order shall be in full force and effect and such orders shall not have been stayed, modified, or vacated on appeal;

        (d)   the Bankruptcy Court shall have entered the Confirmation Order, which shall reflect the Global Settlement and which shall otherwise be reasonably acceptable to the Debtors, the Required Senior Secured Holders, and the Creditors' Committee, and the Confirmation Order shall be a Final Order;

        (e)   all Milestones shall have been met or waived;

        (f)   all outstanding prepetition and postpetition Restructuring Fees and Expenses shall have been paid;

        (g)   the Professional Fee Escrow Account shall have been established and funded in Cash;

        (h)   the Liquidation Trust Agreement shall be executed, and the Liquidation Trustee shall have been appointed and accepted such appointment;

        (i)   the Wind Down Reserve shall have been funded with the Wind Down Amount in accordance with the Wind Down Budget;

        (j)   the Senior Claims Reserve shall have been established and funded;

        (k)   the GUC Reserve shall have been established and funded with the GUC Reserve Funding Amount, the Retained Causes of Action (including any D&O Policy proceeds payable to the Estate on account of settlements or judgments from Commercial Tort Claims and other non-released claims and Causes of Action), the Unencumbered Assets, and any proceeds of the foregoing;

(l) only if the Effective Date of the Plan occurs on or before April 14, 2026, the aggregate Allowed Professional Fee Claims of the Debtors' Advisors (excluding any amounts paid pursuant to the Ordinary Course Professionals Retention Order) shall not exceed $26,471,000.00;

(m) the aggregate Creditors' Committee Fees (including for the Unsecured Notes Trustee) shall not exceed $4,225,000.00 in accordance with section 2.2(c) of the Plan;

(n) the Plan Supplement, and any and all of the schedules, documents, and exhibits contained therein shall have been Filed with the Bankruptcy Court and shall be consistent in all material respects with the Plan;

(o) all documents and agreements necessary to implement the Plan, and the other transactions and other matters contemplated herein, shall have (i) been tendered for delivery and (ii) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements;

(p) all authorizations, consents, regulatory or governmental approvals, rulings or documents, including Bankruptcy Court approval, necessary to effectuate and implement the Plan will have been obtained; and

(q) the Plan shall not have been materially amended, altered, or modified from the Plan as confirmed by the Confirmation Order, unless such alteration, or modification is (i) before substantial consummation, (ii) has been consented to in accordance with section 13.6(a), and (iii) meets the requirements of sections 1122, 1123 and 1127 of the Bankruptcy Code.

## 10.2   *Waiver of Conditions Precedent.*

(a) Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred before the taking of any other such action. Each of the conditions precedent to the occurrence of the Effective Date may be waived by the Debtors (and with respect to section 10.1(f), the First Lien Notes Agent and/or the Second Lien Notes Agent, to the extent such waiver applies to any Restructuring Fees and Expenses due to the First Lien Notes Agent and/or the Second Lien Notes Agent, respectively), with the prior written consent (email being sufficient) of (i) the Required Senior Secured Holders, (ii) with respect to the conditions precedent contained in clauses (c), (d), (g) (solely as it relates to the Creditors' Committee and Trustee Advisors), (h), (k), (m), (n), and (q) in section 10.1, the Creditors' Committee, and (iii) with respect to the condition precedent contained in clause (f) in section 10.1 (solely as it relates to the Restructuring Fees and Expenses due to the Unsecured Notes Trustee), the Unsecured Notes Trustee, such consent not to be unreasonably withheld, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

(b) The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

## 10.3   *Effect of Failure of a Condition.*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any

Claims by or against or any Interests in the Debtors, (ii) prejudice in any manner the rights of any Person, or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Debtors or any other Person.

## ARTICLE XI.        EFFECT OF CONFIRMATION OF PLAN.

### 11.1    *Binding Effect.*

As of the Effective Date, the Plan shall bind (i) the Debtors, (ii) the Liquidation Trustee, (iii) all Holders of Claims against and Interests in the Debtors, and each of their respective successors and assigns, notwithstanding whether any such Holders were (a) Impaired or Unimpaired under the Plan, (b) deemed to accept or reject the Plan, (c) failed to vote to accept or reject the Plan, (d) voted to reject the Plan, and/or (e) received any distribution under the Plan, (iv) all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, (v) each Entity acquiring property under the Plan and the Confirmation Order, and (vi) any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

### 11.2    *Vesting of Assets.*

Except as otherwise provided in the Plan or any Plan Document, on the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all Liquidation Trust Assets, including all claims, rights, and Retained Causes of Action and any property acquired by the Debtors under or in connection with the Plan or the Plan Supplement, shall vest in the Liquidation Trust free and clear of all Liens, Claims, Interests, charges, or other encumbrances unless expressly provided otherwise by the Plan or Confirmation Order. On and after the Effective Date, except as otherwise provided herein, the Liquidation Trustee may operate the Debtors' businesses and may use, acquire, or dispose of property and pursue, compromise or settle any Claims (including any Administrative Expense Claims), Interests, and Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Without limiting the foregoing, the Liquidation Trustee may pay the charges that it incurs on behalf of the Liquidation Trust after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 11.3    *Term of Injunctions or Stays.*

Unless otherwise provided herein or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay. For the avoidance of doubt, the NOL Order shall remain enforceable beyond the Effective Date.

### 11.4    *Injunction Against Interference with Plan.*

Upon the entry of the Confirmation Order, all Holders of Claims and Interests and all other parties in interest, along with their respective present and former Affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

### 11.5    *Injunction.*

(a)        **Except as otherwise expressly provided in the Plan, or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released or discharged**

pursuant to the Plan, including under section 11.6(a) or section 11.6(b) of the Plan, or (ii) subject to exculpation pursuant to section 11.7 of the Plan, and all other parties in interest, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, an Estate, the Liquidation Trust, the Liquidation Trustee, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to section 11.7 of the Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action:  (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted such setoff right either in a Filed Proof of Claim, or in another document Filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors or (i) an Executory Contract or (ii) an Unexpired Lease, in the case of (i) and (ii), that has been assumed by the Debtors as of the Effective Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan and Confirmation Order, to the full extent permitted by applicable law; and (F) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to the Plan, including pursuant to section 11.6(a) or section 11.6(b) of the Plan or otherwise Disallowed; *provided* that such Entities that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, a Debtor or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of the Plan.

(b)     Subject in all respects to section 12.1 of the Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Released Party (solely with respect to Claims or Causes of Action that purportedly may be assertable by, or on behalf of, a Releasing Party) or Exculpated Party that arose or arises from, in whole or in part:  the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Liquidation Trust; the Liquidation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the negotiation, formulation, preparation, dissemination, or consummation of any contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement); any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors (which includes, for the avoidance of doubt, all Claims and Causes of Action asserted or assertable in the Securities Class Actions); the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of

the Debtors; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not, with respect to a Released Party, been released under the Plan or, with respect to an Exculpated Party, been exculpated under the Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Released Party or Exculpated Party. The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and has not been released or exculpated (as applicable) and, only to the extent legally permissible and as provided for in section 12.1 of the Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action. For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

(c)     By participating in the Plan by voting or by accepting Plan Distributions pursuant to the Plan (in whatever sum), each Holder of an Allowed Claim extinguished, discharged, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in this section 11.5, and each such Holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such Holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever and that such release and waiver shall be effective irrespective of which law governs the rights of the said Holder as against a Debtor.

(d)     The injunctions in this section 11.5 shall extend to any successors of the Debtors and their respective property and interests in property.

11.6     *Releases.*

(a)     **Releases by the Debtors and their Estates.** Except as otherwise expressly set forth below in this section 11.6(a), notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Confirmation Date and the Effective Date, the Debtors, the Estates, the Liquidation Trust, and the Liquidation Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Confirmation Date or the Effective Date, as applicable, including any Claims or Causes of Action based on or relating to,

60

or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Liquidation Trust; the Liquidation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by any contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement); any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors (which includes, for the avoidance of doubt, all Claims or Causes of Action asserted or assertable in the Securities Class Actions); the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Confirmation Date or the Effective Date, as applicable.  Notwithstanding anything to the contrary in the foregoing, the releases contained in this section 11.6(a) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, criminal misconduct, gross negligence, or willful misconduct, (b) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (c) before the Effective Date, any post-Confirmation Date obligations of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, or (d) any Intercompany Claims, which, for the avoidance of doubt, shall be treated in accordance with section 4.6 of the Plan. Notwithstanding anything else in the Plan, Disclosure Statement, or the Confirmation Order, no Person or Entity not defined as a Released Party, shall be deemed to be granted a release under the Plan or Confirmation Order.

In addition, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Confirmation Date and the Effective Date, the Debtors, the Estates, the Liquidation Trust, and the Liquidation Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Debtors' trade vendors from any and all Preference Actions.

(b)      **Third-Party Releases.**  Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other

Entity, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Liquidation Trust; the Liquidation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by any contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement); any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors (which includes, for the avoidance of doubt, all Claims and Causes of Action asserted or assertable in the Securities Class Actions); the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date; *provided* that, with respect to Claims against the Debtors, this section 11.6(b) shall only apply to Claims arising from any act or omission, transaction, agreement, event or other occurrence taking place from and including the Petition Date through the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases contained in this section 11.6(b) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, or (c) any right held, retained, or preserved by either the First Lien Notes Agent or Second Lien Notes Agent under this Plan, against the First Lien Noteholders and Second Lien Noteholders, respectively. Nothing contained in the Plan, nor the release of any claims pursuant to the Plan, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released by the Plan.

11.7    Exculpation.

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action based on, relating to, or in any manner arising from, in whole or in part, from the Petition Date through the Effective Date: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Liquidation Trust; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by any contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement); any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated

Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Effective Date; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the exculpations in this section 11.7 shall not release or exculpate (a) any Entity from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state or foreign laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. For the avoidance of doubt, the exculpations contained in this section 11.7 will be in addition to, and not in limitation of, all other releases set forth in sections 11.6(a) and 11.6(b).

11.8    ***Waiver of Statutory Limitation on Releases.***

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER Article XI OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES ARE CONTAINED IN SECTION 11.6 OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

11.9    ***Injunction Related to Releases and Exculpation.***

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released or exculpated pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

11.10    ***Subordinated Claims.***

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and

equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right, to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 11.11   *Retention of Causes of Action/Transfer of Causes of Action and Reservation of Rights.*

Except as otherwise provided in the Plan, including in all respects sections 11.6(a), 11.6(b), 11.7, and 11.9, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately before the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law. Except as otherwise provided in the Plan, including in all respects sections 11.6(a), 11.6(b), 11.7, and 11.9, the Liquidation Trustee, on behalf of the Debtors, shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 11.12   *Debtors are Not Entitled to a Discharge.*

Nothing in the Plan or the Confirmation Order shall grant the Debtors a discharge pursuant to section 1141(d) of the Bankruptcy Code.

### 11.13   *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any Entity based on any of the following: (i) the insolvency or financial condition of a Debtor; (ii) the commencement of the Chapter 11 Cases; or (iii) the Confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation.

### 11.14   *Solicitation of Plan.*

As of the Confirmation Date (i) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (ii) the Debtors and each of their respective directors, officers, employees, Affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any Securities under the Plan.

11.15   *No Successor Liability.*

Except as otherwise expressly provided in the Plan and the Confirmation Order, the Liquidation Trust (i) is not, and shall not be deemed to assume, agree to perform, pay, or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations or the Assets of the Debtors on or before the Effective Date; (ii) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor before the Effective Date; and (iii) shall not have any successor or transferee liability of any kind or character.

## ARTICLE XII.   RETENTION OF JURISDICTION.

12.1   *Retention of Jurisdiction.*

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)   to hear and determine motions and/or applications for the assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)   to determine any motion, adversary proceeding, proceeding, application, contested matter, and/or other litigated matter pending on or commenced after the Confirmation Date;

(c)   to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)   to ensure that distributions to Holders of Allowed Claims and Interests are accomplished as provided for in the Plan and Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(e)   to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim or any counterclaim related thereto;

(f)   to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)   to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)   to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, or approve any modification of the Confirmation Order or any contract, instrument, release, or other agreements or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order (in each case, to the extent Bankruptcy Court approval is necessary), or to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure

Statement, the Confirmation Order, or any order of the Bankruptcy Court, in such a manner as may be necessary to carry out the purposes and effects thereof;

      (i)      to hear and determine all Professional Fee Claims;

      (j)      to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

      (k)      to resolve any dispute related to the Liquidation Trust;

      (l)      to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or relating to any of the foregoing;

      (m)      to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan, the Plan Supplement, and Confirmation Order;

      (n)      to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

      (o)      to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

      (p)      to hear, adjudicate, decide, or resolve any and all matters related to Article XI of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

      (q)      to resolve disputes concerning Disputed Claims or the administration thereof;

      (r)      to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any claims bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purposes;

      (s)      to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

      (t)      to enter a final decree closing the Chapter 11 Cases;

      (u)      to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located; and

      (v)      to hear and determine any rights, claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

12.2    *Courts of Competent Jurisdiction.*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XIII.    MISCELLANEOUS PROVISIONS.

13.1    *Payment of Statutory Fees.*

All fees due and payable pursuant to 28 U.S.C. § 1930(a) before the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date. On and after the Effective Date, the Liquidation Trustee shall pay any and all Statutory Fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Liquidation Trustee, on behalf of each Debtor, shall remain obligated to file post-confirmation quarterly reports and to pay Statutory Fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code. Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to file a Proof of Claim or any other request for payment of Statutory Fees.

13.2    *Exemption from Certain Transfer Taxes.*

Pursuant to section 1146 of the Bankruptcy Code, (i) the issuance, transfer or exchange of any securities, instruments or documents, (ii) the creation, filing or recording of any Lien, mortgage, deed of trust, or other security interest, (iii) the making, assignment, filing or recording of any lease or sublease or the making or delivery of any deed, bill of sale, assignment or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan (including any transactions and transfers of assets to and by the Liquidation Trust) or the reinvesting, transfer, or sale of any real or personal property of the Debtors or the Liquidation Trust pursuant to, in implementation of or as contemplated in the Plan, (iv) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to or taxed under any law imposing any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

13.3    *Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee shall be deemed to have been dissolved, and the members thereof, and their respective counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, except with respect to (i) any continuing confidentiality obligations, (ii) reviewing and prosecuting Professional Fee Claims, (iii) participating in any appeals of the Confirmation Order, and (iv) participating in any pending adversary proceedings. From and after the

67

Effective Date, the Liquidation Trustee shall continue to pay, when due and payable in the ordinary course of business, the reasonable and documented fees and expenses of the Creditors' Committee's professionals solely to the extent arising out of or related to the foregoing without further order of the Bankruptcy Court.

13.4    *Request for Expedited Determination of Taxes.*

The Liquidation Trustee shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, on behalf of the Liquidation Trust for any and all taxable periods ending after the Petition Date through the Wind Down Completion Date.

13.5    *Dates of Actions to Implement Plan*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

13.6    *Amendments.*

(a)    *Plan Modifications*.  The Plan may be amended, modified, or supplemented by the Debtors, with the prior written consent (email being sufficient) of (i) the Required Senior Secured Holders and (ii) solely to the extent that there are Plan modifications that are inconsistent with the Global Settlement or that materially adversely affect Holders of General Unsecured Claims, the Creditors' Committee, in each instance, such consent not to be unreasonably withheld, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of Holders of Allowed Claims or Interests pursuant to the Plan, the Debtors (with the prior written consent (email being sufficient) of the Required Senior Secured Holders and, solely to the extent that there are Plan modifications that are inconsistent with the Global Settlement or that materially adversely affect Holders of General Unsecured Claims, the Creditors' Committee, such consent not to be unreasonably withheld) may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of the Plan, and any Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

(b)    *Other Amendments*.  Before the Effective Date, the Debtors (with the prior written consent (email being sufficient) of the Required Senior Secured Holders and the Creditors' Committee, such consent not to be unreasonably withheld) may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court, as long as such technical adjustments and modifications do not adversely affect in a material way the treatment of the Holders of Claims or Interests under the Plan.

13.7    *Revocation or Withdrawal of the Plan.*

The Debtors reserve the right to revoke or withdraw the Plan before the Effective Date as to any or all of the Debtors (with the prior written consent (email being sufficient) of the Required Senior Secured Holders and the Creditors' Committee, such consent not to be unreasonably withheld). If, with respect to a Debtor, the Plan has been revoked or withdrawn before the Effective Date, or if Confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with

respect to such Debtor: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of Executory Contracts or Unexpired Leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person, (b) prejudice in any manner the rights of such Debtor or any other Person, or (c) constitute an admission of any sort by any Debtor or any other Person.

### 13.8 *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent a Plan Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

### 13.9 *Immediate Binding Effect.*

Notwithstanding any Bankruptcy Rule providing for a stay of the Confirmation Order or Plan, including Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including, without limitation, the Liquidation Trustee, all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim, Interest, or debt has voted on the Plan.

### 13.10 *Waiver of Stay.*

The requirements under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of fourteen days after entry of the order shall be waived by the Confirmation Order. The Confirmation Order shall take effect immediately and shall not be stayed pursuant to the Bankruptcy Code, Bankruptcy Rules 3020(e), 6004(h), 6006(d), or 7062 or otherwise.

### 13.11 *Successors and Assigns.*

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

### 13.12 *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

13.13   ***Exhibits to Plan.***

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.

13.14   ***Computing Time.***

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

13.15   ***Notices.***

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by electronic transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or addressed as follows:

(a)   if to the Debtors:

Luminar Technologies, Inc.
2603 Discovery Drive, Suite 100
Orlando, Florida 32826
Attn:   Robin Chiu, Chief Restructuring Officer
        Alexander Fishkin, Chief Legal Officer
Email: RChiu@pppllc.com
       alexander.fishkin@luminartech.com

          - and –

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:   Ronit J. Berkovich
        Jessica Liou
Email:  Ronit.Berkovich@weil.com
        Jessica.Liou@weil.com

          - and –

700 Louisiana Street, Suite 3700
Houston, Texas 77002
Attn:   Stephanie N. Morrison
        Austin B. Crabtree
Email:  Stephanie.Morrison@weil.com
        Austin.Crabtree@weil.com

(b)   if to the Creditors' Committee:

Paul Hastings LLP
200 Park Ave.
New York, New York 10166
Attn:   Kris Hansen

Erez Gilad
Email: krishansen@paulhastings.com
erezgilad@paulhastings.com

- and –

(c)    If to the Ad Hoc Noteholder Group:

Ropes & Gray LLP
1211 Sixth Avenue
New York, New York 10036
Attn:   Matthew Roose
Sam Badawi
Email: Matthew.Roose@ropesgray.com
Sam.Badawi@ropesgray.com

- and –

191 North Wacker Drive
Chicago, Illinois 60606
Attn:   Conor McNamara
Email: Conor.McNamara@ropesgray.com

(d)    If to the U.S. Trustee:

Office of the United States Trustee
515 Rusk Avenue, Suite 3516
Houston, Texas 77002
Attn:   Jana Whitworth
C. Ross Travis
Email: jana.whitworth@usdoj.gov
c.ross.travis@usdoj.gov

After the Effective Date, the Debtors and the Liquidation Trustee, as applicable, have the authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors and the Liquidation Trustee, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

13.16   ***Reservation of Rights.***

Except as otherwise provided herein, the Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the filing of the Plan, any statement or provisions of the Plan, or the taking of any action by the Debtors with respect to the Plan shall be, or deemed to be, an admission or waiver of any rights of the Debtors with respect to any Claim or Interests before the Effective Date.

Dated:  February 18, 2026
        New York, New York

Respectfully submitted,

LUMINAR TECHNOLOGIES, INC., on behalf
of itself and its affiliated Debtors

By: /s/  *Robin Chiu*
Name: Robin Chiu
Title: Chief Restructuring Officer

## Exhibit A

**Non-Released Parties**

- Austin Russell
- Any director or officer who (i) was a former director or officer of a Debtor as of the Petition Date and (ii) is not a member of the Current Directors and Officers.

**EXHIBIT B**

**Organizational Chart (as of the date hereof)**



**EXHIBIT C**

**Liquidation Analysis**

**LIQUIDATION ANALYSIS**[1]

**Introduction**

The Debtors, with the assistance of certain of their legal and restructuring advisors, have prepared this hypothetical liquidation analysis (the "**Liquidation Analysis**") in connection with the Debtors' *Chapter 11 Plan of Liquidation of Luminar Technologies, Inc. and Its Affiliated Debtors* (Docket No. 120) (as may be amended, modified, or supplemented from time to time, the "**Plan**") and *Disclosure Statement For Chapter 11 Plan of Liquidation of Luminar Technologies, Inc. and Its Affiliated Debtors* (as may be amended, modified, or supplemented from time to time, the "**Disclosure Statement**") pursuant to chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

The Liquidation Analysis permits parties in interest to evaluate whether the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code, also referred to as the "best interests of creditors" test, and to make a decision with respect to how to vote on the Plan. Under this test, the Bankruptcy Court must find, as a condition to confirmation of the Plan, that each Holder of a Claim or Interest in an Impaired Class either (i) has accepted the Plan or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive if the applicable Debtor was liquidated under chapter 7 of the Bankruptcy Code. The Liquidation Analysis is based upon certain assumptions discussed in the Disclosure Statement, the Liquidation Analysis, and in the accompanying notes to the Liquidation Analysis.

To demonstrate satisfaction of the "best interests of creditors" test, the Debtors have:

     i.     estimated the Cash proceeds (the "**Liquidation Proceeds**") a chapter 7 trustee (the "**Trustee**") would generate if each Debtor's chapter 11 case was converted to a case under chapter 7 on the Conversion Date and the Assets of such Debtor's Estate were liquidated;

     ii.    determined the distribution each Holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme set forth in chapter 7 of the Bankruptcy Code (the "**Liquidation Distribution**"); and

     iii.   compared each Holder's Liquidation Distribution to such Holder's distribution under the Plan if it were confirmed and consummated.

**Statement of Limitations**

*The Liquidation Analysis represents an estimate of cash distributions and recovery percentages based on a hypothetical chapter 7 liquidation of the Debtors' Assets. It is, therefore, a hypothetical analysis based on certain assumptions discussed herein and in the Disclosure Statement. As such, Asset values and Claims discussed herein may differ materially from amounts referred to in the Plan and Disclosure Statement. The Liquidation Analysis should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety, as well as the notes and assumptions set forth below.*

*The determination of the costs of, and Liquidation Proceeds from, the hypothetical liquidation of the Debtors' Assets in chapter 7 cases is an uncertain process requiring estimates and assumptions that, although reasonable based on the Debtors' business judgment and input from the Debtors' experienced*

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

*legal and restructuring advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors. Inevitably, some assumptions in the Liquidation Analysis may not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in such a liquidation.*

*The Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the Liquidation Proceeds that would be realized in cases under chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. All limitations and risk factors set forth in the Disclosure Statement are applicable to the Liquidation Analysis and are incorporated by reference herein. The underlying financial information in the Liquidation Analysis was not compiled or examined by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants.*

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN OR IN THE DISCLOSURE STATEMENT OR A CHAPTER 7 TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS. IF THE CHAPTER 11 CASES ARE CONVERTED UNDER CHAPTER 7 OF THE BANKRUPTCY CODE, ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THE LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE LIQUIDATION ANALYSIS. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION, ADMISSION, OR ALLOWANCE BY THE DEBTORS (OR ANY OTHER PARTY) OR OF ANY CLAIMS BY OR AGAINST THE DEBTORS. THE ESTIMATED AMOUNT OF ALLOWED CLAIMS SET FORTH HEREIN SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING ANY DETERMINATION OF THE VALUE OF ANY DISTRIBUTION TO BE MADE ON ACCOUNT OF ALLOWED CLAIMS UNDER THE PLAN, OTHER THAN THE PRESENTATION OF A HYPOTHETICAL LIQUIDATION ANALYSIS. ACCORDINGLY, THE ASSET VALUES, AMOUNTS, AND PRIORITY OF ALLOWED CLAIMS IN THE LIQUIDATION ANALYSIS COULD DIFFER MATERIALLY FROM THE AMOUNTS SET FORTH IN THE PLAN OR THE DISCLOSURE STATEMENT.

## Basis of Presentation

The Liquidation Analysis was prepared by the Debtors, with the assistance of certain of their advisors, and assumes that the Debtors' Assets would be liquidated on a jointly administered but not substantively consolidated basis. The Liquidation Analysis further assumes that the Debtors' chapter 11 cases are converted into cases under chapter 7 cases of the Bankruptcy Code on March 31, 2026 (the "**Conversion Date**"), which is the milestone for entry of a Confirmation Order as set forth in the Cash Collateral Orders. Except as otherwise noted herein, the values reflected in the Liquidation Analysis are based on the unaudited books and records as of December 31, 2025, adjusted for the sales of the LiDAR Assets and LSI Assets, except for Cash and Accounts Receivables, which are estimated as of the Conversion Date. Such values are assumed to be representative of the Debtors' Assets and liabilities as of the Conversion Date.

The Liquidation Analysis was prepared on a legal entity basis for each Debtor. The Liquidation Analysis assumes that, on the Conversion Date, the Bankruptcy Court would appoint the Trustee who would monetize the remaining Assets and administer the wind down of the Estates. The Trustee would oversee the orderly process of liquidating the Debtors' Assets and the distribution of proceeds to Holders of Allowed

Claims and Interests.  The Debtors have assumed that the liquidation process would take approximately 12–24 months.[2]

The Liquidation Analysis includes an estimate of the amount of Claims that could ultimately be Allowed under a hypothetical chapter 7 liquidation.  No recovery or related litigation costs have been attributed to any potential Avoidance Actions under the Bankruptcy Code, including potential preferences or fraudulent transfer actions due to, among other issues, the cost of such litigation, the uncertainty of the outcome, and anticipated disputes regarding these matters.  Additionally, the Liquidation Analysis does not include estimates for tax consequences that may be triggered upon the liquidation and sale of the Debtors' assets. The tax consequences could be material.

In preparing the Liquidation Analysis, the amount of Allowed Claims have been projected based upon a review of scheduled Claims and projections of postpetition obligations.  In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the chapter 11 cases, but which could be asserted and Allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Expense Claims and chapter 7 Administrative Expense Claims, such as wind-down costs, Trustee fees, and tax liabilities. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims incorporated into the Liquidation Analysis. Consequently, Claims asserted or Allowed against the Debtors' Estates could be materially higher in a chapter 7 liquidation.  All amounts included in the Liquidation Analysis have not been discounted to present values.

In these chapter 11 cases, the Debtors intend to sell substantially all of their Assets prior to and following the Effective Date.  Accordingly, many of the assumptions and transactions underlying the Plan would remain the same in a chapter 7 liquidation.  However, if a Trustee is appointed, the Debtors expect that the Trustee would be required to invest substantial time and resources to diligence and analyze the Debtors' remaining Assets (including Causes of Action) and investigate the Claims filed against the Debtors' Estates. The Debtors also expect that there would be additional administrative costs in a chapter 7 liquidation on account of the (i) delay associated with appointing a Trustee, (ii) expected fees of the Trustee, and (iii) the Trustee's professional fees, which would impact creditors' recoveries.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE BY THE DEBTORS (OR ANY OTHER PARTY) OF ANY CLAIMS BY OR AGAINST THE DEBTORS.  THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION ANALYSIS.  THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

**Causes of Action**

As described in the Plan, on the Effective Date, the Debtors shall transfer to the Liquidation Trust all Retained Causes of Action, and the Liquidation Trustee may, on behalf of the Liquidation Trust, enforce all rights to pursue, compromise, or settle, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date.  Due to the uncertain nature of any litigation that might be pursued in connection with Causes of Action, the Debtors have not estimated the value of any potential proceeds or

---

[2]   Although the Liquidation Analysis assumes the liquidation process would occur over a period of 12–24 months, it is possible the disposition and recovery from certain Assets could take shorter or longer to realize.  Throughout this period, the Trustee would also incur administrative expenses, such as payroll, certain overhead, and professional expenses reasonably required to complete the wind-down of the Estates.

incremental litigation costs but believe the value of any potential proceeds or incremental litigation costs would be the same or lower in a chapter 7 liquidation.

**Debtors and Non-Debtor Affiliates**

In certain cases, the Debtors may have receivables from, or equity Interests in, certain non-Debtor Affiliates. The Liquidation Analysis reflects estimates related to these Assets.

**Distribution of Net Proceeds**

Any Liquidation Proceeds would be allocated to Holders of Claims and Interests in accordance with section 726 of the Bankruptcy Code, which provides for the following priority scheme:

- *Liquidation Costs*: includes estimated fees paid to the U.S. Trustee, wind-down costs, Trustee fees, and fees and expenses of advisors and other professionals retained by the Trustee, including expenses associated with selling and otherwise monetizing the Debtors' Assets;

- *First Lien Noteholder Secured Claims*: includes the Secured Claims held by the First Lien Noteholders against the Debtors;

- *Other Secured Claims*: includes trade Claims where the counterparty may hold offsetting receivables against the Debtors;

- *Second Lien Noteholder Secured Claims*: includes the Claims held by the Second Lien Noteholders against the Debtors;

- *Other Priority and Administrative Claims*: includes Claims from counterparties that are able to assert senior priority liens on the Debtors' assets and/or priority or administrative status for their Claims, including certain trade vendors, taxing authorities, and other holders of potential Other Priority Claims;

- *General Unsecured Claims*: includes trade Claims, rejection damages Claims, Intercompany Claims and potential litigation Claims;

- *Subordinated Claims*: includes claims assertable against the Debtors under sections 510(b) and (c) of the Bankruptcy Code;

- *Parent & Intercompany Interests*: includes Equity Interests in the Debtors.

Chapter 7 administrative expense claims that arise in a liquidation scenario would be paid in full from the Liquidation Proceeds prior to proceeds being made available for distribution to Holders of Allowed Claims. Under the "absolute priority rule," no junior creditor may receive any distributions until all senior creditors are paid in full, and no equityholder may receive any distributions until all creditors are paid in full. The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

**Conclusion**

Applying the estimates and assumptions described herein, the Debtors have determined, as summarized in the table below, that upon the Effective Date, the Plan will provide all Holders of Claims against and Interests in the Debtors with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors' Assets under chapter 7 of the Bankruptcy Code and thus believe the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code. The Debtors believe that

the Liquidation Analysis and the conclusions set forth herein are fair and represent the Debtors' best judgment regarding the results of a hypothetical liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

**Liquidation Analysis for the Debtors**

The schedule below presents the net Liquidation Proceeds available for distribution in hypothetical chapter 7 cases. The Liquidation Analysis estimates recoveries under an assumed liquidation of the Debtors' assets including high and low asset recoveries.

*Liquidation Analysis*

| Estimated Proceeds Generated (All figures in $000s) | | | | Luminar Technologies, Inc. | | | Luminar, LLC | | | LA2R Technologies, LLC | | | Condor Acquisition Sub I, Inc. | | | Condor Acquisition Sub II, Inc. | | | Total Debtors | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | Notes | Low | High | Balance | Low | High | Balance | Low | High | Balance | Low | High | Balance | Low | High | Balance | Low | High | Balance | Low | High |
| Cash and cash equivalents | 1 | 100% | 100% | $ 21,374 | 21,374 | 21,374 | $ - | - | - | $ 1 | 1 | 1 | $ - | - | - | $ - | - | - | $ 21,375 | 21,375 | 21,375 |
| Accounts receivable | 2 | 2% | 4% | 13,081 | 243 | 486 | - | - | - | - | - | - | - | - | - | - | - | - | 13,081 | 243 | 486 |
| Post-closing Escrow | 3 | 0% | 0% | 11,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 11,000 | - | - |
| Other assets | 4 | 22% | 42% | 13,333 | 3,433 | 6,690 | 3,896 | 283 | 565 | - | - | - | - | - | - | - | - | - | 17,229 | 3,715 | 7,255 |
| Property and equipment, net | 5 | 0% | 10% | 281 | - | 28 | - | - | - | - | - | - | - | - | - | - | - | - | 281 | - | 28 |
| **Total Distributable Value** | | | | | $ 25,050 | $ 28,578 | | $ 283 | 565 | | $ 1 | 1 | $ - | $ - | $ - | $ - | $ - | $ - | | $ 25,333 | $ 29,144 |
| **Less: Costs** | | Low | High | Amount | Low | High | Amount | Low | High | Amount | Low | High | Amount | Low | High | Amount | Low | High | Amount | Low | High |
| Chapter 7 Trustee Fees | 6 | 3% | 3% | | 751 | 857 | | 8 | 17 | | 0 | 0 | | | | | | | | 760 | 874 |
| Wind Down Costs | 7 | 100% | 100% | 4,000 | 4,000 | 4,000 | - | - | - | - | - | - | - | - | - | - | - | - | 4,000 | 4,000 | 4,000 |
| **Total Costs** | | | | | $ 4,751 | $ 4,857 | | $ 8 | 17 | | $ 0 | 0 | $ - | $ - | $ - | $ - | $ - | $ - | | $ 4,760 | $ 4,874 |
| **Net  Proceeds to Creditors** | | | | | $ 20,298 | $ 23,721 | | $ 274 | 548 | | $ 1 | 1 | $ - | $ - | $ - | $ - | $ - | $ - | | $ 20,573 | $ 24,270 |
| **Paydown - Waterfall** | | | | | | | | | | | | | | | | | | | | | |
| First Lien Noteholder Secured Claims | 8 | 84.4% | 99.0% | 23,954 | 19,948 | 23,168 | | 274 | 548 | | 1 | 1 | | - | - | | - | - | 23,954 | 20,223 | 23,717 |
| *Amount Available after satisfaction of First Lien Noteholder Secured Claims* | | | | | - | 0 | | - | - | | - | - | | | | | | | | | |
| Other Secured Claims | 9 | 100.0% | 100.0% | 8,000 | - | 0 | | - | - | | - | - | | - | - | | - | - | 8,000 | - | - |
| *Amount Available after satisfaction of Other Secured Claims* | | | | | - | 0 | | - | - | | - | - | | | | | | | | | |
| Second Lien Noteholder Secured Claims | 10 | 0.0% | 0.0% | - | - | - | | - | - | | - | - | | - | - | | - | - | - | - | - |
| *Amount Available after satisfaction of Second Lien Noteholder Secured Claims* | | | | | - | 0 | | - | - | | - | - | | | | | | | | | |
| Chapter 11 Administrative & Priority Claims | 11 | 43.8% | 69.1% | 800 | 350 | 553 | | - | - | | - | - | | - | - | | - | - | 800 | 350 | 553 |
| *Amount Available after satisfaction of Chapter 11 Administrative & Priority Claims* | | | | | - | - | | - | - | | - | - | | | | | | | | | |
| General Unsecured Claims | 12 | 0.0% | 0.0% | 532,770 | - | - | | - | - | | - | - | | - | - | | - | - | 532,770 | - | - |
| *Amount Available after satisfaction of General Unsecured Claims* | | | | | - | - | | - | - | | - | - | | | | | | | | | |
| Subordinated Claims | 13 | 0.0% | 0.0% | - | - | - | | - | - | | - | - | | - | - | | - | - | - | - | - |
| *Amount Available after satisfaction of Subordinated Claims* | | | | | - | - | | - | - | | - | - | | | | | | | | | |
| Parent and Intercompany Interest | 14 | 0.0% | 0.0% | - | - | - | | - | - | | - | - | | - | - | | - | - | | | |
| *Amount Available after satisfaction of Parent and Intercompany Interest* | | | | | - | - | | - | - | | - | - | | | | | | | | | |

**Specific Notes and Assumptions**

The following notes detail the assumed treatment and estimated value of (i) the Debtors' Assets, (ii) costs associated with the liquidation of these Assets, and (iii) any Claims that have been asserted or could be asserted against these Assets.

1. **Cash**

   The Debtors' Cash balance is estimated at $21.4 million as of the Conversion Date, which includes funds received through the sale of substantially all the Debtors' assets, redemption of the SAFE Note, cash held in letters of credit, and amount funded into the utility adequate assurance account. The estimated recovery for this Asset in chapter 7 cases is 100%.

2. **Accounts Receivables**

   Accounts Receivables include amounts owed to the Debtors by customers of the Debtors' LiDAR business not acquired by MicroVision. This amount reflects Accounts Receivables that the Debtors estimate will remain uncollected as of the Conversion Date. The estimated recovery for this Asset in chapter 7 cases is between 2% and 4%.

3. **Post-Closing Escrow**

   The LSI Stalking Horse Agreement contains a post-closing escrow of $11 million, to be held for a period of twelve months, as the buyer's sole recourse against Luminar in the event of the breach of certain representations and warranties. The estimated recovery for this Asset in chapter 7 cases is 0%.

4. **Other Assets**

   Other Assets include estimated investments in foreign subsidiaries, the NEXT Note, Plus-AI Safe Note and real property. The estimated recovery for these Assets in chapter 7 cases is between 22% and 42%.

5. **Property, Plant, and Equipment**

   Property, Plant, and Equipment is comprised of the Debtors' plant and machinery assets, office furniture and fixtures and capitalized leasehold improvements. The Debtors are expected to have sold, rejected, or abandoned most equipment leases by the Conversion Date. The estimated recovery for this Asset in chapter 7 cases is between 0% and 10%.

6. **Chapter 7 Trustee Fees**

   Section 326(a) of the Bankruptcy Code provides for Trustee fees of 3.0% for Liquidation Proceeds in excess of $1 million. Accordingly, the Debtors have estimated the Trustee fees based on section 326(a) of the Bankruptcy Code.

7. **Wind Down Trust Costs**

   Assumed liquidation costs include Trustee and professional fees associated with the wind-down of the Estates, including foreign subsidiaries (*e.g.*, liquidation and recovery of assets, claims reconciliation, and other administrative duties of the Trustee relating to such a wind down), as well as estimated expenses that would be incurred during the wind-down period, including technology expenses and overhead costs.

8. **First Lien Noteholder Secured Claims**

   Represents the Secured Claims related to First Lien Notes owed to the First Lien Noteholders that remain outstanding after the sale of the LSI Assets at the Redemption Price, as defined in the First Lien

Notes Indenture, plus accrued interest.  The aggregate balance of those Secured Claims as of the Conversion Date totals $24.0 million.

9. **Other Secured Claims**
Represents other claims secured by accounts receivables held by the counterparty.  The aggregate balance of the Other Secured Claims totals $8 million and payment is settled via non-cash offset of pre-petition payables.

10. **Second Lien Noteholder Secured Claims**
Represents the Secured Claims related to the Second Lien Notes owed to the Second Lien Noteholders that remain outstanding after the sale of the LSI Assets at the Make-Whole Premium, as defined in the Second Lien Notes Indenture, plus accrued interest.  The Second Lien Noteholder Secured Claims are not expected to have a recovery for such Holders after the proceeds are distributed per the Waterfall in a hypothetical chapter 7. The unpaid portion of approximately $272.9 million is considered a Second Lien Deficiency Claim and classified as General Unsecured Claim.

11. **Chapter 11 Administrative and Priority Claims**
This amount includes Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims that are senior in priority to General Unsecured Claims, including professional fee escrow account deficiencies, postpetition accounts payable, certain accrued expenses, postpetition payroll, and severance payments, in each case solely to the extent such amounts are entitled to priority status as of the Conversion Date.

12. **General Unsecured Claims**
This amount includes Claims arising from the Debtors' estimation of General Unsecured Claims based on Claims that have been scheduled, and General Unsecured Claims arising from the rejection of Executory Contracts and Unexpired Leases in cases under chapter 7 of the Bankruptcy Code.  Such rejection damages claims do not account for any assumption and assignment of Executory Contracts and Unexpired Leases that may occur prior to the Conversion Date or for Claims reconciliation process, including mitigation on part of the claimant.  The estimated General Unsecured Claims do not include Claims that are speculative in amount, including disputed litigation Claims, that may be asserted against the Debtors. Recoveries to the General Unsecured Claims are expected to be the liquidation value of unencumbered assets.

13. **Subordinated Claims**
This amount includes Claims asserted against the Debtors arising from the Securities Class Actions. As of the date of this analysis, no Claims have been filed and this amount is unknown.

14. **Parent and Intercompany Interests**
This line item represents any residual recovery value that would be allocated to Parent Interests or Intercompany Interests.  The above analysis does not contemplate any recovery for these Interests.

**EXHIBIT D**

**Plan Release, Injunction and Exculpation Provisions**

11.3        *Term of Injunctions or Stays*.

UNLESS OTHERWISE PROVIDED HEREIN OR IN A FINAL ORDER OF THE BANKRUPTCY COURT, ALL INJUNCTIONS OR STAYS ARISING UNDER OR ENTERED DURING THE CHAPTER 11 CASES UNDER SECTION 105 OR 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE LATER OF THE EFFECTIVE DATE AND THE DATE INDICATED IN THE ORDER PROVIDING FOR SUCH INJUNCTION OR STAY. FOR THE AVOIDANCE OF DOUBT, THE NOL ORDER SHALL REMAIN ENFORCEABLE BEYOND THE EFFECTIVE DATE.

11.4        *Injunction Against Interference with Plan.*

UPON THE ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND ALL OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT AND FORMER AFFILIATES, EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, AND PRINCIPALS, SHALL BE ENJOINED FROM TAKING ANY ACTION TO INTERFERE WITH THE IMPLEMENTATION OR THE OCCURRENCE OF THE EFFECTIVE DATE.

11.5        *Injunction*.

(a)        EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, OR FOR DISTRIBUTIONS REQUIRED TO BE PAID OR DELIVERED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, OR CAUSES OF ACTION THAT ARE (I) RELEASED OR DISCHARGED PURSUANT TO THE PLAN, INCLUDING UNDER SECTION 11.6(A) OR SECTION 11.6(B) OF THE PLAN, OR (II) SUBJECT TO EXCULPATION PURSUANT TO SECTION 11.7 OF THE PLAN, AND ALL OTHER PARTIES IN INTEREST, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, AN ESTATE, THE LIQUIDATION TRUST, THE LIQUIDATION TRUSTEE, THE RELEASED PARTIES, AND/OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO SECTION 11.7 OF THE PLAN WITH RESPECT TO THE EXCULPATED PARTIES), AS APPLICABLE, WITH RESPECT TO SUCH CLAIMS, INTERESTS, AND CAUSES OF ACTION:   (A) COMMENCING, CONDUCTING, OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION, OR OTHER PROCEEDING OF ANY KIND (INCLUDING ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE, OR OTHER FORUM) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR CAUSES OF ACTION; (B) ENFORCING, LEVYING, ATTACHING (INCLUDING ANY PREJUDGMENT ATTACHMENT), COLLECTING, OR OTHERWISE RECOVERING IN ANY MANNER OR BY ANY MEANS, WHETHER DIRECTLY, OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR CAUSES OF ACTION; (C) CREATING, PERFECTING, OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR CAUSES OF ACTION; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION

DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR CAUSES OF ACTION UNLESS (X) SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT EITHER IN A FILED PROOF OF CLAIM, OR IN ANOTHER DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF OR THAT OTHERWISE INDICATES THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE OR (Y) SUCH RIGHT TO SETOFF ARISES UNDER A POSTPETITION AGREEMENT WITH THE DEBTORS OR (I) AN EXECUTORY CONTRACT OR (II) AN UNEXPIRED LEASE, IN THE CASE OF (I) AND (II), THAT HAS BEEN ASSUMED BY THE DEBTORS AS OF THE EFFECTIVE DATE; (E) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN AND CONFIRMATION ORDER, TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW; AND (F) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR CAUSES OF ACTION RELEASED, SETTLED, AND/OR TREATED, ENTITLED TO A DISTRIBUTION, OR CANCELLED PURSUANT TO THE PLAN, INCLUDING PURSUANT TO SECTION 11.6(A) OR SECTION 11.6(B) OF THE PLAN OR OTHERWISE DISALLOWED; *PROVIDED* THAT SUCH ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST, INTERESTS IN, OR CAUSES OF ACTION AGAINST, A DEBTOR OR AN ESTATE SHALL NOT BE PRECLUDED FROM EXERCISING THEIR RIGHTS AND REMEDIES, OR OBTAINING THE BENEFITS, SOLELY PURSUANT TO AND CONSISTENT WITH THE TERMS OF THE PLAN.

       (b)     SUBJECT IN ALL RESPECTS TO SECTION 12.1 OF THE PLAN, NO ENTITY MAY COMMENCE OR PURSUE A CLAIM OR CAUSE OF ACTION OF ANY KIND AGAINST ANY RELEASED PARTY (SOLELY WITH RESPECT TO CLAIMS OR CAUSES OF ACTION THAT PURPORTEDLY MAY BE ASSERTABLE BY, OR ON BEHALF OF, A RELEASING PARTY) OR EXCULPATED PARTY THAT AROSE OR ARISES FROM, IN WHOLE OR IN PART:  THE DEBTORS (INCLUDING THE GOVERNANCE, MANAGEMENT, DIRECT OR INDIRECT OWNERSHIP, TRANSACTIONS WITH, OR OPERATION THEREOF) OR THEIR ESTATES; THE LIQUIDATION TRUST; THE LIQUIDATION TRUSTEE; THE CHAPTER 11 CASES (INCLUDING THE FILING AND ADMINISTRATION THEREOF); THE WIND DOWN; THE DISCLOSURE STATEMENT; THE NEGOTIATION, FORMULATION, PREPARATION, DISSEMINATION, OR CONSUMMATION OF ANY CONTRACT, INSTRUMENT, RELEASE, OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN (INCLUDING THE PLAN SUPPLEMENT); ANY OTHER DEBT OR SECURITY OF THE DEBTORS AND THE OWNERSHIP THEREOF; THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY DEBT OR SECURITY OF THE DEBTORS (WHICH INCLUDES, FOR THE AVOIDANCE OF DOUBT, ALL CLAIMS AND CAUSES OF ACTION ASSERTED OR ASSERTABLE IN THE SECURITIES CLASS ACTIONS); THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN; THE BUSINESS OR CONTRACTUAL OR OTHER ARRANGEMENTS OR OTHER INTERACTIONS BETWEEN ANY RELEASING PARTY AND ANY RELEASED PARTY OR EXCULPATED PARTY; THE RESTRUCTURING OF ANY CLAIM OR INTEREST BEFORE OR DURING THE CHAPTER 11 CASES; ANY OTHER IN-OR-OUT-OF-COURT RESTRUCTURING EFFORTS OF THE DEBTORS; ANY INTERCOMPANY OBLIGATIONS, TRANSACTIONS, OR TRANSFERS; THE FORMULATION, PREPARATION, NEGOTIATION, DISSEMINATION, SOLICITATION, FILING, CONFIRMATION, AND CONSUMMATION OF THE PLAN

(INCLUDING THE PLAN SUPPLEMENT) AND THE TRANSACTIONS CONTEMPLATED BY THE CONFIRMATION ORDER; THE FUNDING OF THE PLAN; THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN OR CONFIRMATION ORDER, INCLUDING THE DISTRIBUTION OF PROPERTY UNDER THE PLAN; OR ANY OTHER AGREEMENT, ACT OR OMISSION, TRANSACTION, TRANSFER, EVENT, OR OTHER OCCURRENCE RELATED TO THE FOREGOING AND TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATED OR RELATING TO THE FOREGOING WITHOUT THE BANKRUPTCY COURT (I) FIRST DETERMINING, AFTER NOTICE AND A HEARING, THAT SUCH CLAIM OR CAUSE OF ACTION REPRESENTS A COLORABLE CLAIM THAT HAS NOT, WITH RESPECT TO A RELEASED PARTY, BEEN RELEASED UNDER THE PLAN OR, WITH RESPECT TO AN EXCULPATED PARTY, BEEN EXCULPATED UNDER THE PLAN AND (II) SPECIFICALLY AUTHORIZING SUCH ENTITY TO BRING SUCH CLAIM OR CAUSE OF ACTION AGAINST ANY SUCH RELEASED PARTY OR EXCULPATED PARTY. THE BANKRUPTCY COURT SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION TO DETERMINE WHETHER A CLAIM OR CAUSE OF ACTION IS COLORABLE AND HAS NOT BEEN RELEASED OR EXCULPATED (AS APPLICABLE) AND, ONLY TO THE EXTENT LEGALLY PERMISSIBLE AND AS PROVIDED FOR IN SECTION 12.1 OF THE PLAN, SHALL HAVE JURISDICTION TO ADJUDICATE THE UNDERLYING COLORABLE CLAIM OR CAUSE OF ACTION. FOR THE AVOIDANCE OF DOUBT, THE FOREGOING SENTENCE IS SUBJECT TO APPLICABLE LAW REGARDING THE BANKRUPTCY COURT'S SUBJECT MATTER JURISDICTION TO HEAR SUCH MATTER.

(c)     BY PARTICIPATING IN THE PLAN BY VOTING OR BY ACCEPTING PLAN DISTRIBUTIONS PURSUANT TO THE PLAN (IN WHATEVER SUM), EACH HOLDER OF AN ALLOWED CLAIM EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN SHALL BE DEEMED TO HAVE AFFIRMATIVELY AND SPECIFICALLY CONSENTED TO BE BOUND BY THE PLAN, INCLUDING THE INJUNCTIONS SET FORTH IN THIS SECTION 11.5, AND EACH SUCH HOLDER ACKNOWLEDGES AND ACCEPTS THAT THE PLAN IS A BINDING COMPROMISE OF AN ALLOWED CLAIM OR AN INTEREST EXTINGUISHED AND RELEASES ALL RIGHTS IN RESPECT OF SUCH ALLOWED CLAIM OR INTEREST EXTINGUISHED SUCH THAT SUCH HOLDERS OF CLAIMS AGREE TO WAIVE ANY RIGHT (IF ANY) TO OBJECT TO OR OTHERWISE CHALLENGE THE PLAN AND ITS EFFECT ON CLAIMS OR ANY OTHER MATTER WHATSOEVER AND THAT SUCH RELEASE AND WAIVER SHALL BE EFFECTIVE IRRESPECTIVE OF WHICH LAW GOVERNS THE RIGHTS OF THE SAID HOLDER AS AGAINST A DEBTOR.

(d)     THE INJUNCTIONS IN THIS SECTION 11.5 SHALL EXTEND TO ANY SUCCESSORS OF THE DEBTORS AND THEIR RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.

11.6     *Releases*.

(a)     RELEASES BY THE DEBTORS AND THEIR ESTATES.  EXCEPT AS OTHERWISE EXPRESSLY SET FORTH BELOW IN THIS SECTION 11.6(A), NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, AS OF THE CONFIRMATION DATE AND THE EFFECTIVE DATE, THE DEBTORS, THE ESTATES, THE LIQUIDATION TRUST, AND THE LIQUIDATION TRUSTEE, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, ANY

ESTATE REPRESENTATIVE(S) APPOINTED OR SELECTED PURSUANT TO SECTION 1123(B)(3) OF THE BANKRUPTCY CODE, AND ANY AND ALL OTHER ENTITIES THAT MAY PURPORT TO ASSERT ANY CLAIM OR CAUSE OF ACTION DERIVATIVELY BY OR THROUGH ANY OF THE FOREGOING ENTITIES, SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS OR THE ESTATES), WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE THAT THE DEBTORS OR THE ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART: ANY ACT OR OMISSION, OBLIGATION, TRANSACTION, TRANSFER, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE OR THE EFFECTIVE DATE, AS APPLICABLE, INCLUDING ANY CLAIMS OR CAUSES OF ACTION BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE GOVERNANCE, MANAGEMENT, DIRECT OR INDIRECT OWNERSHIP, TRANSACTIONS WITH, OR OPERATION THEREOF) OR THEIR ESTATES; THE LIQUIDATION TRUST; THE LIQUIDATION TRUSTEE; THE CHAPTER 11 CASES (INCLUDING THE FILING AND ADMINISTRATION THEREOF); THE WIND DOWN; THE DISCLOSURE STATEMENT; THE NEGOTIATION, FORMULATION, PREPARATION, DISSEMINATION, OR CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY ANY CONTRACT, INSTRUMENT, RELEASE, OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN (INCLUDING THE PLAN SUPPLEMENT); ANY OTHER DEBT OR SECURITY OF THE DEBTORS AND THE OWNERSHIP THEREOF; THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY DEBT OR SECURITY OF THE DEBTORS (WHICH INCLUDES, FOR THE AVOIDANCE OF DOUBT, ALL CLAIMS OR CAUSES OF ACTION ASSERTED OR ASSERTABLE IN THE SECURITIES CLASS ACTIONS); THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN; THE BUSINESS OR CONTRACTUAL OR OTHER ARRANGEMENTS OR OTHER INTERACTIONS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY; THE RESTRUCTURING OF ANY CLAIM OR INTEREST BEFORE OR DURING THE CHAPTER 11 CASES; ANY OTHER IN-OR-OUT-OF-COURT RESTRUCTURING EFFORTS OF THE DEBTORS; ANY INTERCOMPANY OBLIGATIONS, TRANSACTIONS, OR TRANSFERS; THE FORMULATION, PREPARATION, NEGOTIATION, DISSEMINATION, SOLICITATION, FILING, CONFIRMATION, AND CONSUMMATION OF THE PLAN (INCLUDING THE PLAN SUPPLEMENT) AND THE TRANSACTIONS CONTEMPLATED BY THE CONFIRMATION ORDER; THE FUNDING OF THE PLAN; THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN OR THE CONFIRMATION ORDER, INCLUDING THE DISTRIBUTION OF PROPERTY UNDER THE PLAN; OR ANY OTHER AGREEMENT, ACT OR OMISSION, TRANSACTION, TRANSFER, EVENT, OR OTHER OCCURRENCE RELATED TO THE FOREGOING AND TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE OR THE EFFECTIVE DATE, AS APPLICABLE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES CONTAINED IN THIS SECTION 11.6(A) SHALL NOT BE CONSTRUED AS RELEASING (A) ANY RELEASED PARTY FROM CLAIMS OR CAUSES OF ACTION ARISING FROM AN ACT OR OMISSION THAT IS JUDICIALLY DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED ACTUAL FRAUD, CRIMINAL

MISCONDUCT, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (B) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN OR THE TRANSACTIONS CONTEMPLATED BY THE CONFIRMATION ORDER, (C) BEFORE THE EFFECTIVE DATE, ANY POST-CONFIRMATION DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN OR THE TRANSACTIONS CONTEMPLATED BY THE CONFIRMATION ORDER, OR (D) ANY INTERCOMPANY CLAIMS, WHICH, FOR THE AVOIDANCE OF DOUBT, SHALL BE TREATED IN ACCORDANCE WITH SECTION 4.6 OF THE PLAN. NOTWITHSTANDING ANYTHING ELSE IN THE PLAN, DISCLOSURE STATEMENT, OR THE CONFIRMATION ORDER, NO PERSON OR ENTITY NOT DEFINED AS A RELEASED PARTY, SHALL BE DEEMED TO BE GRANTED A RELEASE UNDER THE PLAN OR CONFIRMATION ORDER.

IN ADDITION, PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, AS OF THE CONFIRMATION DATE AND THE EFFECTIVE DATE, THE DEBTORS, THE ESTATES, THE LIQUIDATION TRUST, AND THE LIQUIDATION TRUSTEE, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, ANY ESTATE REPRESENTATIVE(S) APPOINTED OR SELECTED PURSUANT TO SECTION 1123(B)(3) OF THE BANKRUPTCY CODE, AND ANY AND ALL OTHER ENTITIES THAT MAY PURPORT TO ASSERT ANY CLAIM OR CAUSE OF ACTION DERIVATIVELY BY OR THROUGH ANY OF THE FOREGOING ENTITIES, SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED THE DEBTORS' TRADE VENDORS FROM ANY AND ALL PREFERENCE ACTIONS.

(b)    THIRD-PARTY RELEASES.    NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, EACH RELEASING PARTY IS DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED EACH RELEASED PARTY FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS OR CAUSES OF ACTION ASSERTED OR ASSERTABLE ON BEHALF OF THE RELEASING PARTIES THAT SUCH RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART: ANY ACT OR OMISSION, OBLIGATION, TRANSACTION, TRANSFER, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING ANY CLAIMS OR CAUSES OF ACTION BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE GOVERNANCE, MANAGEMENT, DIRECT OR INDIRECT OWNERSHIP, TRANSACTIONS WITH, OR OPERATION THEREOF) OR THEIR ESTATES; THE LIQUIDATION TRUST; THE LIQUIDATION TRUSTEE; THE CHAPTER 11 CASES (INCLUDING THE FILING AND ADMINISTRATION THEREOF); THE WIND DOWN;

THE DISCLOSURE STATEMENT; THE NEGOTIATION, FORMULATION, PREPARATION, DISSEMINATION, OR CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY ANY CONTRACT, INSTRUMENT, RELEASE, OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN (INCLUDING THE PLAN SUPPLEMENT); ANY OTHER DEBT OR SECURITY OF THE DEBTORS AND THE OWNERSHIP THEREOF; THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY DEBT OR SECURITY OF THE DEBTORS (WHICH INCLUDES, FOR THE AVOIDANCE OF DOUBT, ALL CLAIMS AND CAUSES OF ACTION ASSERTED OR ASSERTABLE IN THE SECURITIES CLASS ACTIONS); THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN; THE BUSINESS OR CONTRACTUAL OR OTHER ARRANGEMENTS OR OTHER INTERACTIONS BETWEEN ANY RELEASING PARTY AND ANY RELEASED PARTY IN CONNECTION WITH THE DEBTORS; THE RESTRUCTURING OF ANY CLAIM OR INTEREST BEFORE OR DURING THE CHAPTER 11 CASES; ANY OTHER IN-OR-OUT-OF-COURT RESTRUCTURING EFFORTS OF THE DEBTORS; ANY INTERCOMPANY OBLIGATIONS, TRANSACTIONS, OR TRANSFERS; THE FORMULATION, PREPARATION, NEGOTIATION, DISSEMINATION, SOLICITATION, FILING, CONFIRMATION, AND CONSUMMATION OF THE PLAN (INCLUDING THE PLAN SUPPLEMENT) AND THE TRANSACTIONS CONTEMPLATED BY THE CONFIRMATION ORDER; THE FUNDING OF THE PLAN; THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN OR THE CONFIRMATION ORDER, INCLUDING THE DISTRIBUTION OF PROPERTY UNDER THE PLAN; OR ANY OTHER AGREEMENT, ACT OR OMISSION, TRANSACTION, TRANSFER, EVENT, OR OTHER OCCURRENCE RELATED TO THE FOREGOING AND TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE; *PROVIDED* THAT, WITH RESPECT TO CLAIMS AGAINST THE DEBTORS, THIS SECTION 11.6(B) SHALL ONLY APPLY TO CLAIMS ARISING FROM ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE TAKING PLACE FROM AND INCLUDING THE PETITION DATE THROUGH THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES CONTAINED IN THIS SECTION 11.6(B) SHALL NOT BE CONSTRUED AS RELEASING (A) ANY RELEASED PARTY FROM CLAIMS OR CAUSES OF ACTION ARISING FROM AN ACT OR OMISSION THAT IS JUDICIALLY DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, CRIMINAL MISCONDUCT, OR GROSS NEGLIGENCE, (B) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN OR THE TRANSACTIONS CONTEMPLATED BY THE CONFIRMATION ORDER, OR (C) ANY RIGHT HELD, RETAINED, OR PRESERVED BY EITHER THE FIRST LIEN NOTES AGENT OR SECOND LIEN NOTES AGENT UNDER THIS PLAN, AGAINST THE FIRST LIEN NOTEHOLDERS AND SECOND LIEN NOTEHOLDERS, RESPECTIVELY. NOTHING CONTAINED IN THE PLAN, NOR THE RELEASE OF ANY CLAIMS PURSUANT TO THE PLAN, IS EVIDENCE OF THE MERIT, OR LACK OF MERIT, OF THE CLAIMS OR CAUSES OF ACTION RELEASED BY THE PLAN.

11.7    *Exculpation*.

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NO EXCULPATED PARTY SHALL HAVE OR INCUR LIABILITY FOR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM, ANY CAUSE OF ACTION BASED ON, RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, FROM THE PETITION DATE THROUGH THE EFFECTIVE DATE: THE DEBTORS

(INCLUDING THE GOVERNANCE, MANAGEMENT, DIRECT OR INDIRECT OWNERSHIP, TRANSACTIONS WITH, OR OPERATION THEREOF) OR THEIR ESTATES; THE LIQUIDATION TRUST; THE LIQUIDATION TRUSTEE; THE CHAPTER 11 CASES (INCLUDING THE FILING AND ADMINISTRATION THEREOF); THE WIND DOWN; THE DISCLOSURE STATEMENT; THE NEGOTIATION, FORMULATION, PREPARATION, DISSEMINATION, OR CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY ANY CONTRACT, INSTRUMENT, RELEASE, OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN (INCLUDING THE PLAN SUPPLEMENT); ANY OTHER DEBT OR SECURITY OF THE DEBTORS AND THE OWNERSHIP THEREOF; THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY DEBT OR SECURITY OF THE DEBTORS; THE BUSINESS OR CONTRACTUAL OR OTHER ARRANGEMENTS OR OTHER INTERACTIONS BETWEEN ANY DEBTOR AND ANY EXCULPATED PARTY; THE RESTRUCTURING OF ANY CLAIM OR INTEREST DURING THE CHAPTER 11 CASES OR ON THE EFFECTIVE DATE; ANY INTERCOMPANY OBLIGATIONS, TRANSACTIONS, OR TRANSFERS; THE FORMULATION, PREPARATION, NEGOTIATION, DISSEMINATION, SOLICITATION, FILING, CONFIRMATION, AND CONSUMMATION OF THE PLAN (INCLUDING THE PLAN SUPPLEMENT) AND THE TRANSACTIONS CONTEMPLATED BY THE CONFIRMATION ORDER; THE FUNDING OF THE PLAN; THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN OR CONFIRMATION ORDER, INCLUDING THE DISTRIBUTION OF PROPERTY UNDER THE PLAN; OR ANY OTHER AGREEMENT, ACT OR OMISSION, TRANSACTION, TRANSFER, EVENT, OR OTHER OCCURRENCE RELATED TO THE FOREGOING AND TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE EXCULPATIONS IN THIS SECTION 11.7 SHALL NOT RELEASE OR EXCULPATE (A) ANY ENTITY FROM CLAIMS OR CAUSES OF ACTION ARISING FROM AN ACT OR OMISSION THAT IS JUDICIALLY DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED ACTUAL FRAUD (*PROVIDED* THAT ACTUAL FRAUD SHALL NOT EXEMPT FROM THE SCOPE OF THESE EXCULPATIONS ANY CLAIMS OR CAUSES OF ACTION ARISING UNDER SECTIONS 544 OR 548 OF THE BANKRUPTCY CODE OR STATE OR FOREIGN LAWS GOVERNING FRAUDULENT OR OTHERWISE AVOIDABLE TRANSFERS OR CONVEYANCES), WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, OR (B) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.  FOR THE AVOIDANCE OF DOUBT, THE EXCULPATIONS CONTAINED IN THIS SECTION 11.7 WILL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES SET FORTH IN SECTIONS 11.6(A) AND 11.6(B).

11.8     *Waiver of Statutory Limitation on Releases*.

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER ARTICLE XI OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS. WITHOUT LIMITING THE GENERALITY OF THE

**FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES CONTAINED IN SECTION 11.6 OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.**

11.9     *Injunction Related to Releases and Exculpation.*

**THE CONFIRMATION ORDER SHALL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY ENTITY, WHETHER DIRECTLY, DERIVATIVELY, OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, LOSSES, OR LIABILITIES RELEASED OR EXCULPATED PURSUANT TO THE PLAN, INCLUDING THE CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, AND LIABILITIES RELEASED OR EXCULPATED IN THE PLAN OR THE CONFIRMATION ORDER.**

**Exhibit E**

**Solicitation and Voting Procedures**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **LUMINAR TECHNOLOGIES, INC.,** | § | Case No. 25-90807 (CML) |
| *et al.*, | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

## SOLICITATION AND VOTING PROCEDURES

      **PLEASE TAKE NOTICE** that on December 15, 2025 and December 31, 2025, as applicable, Luminar Technologies, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") each filed a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases. On December 30, 2025, the U.S. Trustee appointed an official committee of unsecured creditors. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.

      **PLEASE TAKE FURTHER NOTICE** that on February 18, 2026, the Bankruptcy Court entered the *Order (I) Approving Disclosure Statement (II) Establishing Solicitation, Voting, and Related Procedures; (III) Scheduling Confirmation Hearing, (IV) Establishing Notice and Objection Procedures for Confirmation of Plan; (V) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases, and (VI) Granting Related Relief* (Docket No. 430) (the "**Disclosure Statement Order**"),[2] which, among other things:

          (i)      authorized the Debtors to solicit votes on the *Third Amended Chapter 11 Plan of Liquidation of Luminar Technologies, Inc. and Its Affiliated Debtors* (attached as Exhibit A to this Disclosure Statement, and as may be modified, amended, or supplemented, the "**Plan**"); and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: LAZR Technologies, LLC (8909); Luminar Technologies, Inc. (4317); Luminar, LLC (7133); Condor Acquisition Sub I, Inc. (0155); and Condor Acquisition Sub II, Inc. (8587). The Debtors' mailing address is 2603 Discovery Drive, Suite 100, Orlando, Florida 32826.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed in such terms in the Disclosure Statement or Plan, as applicable.

(ii)  approved this *Disclosure Statement for Third Amended Chapter 11 Plan of Liquidation of Luminar Technologies, Inc. and Its Affiliated Debtors* (the "**Disclosure Statement**").

## A.  Parties Entitled to Vote.

Holders of Claims in Class 3 (First Lien Noteholder Secured Claims), Class 4 (Second Lien Noteholder Secured Claims), and Class 5 (General Unsecured Claims) are Impaired and entitled to receive distributions under the Plan and, thus, may vote to accept or reject the Plan, subject to certain exceptions discussed below (each, a "**Voting Class**," and collectively, the "**Voting Classes**").

A Holder of a Claim in a Voting Class is nonetheless not entitled to vote to the extent that:

(a)  as of the Voting Record Date (as defined below), such Holder's Claim relates to a debt or obligation that the Debtors have already paid or satisfied;

(b)  as of the Voting Record Date, the outstanding amount of such Holder's Claim is zero ($0.00);

(c)  as of the Voting Record Date, such Holder's Claim has been Disallowed, expunged, disqualified, or suspended;

(d)  such Holder has not timely filed a Proof of Claim in accordance with the *Order (I) Establishing Deadlines to File Proofs of Claim and (II) Approving Form and Manner of Notice Thereof* (Docket No. 118) (the "**Bar Date Order**") as of the Bar Date and the Debtors have not scheduled such Holder's Claim or have scheduled such Holder's Claim in an undetermined amount or as contingent, unliquidated, or disputed or such Holder is not required to file a Proof of Claim pursuant to the Bar Date Order; *provided*, that to the extent that such Holder's deadline to File a Claim arising from any rejection of an Executory Contract or Unexpired Lease to which such Holder is party has not yet occurred, such Holder will be entitled to vote in the amount of $1.00 on account of such Claim; or

(e)  such Holder's Claim is subject to an objection, a request for estimation, or an adversary proceeding as of **March 9, 2026 at 4:00 p.m. (Central Time)**, subject to the procedures set forth below; *provided* that, any such Holder shall receive a Ballot and may submit such Ballot on a provisional basis and may elect to opt out of the Non-Debtor Release Provisions (as defined below) contained in the Plan.  To the extent such Holder does not file a Rule 3018 Motion in accordance with the instructions set forth below, the Ballot will not be counted for voting purposes; however, any opt out election made by such Holder on its Ballot with respect to the Non-Debtor Release Provisions contained in the Plan shall be valid so long as such Ballot is submitted in accordance with the procedures set forth herein. To the extent such Holder files a Rule 3018 Motion in accordance with the instructions set forth below, the extent to which such Ballot shall be counted for voting purposes will be determined by the Bankruptcy Court or as otherwise agreed by the Debtors and the Holder.

With respect to transfers of Claims required to be filed pursuant to Bankruptcy Rule 3001(e), the transferee shall be entitled to receive a Solicitation Package (as defined below) and, if the Holder of such Claim is otherwise entitled to vote with respect to the Plan, cast a Ballot (defined below) on account of such Claim only if: (i) all actions necessary to transfer such Claim are completed by the Voting Record Date or (ii) the transferee Files with the Bankruptcy Court, by the Voting Record Date, (a) all documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (b) a sworn statement of the transferor supporting the validity of the transfer.  In the event a Claim is transferred after the Voting Record Date, the transferee of such Claim shall be bound by any vote or election on the Plan made by the Holder of such Claim as of the Voting Record Date.

Where any portion of a single Claim has been transferred to a transferee and notice of such transfer is required to be filed pursuant to Bankruptcy Rule 3001(e), all Holders of any portion of such single Claim may be (i) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code and (ii) required to vote every portion of such Claim collectively to accept or reject the Plan.  In the event that (i) a Ballot, (ii) a group of Ballots within a Voting Class received from a single creditor, or (iii) a group of Ballots received from the various Holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots may not be counted in the Debtors' discretion.

## B.    Parties Not Entitled to Vote.

Holders of Claims in Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims) are Unimpaired and are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Holders of Claims in Class 6 (Intercompany Claims) are either Impaired and deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or Unimpaired and presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Holders of Claims and Interests in Class 7 (Intercompany Interests), Class 8 (Subordinated Claims), and Class 9 (Parent Interests) are Impaired and are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, Holders of Claims and Interests in the foregoing Classes (collectively, the "**Non-Voting Classes**") are not entitled to vote to accept or reject the Plan.

## C.    Voting Record Date.

The Bankruptcy Court has established **February 18, 2026** as the record date for purposes of determining (i) which Holders of Claims in the Voting Classes are entitled to vote on the Plan and (ii) which Holders of Claims and Interests are entitled to receive a Notice of Non-Voting Status (as defined below) (the "**Voting Record Date**").

## D.    Establishing Claim Amounts for Voting Purposes.

### 1.    First Lien Noteholder Claims (Classes 3 and 5).

The amount of each First Lien Noteholder Secured Claim and First Lien Noteholder Deficiency Claim, if any, for voting purposes only, shall be (i) based on the Redemption Price of the outstanding principal amount of the First Lien Notes assuming, solely for such purposes, a repayment on such notes as of the Voting Record Date (the "**Aggregate First Lien Noteholder**

Voting Amount") and (ii) established by reference to the books and records of the applicable Notes Nominee (as defined below) as of the Voting Record Date and as evidenced by the securities position report from the Deposit Trust Company, giving effect to the value of the Collateral as based on (a) the Debtors' Cash on hand plus (b) the sum of the successful bids for each of the LSI Assets and LiDAR Assets (each as defined in the Global Bidding Procedures Motion), each as of the Voting Record Date (the "**Collateral Value**").[3]  Each First Lien Noteholder shall be entitled to vote its (i) First Lien Noteholder Secured Claim in the amount of its Pro Rata Share of an amount equal to the lesser of the Aggregate First Lien Noteholder Voting Amount and the Collateral Value (the "**Aggregate First Lien Noteholder Secured Voting Amount**") and (ii) if the Aggregate First Lien Noteholder Voting Amount exceeds the Collateral Value, the First Lien Noteholder Deficiency Claim in the amount of its Pro Rata Share of the difference between the Aggregate First Lien Noteholder Voting Amount and the Aggregate First Lien Noteholder Secured Voting Amount.

2.    **Second Lien Noteholder Claims (Classes 4 and 5)**.

The amount of each Second Lien Noteholder Secured Claim, if any, and Second Lien Noteholder Deficiency Claim, for voting purposes only, shall be (i) based on the Redemption Price of the outstanding principal amount of the Second Lien Notes assuming, solely for such purposes, a repayment on such notes as of the Voting Record Date (the "**Aggregate Second Lien Noteholder Voting Amount**") and (ii) established by reference to the books and records of the applicable Notes Nominee (as defined below) as of the Voting Record Date and as evidenced by the securities position report from the Deposit Trust Company, giving effect to the Collateral Value and the Aggregate First Lien Noteholder Secured Voting Amount; *provided, however*, that for purposes of calculating the Aggregate Second Lien Noteholder Voting Amount, the amount of the Make-Whole Premium (as defined in the Second Lien Notes Indenture) that would have otherwise been included in the calculation of the Redemption Price of the Second Lien Notes shall instead be reduced by 50%, and the amount of accrued interest that would have otherwise been included in the calculation of the Redemption Price of the Second Lien Notes shall be limited to only any such interest (including Default Interest, as defined in the Second Lien Notes Indenture) accrued and unpaid through the Petition Date.

To the extent the Collateral Value exceeds the Aggregate First Lien Noteholder Voting Amount, each Second Lien Noteholder shall be entitled to vote its (i) Second Lien Noteholder Secured Claim in the amount of its Pro Rata Share of an amount equal to the lesser of (A) the difference between the Collateral Value and the Aggregate First Lien Noteholder Voting Amount and (B) the Aggregate Second Lien Noteholder Voting Amount (the lesser of (A) and (B), the "**Aggregate Second Lien Noteholder Secured Voting Amount**") and (ii) if the Aggregate Second Lien Noteholder Voting Amount exceeds the Aggregate Second Lien Noteholder Secured

---

[3] "**Global Bidding Procedures Motion**" means the *Emergency Motion of Debtors for Entry of an Order (I) Approving (A) Global Bidding Procedures for Sale of Debtors' Assets, (B) Designation of Stalking Horse Bidder and Stalking Horse Bid, (C) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (D) Assumption and Assignment Procedures and Form and manner of Notice of Assumption and Assignment; (II) Authorizing Entry Into the Stalking Horse Agreement; (III) Scheduling an Auction and Sale Hearing; (IV) Authorizing the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances; (V) Approving Compliance with Indenture in Connection with Sale Including Use of Net Sale Proceeds to Pay Down Prepetition Debt; and (VI) Granting Related Relief* (Docket No. 86).

Voting Amount, its Second Lien Noteholder Deficiency Claim in the amount of its Pro Rata Share of the difference between the Aggregate Second Lien Noteholder Voting Amount and the Aggregate Second Lien Noteholder Secured Voting Amount.

To the extent the Collateral Value does not exceed the Aggregate First Lien Noteholder Voting Amount, each Second Lien Noteholder shall be entitled to vote its (i) Pro Rata Share of a single Second Lien Noteholder Secured Claim in the amount of $1.00, which shall be allocated collectively among the Second Lien Noteholders and (ii) Second Lien Deficiency Claim in the amount of its Pro Rata Share of the Aggregate Second Lien Noteholder Voting Amount.

3. **Unsecured Notes Claims (Class 5).**

The amount of each Unsecured Notes Claim, for voting purposes only, shall be (i) based on the outstanding principal amount of the Unsecured Notes plus accrued and unpaid interest to the Petition Date to the extent provided in the Unsecured Notes Indenture (the "**Unsecured Noteholder Voting Amount**") and (ii) established by reference to the books and records of the applicable Notes Nominee (as defined below) as of the Voting Record Date and as evidenced by the securities position report from the Deposit Trust Company. Each Unsecured Noteholder shall be entitled to vote its Unsecured Notes Claim in the amount of its Pro Rata Share of the Unsecured Noteholder Voting Amount.

4. **General Unsecured Claims (Class 5).**

Except as otherwise provided herein and solely to the extent such Holder is entitled to vote under these procedures, the amount of each General Unsecured Claim in Class 5, for voting purposes only, shall be established pursuant to the following hierarchy:

(a) if a Claim has been estimated or otherwise Allowed for voting purposes by order of the Bankruptcy Court, such Claim is temporarily Allowed in the amount so estimated or Allowed by this Bankruptcy Court;

(b) if (a) does not apply, but the Claim has been estimated or otherwise Allowed for voting purposes pursuant to a stipulation, settlement, or other agreement in writing reached between the applicable Debtor(s) and the Holder of the Claim (whether such stipulation, settlement, or agreement is Filed or not), such Claim is temporarily Allowed against such Debtor(s) in the amount set forth in the stipulation, settlement, or other agreement;

(c) if neither (a) nor (b) applies, then in the liquidated, non-contingent, and undisputed amount set forth on a Proof of Claim timely Filed in accordance with the Bar Date Order as of the Voting Record Date; *provided* that, if the amount set forth on a timely-Filed Proof of Claim is wholly unliquidated, contingent, and/or disputed (as determined on the face of the Claim or based on reasonable review by the Debtors and/or the Voting Agent), then the Claim shall be temporarily allowed for voting purposes in the amount of $1.00;

(d) if neither (a), (b), nor (c) applies, then in the liquidated, non-contingent, and undisputed amount set forth on the Debtors' Schedules; *provided* that, if the Claim appearing on the Debtors' Schedules is either contingent, unliquidated, and/or disputed, or in a $0.00 amount, then the Claim shall be Disallowed for voting purposes, except to the extent that

such Holder's deadline to File a Proof of Claim arising from any rejection of an Executory Contract or Unexpired Lease to which such Holder is party has not yet occurred; *provided*, that, to the extent such Holder's deadline to File a Proof of Claim has not yet occurred, such Holder will be entitled to vote in the amount of $1.00 on account of such Claim;

(e) notwithstanding anything to the contrary contained herein, any Holder who has Filed duplicate Proofs of Claim or purchased duplicate Claims within the same Voting Class may be provided with only one Solicitation Package and one Ballot for voting a single Claim in such Class, regardless of whether the Debtors have objected to such duplicate Claims; and

(f) if a Proof of Claim has been amended by a later Proof of Claim that is Filed on or prior to the Bar Date, the later Filed amended Proof of Claim shall be entitled to vote in a manner consistent with these tabulation rules, and the earlier Filed Proof of Claim shall be Disallowed for voting purposes, regardless of whether the Debtors have objected to such amended Proof of Claim.  Except as otherwise ordered by the Bankruptcy Court, any amendments to Proofs of Claim after the Bar Date shall not be considered for purposes of these tabulation rules.

5. **General.**

If the Debtors have Filed an objection to, a request for estimation of, or an adversary proceeding relating to a Claim or Interest on or before **March 9, 2026 at 4:00 p.m. (Central Time)**, such Claim or Interest shall be temporarily Disallowed for voting purposes, except as ordered by the Bankruptcy Court before the Voting Deadline; *provided*, *however*, that, if the Debtors' objection seeks only to reclassify or reduce the Allowed amount of such Claim or Interest, then such Claim or Interest is temporarily Allowed for voting purposes in the reduced amount and/or as reclassified (as applicable), except as may be ordered by the Bankruptcy Court before or concurrent with, entry of an order confirming the Plan.

If any Holder seeks to challenge the Allowed amount of its Claim or Interest for voting purposes, such Holder must File with the Bankruptcy Court a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily Allowing such Claim or Interest for voting purposes in a different amount (a "**Rule 3018(a) Motion**").  Any Rule 3018(a) Motion must be Filed with the Bankruptcy Court so as to be actually received not later than **March 16, 2026 at 4:00 p.m. (Central Time)**.

Upon the filing of any such Rule 3018(a) Motion, such Holder's provisional Ballot shall be counted in accordance with the above-designated guidelines, unless temporarily Allowed in a different amount by an order of the Bankruptcy Court entered prior to or concurrent with entry of an order confirming the Plan.

For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims against one Debtor held by a single Holder in a particular Class shall be aggregated as if such Holder held one Claim in such Debtor in such Class, and the votes related to such Claims shall be treated as a single vote to accept or reject the Plan.

E.    **Form, Content, and Manner of Notices.**

1.    **Voting Agent**.

The Debtors have retained Omni Agent Solutions, Inc. ("**Omni**" or the "**Voting Agent**") as their claims, noticing, and solicitation agent pursuant to the *Order Authorizing the Employment and Retention of Omni Agent Solutions, Inc. as Claims, Noticing, and Solicitation Agent* (Docket No. 36).  Pursuant to the Disclosure Statement Order, Omni is authorized to assist the Debtors in (i) distributing the Solicitation Packages, (ii) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by Holders of Claims, (iii) responding to inquiries from Holders of Claims and Interests and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, (iv) soliciting votes on the Plan, and (v) if necessary, contacting creditors and equity holders regarding the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto.

2.    **The Solicitation Package**.

The following materials shall constitute the Solicitation Package:

(a)    the Disclosure Statement Order, as entered by the Bankruptcy Court (without attachments);

(b)    the Disclosure Statement with all exhibits thereto, including the Plan;

(c)    a copy of these Solicitation and Voting Procedures, annexed as **Exhibit 2** to the Disclosure Statement Order;

(d)    the *Notice of (I) Approval of (A) Disclosure Statement, (B) Solicitation and Voting Procedures, and (C) Notice Procedures for the Assumption or Rejection of Executory Contracts and Unexpired Leases; (II) Confirmation Hearing; and (III) Establishment of Notice and Objection Procedures for Confirmation of Plan* (the "**Confirmation Hearing Notice**");

(e)    if the recipient is entitled to vote on the Plan (as set forth herein), a Ballot customized (where possible and appropriate) for such Holder and conforming to Official Bankruptcy Form No. B 314, in the form described below;[4]

(f)    a postage-prepaid return envelope.

Holders of Claims or Interests in a Non-Voting Class shall only receive (i) the Confirmation Hearing Notice, (ii) the Notice of Non-Voting Status, and (iii) a Release Opt Out Form (each, as defined and described below); *provided* that the Debtors are not required to serve

---

[4]  Official Bankruptcy Form No. B 314 can be found at http://www.uscourts.gov/forms/bankruptcy-forms, the official website for the United States Bankruptcy Courts.

Holders of Claims and Interests in Class 6 (Intercompany Claims) or Class 7 (Intercompany Interests) copies of the Confirmation Hearing Notice, Notice of Non-Voting Status, a Release Opt Out Form, or any other type of notice in connection with solicitation of the Plan.

3.     **Distribution of Solicitation Packages.**

The Solicitation Package shall provide the Plan, the Disclosure Statement, and the Disclosure Statement Order in electronic format (on a QR code included in the Confirmation Hearing Notice) instead of printed hard copies.  Only the Ballots and the Confirmation Hearing Notice will be provided in paper format.  Moreover, the Plan and Disclosure Statement will be available at no charge via the internet at https://omniagentsolutions.com/Luminar.  If service by QR code imposes a hardship for any party entitled to receive a copy of the Plan and the Disclosure Statement (*e.g.*, the party does not own or have access to a smartphone or a tablet), such party may request a paper copy or a USB flash drive that includes copies of the Plan, Disclosure Statement, and Disclosure Statement Order (without attachments, except the Solicitation and Voting Procedures as annexed as **Exhibit 2** thereto) by contacting Omni (i) through e-mail at LuminarInquiries@OmniAgnt.com, (ii) by writing to Luminar Technologies, Inc., Ballot Processing, C/O Omni Agent Solutions, Inc., 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367, or (iii) via telephone, toll-free, at 888-901-3403 (US & Canada) or +747-293-0190 (International).  Upon receipt of such request, the Debtors will provide such party with a paper copy of, or USB flash drive containing, the Plan, Disclosure Statement, and Disclosure Statement Order at no cost to the creditor within five (5) days of such request or as soon as reasonably practicable thereafter.

The Debtors shall mail to Holders of Claims in Voting Classes entitled to vote on the Plan as of the Voting Record Date the Solicitation Packages by **February 23, 2026**, or as soon as reasonably practicable thereafter (the "**Solicitation Mailing Deadline**").  The Debtors will also provide complete Solicitation Packages (excluding Ballots) to the U.S. Trustee and all parties in interest required to be notified under Bankruptcy Rule 2002 and Local Rule 2002-1.

The Debtors are not required to mail Solicitation Packages to Holders (i) that have Claims that have already been paid in full during the Chapter 11 Cases, (ii) whose prior mailings in these Chapter 11 Cases were returned as undeliverable and that have not provided a forwarding address by the Voting Record Date[5], (iii) that hold Claims or Interests in Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 6 (Intercompany Claims), Class 7 (Intercompany Interests), Class 8 (Subordinated Claims), or Class 9 (Parent Interests), and/or (iv) that are not otherwise entitled to vote to accept or reject the Plan in accordance with the terms and provisions of these Solicitation and Voting Procedures.

In the event that the United States Postal Service returns any mailings as undeliverable, the Debtors are excused from mailing Solicitation Packages or Notices of Non-Voting Status to addresses from which the Debtors received mailings returned as

---

[5]  For purposes of serving the Solicitation Packages, the Debtors are authorized to rely on the address information for the Voting and Non-Voting Classes as compiled, updated, and maintained by the Voting Agent as of the Voting Record Date, and the Debtors and the Voting Agent not be required to conduct any additional research for updated addresses based on undeliverable Solicitations Packages (including Ballots).

undeliverable. For purposes of serving the Solicitation Packages and Notices of Non-Voting Status, the Debtors may rely on the address information for the Holders of Claims and Interests as compiled, updated, and maintained by the Voting Agent as of the Voting Record Date. The Debtors and the Voting Agent are not required to conduct any additional research for updated addresses based on undeliverable Solicitation Packages (including Ballots) and will not be required to resend Solicitation Packages or other materials, including Notices of Non-Voting Status, that are returned as undeliverable unless the Debtors are provided with accurate addresses for such parties prior to the Voting Record Date.

To avoid duplication and reduce expenses, the Debtors will use commercially reasonable efforts to ensure that each Holder of a Claim receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class as against the Debtors.

4.    **Forms of Ballots.**

Holders of Claims in the Voting Classes that are eligible to vote (as set forth herein) shall receive ballots substantially in the forms attached to the Disclosure Statement Order as **Exhibits 3–9** (the "**Ballots**"), as applicable.[6] All Holders of Claims in the Voting Classes will receive a Ballot that includes an election to opt out of the non-Debtor release provisions in section 11.6(b) of the Plan (the "**Non-Debtor Release Provisions**"). Holders of Claims in the Voting Classes that properly and timely elect to opt out of the Non-Debtor Release Provisions will not be a Releasing Party or Released Party under the Plan.

The Debtors will distribute Ballots to each of the Holders of Claims in Voting Classes; *provided*, that the following procedures shall apply, as applicable:

a.    *Holders of Notes Claims in Classes 3, 4, and 5.*

The Debtors are authorized to distribute the following two forms of Ballots with respect to each of the First Lien Noteholder Claims, Second Lien Noteholder Claims, and Unsecured Notes Claims (collectively, the "**Notes Claims**" and such underlying notes, the "**Notes**") entitled to vote in Classes 3, 4, and 5, as applicable: (i) a form of Ballot for a beneficial owner of the Notes Claim (a "**Notes Beneficial Holder**," and the corresponding ballot, the "**Notes Beneficial Holder Ballot**"); and (ii) a form of Ballot for the bank, broker, or other financial institution that holds the applicable Notes Claims "in street name" at DTC on behalf of the Notes Beneficial Holder (or agent thereof) (each, a "**Notes Nominee**") to transmit the votes of one or more beneficial owners (the "**Notes Nominee Master Ballot**").

For Holders of First Lien Noteholder Claims or Second Lien Noteholder Claims, the respective Notes Beneficial Holder Ballot and Notes Nominee Master Ballot shall include a section to vote both (i) the First Lien Noteholder Secured Claim and First Lien Noteholder

---

[6] Omni is required to retain all paper copies of Ballots and all solicitation-related correspondence for one (1) year following the Effective Date, whereupon, Omni is authorized to destroy and/or otherwise dispose of all paper copies of Ballots; printed solicitation materials including unused copies of the Solicitation Package; and all solicitation-related correspondence (including undeliverable mail), in each case unless otherwise directed by the Debtors or the Clerk of the Bankruptcy Court in writing within such one (1) year period.

Deficiency Claim or (ii) the Second Lien Noteholder Secured Claim and Second Lien Noteholder Deficiency Claim, as applicable.  For the avoidance of doubt, any Notes Beneficial Holder holding both a First Lien Noteholder Claim and a Second Lien Noteholder Claim must submit a separate Ballot corresponding to each of its First Lien Noteholder Claim in Class 3 and Class 5 and Second Lien Noteholder Claim in Class 4 and Class 5, respectively.

Any Notes Beneficial Holder may vote on the Plan by completing and signing a Notes Beneficial Holder Ballot on its own behalf and returning such Ballot directly to the Voting Agent on or before the Voting Deadline (provided such Notes Beneficial Holder does not hold such positions at DTC in "street name" through a Notes Nominee, as detailed below).

The following additional procedures shall apply to Claims of Notes Beneficial Holders who hold their position at DTC in "street name" through a Notes Nominee:

(a) the Voting Agent shall distribute, or cause to be distributed, the appropriate number of copies of Ballots to Notes Nominees identified by the Voting Agent as entities through which Notes Beneficial Holders hold Notes Claims as of the Voting Record Date;

(b) any Notes Nominee that is a holder of record with respect to Notes shall solicit votes from Notes Beneficial Holders of such Claims by: (i) distributing the Solicitation Packages, including the Notes Beneficial Holder Ballots it receives from the Voting Agent, to all such Notes Beneficial Holders, no later than five (5) business days following receipt of the Solicitation Package;[7] (ii) providing such Notes Beneficial Holders with a return address and envelope to send Ballots; (iii) promptly collecting Notes Beneficial Holder Ballots from such Notes Beneficial Holders that cast votes on the Plan; (iv) compiling and validating the votes and other relevant information of all such Notes Beneficial Holders on the Notes Nominee Master Ballot; and (v) transmitting the applicable Notes Beneficial Holder Ballot to the Voting Agent by the Voting Deadline;

(c) any Notes Beneficial Holder holding a Notes Claim as a record holder in its own name shall vote on the Plan by completing and signing a Notes Nominee Master Ballot on its own behalf and returning such Ballot directly to the Voting Agent on or before the Voting Deadline;

(d) any Notes Beneficial Holder holding Notes in "street name" through a Notes Nominee must vote on the Plan through such Notes Nominee by completing and signing the Notes Beneficial Holder Ballot and returning such Ballot to the appropriate Notes Nominee as promptly as possible and in sufficient time to allow such Notes Nominee to process the Ballot and return the Notes Nominee Master Ballot to the Voting Agent prior to the Voting Deadline.  Any Notes Beneficial Holder holding Notes in "street name" that submits a Notes Beneficial Holder Ballot to the Debtors or Voting Agent will not have such Notes Beneficial Holder Ballot counted for purposes of accepting or rejecting the Plan;

---

[7] Solicitation Packages may be sent in paper format or via electronic transmission in accordance with the customary requirements of each Notes Nominee.  Each Notes Nominee will then distribute the Solicitation Packages, as appropriate, in accordance with its customary practices and obtain votes to accept or to reject the Plan also in accordance with its customary practices.

(e) any Notes Beneficial Holder Ballot returned to a Notes Nominee by a Notes Beneficial Holder shall not be counted for purposes of accepting or rejecting the Plan until such Notes Nominee properly completes and delivers to the Voting Agent the Notes Nominee Master Ballot that reflects the vote of such Notes Beneficial Holders by the Voting Deadline or otherwise validates the Notes Beneficial Holder Ballot in a manner acceptable to the Voting Agent.  Notes Nominees shall retain all Notes Beneficial Holder Ballots returned by Notes Beneficial Holders for a period of one (1) year after the Effective Date of the Plan;

(f) if a Notes Beneficial Holder holds Notes through more than one Notes Nominee or through multiple accounts, such Notes Beneficial Holder may receive more than one Notes Beneficial Holder Ballot, and each such Notes Beneficial Holder should execute a separate Notes Beneficial Holder Ballot for each block of Notes that it holds through any Notes Nominee and must return each such Notes Beneficial Holder Ballot to the appropriate Notes Nominee;

(g) if a Notes Beneficial Holder holds a portion of its Notes through a Notes Nominee(s) and another portion in its own name as the record holder, such Notes Beneficial Holder should follow the procedures described herein to vote the portion held in its own name and the procedures described in the rest of this section to vote the portion held by the Notes Nominee(s); and

(h) Notes Beneficial Holders holding Notes through a Notes Nominee must return their paper ballot to their Notes Nominee, unless, at the option of the Notes Nominee, such Nominee instructs their Notes Beneficial Holders that they may relay votes or voting instructions electronically or otherwise to the Notes Nominee or the entity preparing the Notes Nominee Master Ballot on such Notes Nominee's behalf, and a Notes Nominee(s) may use their customary procedures for obtaining such votes electronically or otherwise.

5. **Notice of Non-Voting Status and Release Opt Out Forms.**

Holders of Claims and Interests in the Non-Voting Classes, in lieu of a Solicitation Package, will receive: (i) the Confirmation Hearing Notice, (ii) a Notice of Non-Voting Status substantially in the form attached to the Disclosure Statement Order as **Exhibit 10** (the "**Notice of Non-Voting Status**"), and (iii) a Release Opt Out Form (as defined below) (together, the "**Non-Voting Class Packages**"); *provided* that, the Debtors are not required to serve Holders of Claims and Interests in Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests) copies of the Confirmation Hearing Notice, Notice of Non-Voting Status, or any other type of notice in connection with solicitation of the Plan because such Claims and Interests are held by the Debtors or the Debtors' affiliates.

The Notice of Non-Voting Status provides (i) notice of the Bankruptcy Court's approval of the Disclosure Statement, (ii) notice of the filing of the Plan and Disclosure Statement, (iii) notice of the Holders' non-voting status, and (iv) information about how to obtain copies of the Disclosure Statement and Plan.  In addition, the Notice of Non-Voting Status contains the full text of the release, exculpation, and injunction provisions set forth in Article XI of the Plan and

11

advises such Holders in Non-Voting Classes that they will be bound by the Non-Debtor Release Provisions unless they timely, properly, and affirmatively opt out.

The Debtors shall cause to be mailed a release opt out form, substantially in the form attached to the Disclosure Statement Order as **Exhibit 11** (the "**Release Opt Out Form**"), to Holders of Claims and Interests in the Non-Voting Classes.  For Holders of Claims in the Voting Classes, the opt out option shall be on such Holder's Ballot.

In addition, Holders of Interests in Class 9 (Parent Interests) shall receive the Non-Voting Class Package.  The Debtors shall cause to be mailed the Non-Voting Class Package to the banks, brokers, and financial institutions (or their agents) that might have purchased equity securities in "street name" (collectively, including their agents, the "**Equity Nominees**") on behalf of the Holders of Interests in Class 9 (Parent Interests).  With their mailing, the Debtors shall include instructions to the Equity Nominees concerning the requirements in subparagraphs (a)–(d) below.

(a) such Equity Nominees shall either: (i) within seven (7) calendar days of receipt of the Non-Voting Class Package, request from the Debtors sufficient copies of the Non-Voting Class Package to forward to all such beneficial owners and within seven (7) calendar days of receipt of those notices and claim forms forward them to all such beneficial owners; or (ii) within seven (7) calendar days of receipt of the Non-Voting Class Package, provide a list of the names and addresses of all such beneficial owners to the Debtors and the Debtors shall send the Non-Voting Class Package promptly to such identified beneficial owners.

(b) Equity Nominees that elect to send the Non-Voting Class Package to their beneficial owners shall also send a statement to the Debtors and Omni confirming that the mailing was made and shall retain their mailing records for use in connection with any further notices that may be provided in these Chapter 11 Cases.

(c) if it is the Equity Nominee's customary and accepted practice to forward such materials to beneficial owners by e-mail, e-delivery, or any other method of electronic or printed communication, the Equity Nominees are authorized to follow those customary practices, within seven (7) calendar days of receipt of the materials, in lieu of sending actual printed copies of the Non-Voting Class Package.

(d) within seven (7) calendar days of forwarding such notice, the Nominees may request reimbursement for reasonable and documented noticing costs and research fees, if any, by making such request in writing to the Debtors at the address to be provided by Omni to the Equity Nominees.

A Holder that properly, timely, and affirmatively elects on the Release Opt Out Form to opt out of the Non-Debtor Release Provision will not be a Releasing Party or Released Party under the Plan.  An encrypted opt-out data and audit trail will be created through the electronic submission process and become part of the record of any opt-out election submitted in this manner.  Additionally, any Holder's electronic signature will be deemed to be legally valid and effective immediately.  For the avoidance of doubt, the Voting Agent's online portal at

https://omniagentsolutions.com/Luminar-Ballots (the "**Online Portal**") is the sole method for Holders of Claims and Interests in Non-Voting Classes to transmit opt-out elections electronically.

All Release Opt Out Forms must be properly completed and returned so as to be **actually received** by the Voting Agent by **March 23, 2026 at 4:00 p.m. (Central Time)** (the "**Opt Out Deadline**") either by (i) delivering the Release Opt Out Form to the Voting Agent by first-class mail, hand delivery, or overnight courier or (ii) submitting the Release Opt Out Form by electronic, online transmission through the Online Portal, each in accordance with the instructions included on the Release Opt Out Form.

6.      **Voting Deadline.**

The Bankruptcy Court has established **March 23, 2026** as the deadline to submit votes to accept or reject the Plan (the "**Voting Deadline**").  The Debtors may extend the Voting Deadline, in their discretion, without further order of the Bankruptcy Court.  To be counted as a vote to accept or reject the Plan, each Ballot must be properly executed, completed, and timely delivered to the Voting Agent:  (i) by first-class mail in the return envelope provided with each Ballot; (ii) by overnight mail; (iii) by hand delivery, (iv) via E-Ballot through the Online Portal, or (v) only with respect to Noteholder Nominee Master Ballots and Notes Nominee Master Ballots, via electronic mail to Omni so that (in each instance) it is **actually received** by the Voting Agent no later than the Voting Deadline.

Holders of Claims submitted their Ballots in hard copy to the Voting Agent shall mail or deliver them to the following address:

| OMNI'S ADDRESS FOR RECEIPT OF PAPER BALLOTS (WHETHER BY HAND DELIVERY, OVERNIGHT MAIL, OR FIRST CLASS MAIL) |
|---|
| **LUMINAR TECHNOLOGIES, INC.**<br>**BALLOT PROCESSING**<br>**C/O OMNI AGENT SOLUTIONS, INC.**<br>**5955 DE SOTO AVENUE, SUITE 100**<br>**WOODLAND HILLS, CALIFORNIA 91367** |

In all instances, Holders shall consult their Ballot for specific instructions regarding submission of their votes and any elections.  The manner of Ballot submission is at the election and risk of the Holders of Claims in the Voting Classes who vote on the Plan.  Regardless of the manner of submission, to be counted, Ballots must be actually, timely, and properly received by the Voting Agent by the Voting Deadline.  The Debtors strongly recommend submitting electronic Ballots through the Online Portal.

7.      **Tabulation Procedures.**

a.      *General Rules*.

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements

for completion and submission of Ballots so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Bankruptcy Local Rules:

(a) whenever a Holder of Claims casts more than one Ballot voting the same Claims before the Voting Deadline, the latest dated valid Ballot received on or before the Voting Deadline shall be deemed to reflect such Holder's intent and thus, supersede any previously received Ballot.  Following the Voting Deadline, no Ballot may be changed or revoked, absent further order of the Bankruptcy Court or as directed by the Debtors.

(b) whenever a Holder of Claims casts a Ballot that is properly completed, executed, and timely returned to the Voting Agent but does not indicate either an acceptance or rejection of the Plan, the Ballot will not be counted.

(c) whenever a Holder of Claims casts a Ballot that is properly completed, executed, and timely returned to the Voting Agent but indicates both an acceptance and a rejection of the Plan, the Ballot will not be counted.

(d) a Holder shall be deemed to have voted the full amount of its Claim in each Class and shall not be entitled to split its vote within a particular Class or between more than one Debtor. Any such Holder's Ballot that partially accepts and partially rejects the Plan, between the same or multiple Debtors, will not be counted.

(e) a Person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a Holder of Claims should indicate such capacity when signing, and if so requested by the Debtors or the Voting Agent, must submit proper evidence satisfactory to the Debtors of its authority to so act.

(f) a Holder of Claims against more than one Debtor that casts a single Ballot shall have its votes counted separately with respect to each such Debtor.

(g) a Holder of Claims in more than one Class must use separate Ballots for each Class of Claims.

(h) the Debtors, unless subject to contrary order of the Bankruptcy Court, may waive any defects or irregularities as to any particular irregular Ballot at any time, either before or after the Voting Deadline.

(i) Holders of First Lien Noteholder Secured Claims shall receive one Ballot on account of their Class 3 First Lien Noteholder Secured Claims and their Class 5 First Lien Noteholder Deficiency Claims, as applicable.  Holders of First Lien Noteholder Secured Claims and First Lien Noteholder Deficiency Claims must vote each claim consistently, either to accept or reject the Plan.  Holders that vote inconsistently may have their vote(s) discarded.

(j) Holders of Second Lien Noteholder Secured Claims shall receive one Ballot on account of their Class 4 Second Lien Noteholder Secured Claims and Class 5 Second Lien Noteholder Deficiency Claims.  Holders of Second Lien Noteholder Secured Claims and Second Lien

Noteholder Deficiency Claims must vote each claim consistently, either to accept or reject the Plan.  Holders that vote inconsistently may have their vote(s) discarded.

(k) the following Ballots shall not be counted:

    i.    any Ballot received after the Voting Deadline, unless the Debtors shall have granted an extension of the Voting Deadline in writing with respect to such Ballot or waived the late submission;

    ii.    any Ballot that is illegible or contains insufficient information to permit the identification of the voting party;

    iii.    any Ballot cast by a Person or Entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan;

    iv.    any Ballot cast by a Person or Entity that is not entitled to vote, even if such Person or Entity holds a Claim or Interest in a Voting Class;

    v.    any unsigned Ballot, provided that E-Ballots submitted on the Online Portal will be deemed to contain a legal, valid signature;

    vi.    any Ballot containing a vote that the Bankruptcy Court determines, after notice and a hearing, was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code; or

    vii.    any Ballot transmitted to the Voting Agent by e-mail (other than a Notes Nominee Master Ballot) or facsimile or other means not specifically approved herein.

b.    ***Rules for Notes Claims***.

The following rules will apply with respect to the tabulation of Notes Nominee Master Ballots cast by Notes Nominees for Notes Beneficial Holders of Notes Claims, in each case accounting for, and providing separate Ballots for, Holders of First Lien Noteholder Secured Claims and Second Lien Noteholder Secured Claims, as applicable:

(a) votes cast by Notes Beneficial Holders through Notes Nominees will be applied to the applicable positions of Notes held by such Notes Nominees as of the Voting Record Date, as evidenced by the applicable records.  Votes submitted by a Notes Nominee will not be counted in excess of the amount of such Notes held by such Notes Nominee as of the Voting Record Date;

(b) if conflicting votes or "over votes" are submitted by a Notes Nominee, the Debtors will use reasonable efforts to reconcile discrepancies with the Notes Nominees;

(c) if over votes on a Notes Nominee Master Ballot are not reconciled prior to the preparation of the vote certification, the Debtors shall apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and to reject the Plan submitted on the Notes Nominee Master Ballot that contained the over-vote; and

15

(d) a single Notes Nominee may complete and deliver to the Voting Agent multiple Notes Nominee Master Ballots.  Votes reflected on multiple Notes Nominee Master Ballots will be counted, except to the extent that they are duplicative of other Notes Nominee Master Ballots.  If two or more Notes Nominee Master Ballots are inconsistent, the last-dated, valid Notes Nominee Master Ballot received prior to the Voting Deadline will, to the extent of such inconsistency, supersede and revoke any prior-dated Notes Master Nominee Ballot.

c.      ***Miscellaneous Rules***.

Each Holder of Claims that votes to accept or reject the Plan is deemed to have voted the full amount of its Claim therefor.

The Voting Agent may, but is not required to, contact parties who submit incomplete or otherwise deficient Ballots to make a reasonable effort to cure such deficiencies, *provided* that, neither the Debtors nor Voting Agent is required to contact such parties to provide notification of defects or irregularities with respect to completion or delivery of Ballots, nor will any of them incur any liability for failure to provide such notification.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived prior to the Voting Deadline) will be invalidated.

The Debtors and/or their Voting Agent, as applicable, are authorized to determine all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots, which determination will be final and binding on all parties.

The Debtors are authorized to reject any and all Ballots submitted by any Holders of Claims not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.

The Debtors are further authorized to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any Holders of Claims.  The interpretation (including the Ballot and the respective instructions thereto) by the Debtors in accordance with the foregoing sentence will be final and binding on all parties.

The Debtors or their Voting Agent shall file the Voting Report on or before **March 30, 2026**.

8.      **Confirmation Hearing Notice**.

Within three (3) days after entry of the Disclosure Statement Order, or as soon as reasonably practicable thereafter, the Debtors will serve the Holders of Claims and Interests in the Non-Voting Classes via e-mail or first-class mail, a copy of the Confirmation Hearing Notice, which sets forth (i) the Voting Deadline, (ii) the Objection Deadline and procedures for filing

objections and responses to confirmation of the Plan, (iii) the time, date, and place for the Confirmation Hearing, and (iv) information about the Plan's release and injunction provisions in compliance with Bankruptcy Rule 2002(c)(3). The Debtors will separately serve Holders of Claims in Voting Classes with the Confirmation Hearing Notice as part of their Solicitation Packages.

The Debtors may, in their discretion, give supplemental publication notice of the Confirmation Hearing, no later than twenty-eight (28) days prior to the Confirmation Hearing, in one or more local or foreign newspapers, trade journals, or similar publications as the Debtors deem appropriate.

**The Debtors reserve the right and are authorized to make non-substantive or immaterial changes to the Disclosure Statement, Plan (including, for the avoidance of doubt, the Plan Supplement), Ballots, Confirmation Hearing Notice, and related documents without further order of the Bankruptcy Court, including, without limitation, changes to correct typographical and grammatical errors, if any, and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Packages before their distribution.**