IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| LUMINAR TECHNOLOGIES, INC., *et al.*, | § § § | Case No. 25-90807 (CML) |
| Debtors.[1] | § § § § | (Jointly Administered) |

DEBTORS' MEMORANDUM OF LAW
IN SUPPORT OF CONFIRMATION OF THE DEBTORS'
FOURTH AMENDED CHAPTER 11 PLAN OF LIQUIDATION
OF LUMINAR TECHNOLOGIES, INC. AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Stephanie N. Morrison (24126930)
Austin B. Crabtree (24109763)
700 Louisiana Street, Suite 3700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Ronit J. Berkovich (admitted *pro hac vice*)
Jessica Liou (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

March 30, 2026
Houston, Texas

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  LAZR Technologies, LLC (8909); Luminar Technologies, Inc. (4317); Luminar, LLC (7133); Condor Acquisition Sub I, Inc. (0155); and Condor Acquisition Sub II, Inc. (8587).  The Debtors' mailing address is 2603 Discovery Drive, Suite 100, Orlando, Florida 32826.

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .........................................................................................................................3

    I.      Chapter 11 Cases.............................................................................................3

    II.    Declarations in Support of Confirmation.........................................................4

    III.   Plan Summary ................................................................................................4

    IV.   Settlements Embodied in the Plan ...................................................................7

        A.     Global Settlement.................................................................................7

        B.     Plan Settlement ...................................................................................8

    V.     Plan Solicitation .............................................................................................9

    VI.   Plan Supplement ..........................................................................................11

    VII.  Tabulation ...................................................................................................12

ARGUMENT..............................................................................................................................13

    I.      Settlement, Release, Exculpation, and Injunction Provisions Are
         Appropriate and Should Be Approved............................................................13

        A.     Settlements Are Reasonable and Satisfy Bankruptcy Rule 9019 ..............13

        B.     Global Settlement Satisfies Bankruptcy Rule 9019.................................15

        C.     Plan Settlement Satisfies Bankruptcy Rule 9019....................................16

        D.     Plan Releases, as Encompassed in the Settlements, Are
             Appropriate and Should Be Approved.......................................................20

        E.     Exculpation Provision Is Appropriate, Consistent with Fifth
             Circuit Precedent, and Should Be Approved .............................................32

        F.     Injunction Provisions Are Appropriate and Should Be
             Approved...............................................................................................33

    II.    Plan Satisfies Bankruptcy Code's Requirements and Should Be
         Confirmed ....................................................................................................35

        A.     Section 1129(a)(1) of the Bankruptcy Code: Plan Complies
             with Applicable Provisions of Bankruptcy Code......................................36

        B.     Section 1129(a)(2):  Debtors have Complied with Bankruptcy
             Code ....................................................................................................42

        C.     Section 1129(a)(3):  Plan Has Been Proposed in Good Faith
             and Not by Any Means Forbidden by Law.................................................46

        D.     Section 1129(a)(4):  Plan Provides that Professional Fees and
             Expenses are Subject to Court Approval ...................................................48

E.      Section 1129(a)(5):  Debtors Have Disclosed All Necessary
        Information Regarding Directors, Officers, and Insiders ..........................49

F.      Section 1129(a)(6):  Plan Does Not Contain Any Rate Changes ..............50

G.      Section 1129(a)(7):  Plan Satisfies Best Interests Test .............................50

H.      Section 1129(a)(8):  Plan Has Been Accepted by Impaired
        Voting Class.............................................................................................53

I.      Section 1129(a)(9):  Plan Provides for Payment in Full of All
        Allowed Priority Claims ..........................................................................54

J.      Section 1129(a)(10):  At Least One Class of Impaired Claims
        Has Accepted Plan ...................................................................................55

K.      Section 1129(a)(11):  Plan is Feasible .....................................................56

L.      Section 1129(a)(12):  All Statutory Fees Have Been or Will be
        Paid .........................................................................................................60

M.      Sections 1129(a)(13)–(16) and 1129(e):  Inapplicable
        Provisions................................................................................................61

N.      Plan Satisfies "Cram Down" Requirements under Bankruptcy
        Code Section 1129(b) for Non-Accepting Classes ...................................61

O.      Section 1129(c):  Plan is Only Plan on File.............................................64

P.      Section 1129(d):  Principal Purpose of Plan is Not Avoidance
        of Taxes...................................................................................................64

Q.      Modifications to the Plan Do Not Require Resolicitation ........................64

R.      Request for Waiver of Bankruptcy Rules 3020(e), 6004(h), and
        6006(d).....................................................................................................66

III.    Bankruptcy Court Should Overrule the UST Objection and Confirm
        the Plan................................................................................................................67

A.      Objections to the Third-Party Releases Should be Overruled ..................68

B.      The U.S. Trustee's Request to Expand Container Store Should
        Be Denied.................................................................................................72

C.      Objections to the Injunction Provisions To the Extent Not
        Already Resolved Should be Overruled ...................................................74

D.      Objections to Request for Waiver of 3020(e) Should be
        Overruled .................................................................................................75

Reservation of Rights...............................................................................................76

Conclusion ...............................................................................................................76

ii

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re 4 West Holdings, Inc.*,
593 B.R. 448 (Bankr. N.D. Tex. 2018).......................................................................66

*In re 47th and Belleview Partners*,
95 B.R. 117 (Bankr. W.D. Mo. 1988).........................................................................57

*In re Ameriforge Grp., Inc.*,
No. 17-32660 (DRJ) (Bankr. S.D. Tex. May 22, 2017) (Docket No. 142) ...............28

*In re Applied Safety, Inc.*,
200 B.R. 576 (Bankr. E.D. Pa. 1996) .........................................................................59

*In re Armstrong World Indus., Inc.*,
348 B.R. 111 (D. Del. 2006).......................................................................................63

*In re ASARCO LLC*,
420 B.R. 314 (Bankr. S.D. Tex. 2009) .......................................................................65

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999).....................................................................................................51

*Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*,
584 F.3d 229 (5th Cir. 2009) ......................................................................................33

*In re Bigler LP*,
442 B.R. 537 (Bankr. S.D. Tex. 2010) .........................................................13, 21, 27

*In re Block Shim Dev. Co.-Irving*,
939 F.2d 289 (5th Cir. 1991) ...............................................................................46, 51

*In re Brotby*,
303 B.R. 177 (B.A.P. 9th Cir. 2003)...........................................................................59

*In re Camp Arrowhead*,
451 B.R. 678 (Bankr. W.D. Tex. 2011) ......................................................................75

*In re Chapel Gate Apartments, Ltd.*,
64 B.R. 569 (Bankr. N.D. Tex. 1986).........................................................................48

*In re Core Sci., Inc.*,
No. 22-90341 (CML) (Bankr. S.D. Tex. Jan. 16, 2024) (Docket No. 1749)........28, 71

*In re Couture Hotel Corp.*,
    536 B.R. 712 (Bankr. N.D. Tex. 2015)....................................................................................46

*In re Cutera, Inc.*,
    No. 25-90088 (ARP) (Bankr. S.D. Tex. Apr. 16, 2025) (Docket No. 251)...........27, 28, 69, 71

*In re Cypresswood Land Partners, I*,
    409 B.R. 396 (Bankr. S.D. Tex. 2009) .....................................................................36, 56, 57

*In re DBSD N. Am., Inc.*,
    419 B.R. 179 (Bankr. S.D.N.Y. 2009), aff'd, No. 09 CIV. 10156 (LAK), 2010
    WL 1223109 (S.D.N.Y. Mar. 24, 2010), aff'd in part, rev'd in part, 627 F.3d
    496 (2d Cir. 2010)...............................................................................................................59

*In re Derosa-Grund*,
    567 B.R. 773 (Bankr. S.D. Tex. 2017) ...............................................................................21, 22

*In re DocuData Sols., L.C.*,
    No. 25-90023 (CML) (Bankr. S.D. Tex. June 23, 2025) (Docket No. 834)................28, 69, 71

*In re Drexel Burnham Lambert Grp.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992)..................................................................................63

*In re DRF Logistics, LLC*,
    No. 24-90447 (CML) (Bankr. S.D. Tex. Nov. 25, 2024) (Docket No. 530) .....................28, 71

*In re Eagle Bus Mfg., Inc.*,
    134 B.R. 584 (Bankr. S.D. Tex. 1991) .................................................................................37

*In re Energy & Expl. Partners, Inc.*,
    No. 15-44931 (RFN) (Bankr. N.D. Tex. April 21, 2016) (Docket No. 730).....................27, 71

*In re Energy Partners, Ltd.*,
    No. 09-32957 (JB), 2009 WL 2898876 (Bankr. S.D. Tex. Aug. 3, 2009)..............................67

*In re Enron Corp.*,
    No. 01–16034 (AJG), 2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15,
    2004) .....................................................................................................................................17

*Epstein v. The Container Store Grp. Inc. (In re Container Store Grp., Inc.)*,
    --- B.R. ----, 2026 WL 395898 (S.D. Tex. Feb. 12, 2026)............................................. *passim*

*In re Everstream Sols. LLC*,
    No. 25-90144 (CML) (Bankr. S.D. Tex. Nov. 19, 2025) (Docket No. 594) ..............28, 69, 71

*In re Fieldwood Energy LLC*,
    No. 20-33948 (MI), 2021 WL 2853151 (Bankr. S.D. Tex. June 25, 2021)
    *aff'd*, 93 F.4th 817 (5th Cir. 2024)......................................................................................66

*In re Gen. Homes Corp.*,
    134 B.R. 853 (Bankr. S.D. Tex. 1991) ........................................................................21

*In re GenOn Energy, Inc.*,
    No. 17-33695 (DRJ) (Bankr. S.D. Tex. Dec. 12, 2017) (Docket No. 1250) ..........................27

*In re GOL Linhas Aéreas Inteligentes S.A.*,
    No. 24-10118 (MG) (Bankr. S.D.N.Y. May 22, 2025) (Docket No. 1658) .....................28, 71

*In re Harborwalk, LP*,
    Nos. 10-80043, 10-80044, 10-80045, 2010 WL 5116620 (Bankr. S.D. Tex.
    Oct. 25, 2010) ........................................................................................................43

*Harrington v. Purdue Pharma L.P.*,
    603 U.S. 204 (2024) ....................................................................................28, 69, 70, 71

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe
    Enters., Ltd., II)*,
    994 F.2d 1160 (5th Cir. 1993) .................................................................................36, 58

*In re Heritage Org., L.L.C.*,
    375 B.R. 230 (Bankr. N.D. Tex. 2007)........................................................21, 22, 37, 57

*In re Highland Cap. Mgmt., L.P.*,
    132 F.4th 353 (5th Cir. 2025) .................................................................................35, 75

*Highland Cap. Mgmt., L.P., v. Nexpoint Advisors, L.P.*,
    No. 24-10534 (5th Cir. 2025) (Docket No. 110) .............................................................35

*In re Holmes*,
    301 B.R. 911 (Bankr. M.D. Ga. 2003)...........................................................................57

*In re Idearc Inc.*,
    423 B.R. 138 (Bankr. N.D. Tex. 2009), *subsequently aff'd*, 662 F.3d 315 (5th
    Cir. 2011) ................................................................................................... *passim*

*In re Indep. Cont. Drilling Inc.*,
    No. 24-90612 (ARP) (Bankr. S.D. Tex. Jan. 24, 2025) (Docket No. 124).............................69

*In re J T Thorpe Co.*,
    308 B.R. 782 (Bankr. S.D. Tex. 2003) ......................................................................36, 43

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987),
    *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) .........................63

*In re Lack's Stores, Inc.*,
    No. 10-60149, 2012 WL 2375825 (Bankr. S.D. Tex. June 21, 2012)...................................48

*In re Lehman Bro. Holdings Inc.*,
    Case No. 08-13555 (JMP), (Bankr. S.D.N.Y. Dec. 6, 2011) (Docket No.
    23023) ....................................................................................................................17

*Mabey v. Sw. Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*,
    150 F.3d 503 (5th Cir. 1998) ......................................................................42, 48

*In re Maremont Corp.*,
    601 B.R. 1 (Bankr. D. Del. 2019) ...........................................................................48

*In re Mirant Corp.*,
    348 B.R. 725 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Objecting Class 3
    Claimholders v. New Mirant Entities*, No. 4:06-CV-744-A (JHM), 2006 WL
    3780884 (N.D. Tex. Dec. 26, 2006) ......................................................................22

*In re MLN US HoldCo LLC*,
    No. 25-90090 (CML) (Bankr. S.D. Tex. April 17, 2025) (Docket No. 263)....................28, 71

*In re Mobileum, Inc.*,
    No. 24-90414 (CML) (Bankr. S.D. Tex. Sept. 11, 2024), (Docket No. 194)....................28, 71

*In re Moody Nat'l SHS Hous. H, LLC*,
    No. 10-30172 (MI), 2010 WL 5116872 (Bankr. S.D. Tex. June 30, 2010) ....................27, 43

*In re Nailite Int'l*,
    No. 09-10526 (MFW), 2009 Bankr. LEXIS 4878 (Bankr. D. Del. Dec. 8,
    2009) ....................................................................................................................58

*NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap.
    Mgmt., L.P.)*,
    48 F.4th 419 (5th Cir. 2022), *pet. for cert. denied*, No. 22-631 (U.S. Jul. 2,
    2024) ...............................................................................................................33, 35

*In re Nine Energy Service, Inc.*,
    No. 26-90295 (CML) (Bankr. S.D. Tex. March 4, 2026) (Docket No. 189)................... *passim*

*In re Northbelt, LLC*,
    630 B.R. 228 (Bankr. S.D. Tex. 2020) ...................................................................59

*Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun
    Elec. Power Coop., Inc.)*,
    119 F.3d 349 (5th Cir. 1997) ................................................................................13

*Off. Comm. of Unsecured Creditors v. Moeller (In re Age Ref., Inc.)*,
    801 F.3d 530 (5th Cir. 2015) ................................................................................14

*In re PC Liquidation Corp.*,
　No. 05-89022-288, 2006 Bankr. LEXIS 4638 (Bankr. E.D.N.Y. Nov. 13,
　2006) ...................................................................................................................................58

*In re Pearl Res.*,
　622 B.R. 236 (Bankr. S.D. Tex. 2020) ..............................................................................58

*In re Pero Bros. Farms, Inc.*,
　90 B.R. 562 (Bankr. S.D. Fla. 1988)...................................................................................57

*In re PHI, Inc.*,
　No. 19-30923 (HDH), 2019 WL 3539941 (Bankr. N.D. Tex. Aug. 2, 2019) .......................67

*Phx. Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint
　Venture)*,
　995 F.2d 1274 (5th Cir. 1991) .........................................................................................9, 37

*In re Pine Gate Renewables, LLC*,
　No. 25-90669 (CML) (Bankr. S.D. Tex. Feb. 18, 2026) .............................................. *passim*

*In re PosiGen, PBC*,
　No. 25-90787 (CML) (Bankr. S.D. Tex. Feb. 24, 2026) (Docket No. 613) .................... *passim*

*In re Premiere Network Servs., Inc.*,
　333 B.R. 130 (Bankr. N.D. Tex. 2005).................................................................................37

*Republic Supply Co. v. Shoaf*,
　815 F.2d 1046 (5th Cir. 1987) .............................................................................................27

*Rivercity v. Herpel (In re Jackson Brewing Co.)*,
　624 F.2d 599 (5th Cir. 1980) ...............................................................................................21

*In re Robertshaw US Holding Corp.*,
　662 B.R. 300 (Bankr S.D. Tex. 2024) ......................................................................28, 69, 71

*In re Roqumore*,
　393 B.R. 474 (Bankr. S.D. Tex. 2008) .............................................................................14, 22

*In re Sea Trail Corp.*,
　No. 11-07370 (SWH), 2012 WL 5247175 (Bankr. E.D.N.C. Oct. 23, 2012) .......................63

*In re Seahawk Drilling Inc.*,
　No. 11-20089-RSS, 2009 WL 10817066 (Bankr. S.D. Tex. Sept. 18, 2009)........................47

*In re Sears Holdings Corp.*,
　No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 15, 2019) (Docket No. 5370) ..........................17

*In re Sentry Op. Co. of Tex., Inc.*,
  264 B.R. 850 (Bankr. S.D. Tex. 2001) ...............................................................37, 62

*In re SPC Seller*,
  No. 09-12647 (BLS), 2010 Bankr. LEXIS 5321 (Bankr. D. Del. Dec. 8, 2010).....................57

*In re Star Ambulance Serv. LLC*,
  540 B.R. 251 (Bankr. S.D. Tex. 2015) ...............................................................42

*In re Sun Country Dev., Inc.*,
  764 F.2d 406 (5th Cir. 1985) .............................................................................46

*In re T-H New Orleans Ltd. P'ship*,
  116 F.3d 790 (5th Cir. 1997) ......................................................................46, 59

*In re Tex. Extrusion Corp.*,
  844 F.2d 1142 (5th Cir. 1988) ...........................................................................51

*The Cadle Co. v. Mims (In re Moore)*,
  608 F.3d 253 (5th Cir. 2010) .............................................................................22

*In re The Container Store Group, Inc.*,
  No. 24-90627 (ARP) (Bankr. S.D. Tex. Jan. 9, 2025) (Docket No. 181)................................69

*In re The Great Atl. & Pac. Tea Co.*,
  Case No. 10-24549 (RDD) ................................................................................17

*In re The Great Atl. & Pac. Tea Co.*,
  No. 10-24549 (RDD), (Bankr. S.D.N.Y. Feb. 28, 2012) (Docket No. 3477)..........................17

*In re Tribune Co.*,
  F.3d 228 (3d Cir. 2020) 972 ............................................................................63

*In re Two Sts., Inc.*,
  597 B.R. 309 (Bankr. S.D. Miss. 2019)................................................................57

*In re Vill. at Camp Bowie I, L.P.*,
  710 F.3d 239 (5th Cir. 2013) .............................................................................46

*In re Wellpath Holdings, Inc.*,
  No. 24-90533 (ARP) (Bankr. S.D. Tex. May 1, 2025) (Docket No. 2596)........................28, 71

*In re Winn-Dixie Stores*,
  356 B.R. 239 (Bankr. M.D. Fla. 2006) ...............................................................17

*In re Wool Growers Cent. Storage Co.*,
  371 B.R. 768 (Bankr. N.D. Tex. 2007)................................................................27

vi

*In re WorldCom, Inc.*,
   Case No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31,
   2003) ......................................................................................................................17

**Statutes**

11 U.S.C. 1126(c) ........................................................................................................54

11 U.S.C. § 105 ...........................................................................................................42

11 U.S.C. § 1103 .........................................................................................................42

11 U.S.C. § 1107 .........................................................................................................42

11 U.S.C. § 109 ...........................................................................................................43

11 U.S.C. § 507 ...........................................................................................................61

11 U.S.C. § 1114 .........................................................................................................61

11 U.S.C. § 1122 ................................................................................................. *passim*

11 U.S.C. § 1123 ................................................................................................. *passim*

11 U.S.C. § 1125 ................................................................................................. *passim*

11 U.S.C. § 1126 ................................................................................................. *passim*

11 U.S.C. § 1129 ................................................................................................. *passim*

**Other Authorities**

H.R. Rep. No. 95-595, First Session (1977) .................................................................36

S. Rep. No. 95-989 (1978) ...........................................................................................36

Luminar Technologies, Inc., and its debtor affiliates, as debtors and debtors in possession in the above-captioned Chapter 11 Cases (collectively, the "**Debtors**"), respectfully submit this memorandum of law in support of, and reply to objections to, confirmation of the Plan[2] and respectfully represent as follows:[3]

## PRELIMINARY STATEMENT

1.      The Debtors are pleased to be before the Court seeking confirmation of a chapter 11 plan of liquidation with the support of the Debtors' key stakeholders—the Ad Hoc Noteholder Group and Creditors' Committee—and that has been overwhelmingly accepted by every class entitled to vote on the Plan.  The Plan provides for the orderly wind-down of the Debtors' estates while maximizing value for creditors through the formation of a liquidation trust administered by a liquidation trustee tasked with monetizing the Debtors' remaining assets, reconciling claims, and making distributions to creditors.

2.      The Debtors commenced these Chapter 11 Cases to facilitate value-maximizing sale processes for its LiDAR business ("**LiDARCo**") and for the equity of Luminar Semiconductor, Inc. and certain of its subsidiaries (collectively, "**LSICo**").  In parallel to pursuing these two sale transactions, the Debtors worked closely with the Ad Hoc Noteholder Group and Creditors' Committee to negotiate a chapter 11 plan of liquidation that distributes Estate Assets to creditors in a fair, efficient, and expeditious manner.  Those negotiations—conducted over several weeks and at arm's length—culminated in a comprehensive global settlement to resolve all of the Creditors' Committee's concerns in these Chapter 11 Cases and the Plan, including the allocation

---

[2]    "**Plan**" means the Debtors' *Fourth Amended Chapter 11 Plan of Liquidation of Luminar Technologies, Inc. and Its Affiliated Debtors* (Docket No. 558), including all exhibits and attachments thereto and as amended, supplemented, or otherwise modified from time to time.

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or Disclosure Statement, as applicable.

of consideration to be distributed to Holders of General Unsecured Claims (the "**Global Settlement**").  Moreover, the Debtors facilitated these transactions and negotiations with limited liquidity and on an expedited timeline.  With both sale transactions successfully consummated, the Debtors now seek confirmation of the Plan.

3.      The Plan has been ***overwhelmingly accepted*** by Holders of Claims entitled to vote on the Plan.  In addition to 100% approval by the Holders of First Lien Noteholder Secured Claims (Class 3) and Second Lien Noteholder Secured Claims (Class 4), 205 General Unsecured Claims (Class 5) votes were validly cast, with over 97% in number and 92% in amount voting to accept the Plan.

4.      The Debtors have also worked constructively with the parties that filed objections to confirmation of the Plan (collectively, the "**Objections**")[4] and with parties that raised informal comments and, where possible, reached consensual resolutions, including through the addition of provisions in the Proposed Confirmation Order (as defined below).  As a result of these efforts, the Proposed Confirmation Order resolves all but one of the objections to confirmation of the Plan.  Moreover, the Debtors have filed an amended Plan that conforms to the District Court's rulings in *Container Store*[5] and is consistent with this Court's rulings in *Pine Gate*[6] and *PosiGen*.[7]

---

[4]     *See* (i) *United States Trustee's Objection to Confirmation of the Third Amended Chapter 11 Plan of Liquidation of Luminar Technologies, Inc. and Its Affiliated Debtors* (Docket No. 544) (the "**UST Objection**"), (ii) *Objection of the U.S. Securities and Exchange Commission to Confirmation of the Chapter 11 Plan* (Docket No. 538) (the "**SEC Objection**"), (iii) *Limited Objection of Creditor Scale AI, Inc. to Third Amended Chapter 11 Plan of Liquidation of Luminar Technologies, Inc. and Its Affiliated Debtors* (Docket No. 542) (the "**Scale AI Limited Objection**"), and (iv) *Fabrinet's Joinder to Limited Objection of Creditor Scale AI, Inc. to Third Amended Chapter 11 Plan of Liquidation of Luminar Technologies, Inc. and its Affiliated Debtors* (Docket No. 545) (the "**Fabrinet Joinder**").

[5]     *Epstein v. The Container Store Grp. Inc.*, *(In re Container Store Grp., Inc.)*, --- B.R. ----, 2026 WL 395898 (S.D. Tex. Feb. 12, 2026).

[6]     *In re Pine Gate Renewables, LLC*, No. 25-90669 (CML) (Bankr. S.D. Tex. Feb. 18, 2026) Conf. Hr'g Tr. 63:24–25, 64:1, 68:15–24.

[7]     *PosiGen, PBC*, No. 25-90787 (CML) (Bankr. S.D. Tex. Feb. 23, 2026) Conf. Hr'g. Tr. 60:11–14.

The U.S. Trustee's objection is the only remaining objection to the Plan. With the changes made to the amended Plan, the Debtors believe they have significantly narrowed the UST Objection to the Third-Party Release opt-out feature. The remaining objections from the U.S. Trustee related to third-party releases generally have been rejected time and time again, including as recently as February of 2026 by this Court and the District Court and this Court has also recently found third-party releases for parties receiving minimal recovery to be consistent with *Container Store*.[8]

5.      For the reasons set forth herein and as the evidence will show, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code. Accordingly, the Court should confirm the Plan. A proposed order confirming the Plan will be filed contemporaneously herewith (the "**Proposed Confirmation Order**").

## BACKGROUND

### I.      Chapter 11 Cases

6.      On December 15, 2025, and December 31, 2025, as applicable (the "**Petition Date**"), the Debtors each commenced with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). No trustee or examiner has been appointed in these Chapter 11 Cases. On December 30, 2025, the U.S. Trustee for Region 7 (the "**U.S. Trustee**") appointed the official committee of unsecured creditors (the "**Creditors' Committee**") in the Debtors' Chapter 11 Cases.

7.      The Debtors' Chapter 11 Cases are being jointly administered for procedural purposes pursuant to Rule 1015(b) of the Bankruptcy Rules and Rule 1015-1 of the

---

8       *See In re Container Store Grp., Inc,.* 2026 WL 395898 (S.D. Tex. Feb. 12, 2026) (holding that third-party releases are consensual); *PosiGen,* No. 25-90787 (CML) (Bankr. S.D. Tex. Feb. 23, 2026) (same); *In re Nine Energy Service, Inc.*, No. 26-90295 (CML) (Bankr. S.D. Tex. March 4, 2026) (Docket No. 189) (approving chapter 11 plan with opt-out third-party releases); *In re Pine Gate Renewables, LLC*, No. 25-90669 (CML) (Bankr. S.D. Tex. Feb. 18, 2026) (finding that third-party releases are consensual and that the third-party releases with respect to the general unsecured claims class—which received minimal recovery—were consistent with *Container Store*).

Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

8. The pertinent facts relating to the commencement of these Chapter 11 Cases and the key events during the cases are set forth more fully in the Disclosure Statement.

## II. Declarations in Support of Confirmation

9. In support of Confirmation, the Debtors respectfully refer the Court to the following declarations and affidavits (collectively, the "**Confirmation Declarations**"):

- *Declaration of Robin Chiu in Support of Confirmation of Debtors' Fourth Amended Chapter 11 Plan of Liquidation of Luminar Technologies, Inc. and Its Affiliated Debtors* (the "**Chiu Declaration**"), filed contemporaneously herewith, which addresses the satisfaction of the elements under section 1129 of the Bankruptcy Code;

- *Declaration of Patricia Ferrari in Support of Confirmation of Chapter 11 Plan* (the "**Ferrari Declaration**"), filed contemporaneously herewith, which addresses the Investigation, the Debtor Releases, and the Third-Party Releases (each as defined herein);

- *Declaration of Jeriad R. Paul in Support of Confirmation of the Chapter 11 Plan of Liquidation of Luminar Technologies, Inc. and its Affiliated Debtors* (the "**Voting Declaration**"), filed contemporaneously herewith; and

- *Affidavit of Service* (Docket No. 484), filed on March 3, 2026 (the "**Solicitation Certificate**").

10. The Confirmation Declarations and any testimony and other declarations that may be adduced or submitted at, or in connection with, the Confirmation Hearing (as defined below) are herein incorporated in full.

## III. Plan Summary

11. The Plan contemplates the (i) distribution of any proceeds remaining from the completed sales of substantially all the Debtors' assets pursuant to section 363 of the

4

Bankruptcy Code to QCi for LSICo[9] and to MicroVision for LiDARCo and (ii) efficient and orderly wind-down of the Debtors' estates in accordance with the Global Settlement and the absolute priority rule. Additionally, the Plan provides for distributions to creditors in the most efficient and expeditious manner possible. Specifically, the Plan provides for, among other things:[10]

- the creation of a Liquidation Trust, and the appointment of Matthew Dundon of Dundon Advisers LLC as the Liquidation Trustee, *See* Plan Supplement, Ex. 5;

- certain distributions to be made and reserves to be established and maintained by the Liquidation Trust, including: (i) initial funding of the Senior Claims Reserve on account of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims, (ii) funding of the Wind Down Reserve with the Wind Down Amount ($3,000,000) in accordance with the Wind Down Budget, (iii) funding of the First Lien Reserve and Second Lien Reserve, (iv) funding of the GUC Reserve, (v) initial funding of the Liquidation Reserve in an amount up to $150,000 with the first dollars of Post Effective Date Available Cash (Non-GUC Reserve Assets) otherwise distributable as Excess Cash to the First Lien Reserve and Second Lien Reserve pursuant to the Waterfall; and (vi) funding of the Professional Fee Escrow Account and payment of Professional Fee Claims therefrom;

- the following treatment of Claims against, and Interests in, the Debtors:

  o Holders of Allowed Administrative Expense Claims will receive from the Senior Claims Reserve (i) Cash in an amount equal to the Allowed amount of such Administrative Expense Claim or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code;

---

[9]   Such remaining proceeds are less distributions made pursuant to the *Order (I) Approving the Sale of the LSI Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Approving Compliance with Indenture in Connection with Sale Including Use of Net Sale Proceeds to Offer to Purchase Certain Prepetition Secured Debt from Holders Thereof in Accordance with the Asset Sale Offers; and (III) Granting Related Relief* (Docket No. 320) in connection with the Asset Sale Offer.

[10]   The following list is a summary of select Plan provisions. The Plan should be referred to for additional details and provisions.

o     Holders of Allowed Other Priority Claims will receive, either (i) payment in full in Cash or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code;

o     Holders of Allowed Other Secured Claims will receive: (i) payment in full in Cash in an amount equal to the Allowed amount of such Other Secured Claim; (ii) such other treatment sufficient to render such Holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code; or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code;

o     Holders of Allowed Priority Tax Claims will receive either (i) Cash in an amount equal to such Allowed Priority Tax Claim or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code;

o     Holders of the Allowed First Lien Noteholder Secured Claims will receive such Holder's Pro Rata Share of the First Lien Liquidation Trust Interests;

o     Holders of the Allowed Second Lien Noteholder Secured Claims will receive such Holder's Pro Rata Share of the Second Lien Liquidation Trust Interests;

o     Holders of Allowed General Unsecured Claims will receive such Holder's Pro Rata Share of the GUC Liquidation Trust Interests;

o     Intercompany Claims will be adjusted, Reinstated, or discharged (each without any distribution) to the extent reasonably determined to be appropriate by the Debtors or Liquidation Trustee (as applicable);

o     Intercompany Interests will be cancelled, released, and extinguished, by distribution, contribution, merger, or otherwise, as determined by the Debtors or the Liquidation Trustee (as applicable); *provided* that no Plan Distributions will be made to Holders of an Intercompany Interest on account of such Intercompany Interest under the Plan;

o     Holders of Subordinated Securities Claims will not receive any distributions; all Subordinated Claims, if any, will be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect; and

o     Parent Interests will be cancelled (i) on the Effective Date, with respect to all Unblocked Parent Interests and (ii) after OFAC issues the OFAC License, with respect to all Blocked Parent Interests, and the Holders of Parent Interests will not receive or retain any property on account of such Parent Interests under the Plan.

6

**IV.     Settlements Embodied in the Plan**

12.     During these Chapter 11 Cases, the Debtors engaged in constructive and meaningful discussions with their key stakeholders to build support for the Plan and resolve disputes, eventually resulting in the Global Settlement and the Plan Settlement (collectively, the "**Settlements**").

**A.     *Global Settlement***

13.     The Global Settlement is incorporated into the Plan and provides for the resolution of all disputes, claims, and controversies between the parties, including those related to the Plan and treatment of General Unsecured Claims, among other issues.  The Global Settlement includes, among others, the following material terms and conditions (each as set forth in the Plan):[11]

(i)     Holders of General Unsecured Claims (including First Lien Noteholder Deficiency Claims, if any, and Second Lien Noteholder Deficiency Claims) will receive GUC Liquidation Trust Interests entitling them to their Pro Rata Share of the GUC Reserve Assets proceeds, net of any costs and expenses incurred by the Liquidation Trust (including fees of the Liquidation Trustee and any taxes incurred by the Liquidation Trustee, whether such taxes are incurred directly by the Liquidation Trustee in his or her role as such, or on account of those taxes attributed proportionately to each Holders' share of GUC Liquidation Trust Interests) in connection with the pursuit, abandonment, or liquidation of all GUC Reserve Assets;

(ii)     GUC Reserve Assets include (i) the GUC Residual Amount, if any, (ii) the GUC Reserve Funding Amount of $1,500,000.00, (iii) the Retained Causes of Action belonging to each of the Debtors and the Debtors' Estates and the proceeds thereof (including any D&O Policy proceeds payable to the Estate on account of settlements or judgments from Commercial Tort Claims and other non-released claims and Causes of Action), (iv) the Unencumbered Assets, and (v) the proceeds of each of the foregoing clauses (i)–(iv);

---

[11]     The terms of the Global Settlement are more fully set forth in Section I.B of the Disclosure Statement and in section 5.2 of the Plan.

(iii) Matthew Dundon of Dundon Advisers, LLC will be appointed as Liquidation Trustee; the Creditors' Committee may select each of the three members of the Liquidation Trust Oversight Board, if any;

(iv) The Debtors shall be deemed substantively consolidated for purposes of distributions to Holders of General Unsecured Claims;

(v) All Preference Actions against the Debtors' trade vendors shall be deemed released on the Effective Date;

(vi) The Ad Hoc Noteholder Group consents to the Debtors' use of Cash Collateral (as defined in the Final Cash Collateral Order (Docket No. 319) through the Effective Date;

(vii) The sum of the Allowed Professional Fee Claims of the Creditors' Committee Advisors and the Restructuring Fees and Expenses due to the Unsecured Notes Trustee shall be capped in the aggregate at $4.225 million; provided that any amounts up to $200,000 incurred in excess of $4.025 million shall be payable from the first dollars to be distributed as Post Effective Date Available Cash (GUC Reserve Assets);

(viii) Only if the Effective Date of the Plan occurs on or before April 14, 2026, the aggregate Allowed Professional Fee Claims of the Debtors' Advisors (excluding any amounts paid pursuant to the Ordinary Course Professionals Retention Order) shall not exceed $26.471 million; and

(ix) The scope of the Debtor Releases and the parties included on the Schedule of Non-Released Parties shall be acceptable to the Creditors' Committee.

B.   *Plan Settlement*

14.   As a proposed compromise and settlement of inter-Estate and inter-creditor issues, the Plan Settlement contemplates that each Class 5 General Unsecured Claim shall be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors.  *See* Plan, § 5.1(c).  Specifically, Section 5.1(b) of the Plan contemplates the following treatment:

(i) all Assets of the Debtors shall be consolidated and treated as Liquidation Trust Assets irrespective of which Debtor owns such Assets;

(ii) each General Unsecured Claim against any Debtor shall be deemed a single General Unsecured Claim against, and a single obligation of, the Debtors;

8

(iii)   any General Unsecured Claims on account of a guarantee provided by a Debtor of the obligations of another Debtor shall be treated as eliminated so that any Claim against any Debtor and any Claim based upon a guarantee thereof by any other Debtor shall be treated as one Claim against a single consolidated Estate; and

(iv)   any joint or joint and several liability of any of the Debtors relating to a General Unsecured Claim shall be one obligation of the Debtors, and any Claims based upon such joint or joint and several liability shall be treated as one Claim against a single consolidated Estate.

15.   Section 5.1(c) of the Plan expressly provides that the Plan Settlement shall not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to distribution rights under the Plan. *See* Plan, § 5.1(c).

## V.   Plan Solicitation

16.   On February 18, 2026, the Court entered the Disclosure Statement Order,[12] which, among other things:

(i)   approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code;

(ii)   scheduled the hearing to consider confirmation of the Plan for April 1, 2026 at 9:30 a.m. (Central Time) (the "**Confirmation Hearing**");

(iii)   established March 23, 2026 at 4:00 p.m. (Central Time) as the deadline to (a) vote to accept or reject the Plan (the "**Voting Deadline**"), (b) opt-out of Third-Party Releases, and (c) object to confirmation of the Plan (the "**Plan Objection Deadline**");

(iv)   approved the proposed procedures for (a) soliciting, receiving, and tabulating votes to accept or reject the Plan, (b) voting to accept or reject the Plan, and (c) filing objections to the Plan (the "**Solicitation and Voting Procedures**");

(v)   approved the form of ballots with voting instructions (the "**Ballots**") and certain other notices;

---

[12]   "**Disclosure Statement Order**" means the *Order (I) Approving Disclosure Statement; (II) Establishing Solicitation, Voting, and Related Procedures; (III) Scheduling Confirmation Hearing; (IV) Establishing Notice and Objection Procedures for Confirmation of Plan; (V) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; and (VI) Granting Related Relief* (Docket No. 430).

9

(vi)   approved procedures for assumption, assumption and assignment, or rejection of the Debtors' executory contracts and unexpired leases;

(vii)   approved the form to opt out of Third-Party Releases (the "**Release Opt-Out Form**");

(viii)   approved the form and manner of notice of the Confirmation Hearing (the "**Confirmation Hearing Notice**"); and

(ix)   established March 16, 2026 as the deadline to file the Plan Supplement.

17.   As set forth in the Solicitation and Voting Procedures, the Holders of Claims in Class 3 (First Lien Noteholder Secured Claims), Class 4 (Second Lien Noteholder Secured Claims), and Class 5 (General Unsecured Claims) were entitled to vote on the Plan, subject to certain exceptions[13] (each a "**Voting Class**," and collectively, the "**Voting Classes**").

18.   On February 20, 2026, the Debtors filed the Confirmation Hearing Notice (Docket No. 444) to give parties in interest notice of the Confirmation Hearing and, through Omni, caused the Confirmation Hearing Notice to be served in accordance with the Solicitation and Voting Procedures.  *See* Solicitation Certificate.  On February 23, 2026, the Debtors commenced the solicitation of votes on the Plan in accordance with the Disclosure Statement Order by causing Omni Agent Solutions, Inc. ("**Omni**"), the Debtors' solicitation agent, to distribute the Confirmation Hearing Notice (including a QR code to the Disclosure Statement, Plan, Order, and Solicitation and Voting Procedures), and the applicable Ballot containing boxes to indicate assent or dissent to the Plan and to opt-out of the Third Party Releases (collectively, the "**Solicitation Package**") to each creditor entitled to vote on the Plan.  *See* Solicitation Certificate.  The Confirmation Hearing Notice was also published in the Wall Street Journal on February 24, 2026. *See* Publication Aff. (Docket No. 460).

---

[13]   Such exceptions are set forth in the Solicitation and Voting Procedures.  *See* Disclosure Statement Order, Ex. 2, at 2.

19.     If Holders of Claims and Interests were not entitled to vote on the Plan, on or before February 23, 2026, Omni served such Holders with (i) the Confirmation Hearing Notice, (ii) the Release Opt-Out Form, and (iii) notice informing them of their non-voting status (the "**Notice of Non-Voting Status**"), which conspicuously contained the full text of the release, exculpation, and injunction provisions in bold/italics set forth in Sections 11.5, 11.6, and 11.7 of the Plan and advised such Holders that they would be deemed to have consented to the Third-Party Releases unless they timely and properly opted out of such releases contained in the Release Opt-Out Form, in accordance with Rule 40 of the *Procedures for Complex Cases in the Southern District of Texas* (the "**Complex Case Rules**") and consistent with the Disclosure Statement Order.  *See* Solicitation Certificate; *see generally* Voting Declaration.  The materials included in the Solicitation Package were also made available at no cost on the Debtors' restructuring website maintained by Omni at https://cases.omniagentsolutions.com/Luminar (the "**Case Website**").  Additionally, Omni periodically served subsequent notices of Non-Voting Status on Holders of Claims in the Non-Voting Classes on account of (i) forwarding instructions included on packages returned as undeliverable and/or (ii) at the request of interested parties.   *See* Voting Declaration, ¶ 9.

## VI.     Plan Supplement

20.     On March 16, 2026, March 19, 2026, and March 30, 2026, the Debtors timely filed the Plan Supplement (Docket Nos. 523, 530, and 560).  The Plan Supplement included the following draft documents and information: (i) the Schedule of Retained Causes of Action; (ii) the Schedule of Assumed Contracts; (iii) the Wind Down Budget; (iv) the Liquidation Trust Agreement; (v) the identity of the Liquidation Trustee; (vi) information regarding the appointment of the Liquidation Trust Oversight Board; and (vii) information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code.  *See* Plan Supplement, Exs. 1–5.

11

**VII.  Tabulation**

21.    After the Voting Deadline, and following a complete review by Omni of all Ballots received, Omni tabulated the Ballots.  *See* Voting Declaration, ¶ 15.  Exhibit A to the Voting Declaration also describes in detail the voting results for each Debtor.  As reflected in the Voting Declaration, all Voting Classes voted to accept the Plan pursuant to the requirements of section 1126 of the Bankruptcy Code at three (3) of the five (5) Debtor entities.[14]  *See* Voting Declaration Ex. A.  Moreover, out of the 116 Holders of General Unsecured Claims who validly voted on the Plan, over 92% in amount and over 97% in number voted to accept the Plan.  Only five (5) Holders of General Unsecured Claims—each at Luminar Technologies, Inc.—voted to reject the Plan.

| Aggregate Voting Results | | | | | |
| --- | --- | --- | --- | --- | --- |
| | Accept | | Reject | | |
| **Class** | **Amount (% of Amount Voted)** | **Number (% of Number Voted)** | **Amount (% of Amount Voted)** | **Number (% of Number Voted)** | **Result** |
| Class 3 (First Lien Noteholder Claims) | $112,979,593.38 (100%) | 18 (100%) | $0 (0%) | 0 (0%) | Accept |
| Class 4 (Second Lien Noteholder Claims) | $18,078,066.50 (100%) | 42 (100%) | $0 (0%) | 0 (0%) | Accept |
| Class 5 (General Unsecured Claims) | $289,403,944.07 (92.16%) | 110 (97.14%) | $35,744,486.36 (7.84%) | 5 (2.86%) | Accept |

---

[14]   As set forth in Exhibit A to the Voting Declaration, two Debtors—Condor Acquisition Sub I, Inc. and Condor Acquisition Sub, II, Inc.—did not have any Holders of Claims or Interests that were Allowed in an amount greater than zero for voting purposes in any of the Voting Classes.  Pursuant to section 3.4 of the Plan, any such Class shall be considered vacant, deemed eliminated from the Plan of such Debtor for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether such Debtor's Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

**ARGUMENT**

22.     This argument is divided into three parts.  *Part I* addresses satisfaction of the applicable requirements for settlements, releases, exculpation, and injunction provisions contained in a chapter 11 plan pursuant to Bankruptcy Rule 9019, section 1123 of the Bankruptcy Code, and applicable Fifth Circuit law.  *Part II* demonstrates the satisfaction of each of the requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code.  *Part III* responds to certain objections raised to the confirmation of the Plan.

**I.     Settlement, Release, Exculpation, and Injunction Provisions Are Appropriate and Should Be Approved**

**A.     *Settlements Are Reasonable and Satisfy Bankruptcy Rule 9019***

23.     The Settlements are (i) in exchange for good and valuable consideration provided by each of the Estates (including, without limitation, performance of the terms of the Plan), and a good faith settlement and compromise of the released claims, (ii) in the best interests of the Debtors, the Estates, and all holders of Claims, (iii) fair, equitable, and reasonable, and (iv) effected after due notice and opportunity for hearing.

24.     In the Fifth Circuit, "[t]he standard for evaluating the validity of a settlement contained in a Chapter 11 plan is the same as the standard for evaluating a settlement between a debtor and another party outside the context of a plan . . . . Stated differently, settlement provisions in a Chapter 11 plan must satisfy the standards used to evaluate compromises under [Bankruptcy] Rule 9019." *In re Bigler LP*, 442 B.R. 537, 543 n.6 (Bankr. S.D. Tex. 2010) (citing *In re MCorp Fin., Inc.*, 160 B.R. 941, 951 (S.D. Tex. 1993)).  Accordingly, approval should be given "if the settlement is 'fair and equitable and in the best interest of the estate.'" *Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349,

13

355 (5th Cir. 1997) (quoting *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995) (additional citations omitted)).

25.     To determine whether a settlement is fair and equitable, courts "apply [a] three-part test . . . with a focus on comparing 'the terms of the compromise with the likely rewards of litigation.'" *Off. Comm. of Unsecured Creditors v. Moeller (In re Age Ref., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015) (quoting *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980)).  Specifically, a bankruptcy court evaluates (i) "the probability of success in [] litigat[ing] [the claim subject to settlement], with due consideration for the uncertainty in fact and law," (ii) "the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay," and (iii) "all other factors bearing on the wisdom of the compromise," including (a) "the best interests of the creditors, with proper deference to their reasonable views," and (b) "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Id.* (first citing *Jackson Brewing*, 624 F.2d at 602; then quoting *Cajun Elec. Power*, 119 F.3d at 356; and then quoting *Foster Mortg.*, 68 F.3d at 917–18) (internal quotation marks omitted).

26.     Although the debtor bears the burden of establishing that a settlement is fair and equitable based on the balance of the above factors, "the [debtor's] burden is not high." *See In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008).  The court need only determine that the settlement does not "fall beneath the lowest point in the range of reasonableness." *See In re Idearc Inc.*, 423 B.R. 138, 182 (Bankr. N.D. Tex. 2009), *subsequently aff'd*, 662 F.3d 315 (5th Cir. 2011) (citation omitted); *Roqumore*, 393 B.R. at 480 ("The Trustee need only show that his decision falls within the 'range of reasonable litigation alternatives.'") (citations omitted).

14

27.     As discussed more fully below, each Settlement is fair and equitable and achieves the best resolution of the issues at hand.  The Settlements are the result of weeks of good faith, arm's length negotiations.  As described in greater detail above, the Settlements, among other things, provide for a clear path to execution of the Plan and the wind down of the Debtors' estates. The Debtors, the Ad Hoc Noteholder Group, and the Creditors' Committee are all represented by experienced and competent counsel who vigorously negotiated the Settlements and such parties unanimously agree that approval of the Settlements is a significantly better outcome than the alternatives.  Moreover, no party has objected to the Settlements.

**B.      *Global Settlement Satisfies Bankruptcy Rule 9019***

28.     The Global Settlement is the result of good-faith, arm's-length negotiation and resolves disputes and potential litigation between the Debtors and the Creditors' Committee, including those related to the treatment of General Unsecured Claims.

29.     Approval of the Global Settlement will maximize recoveries to creditors. *See* Chiu Declaration, ¶ 10.  The Global Settlement averts the risk of costly, time-consuming litigation relating to, among other things, the extent of the prepetition secured creditors' liens and the value of any Unencumbered Assets—and any related delays in distributions to creditors—by resolving various issues, including (i) providing Holders of General Unsecured Claims with GUC Liquidation Trust Interests; (ii) a GUC Reserve Funding Amount of $1,500,000; and (iii) the appointment of the Liquidation Trustee which shall be mutually agreeable between the Ad Hoc Noteholder Group and the Creditors' Committee, and reasonably acceptable to the Debtors.  *See id.*  Any such litigation would present challenges for the Debtors, the outcome of which would be uncertain and potentially detrimental to the Estates and other creditors.  *See id.*  As such, the Global Settlement is fair, reasonable, and in the best interests of the Estates.

## C.   *Plan Settlement Satisfies Bankruptcy Rule 9019*

30.     The Plan Settlement is a proposed compromise and settlement of inter-Estate and inter-creditor issues, including those relating to whether the liabilities and assets of the Debtors should be substantively consolidated for distribution purposes under the Plan.  *See* Plan, § 5.1(b).  The Plan Settlement provides for the following treatment:

(i)     all Assets of the Debtors shall be consolidated and treated as Liquidation Trust Assets irrespective of which Debtor owns such Assets;

(ii)    each General Unsecured Claim against any Debtor shall be deemed a single General Unsecured Claim against, and a single obligation of, the Debtors;

(iii)   any General Unsecured Claims on account of a guarantee provided by a Debtor of the obligations of another Debtor shall be treated as eliminated so that any Claim against any Debtor and any Claim based upon a guarantee thereof by any other Debtor shall be treated as one Claim against a single consolidated Estate; and

(iv)    any joint or joint and several liability of any of the Debtors relating to a General Unsecured Claim shall be one obligation of the Debtors, and any Claims based upon such joint or joint and several liability shall be treated as one Claim against a single consolidated Estate.

31.     Moreover, as a result of the Plan Settlement, each Class 5 General Unsecured Claim shall be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors.  *See* Plan, § 5.1(c).  The Plan shall not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to distribution rights under the Plan.  *Id.*  The Plan Settlement shall not (other than for purposes related to funding Plan Distributions under the Plan) affect (i) the legal and organizational structure of the Debtors, (ii) Executory Contracts or Unexpired Leases that were entered into during the Chapter 11 Cases or that have been or will be assumed or rejected, (iii) any agreements entered into by the Liquidation Trust on or after the Effective Date, (iv) the Liquidation Trustee's ability to subordinate or otherwise challenge Claims on an entity-by-entity basis, (v) any Causes of Action

or Avoidance Actions or defenses thereto, which in each case shall survive entry of the Confirmation Order as if there had been no Plan Settlement, and (vi) distributions to the Debtors or the Liquidation Trust from any insurance policies or the proceeds thereof.  *Id.*

32.     ***Limited Substantive Consolidation.***     Here, limited substantive consolidation for distribution purposes should be approved as part of Settlements reached pursuant to Bankruptcy Rule 9019.

33.     Indeed, bankruptcy courts routinely order limited substantive consolidation for distribution purposes as part of plan settlements under the Bankruptcy Rule 9019 standard (the "**9019 Standard**").  *See In re Enron Corp.*, No. 01–16034 (AJG), 2004 Bankr. LEXIS 2549, at \*195 (Bankr. S.D.N.Y. July 15, 2004) ("It is well established that debtors may properly reach a settlement regarding whether the estates should be substantively consolidated."); *In re Winn-Dixie Stores*, 356 B.R. 239, 250–51 (Bankr. M.D. Fla. 2006) (approving substantive consolidation settlement pursuant to Bankruptcy Rule 9019).  Settlements of substantive consolidation issues have been approved under the 9019 Standard pursuant to chapter 11 plans confirmed by courts previously.[15]  Similar relief is appropriate here.  The Plan Settlement provides for a proposed compromise and settlement of inter-Estate and inter-creditor issues and, therefore, the proposed limited substantive consolidation under the Plan should be evaluated under the standard for approving settlements under Bankruptcy Rule 9019.  *See In re The Great Atl. & Pac. Tea Co.,* Case No. 10-24549 (RDD), Hr'g Tr. 43:7-21 (Bankr. S.D.N.Y. Feb. 27, 2012) (Docket No. 3505)

---

[15]    *See, e.g.*, *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 15, 2019) (Docket No. 5370) (approving substantive consolidation settlement under Bankruptcy Rule 9019); *In re The Great Atl. & Pac. Tea Co.,* No. 10-24549 (RDD), at 21 (Bankr. S.D.N.Y. Feb. 28, 2012) (Docket No. 3477) (same); *In re Lehman Bro. Holdings Inc.*, Case No. 08-13555 (JMP), at 13–14 (Bankr. S.D.N.Y. Dec. 6, 2011) (Docket No. 23023) (same); *Enron*, Bankr. LEXIS 2549, at \*195 (same); *In re WorldCom, Inc.*, Case No. 02-13533 (AJG), 2003 WL 23861928, at \*38, \*44–48 (Bankr. S.D.N.Y. Oct. 31, 2003) (same); *Winn-Dixie Stores*, 356 B.R. at 250–51 (same).

("As I noted in my original ruling, there are cases that treat a partial substantive consolidation as a settlement and I think do so appropriately . . . .").

34.     By its terms, the Plan serves as a motion by the Debtors for entry of a Bankruptcy Court order approving the Settlements, including the Bankruptcy Court's findings that the Settlements are (i) in exchange for good and valuable consideration provided by each of the Estates (including, without limitation, performance of the terms of the Plan), and a good faith settlement and compromise of the released Claims, (ii) in the best interests of the Debtors, the Estates, and all holders of Claims, (iii) fair, equitable, and reasonable, and (iv) effected after due notice and opportunity for hearing.  Plan § 5.1(c).  The limited substantive consolidation of the Assets and liabilities for distribution purposes is an essential component of the Settlements.

35.     Here, the limited substantive consolidation provided for pursuant to the Plan Settlement is fair and equitable and in the best interest of the Estate.  The settlement of inter-Estate and inter-creditor issues is crucial to the Debtors' Plan to ensure a timely Wind-Down of these Chapter 11 Cases and maximize recoveries for Holders of General Unsecured Claims.  *See* Chiu Declaration, ¶ 12.  Throughout the prepetition period, Luminar Parent provided shared services to certain of its Debtor and Non-Debtor Affiliates and incurred expenses arising from providing these services.[16]  *Id.*  Luminar Parent did not provide vendors with separate financial statements for individual Debtors, nor did it represent that obligations would be satisfied solely by the contracting entity.  *Id.*  Indeed, Luminar Parent and its affiliated Debtors consistently interacted with vendors

---

[16] These shared services included, among other things, (i) corporate management services, (ii) human resources, (iii) internal audit, (iv) financial services, (v) legal advice and related assistance, (vi) tax, (vii) treasury and risk management, (viii) information technology, (ix) operations, (x) communications, (xi) shared contracts, (xii) revenue cycle management, (xiii) procurement/supply chain, and (ix) policy decisions.  Moreover, the Company's financial reporting and tax filings were done on a consolidated basis.  *See* Chiu Declaration, ¶ 12.

and other third parties as a unified enterprise. *Id.* Further, all payables and receivables were booked at Luminar Parent, including intercompany payables and receivables.

36. For administrative ease and to avoid costs and time associated with reconciling inter-Estate and inter-creditor issues, the Plan provides that each Class 5 General Unsecured Claim shall be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors. *See* Plan, § 5.1(c). In addition, the Plan provides that all Assets of the Debtors shall be consolidated and treated as Liquidation Trust Assets irrespective of which Debtor owns such Assets. *Id.* § 5.1(b)(i).

37. Moreover, the Plan does not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to distribution rights under the Plan. The Plan Settlement does not (other than for purposes related to funding Plan Distributions under the Plan) affect (i) the legal and organizational structure of the Debtors, (ii) Executory Contracts or Unexpired Leases that were entered into during the Chapter 11 Cases or that have been or will be assumed or rejected, (iii) any agreements entered into by the Liquidation Trust on or after the Effective Date, (iv) Liquidation Trustee's ability to subordinate or otherwise challenge Claims on an entity-by-entity basis, (v) any Causes of Action or Avoidance Actions or defenses thereto, which in each case shall survive entry of the Confirmation Order as if there had been no Plan Settlement, and (vi) distributions to the Debtors or the Liquidation Trust from any insurance policies or the proceeds thereof. *Id.* § 5.1(c). Notably, no party has objected to the limited substantive consolidation contemplated by the Plan Settlement, and the Ad Hoc Noteholder Group and Creditors' Committee support such consolidation.

38.     Accordingly, the Debtors submit that the Plan Settlement, including the limited substantive consolidation for distribution purposes provided therein, is fair, reasonable, and in the best interests of the Estates and should therefore be approved.

**D.     *Plan Releases, as Encompassed in the Settlements, Are Appropriate and Should Be Approved***

39.     The Plan provides for the release of certain Claims and Causes of Action by (i) the Debtors and their estates as set forth in Section 11.6(a) of the Plan (the "**Debtor Releases**") and (ii) certain non-Debtor third parties as set forth in Section 11.6(b) of the Plan (the "**Third-Party Releases**"), in favor of the Released Parties.[17]  The Debtor Releases and Third-Party Releases are integral components of the Plan, were negotiated as part of the Settlements, are appropriate and necessary under the circumstances, are consistent with the Bankruptcy Code, and comply with applicable case law and precedent in the Fifth Circuit and for the reasons set forth below should be approved.

**1.     Debtor Releases**

40.     The Plan provides for releases by the Debtors and their Estates of the Released Parties which include, among others, in each case solely in their capacity as such (i) the Debtors, (ii) the Creditors' Committee and each of its members (iii) the members of the Ad Hoc Noteholder Group, (iv) the First Lien Notes Agent and Second Lien Notes Agent, (v) the

---

[17]     "**Released Parties**" means, collectively: (i) the Debtors; (ii) the Creditors' Committee and each of its members, solely in their capacities as such; (iii) the members of the Ad Hoc Noteholder Group; (iv) the First Lien Notes Agent and Second Lien Notes Agent, solely in their capacities as such; (v) the Unsecured Notes Trustee and its counsel and agents, and (vi) with respect to each of the foregoing Persons in clauses (i) through (v), all Related Parties.  Notwithstanding the foregoing, any Person that opts out of the releases set forth in section 11.6(b) of the Plan shall not be deemed a Released Party thereunder. For the avoidance of doubt, no Person on the Non-Released Parties Schedule shall be deemed a Released Party.

Unsecured Notes Trustee and its counsel and agents, and (vi) the Current Directors and Officers.[18] Moreover, the Debtor Releases expressly carve-out from the releases any claims or Causes of Action against each of the parties included on the Non-Released Parties Schedule (*i.e.*, the "**Non-Released Parties**"), who have been identified to remove any doubt that these individuals and parties are not being released notwithstanding anything else in the Plan.

41.     Under section 1123(b)(3)(A) of the Bankruptcy Code, a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3)(A).  Accordingly, a debtor may release causes of action as consideration for concessions made by its stakeholders pursuant to a chapter 11 plan.  *See, e.g.*, *Bigler*, 442 B.R. at 547 (finding that plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the [d]ebtors and the [e]state are releasing claims that are property of the [e]state in consideration for funding of the Plan . . . ."); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 308 (Bankr. N.D. Tex. 2007) ("[T]he plain language of § 1123(b)(3) provides for the inclusion in a plan of a settlement of claims belonging to the debtor or to the estate . . . .") (emphasis omitted); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991) ("To the extent that . . . the plan purports to release any causes of action against the [creditor] which the [d]ebtor could assert, such provision is authorized by § 1123(b)(3)(A) . . . .").  In considering the appropriateness of a release of claims by a debtor, courts consider whether the release is (i) "fair and equitable" and (ii) "in the best interest of the estate."  *See Jackson Brewing*, 624 F.2d at 602 (citing *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); *see Bigler*, 442 B.R. at 543–44 n.6; *see In re Derosa-Grund*, 567 B.R. 773, 784–

---

[18]   As defined in the Plan, "**Current Directors and Officers**" means Elizabeth Abrams, Yarden Amsalem, Thomas Beaudoin, Robin Chiu, Patricia Ferrari, Alexander Fishkin, Alec Gores, Mary Lou Jepsen, Shaun Maguire, Katharine A. Martin, Paul Ricci, Dominick Schiano, Matthew Simoncini, and Daniel Tempesta.

85 (Bankr. S.D. Tex. 2017); *see also In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Objecting Class 3 Claimholders v. New Mirant Entities*, No. 4:06-CV-744-A (JHM), 2006 WL 3780884 (N.D. Tex. Dec. 26, 2006); *Heritage*, 375 B.R. at 259.

42.     Courts generally determine whether a release is "fair and equitable" and "in the best interests of the estate" by reference to the following so-called "*Foster Mortgage*" factors:

- the probability of success of litigation, with due consideration for the uncertainty in fact and law;

- the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay, including the difficulties, if any, to be encountered in the matter of collection;

- the paramount interest of the creditors and a proper deference to their respective views;

- the extent to which the settlement is truly the product of arm's-length bargaining and not fraud or collusion; and

- all other factors bearing on the wisdom of the compromise.

*The Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010) (citing *Foster Mortg.*, 68 F.3d at 917–18); *see also Derosa-Grund*, 567 B.R. at 784–85; *Roqumore*, 393 B.R. at 479–80.

43.     The Debtor Releases meet the foregoing standard, are in the best interests of the Estates, and should be approved for the following reasons. *First*, the Debtors do not believe there exists any valuable, colorable, or material claims against the current directors and officers, with the exception of Mr. Russell (the "**Released Directors and Officers**").[19]  As detailed in the Ferrari Declaration, the Special Investigation Committee, comprised of Elizabeth Abrams and Patricia Ferrari, approved the Debtor Releases for the Released Directors and Officers following a thorough Investigation.[20]  Specifically, the Investigation considered, among other things, all

---

[19]     *See* Ferrari Declaration, ¶ 16.

[20]     *See* Ferrari Declaration, ¶ 11.

potential claims and causes of action against current and former directors and officers, including those related to potential breaches of fiduciary duties, corporate waste, and avoidance actions for any preferential or fraudulent transfers.[21]

44.     Before the Petition Date, the Special Investigation Committee retained King & Spalding LLP ("**K&S**") as independent counsel to assist the Special Investigation Committee and Weil (together with K&S, the "**Advisors**") with the Investigation.[22]   At the outset of the Investigation, the Special Investigation Committee and the Advisors identified various factual areas on which to focus initially, including, among other things, (i) the Debtors' management and corporate governance, (ii) the Debtors' financial and operational performance, and (iii) the allegations and claims asserted in prepetition litigation involving the Debtors.[23]

45.     During the Investigation, the Special Investigation Committee, and its Advisors, reviewed nearly one million documents collected from the Debtors and certain current and former directors and officers, primarily related to the time period between January 1, 2021 and the chapter 11 petition date (including, among other things, email correspondence and text messages from and related to the certain parties, relevant public filings, Board materials and minutes (including Board committee materials and minutes), employment agreements for certain officers, and complaints filed against current and former directors and officers of the Debtors); filing a motion under Bankruptcy Rule 2004 and serving a subpoena on Mr. Austin Russell in connection with the Investigation (Docket No. 132); interviewing more than a dozen witnesses, including, but not limited to, the current outside directors, current officers, and current and certain

---

[21]   *See id.*

[22]   *See id.*, ¶ 12.

[23]   *See id.*, ¶ 14.

former advisors to the Debtors, to gather additional factual information; analyzing a broad array of information to identify potential claims and causes of action; and performing substantive legal and factual analysis.[24]

46.     As a result of the Investigation, the Special Investigation Committee determined that the Investigation had not revealed any colorable claims or causes of action on behalf of the Debtors and their Estates against the Released Directors and Officers, including, but not limited to, claims for breach of fiduciary duty, corporate waste, or preferential or fraudulent conveyances.[25]  Based upon the information available to the Debtors, including the results of the Investigation, certain Persons were included on the Non-Released Parties Schedule.[26]  For the avoidance of doubt, Persons on the Non-Released Parties Schedule do not include the individuals identified as the Current Directors and Officers.

47.     *Second*, based on the comprehensive Investigation and following deliberation with the Advisors, the Special Investigation Committee approved the inclusion of the Debtor Releases of the Released Directors and Officers as part of the Plan.[27]

48.     *Third*, many of the Released Directors and Officers provided and continue to provide integral support to the Debtors throughout these Chapter 11 Cases and have contributed meaningfully to the Debtors' proposed Plan and wind down, including in the following ways: (i) the Released Directors and Officers were instrumental in the successful consummation of the value maximizing sales of the Debtors' (a) equity interests in Luminar Semiconductor, Inc. (the "**LSI Assets**") and (b) Light Detector and Ranging-related business segment (collectively, the "**LiDAR**

---

[24]   *See id.*, ¶ 13.

[25]   *See id.*, ¶ 16.

[26]   *See id.*, ¶ 20.

[27]   *See id.*, ¶¶ 21–22.

**Assets**"), which LiDAR Assets ultimately sold for approximately $10 million more than the initially submitted stalking-horse bid, providing direct benefit to the Debtors' Estate, while preserving jobs for approximately 172 former Company employees; (ii) through consistent diligence and thorough preparation at every stage of the negotiation process, the Released Directors and Officers played a pivotal role in guiding the Debtors to a successful Global Settlement, carefully evaluating complex issues and exercising sound business judgment to ultimately assist the Debtors in avoiding costly and protracted litigation, thereby maximizing creditor recoveries; and (iii) since the commencement of these chapter 11 cases, the Debtors' current officers, with the assistance of the Debtors' directors and executive management team, have also managed the intense demands associated with these cases while maintaining their regular duties.[28]

49.     In approving the Debtor Releases of the Released Directors and Officers, the Special Investigation Committee also considered the fact that the Debtor Releases contained certain limitations, including (among other limitations and carve-outs) that the Debtor Releases shall not be construed as releasing any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, criminal misconduct, gross negligence, or willful misconduct.  Additionally, based upon the information available to the Debtors, including the results of the Investigation, certain Persons were included on the Non-Released Parties Schedule.  Such parties will not, therefore, be released under the Plan from any Claims, obligations, rights, suits, damages, Causes of Action, remedies, or liabilities whatsoever.[29]

---

[28]     *See id.*, ¶ 19.

[29]     *See id.*, ¶ 20.

50.     *Finally*, the Debtor Releases have broad support from the Debtors' stakeholders. In fact, all Voting Classes voted overwhelmingly in favor of the Plan. *See* Voting Declaration, ¶ 15, Exhibit A.

51.     The *Factor Mortgage* factors are therefore satisfied because the Debtor Releases, among other things, (i) only include individuals who are not associated with any potential wrongdoing (based on the findings of the Investigation), (ii) are not believed to release any valuable, colorable, or material claims, and (iii) are supported by the Debtors' stakeholders, including the Ad Hoc Noteholder Group and the Creditors' Committee.

52.     Accordingly, the Debtor Releases are fair, equitable, and in the best interest of the Estates, are consistent with prevailing Fifth Circuit law, and should be approved by the Court.

### 2.     Third-Party Releases

53.     In addition to the Debtor Releases, Section 11.6(b) of the Plan provides for certain consensual Third-Party Releases. Section 1123(b)(6) of the Bankruptcy Code provides that a chapter 11 plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1123(b)(6). Under Fifth Circuit law, a plan may include releases of third parties if such releases are provided by parties that consented to such releases and received consideration in exchange therefor.[30] And the District

---

[30]   *See Bigler*, 442 B.R. at 549; *see Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987) (acknowledging that Bankruptcy Code does not prohibit a non-debtor release "when it has been accepted and confirmed as an integral part of a plan of reorganization"); *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007) ("Most courts allow consensual nondebtor releases to be included in a plan." (citations omitted)). If these requirements are satisfied, a release should be approved when it is "an essential means of implementing [a] [p]lan pursuant to Section 1123(a)(5) of the Bankruptcy Code[.]" *In re Moody Nat'l SHS Hous. H, LLC*, No. 10-30172 (MI), 2010 WL 5116872, at *5 (Bankr. S.D. Tex. June 30, 2010) (approving consensual nondebtor release).

Court has continued to view third-party releases as a permissible, consensual release consistent with Fifth Circuit law.[31]

54.     In determining whether a third-party release is consensual, courts in the Fifth Circuit have focused on two things—notice and an opportunity to object—*i.e.*, whether "notice has gone out, parties have actually gotten it, they've had the opportunity to look over it, [and] the disclosure is adequate so that they can actually understand what they're being asked to do and the options that they're being given."  Conf. Hr'g Tr. 47:7–11, *In re Energy & Expl. Partners, Inc.*, No. 15-44931 (RFN) (Bankr. N.D. Tex. April 21, 2016) (Docket No. 730) (approving third-party releases as consensual, over objection, in light of sufficient notice and opportunity to object); *see also* Conf. Hr'g Tr. 91:15-92:5, *In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. Apr. 16, 2025) (Docket No. 251) (analyzing the facts and circumstances surrounding opt-out third-party releases before determining such releases were appropriate); *In re GenOn Energy, Inc.*, No. 17-33695 (DRJ) (Bankr. S.D. Tex. Dec. 12, 2017) (Docket No. 1250) (approving third-party releases as consensual over objections from parties in interest, including U.S. Trustee); *In re Ameriforge Grp., Inc.*, No. 17-32660 (DRJ) (Bankr. S.D. Tex. May 22, 2017) (Docket No. 142) (confirming chapter 11 plan over objection because certain impaired creditors were deemed to have consented to third-party release provisions unless they opted out).

55.     Moreover, as the Court recently confirmed, nothing in the Supreme Court's recent decision in *Purdue* has modified the law in this jurisdiction which provides that opt-out features are an appropriate mechanism to obtain consensual third-party releases.  *See In re Pine Gate Renewables, LLC*, No. 25-90669 (CML) (Docket No. 1483), ¶ 10 (Bankr. S.D. Tex. Feb. 19, 2026) (approving opt out releases)*; In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr

---

[31]     *Container Store*, 2026 WL 395898 at *8.

S.D. Tex. 2024) (holding that the use of opt-out mechanisms in plans of reorganization are an appropriate method to obtain consensual third-party releases and explaining that "[h]undreds of Chapter 11 Cases have been confirmed in this District with consensual third-party releases with an opt-out. And, again, *Purdue* did not change the law in this Circuit."); *Container Store*, 2026 WL 395898, at \*14 ("A bankruptcy court's authority to enter consensual third-party releases is a matter of federal law. And, as discussed, 'what constitutes consent, including opt-out features and deemed consent for not opting out, has long been settled in this [d]istrict.'") (cleaned up).[32]

56.     The parameters around when an opt-out is appropriate are evolving in this district in light of the recent decision in *Container Store*. *Container Store*, 2026 WL 395898 at \*19 ("For these reasons, consistent with its longstanding precedent, the court holds that the failure to opt-out constitutes consent to a third-party release under the appropriate circumstances."). The District Court in *Container Store* held that the debtors' "third-party releases [were] consensual, with the exception of claimants in Class 5 and Class 8, who received no recovery under the Plan and were deemed to reject it." *See Container Store*, 2026 WL 395898, at \*20. This Court has since followed the *Container Store* holding, confirming the chapter 11 plans of *Nine Energy*,[33]

---

[32]    *See also In re Nine Energy Serv., Inc.*, No. 26-90295 (CML) (Bankr. S.D. Tex. March 4, 2026) (Docket No. 189) (approving chapter 11 plan with opt-out third-party releases); *In re PosiGen, PBC*, No. 25-90787 (CML) (Bankr. S.D. Tex. Feb. 24, 2026) (Docket No. 613) (same); *In re Pine Gate Renewables, LLC*, No. 25-90669 (CML) (Bankr. S.D. Tex. Feb. 19, 2026) (Docket No. 1483) (same); *In re Everstream Sols. LLC*, No. 25-90144 (CML) (Bankr. S.D. Tex. Nov. 19, 2025) (Docket No. 594) (same); *In re DocuData Sols., L.C.*, No. 25-90023 (CML) (Bankr. S.D. Tex. June 23, 2025) (Docket No. 834) (same); *In re Wellpath Holdings, Inc.*, No. 24-90533 (ARP) (Bankr. S.D. Tex. May 1, 2025) (Docket No. 2596) (same); *In re MLN US HoldCo LLC*, No. 25-90090 (CML) (Bankr. S.D. Tex. April 17, 2025) (Docket No. 263) (same); *In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. April 16, 2025) (Docket No. 237) (same); *In re DRF Logistics, LLC,* No. 24-90447 (CML) (Bankr. S.D. Tex. Nov. 25, 2024) (Docket No. 530) (same); *In re Mobileum, Inc.*, No. 24-90414 (CML) (Bankr. S.D. Tex. Sept. 11, 2024), (Docket No. 194) (same); *In re Core Sci., Inc.*, No. 22-90341 (CML) (Bankr. S.D. Tex. Jan. 16, 2024) (Docket No. 1749) (same); *see also In re GOL Linhas Aéreas Inteligentes S.A.*, No. 24-10118 (MG) (Bankr. S.D.N.Y. May 22, 2025) (Docket No. 1658) (approving chapter 11 plan with opt-out third-party releases based upon a reading of *Purdue* and case law from the Fifth Circuit).

[33]    *In re Nine Energy Service, Inc.*, No. 26-90295 (CML) (Bankr. S.D. Tex. March 4, 2026)  (Docket No. 189).

after amendments were made to the plan, and *Pine Gate*[34] and *PosiGen*,[35] to remove classes receiving no recovery from eligibility to opt-out of third-party releases.

57.     Furthermore, the Complex Case Rules for this jurisdiction permit consensual third-party releases with an opt-out.  Specifically, the Complex Case Rules provide:

> If a proposed plan seeks consensual pre- or post-petition releases with respect to claims that creditors may hold against non-debtor parties, then a ballot must be sent to creditors entitled to vote on the proposed plan and notices must be sent to non-voting creditors and parties-in-interest.  The ballot and the notice must inform the creditors of such releases and provide a box to check to indicate assent or opposition to such consensual releases together with a method for returning the ballot or notice.

Complex Case Rules ¶ 40.

58.     Here, the Third-Party Releases satisfy the Fifth Circuit's standard for approval of third-party releases under the Bankruptcy Code, the Court's standard for approval of the same, and the Complex Case Rules and should be approved.

59.     *First*, as set forth above, and in compliance with the Disclosure Statement Order, parties in interest were provided extensive notice of these Chapter 11 Cases, the Plan, the proposed Third-Party Releases, and the Plan Objection Deadline.  The Notice of Non-Voting Status and the Ballots expressly included, in bold font, the terms of the Third-Party Releases, as set forth in Section 11.6(b) in the Plan.  *See* Disclosure Statement Order, Exs. 3-9.  The Notice of Non-Voting Status and the Ballots advised careful review and consideration of the terms of the Third-Party Releases.  *Id.*  The language of the Third-Party Releases was also emphasized using

---

[34]     *See Pine Gate*, No. 25-90669 (CML) (Bankr. S.D. Tex. Feb. 19, 2026) (Docket No. 1483), ¶ R(b) ("[T]he Holders of Subordinated Claims in Class 6 shall not constitute Releasing Parties and shall not be bound by the Third-Party Release in their capacities as such, irrespective of whether they opted out of the Third-Party Release.").

[35]     *See PosiGen*, No. 25-90787 (CML) (Bankr. S.D. Tex. Feb. 24, 2026)  (Docket No. 613).

bold font in the Plan and was included in the Disclosure Statement. *See* Plan, § 11.6(b); Disclosure Statement, Ex. D.[36]

60.     In addition, the Notice of Non-Voting Status, the Release Opt-Out Form, and the Ballots each set forth the procedures for opting out of such Third-Party Releases, and the Ballots and Release Opt-Out Form each included the appropriate form for parties to opt out of the Third-Party Releases in compliance with the Bankruptcy Code, applicable Bankruptcy Rules, and the applicable Bankruptcy Local Rules and the Complex Case Rules, including Rule 40. *See* Disclosure Statement Order, ¶ 23, Ex. 11.  The Ballots provided a checkbox to opt out of the consensual Third-Party Releases, and the Notice of Non-Voting Status included the Release Opt-Out Form that also provided a checkbox to opt out of the consensual Third-Party Releases. *See* Disclosure Statement Order, Exs. 3-10.  Ultimately, as of the Voting Deadline, 59 unique parties submitted valid Release Opt Out Forms. *See* Voting Declaration Ex. B.

61.     *Second*, the Third-Party Releases are sufficiently specific to put the Releasing Parties on notice of the claims being released.  The Third-Party Releases describe the nature and type of claims being released, including claims with respect to:

> [T]he Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Liquidation Trust; the Liquidation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the negotiation, formulation, preparation, dissemination, or consummation of any contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement); any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other

---

[36]     *In re Pine Gate Renewables, LLC*, No. 25-90669 (CML) (Bankr. S.D. Tex. Feb. 18, 2026) Conf. Hr'g Tr. 64:1–6 ("I would note that these opt-outs were provided under separate notice, they were conspicuous, they describe the scope of the releases.  So I'm going to find every other class is bound by them.").

interactions between any Releasing Party and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases; any in-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place from the Petition Date through and including the Effective Date related or relating to the foregoing.

Plan, § 11.6(b).

62.     *Third*, the Third-Party Releases are an integral part of the Plan that embodied the Global Settlement between the parties representing the Debtors' key stakeholder: the Ad Hoc Noteholder Group and the Creditors' Committee.  *See* Chiu Declaration, ¶ 27.  The Ad Hoc Noteholder Group and Creditors' Committee have reviewed the Third-Party Releases and support the inclusion of the Third-Party Releases in the Plan, which supports that the Third-Party Releases benefit the Debtors' stakeholders and are appropriate.  In connection with the Third-Party Releases, the Debtors, the Ad Hoc Noteholder Group, and the Creditors' Committee had extensive discussions regarding the parties to be included in the definition of Released Parties and reviewed the forms of Ballots and other solicitation materials relating to the Third-Party Releases.

63.     *Fourth*, the Third-Party Releases were provided for consideration.  As described above, the Released Parties provided pre- and postpetition services to the Debtors, and many of such parties were instrumental throughout these Chapter 11 Cases and allowed the Debtors to maximize the value of their Estates.  The Debtors amended the Plan to comply with *Container Store*, and this Court's holding in *Pine Gate*, by explicitly removing Classes of creditors and equity holders who are deemed to reject and will receive no recovery —from the definition of Releasing Parties.  *See* Plan, § 1.136.  In compliance with the Fifth Circuit and this Court's rulings,

31

only Classes that would receive a recovery under the Plan will need to opt out to avoid consenting to the Third-Party Releases.

64.     As discussed in more detail below, the Court should approve the Third-Party Releases in the Plan.  They comply with the Bankruptcy Code, the Complex Case Rules, and controlling Fifth Circuit standards and are appropriate and justified under the circumstances.

**E.     *Exculpation Provision Is Appropriate, Consistent with Fifth Circuit Precedent, and Should Be Approved***

65.     The Plan provides for the exculpation of certain parties as set forth in Section 11.7 of the Plan (the "**Exculpation Provision**").  The Exculpation Provision protects the Exculpated Parties[37] from, among other things, Causes of Action arising out of or relating to the Debtors' wind down, these Chapter 11 Cases, and the negotiations and agreements made in connection therewith.  *See* Plan, § 11.7.  Unlike the Third-Party Releases, the Exculpation Provision does not affect the liability of third parties *per se*, but rather sets a standard of care in hypothetical future litigation against an Exculpated Party for acts arising out of these Chapter 11 Cases, with a carve out for actual fraud, willful misconduct, and gross negligence.  As such, the Exculpation Provision prevents future collateral attacks against a limited set of estate fiduciaries that have exercised their fiduciary duties to maximize value for the Debtors and the Estates.

66.     Courts in this circuit permit exculpation of debtors for actions short of gross negligence committed during the course of bankruptcy and, although more carefully scrutinized, permit exculpation of non-debtor parties where a separate statutory basis for exculpation exists. *See NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.),* 48 F.4th 419, 437 (5th Cir. 2022), *pet. for cert. denied*, No. 22-631 (U.S. Jul. 2, 2024) ("***Highland I***")

---

[37]   "**Exculpated Parties**" means each of the following in their capacity as such and, in each case, to the maximum extent permitted by law: (i) the Debtors; and (ii) the Creditors' Committee and each of its members, solely in their capacities as such.

("[Section] 524(e) does not permit absolving the non-debtor from any negligent conduct that occurred during the course of the bankruptcy absent another source of authority.") (cleaned up). In this vein, section 1103(c) of the Bankruptcy Code is widely recognized as a separate statutory basis for exculpation for creditors' committees. *See Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 253 (5th Cir. 2009) (approving the exculpation of a creditors' committee and its members because section 1103(c) of the Bankruptcy Code implies "qualified immunity for [committee members'] actions within the scope of their duties").

67.     Here, the Exculpation Provision is appropriate as it does not protect Estate fiduciaries from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.  The Exculpation Provision is further limited such that it is only applicable "to the fullest extent permitted by applicable law" and only covers actions from the Petition Date through the Effective Date.  *See* Plan, § 11.7.

68.     Accordingly, the Debtors submit that the Exculpation Provision is appropriate and should be approved.

F.      *Injunction Provisions Are Appropriate and Should Be Approved*

69.     The Plan also provides for the injunction of certain actions as set forth in Section 11.5 of the Plan (the "**Injunction Provisions**").  The Injunction Provisions are appropriate because they comply with the Bankruptcy Code and are necessary to implement and enforce the Plan.  In accordance with the District Court's ruling in *Container Store*[38] and consistent with this

---

[38]   *Container Store*, 2026 WL 395898.

33

Court's ruling in *Pine Gate*,[39] the Debtors amended the Gatekeeper Provision (as defined below) in the Injunction Provisions to only apply to claims against the Exculpated Parties.

70.     As is common in chapter 11 plans in Chapter 11 Cases, the Injunction Provisions permanently enjoin any Entity from commencing or continuing in any manner any claim that was exculpated under the Plan.  The Injunction Provisions also include a "gatekeeper" provision to implement the Plan's exculpation provisions which provides that, before any Claim or Cause of Action is brought against an Exculpated Party, the Court must (i) determine, after notice and a hearing, that such Claim or Cause of Action is colorable and has not been exculpated under the Plan and (ii) specifically authorize such Entity to bring such Claim or Cause of Action against any such Exculpated Party (the "**Gatekeeper Provision**").  As discussed in more detail below, the Gatekeeper Provision is consistent with the ones authorized by the Fifth Circuit in *Highland I* and in *In re Highland Cap. Mgmt., L.P.*, 132 F.4th 353 (5th Cir. 2025) ("*Highland II*")[40] and, more recently, by this Court in other cases.  The Debtors believe that these changes resolve the concerns raised by the U.S. Trustee with respect to the Injunction Provisions.

71.     Moreover, in *Highland I*, the Fifth Circuit approved a gatekeeper provision related to claims that were being exculpated under the plan,[41] and in *Highland II*, the Fifth Circuit clarified that the scope of a gatekeeper provision may not extend beyond claims subject to the

---

[39]   *In re Pine Gate Renewables, LLC*, No. 25-90669.

[40]   On May 29, 2025, the Supreme Court issued an order providing that the following the Fifth Circuit's *Highland II* decision was stayed pending further order of the Supreme Court.  *See Highland Cap. Mgmt., L.P., v. Nexpoint Advisors, L.P.*, No. 24-10534 (5th Cir. 2025) (Docket No. 110).  On June 9, 2025, the Supreme Court issued an order denying Highland Capital Management's application for a stay.  *See id.* (Docket No. 115).

[41]   *See Highland I*, 48 F.4th at 439 ("In sum, the Plan violates § 524(e) but only insofar as it exculpates and enjoins certain non-debtors. . . We otherwise affirm the inclusion of the injunction and the gatekeeper provisions in the Plan.").

plan's injunction (there, the exculpated claims).[42]   Thus, because the Gatekeeper Provision is narrowly tailored to apply only to *Claims or Causes of Action against Exculpated Parties* it is consistent with the Fifth Circuit precedent set forth in *Highland I* and *Highland II*.

72.    The Gatekeeper Provision is also consistent with gatekeeper provisions recently approved by this Court in *Nine Energy, PosiGen*, and *Pine Gate*, each of which limited the gatekeeper provision solely to exculpated parties.[43]

73.    The Injunction Provisions are an integral component of the Plan, appropriate and necessary under the circumstances, consistent with the Bankruptcy Code, narrowly tailored, and compliant with applicable case law and precedent in the Fifth Circuit and, for the reasons set forth above, should be approved.

## II.    Plan Satisfies Bankruptcy Code's Requirements and Should Be Confirmed

74.    To achieve confirmation of the Plan, the Debtors must demonstrate that the Plan satisfies section 1129 of the Bankruptcy Code by a preponderance of the evidence.  *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) ("[P]reponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown."); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009); *In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003).  The Plan satisfies all applicable requirements of section 1129 of the Bankruptcy

---

[42]    *See Highland II*, 132 F.4th at 362 ("The clear weight of Supreme Court and Fifth Circuit precedent dictates our holding: that a proper reading of *Highland I* requires that the definition of 'Protected Parties' used in the Plan's Gatekeeper Clause be narrowed coextensively with the definition of 'Exculpated Parties' used in the Exculpation Provision.").

[43]    *See In re Nine Energy Serv., Inc.*, No. 26-90295 (CML) (Bankr. S.D. Tex. March 4, 2026) (Docket No. 189); *In re PosiGen, PBC*, No. 25-90787 (CML) (Bankr. S.D. Tex. Feb. 24, 2026) (Docket No. 613); *In re Pine Gate Renewables, LLC*, No. 25-90669 (CML) (Bankr. S.D. Tex. Feb. 19, 2026) (Docket No. 1483).

Code and complies with all other applicable sections of the Bankruptcy Code, Bankruptcy Rules, Bankruptcy Local Rules, and applicable nonbankruptcy law.

**A.** ***Section 1129(a)(1) of the Bankruptcy Code: Plan Complies with Applicable Provisions of Bankruptcy Code***

75. Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). The legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code governing classification of claims and contents of a plan, respectively. *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978).

**1. Section 1122:  Plan's Classification Structure is Proper**

76. Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). A plan proponent is afforded "significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar." *In re Idearc Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex 2009); *see also Phx. Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1278 (5th Cir. 1991) ("'[S]ubstantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class."); *In re Sentry Op. Co. of Tex., Inc.*, 264 B.R. 850, 860 (Bankr. S.D. Tex. 2001) (noting that "[section] 1122 is permissive of any classification scheme that is not proscribed, and that substantially similar claims may be separately classified") (emphasis omitted); *In re Premiere Network Servs., Inc.,* 333 B.R. 130, 133 (Bankr. N.D. Tex. 2005) (claims may be separated for "good business reasons."); *Heritage,* 375 B.R. at 303 (the "general rule" remains that "the division of creditors into classes

under a plan of arrangement be according to the nature of the creditors' respective claims"); *In re Eagle Bus Mfg., Inc.*, 134 B.R. 584, 596 (Bankr. S.D. Tex. 1991) ("A classification scheme satisfies section 1122(a) of the Bankruptcy Code when a reasonable basis exists for the choices made and all claims within a particular class are substantially similar.").

77.     The classification structure of the Plan is rational and complies with the Bankruptcy Code.  The Plan provides for the separate classification of Claims and Interests based upon the different legal nature and priority of such Claims and Interests, which classification generally tracks the Debtors' prepetition capital structure and divides the applicable Claims and Interests into Classes based on the underlying instruments, debts, or circumstances giving rise to such Claims and Interests.  *See* Plan, Art. III.  Within a given Class, all Claims and Interests have the same or similar rights against the Debtors.  *See* Chiu Declaration, ¶ 17.

78.     Here, the Plan provides for the following nine (9) Classes of Claims and Interests: (1) Class 1 (Other Priority Claims); (2) Class 2 (Other Secured Claims); (3) Class 3 (First Lien Noteholder Secured Claims); (4) Class 4 (Second Lien Noteholder Secured Claims); (5) Class 5 (General Unsecured Claims); (6) Class 6 (Intercompany Claims); (7) Class 7 (Intercompany Interests) (8) Class 8 (Subordinated Claims); and (9) Class 9 (Parent Interests).[44]

79.     The Debtors have a reasonable and permissible basis for the differing classification of Class 2 (Other Secured Claims), Class 3 (First Lien Noteholder Secured Claims), and Class 4 (Second Lien Noteholder Secured Claims), which are comprised of dissimilar interests given that the Secured Claims in Classes 2, 3, and 4 either have different collateral or different priority entitlements to such Collateral.  *See* Chiu Declaration, ¶ 18.

---

[44]   Administrative Expense Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and are separately treated under the Plan.

- ***Class 2 (Other Secured Claims).***  Class 2 is comprised of any Secured Claim other than a First Lien Noteholder Secured Claim or a Second Lien Noteholder Secured Claim.  *See* Plan, § 1.114.

- ***Class 3 (First Lien Noteholder Secured Claims).***  Class 3 is comprised of First Lien Noteholder Claims secured by a Lien on Collateral to the extent of the value of such Collateral *See* Plan, § 1.67.

- ***Class 4 (Second Lien Noteholder Secured Claims).***  Class 4 is comprised of Second Lien Noteholder Claims secured by a Lien on Collateral to the extent of the value of such Collateral.  *See* Plan, §1.152.

80.    Similarly, the Debtors have a reasonable and permissible basis for the differing classification of each of the four (4) Classes of unsecured Claims:

- ***Class 1 (Other Priority Claims).***  Class 1 is comprised of any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code. *See* Plan, § 1.113.

- ***Class 5 (General Unsecured Claims).***  Class 5 is comprised of any prepetition, unsecured Claim against a Debtor that is not a Subordinated Claim, Priority Tax Claim, Other Priority Claim, or Intercompany Claim.  For the avoidance of doubt, General Unsecured Claims shall include the First Lien Noteholder Deficiency Claims (if any) and the Second Lien Noteholder Deficiency Claims.  *See* Plan 1.76.

- ***Class 6 (Intercompany Claims).***  Class 6 is comprised of any Claim against a Debtor held by another Debtor or non-Debtor Affiliate as of the Effective Date.  *See* Plan, § 1.90.

- ***Class 8 (Subordinated Claims).***  Class 8 is comprised of Claims which are subject to subordination under section 510(b) or (c) of the Bankruptcy Code. *See* Plan, § 1.169.

81.    The Debtors also have a reasonable and permissible basis for the different classification of the two (2) Classes of Interests: Class 7 (Intercompany Interests) and Class 9 (Parent Interests) because each of these Classes relate to different Debtors, as set forth below.

- ***Class 7 (Intercompany Interests).***  Class 7 is comprised of Interests in a Debtor (other than the Parent Debtor) held by another Debtor. *See* Plan, § 1.91.

38

- ***Class 9 (Parent Interests).***  Class 9 is comprised of Interests in a Debtor, including the Blocked Parent Interests and Unblocked Parent Interests.  *See* Plan, §§ 1.16, 1.117, 1.176.

82.     Therefore, the classification structure of the Plan is rational and complies with the Bankruptcy Code.  All Claims and Interests within a Class have the same or similar rights against the Debtors.  The Plan provides for the separate classification of Claims and Interests based upon the different legal nature and priority of such Claims and Interests.  The classification scheme generally tracks the Debtors' prepetition capital structure and divides the applicable Claims and Interests into Classes based on the underlying instruments, debts, or facts and circumstances giving rise to such Claims and Interests.  *See* Chiu Declaration, ¶ 17.

**2.      Section 1123(a):  Plan's Content is Appropriate**

83.     Section 1123(a) of the Bankruptcy Code sets forth seven requirements that a plan must satisfy.  *See* 11 U.S.C. § 1123(a).  The Plan satisfies each such applicable requirement:

- Section 1123(a)(1).  Article III of the Plan designates Classes of Claims and Interests as required by section 1123(a)(1).  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in Article III of the Plan.

- Section 1123(a)(2).  Article III of the Plan specifies whether each Class of Claims or Interests is Impaired or Unimpaired under the Plan as required by section 1123(a)(2).

- Section 1123(a)(3).  Article IV of the Plan specifies the treatment of any Class of Claims or Interests that is Impaired as required by section 1123(a)(3).

- Section 1123(a)(4).  Article IV of the Plan provides that, except as otherwise agreed to by a holder of a particular Claim or Interest, each Claim or Interest of a particular class is provided the same treatment, as required by section 1123(a)(4).

- Section 1123(a)(5).  The Plan provides adequate means for its implementation through, among other things, (i) the Plan Settlement, which provides for the limited substantive consolidation of the Debtors' Assets for distribution purposes under the Plan (Plan, § 5.1, Chiu Declaration, ¶ 23); (ii)  the Global

39

Settlement (Plan, § 5.2); (iii) the appointment of the Liquidation Trustee (Plan, § 5.4); (iv) the establishment of the Liquidation Trust (Plan, § 5.5); (v) the transfer of remaining Assets to the Liquidation Trust and the establishment and funding of reserves on the Effective Date (Plan, § 5.7); (vi) the compromise and settlement of Claims, Interests, and controversies (Plan, § 5.8); (vii) provisions for resolving Disputed Claims (Plan, Art. VIII); (xii) provisions governing distributions to creditors (Plan, Art. VII); (xiii) procedures for assuming and assigning executory contracts and unexpired leases (Plan, Art. IX); and (xiv) the Debtor Releases, Third-Party Releases, and Exculpation Provision (Plan, §§ 11.6, 11.7).

- Section 1123(a)(7). Section 5.4(a) of the Plan provides that on the Effective Date, the Liquidation Trustee shall be appointed for each of the Debtors and the Liquidation Trust. Section 5.5(q) of the Plan provides that the Liquidation Trust shall be the successor-in-interest to, and representative of, the Estate of each of the Debtors within the meaning of section 1123(b)(3)(B) of the Bankruptcy Code. The Plan Supplement provides that (i) Matthew Dundon of Dundon Advisers, LLC will serve as the Liquidation Trustee. Further, the Liquidation Trustee shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval, and subject to any consent or consultation rights of the Liquidation Trust Oversight Board, if any, as set forth in the Liquidation Trust Agreement, to carry out and implement all provisions of the Plan, including, but not limited to prosecuting any Retained Causes of Action, electing not to pursue any Retained Causes of Action, and determining whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Retained Causes of Action, as the Liquidation Trustee may determine is in the best interests of the Debtors or Estates (as applicable). Plan, § 5.4(c)(v).

84.    Accordingly, the Plan satisfies section 1123(a) of the Bankruptcy Code.

**3.    Section 1123(b):  Plan's Content is Permitted**

85.    Section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may be incorporated into a plan. Here, the relevant provisions of the Plan are permissible under section 1123(b),[45] as set forth in more detail below.

- Section 1123(b)(1). Pursuant to Article III of the Plan, Classes 1 (Other Priority Claims) and 2 (Other Secured Claims) are Unimpaired under the Plan, and Classes 3 (First Lien Noteholder Secured Claims), 4 (Second Lien Noteholder Secured Claims), 5 (General Unsecured Claims), 7 (Intercompany Interests), 8 (Subordinated Claims), and 9 (Parent Interests) are Impaired

---

[45]    Section 1123(b)(4), which authorizes the sale of substantially all of a debtor's property pursuant to a plan, is inapplicable here.

under the Plan. Holders of Class 6 (Intercompany Claims) are either Impaired and deemed to have rejected the Plan or Unimpaired and presumed to have accepted the Plan.

- Section 1123(b)(2). The Plan provides for the rejection of the Executory Contracts and Unexpired Leases (including, but not limited to, those giving rise to D&O Indemnification Obligations) to which any of the Debtors are parties as of the Effective Date, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to assume Filed by the Debtors on or before the Confirmation Date, (iv) is specifically designated as a contract or lease to be assumed by the Debtors on the Schedule of Assumed Contracts, (v) is the subject of a pending Assumption Dispute, or (vi) is a D&O Policy or other insurance policy to which any Debtor or the Liquidation Trustee is a beneficiary or an insured. *See* Plan, § 9.1(a). For the avoidance of doubt, all D&O Indemnification Obligations shall be deemed rejected as of the Effective Date.

- Section 1123(b)(3)(A). As described above, the Settlements represent a good faith compromise and global settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that the parties to the Settlements may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. Additionally, as discussed in more detail above, the Debtor Releases, Third-Party Releases, Exculpation Provision, and Injunction Provisions are permitted pursuant to sections 105, 1103, 1107, 1123(b)(3)(A), 1123(b)(6), 1125(e), and/or 1141 of the Bankruptcy Code.

- Section 1123(b)(3)(B). The Plan preserves and retains certain rights, claims, and Causes of Action of the Estates to be pursued by the Liquidation Trust on behalf of the Debtors. *See* Plan, § 5.4(c)(v).

- Section 1123(b)(5). Article III of the Plan modifies the rights of Holders of First Lien Noteholder Secured Claims (Class 3), Second Lien Noteholder Secured Claims (Class 4), General Unsecured Claims (Class 5), Intercompany Claims (Class 6), and Subordinated Claims (Class 8), and leaves Unimpaired the rights of Holders of Other Priority Claims (Class 1) and Other Secured Claims (Class 2).

- Section 1123(b)(6). There are no provisions in the Plan that are inconsistent with the Bankruptcy Code. In accordance with section 1123(b)(6) of the Bankruptcy Code, Article XI of the Plan includes certain release, exculpation, and injunction provisions that are essential to the Plan and are consistent with the provisions of the Bankruptcy Code and Fifth Circuit precedent. *See id.*, at §§ 11.3–11.9.

41

86.     Accordingly, each of the foregoing permissive provisions are consistent with section 1123(b) of the Bankruptcy Code. In addition, as discussed in more detail above, the Debtor Releases, Third-Party Releases, Exculpation Provision, and Injunction Provisions are permitted pursuant to sections 105, 1103, 1107, 1123(b)(3)(A), 1123(b)(6), 1125(e), and 1141 of the Bankruptcy Code and applicable law. *See supra* § I.

87.     For the foregoing reasons, the Plan complies fully with sections 1122 and 1123 of the Bankruptcy Code, and, therefore, satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

**B.     *Section 1129(a)(2):  Debtors have Complied with Bankruptcy Code***

88.     Under section 1129(a)(2) of the Bankruptcy Code, "[t]he proponent of the plan [must] compl[y] with the applicable provisions of this title." 11 U.S.C. § 1129(a)(2). The "applicable provisions" of the Bankruptcy Code have been interpreted to include, principally, sections 1125 and 1126 of the Bankruptcy Code. *See, e.g.*, *Mabey v. Sw. Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 512 n.3 (5th Cir. 1998) (noting that section 1129(a)(2) includes requirement of compliance with section 1125); *In re Star Ambulance Serv. LLC*, 540 B.R. 251, 262 (Bankr. S.D. Tex. 2015) ("Courts interpret this language to require that the plan proponent comply with the disclosure and solicitation requirements set forth in Bankruptcy Code §§ 1125 and 1126.") (citation omitted). Often, courts have also considered whether the debtor "is a proper debtor under [s]ection 109 of the Bankruptcy Code and a proper proponent of [a plan] under [s]ection 1121(a) of the Bankruptcy Code." *J T Thorpe*, 308 B.R. at 786 (holding that debtor's compliance with sections 109, 1125, and 1126 satisfied requirements of section 1129(a)(2)); *see also Moody Nat'l*, 2010 WL 5116872, at *4 (same); *In re Harborwalk, LP*, Nos. 10-80043, 10-80044, 10-80045, 2010 WL 5116620, at *4 (Bankr. S.D. Tex. Oct. 25, 2010) (same).

1. **Debtors Are Proper Debtors and Plan Proponents**

89.     Under section 109(a) of the Bankruptcy Code, "a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor . . . ." 11 U.S.C. § 109(a).  Further, "a person that may be a debtor under chapter 7 of [the Bankruptcy Code, with exceptions not applicable here] . . . may be a debtor under chapter 11 . . . ." 11 U.S.C. § 109(d).  Each Debtor has a domicile, a place of business, and property in the United States and is eligible for relief under chapter 7 of the Bankruptcy Code.  *See* Chiu Declaration, ¶ 32. Therefore, each Debtor is a proper chapter 11 debtor.

2. **Debtors Have Complied with Sections 1125 and 1127**

90.     Under section 1125(b) of the Bankruptcy Code:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

11 U.S.C. § 1125(b).

91.     On February 18, 2026, the Court entered the Disclosure Statement Order, which approved the Disclosure Statement as containing "adequate information" in accordance with section 1125(b) of the Bankruptcy Code and approved the Solicitation Package.  As detailed in the Voting Declaration, the Debtors solicited votes from Holders of Claims in the Voting Classes.  In accordance with section 1125(b), the Debtors did not solicit votes on the Plan until after the Disclosure Statement Order was entered.

92.     In addition, the Debtors may make certain additional immaterial changes to the Plan prior to or during the Confirmation Hearing pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  In accordance with Bankruptcy Rule 3019, these modifications

43

will not require additional disclosure under section 1125 of the Bankruptcy Code or the re-solicitation of votes under section 1126 of the Bankruptcy Code. Further, these modifications to the Plan will be consistent with section 1129 of the Bankruptcy Code.

93. Based on the foregoing, the Debtors have satisfied the requirements of sections 1125 and 1127 of the Bankruptcy Code.

**3. Debtors Have Complied with Section 1126**

94. Section 1126 of the Bankruptcy Code sets forth the procedures for soliciting votes on a chapter 11 plan and determining acceptance thereof. Pursuant to section 1126 of the Bankruptcy Code, only Holders of Allowed Claims or Interests that are Impaired and will receive or retain property under the Plan on account of such Claims or Interests may vote to accept or reject the Plan. *See* 11 U.S.C. § 1126.

95. As provided in the Voting Declaration, the Debtors solicited acceptances of the Plan from the Voting Classes, which included the Holders of First Lien Noteholder Secured Claims, Second Lien Noteholder Secured Claims, and General Unsecured Claims. In accordance with sections 1126(f) and 1126(g) of the Bankruptcy Code, the Debtors did not solicit acceptances of the Plan from Holders of Other Priority Claims, Other Secured Claims, Subordinated Claims, and Parent Interests because Holders of such Claims and Interests are either Unimpaired and conclusively presumed to have accepted the Plan or are Impaired and deemed to reject the Plan. The Debtors also did not solicit acceptances of the Plan from Holders of Intercompany Claims or Intercompany Interests because Holders of such Claims and Interests are either Unimpaired and conclusively presumed to have accepted the Plan or are Impaired and deemed to reject the Plan.

96. Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by impaired classes of claims entitled to vote to accept or reject the plan:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c).

97.     Similarly, Section 1126(d) of the Bankruptcy Code specifies the requirements for acceptance of a plan by impaired classes of interests entitled to vote to accept or reject the plan:

> A class of interests has accepted a plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(d).

98.     As set forth in the Voting Declaration, with respect to each of the Debtors, the Plan has been accepted by at least two-thirds in amount and more than one-half in number of Claims in Class 3 (First Lien Noteholder Secured Claims), Class 4 (Second Lien Noteholder Secured Claims), and Class 5 (General Unsecured Claims).  *See* Voting Declaration, Ex. A.[46]

99.     Based on the foregoing, the Debtors have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

---

[46]   As described in note 14, *supra*, two of the Debtors—Condor Acquisition Sub I, Inc. and Condor Acquisition Sub II, Inc.—did not have any Holders of Claims or Interests that were Allowed in an amount greater than zero for voting purposes in any of the Voting Classes, which vacant Classes were deemed eliminated and disregarded for purposes of determining whether such Debtor's Plan satisfies section 1129(a)(8) of the Bankruptcy Code, pursuant to section 3.4 of the Plan.

**C.**    ***Section 1129(a)(3): Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law***

100.    Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Good faith is determined through consideration of whether the plan was proposed with "the legitimate and honest purpose to reorganize and has a reasonable hope of success." *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985). The plan must also achieve a result consistent with the Bankruptcy Code. *See In re Block Shim Dev. Co.-Irving*, 939 F.2d 289, 292 (5th Cir. 1991). The good faith standard is "viewed in light of the totality of circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code to give debtors a reasonable opportunity to make a fresh start." *Sun Country*, 764 F.2d at 408; *In re Vill. at Camp Bowie I, L.P.*, 710 F.3d 239, 247 (5th Cir. 2013) ("Good faith should be evaluated 'in light of the totality of the circumstances' . . . mindful of the purposes underlying the Bankruptcy Code.") (citing *In re Cajun Elec. Power*, 150 F.3d at 519); *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997); *see also In re Couture Hotel Corp.*, 536 B.R. 712, 735 (Bankr. N.D. Tex. 2015) (finding that plan that is "the result of arm's-length discussions and negotiations among the Debtor [and other relevant parties and stakeholders] . . . clearly promotes the objectives and purposes of the Bankruptcy Code and is being proposed in good faith.").

101.    Here, the Plan has been proposed in good faith and for the legitimate purpose of winding down and liquidating the Estates and distributing any remaining proceeds in accordance with the Plan. The Debtors engaged in extensive, arm's-length negotiations over the Plan with the Ad Hoc Noteholder Group and the Creditors' Committee, each of which is represented by experienced and sophisticated legal and other advisors. *See* Chiu Declaration, ¶ 33. The Plan preserves and maximizes the value of the Debtors' remaining assets for the Estate. *See*

*id.* The Plan provides for repayment of the Debtors' secured debt, repayment of administrative expense claims and priority claims, and the opportunity to provide recoveries to unsecured creditors. The Debtors have upheld their fiduciary duties to stakeholders before and throughout these Chapter 11 Cases by seeking to maximize the value of the Debtors' Estates. The Plan is a good faith and sound effort by the Debtors to liquidate their remaining Assets so that value is maximized for the benefit of all stakeholders.

102. Confirmation of the Plan is supported by the Debtors' key creditor constituencies, as it has the support of the Creditors' Committee and the Ad Hoc Noteholder Group and the Voting Classes voted overwhelmingly to accept the Plan.[47] That the Plan has such wide support from the Debtors' creditor constituencies demonstrates that the Plan is fundamentally fair to creditors.[48]

103. Furthermore, the Plan is not by any means forbidden by law, and indeed, is in full compliance with the Bankruptcy Code and applicable nonbankruptcy law. Accordingly, the Debtors have proposed the Plan in good faith in compliance with section 1129(a)(3) of the Bankruptcy Code.

---

[47] *See, e.g.*, *In re Seahawk Drilling Inc.*, No. 11-20089-RSS, 2009 WL 10817066, at *9 (Bankr. S.D. Tex. Sept. 18, 2009) ("The Plan is the result of extensive good faith, arm's length negotiations between the Debtors and certain of their principal constituencies (including the Creditors Committee and the Equity Committee) and reflects substantial input from the principal constituencies having an interest in the Chapter 11 Cases and, as evidenced by the overwhelming acceptance of the Plan, achieves the goal of an orderly and consensual liquidation. The Creditors Committee and the Equity Committee support confirmation of the Plan.").

[48] *See also In re Maremont Corp.*, 601 B.R. 1, 20 (Bankr. D. Del. 2019) ("The [d]ebtors' good faith is evident from the facts and record of the [c]hapter 11 [c]ases," which demonstrate "that the [d]ebtors engaged in extensive good-faith, arm's length negotiations with [major stakeholders], which led to the [p]lan's formulation."); *In re Lack's Stores, Inc.*, No. 10-60149, 2012 WL 2375825, at *6 (Bankr. S.D. Tex. June 21, 2012) ("[T]he Plan represents extensive arm's-length negotiations among the Debtors, the Committee, and their respective legal and financial advisors, as applicable, and reflects the best interests of the Debtors' Estates and Holders of Claims and Equity Interests.").

D.      *Section 1129(a)(4): Plan Provides that Professional Fees and Expenses are Subject to Court Approval*

104.    Section 1129(a)(4) requires that "[a]ny payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."  11 U.S.C. § 1129(a)(4).  Section 1129(a)(4) has been construed to require that all payments of professional fees made from estate assets be subject to review and approval as to their reasonableness by the court.  *See In re Cajun Elec. Power*, 150 F.3d at 513-14; *see also In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting "there must be a provision [in the plan] for review by the Court of any professional compensation").  This is a "relatively open-ended standard" involving a case-by-case inquiry and, under appropriate circumstances, does not necessarily require that a bankruptcy court review the amount charged.  *See In re Cajun Elec. Power*, 150 F.3d at 517 (finding with respect to routine legal fees and expenses that have been approved, "the court will ordinarily have little reason to inquire further with respect to the amount charged").

105.    All payments by the Debtors for services provided to the Debtors during these Chapter 11 Cases will be subject to approval by the Court as reasonable in accordance with section 1129(a)(4) of the Bankruptcy Code.  *See* Chiu Declaration, ¶ 37.  Specifically, Section 2.2 of the Plan provides that all Professionals seeking approval by the Court of Professional Fee Claims shall File, on or before (and no later than) the date that is forty-five (45) calendar days after the Effective Date (unless extended by the Debtors), their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred, thereby giving interested parties adequate time to review the Professional Fee Claims.  *See* Chiu Declaration, ¶ 37.  Further, Section 12.1 of the Plan provides that the Court shall retain jurisdiction

48

to "hear and determine all Professional Fee Claims." Plan, § 12.1(i). Accordingly, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

E.   **Section 1129(a)(5):   Debtors Have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders**

106.   Section 1129(a)(5) of the Bankruptcy Code requires the plan proponent disclose the identity and affiliations of the proposed officers and directors of the debtors post-confirmation, that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy, and, to the extent that there are any insiders that will be retained or employed by the debtors post-confirmation, that there be disclosure of the identity and nature of any compensation of any such insiders.  11 U.S.C. § 1129(a)(5).

107.   The Debtors have satisfied the requirements under section 1129(a)(5) of the Bankruptcy Code through their disclosure that Matthew Dundon of Dundon Advisers, LLC will serve as the Liquidation Trustee. *See* Plan Supplement, Ex. 5. In addition, Exhibit 4 of the Plan Supplement discloses the Liquidation Trustee's salary. *Id.* at Ex. 4. Upon the Effective Date, the Liquidation Trustee shall be the sole officer, director, or manager, as applicable, of each of the Debtors and non-Debtor subsidiaries in which the Debtors held equity directly or indirectly as of the Effective Date without the requirement of having to take any further action. *See* Plan, § 6.1. Moreover, the Liquidation Trustee shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise expressly indicated), and subject to any consent or consultation rights of the Liquidation Trust Oversight Board, if any, as set forth in the Liquidation Trust Agreement, to carry out and implement all provisions of the Plan. Plan, § 5.4. Accordingly, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

49

**F.**     *Section 1129(a)(6):  Plan Does Not Contain Any Rate Changes*

108.     Section 1129(a)(6) of the Bankruptcy Code requires applicable government approval of "any rate change provided for in the plan." *See* 11 U.S.C. § 1129(a)(6).  The Plan does not provide for rate changes by the Debtors.  *See* Chiu Declaration, ¶ 40.  Accordingly, section 1129(a)(6) does not apply to the Plan.

**G.**     *Section 1129(a)(7):  Plan Satisfies Best Interests Test*

109.     Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired claim or interest has either accepted the plan or will receive or retain property having, as of the effective date of the plan, a present value of not less than what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time—commonly referred to as the "best interests" test. *See* 11 U.S.C. § 1129(a)(7).  The best interests test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or interest under the debtor's plan. *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1159 n.23 (5th Cir. 1988) (noting that a bankruptcy court is required to determine whether impaired claims would receive no less under a reorganization than through a liquidation). A party's speculation that it would fare better in a hypothetical chapter 7 liquidation is insufficient to challenge a plan proponent's liquidation analysis. *Block Shim*, 939 F.2d at 292.

110.     Here, the relative recoveries of Holders of Impaired Claims or Interests under the Plan and in a hypothetical chapter 7 liquidation are set forth in Exhibit C to the Disclosure Statement (the "**Liquidation Analysis**").  The best interests test is satisfied as to every single holder of a Claim against or Interest in the Debtors.  *See* Disclosure Statement, Ex. C.

111.     Specifically, the Debtors determined that (i) section 1129(a)(7) of the Bankruptcy Code does not apply to the holders of Claims in Classes 1 (Other Priority Claims) and 2 (Other Secured Claims) as they are Unimpaired and, therefore, are deemed to have accepted the Plan, (ii) the best interests test is satisfied with regard to the holders of Claims in Class 3 (First Lien Noteholder Secured Claims), Class 4 (Second Lien Noteholder Secured Claims), and Class 5 (General Unsecured Claims) because Holders of Allowed First Lien Noteholder Secured Claims, Allowed Second Lien Noteholder Secured Claims, and Allowed General Unsecured Claims are expected to receive a higher recovery under the Plan than if the cases are converted to chapter 7, and (iii) the best interests test is satisfied with respect to Class 8 (Subordinated Claims) and Class 9 (Parent Interests) because there would be no recovery available to these Classes in either a chapter 7 or under the Plan.  *See* Chiu Declaration, ¶ 44.  Moreover, 100% of the holders of Claims in Class 3 (First Lien Noteholder Secured Claims) and Class 4 (Second Lien Noteholder Secured Claims) have voted to accept the Plan, satisfying the best interests test for Classes 3 and 4.  *See* Chiu Declaration, ¶ 45; *see also* Voting Declaration Ex. A.  The Liquidation Analysis demonstrates that each holder of an Allowed Claim will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. *See* Disclosure Statement, Ex. C.

112.     Therefore, the Plan satisfies the "best interests" test.   The estimated calculations are set forth in the Disclosure Statement and Liquidation Analysis and are detailed below.[49]

---

[49]   The following table is a summary of the recoveries of Claims under the Liquidation Analysis.  The Liquidation Analysis should be referred to for additional detail on the assumptions relied on and the facts underlying the recoveries in a chapter 7 liquidation for all Claims.

| Class and Designation | Plan Recoveries | Chapter 7 Liquidation | |
|---|---|---|---|
| | | Low | High |
| 1 (Other Secured Claims) | 100% | 100% | 100% |
| 2 (Other Priority Claims) | 100% | 44% | 69% |
| 3 (First Lien Noteholder Secured Claims) | 100% | 84% | 99% |
| 4 (Second Lien Noteholder Secured Claims | 48%-100% | 0% | 0% |
| 5 (General Unsecured Claims) | 0%-1% | 0% | 0% |
| 6 (Intercompany Claims) | None | 0% | 0% |
| 7 (Intercompany Interests) | None | 0% | 0% |
| 8 (Subordinated Claims) | None | 0% | 0% |
| 9 (Parent Interests) | None | 0% | 0% |

*See* Chiu Declaration, ¶ 46(i).

113.     The Liquidation Analysis represents an estimate of recovery values based upon a hypothetical liquidation of the Debtors and was prepared on a legal entity basis for each Debtor.

114.     The Liquidation Analysis is sound and reasonable and incorporates justified assumptions and estimates regarding the liquidation of the Debtors' assets and claims, including (i) the additional costs and expenses that would be incurred by the Debtors as a result of a chapter 7 trustee's fees, (ii) the additional costs and expenses that would be incurred by the Debtors as a result of a chapter 7 trustee's retention of financial and legal advisors to assist in the administration of the chapter 7 liquidation, and (iii) the additional costs associated with the wind-down of the Debtors' remaining operations after the chapter 7 conversion.  *See* Liquidation Analysis.

115. The Debtors determined that, subject to the assumptions and limitations described in the Liquidation Analysis, each Holder will receive a recovery greater than or equal to what such Holder would receive in a hypothetical chapter 7 liquidation of the Debtors' assets commencing on the Conversion Date (*i.e.*, March 31, 2026). *See* Chiu Declaration, ¶ 49. Because each Holder of a Claim or Interest in an Impaired Class will receive a distribution under the Plan greater than or equal to what such Holder would receive in a hypothetical chapter 7 liquidation, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code. *See id.*

### H.   *Section 1129(a)(8):  Plan Has Been Accepted by Impaired Voting Class*

116. Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests accept the plan.  11 U.S.C. § 1129(a)(8).  Section 1126(c) of the Bankruptcy Code provides that a plan is accepted by an impaired class of claims if the accepting class members hold at least two-thirds in amount and more than one-half in number of the claims voted in their respective class.  11 U.S.C. § 1126(c).

117. As set forth above, Class 3 (First Lien Noteholder Secured Claims) and Class 4 (Second Lien Noteholder Secured Claims) voted to accept the Plan at each Debtor entity at which such Classes held claims and Class 5 (General Unsecured Claims) voted to accept the Plan at three (3) Debtor entities.   *See* Voting Declaration, ¶ 15.  Two Debtors—Condor Acquisition Sub I, Inc. and Condor Acquisition Sub II, Inc.—did not have any Holders of Claims or Interests that were Allowed in an amount greater than zero for voting purposes in any of the Voting Classes.  Pursuant to section 3.4 of the Plan, any such Class shall be considered vacant, deemed eliminated from the Plan of such Debtor for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether such Debtors' Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.  In short, at each Debtor entity where an Impaired Accepting Class was permitted to vote, an Impaired Accepting Class voted to accept

53

the Plan in accordance with 11 U.S.C. 1126(c).  And, at the two Debtor entities where no members of an Impaired Accepting Class were permitted to vote, the Plan satisfies section 1129(a)(8).

118.    Holders of Claims in Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims) are Unimpaired and, therefore, are conclusively presumed to accept the Plan.  *See* Plan, § 3.2.  Holders of Claims in Class 8 (Subordinated Claims) will not receive any distribution on account of such Claims and Holders of Interests in Class 9 (Parent Interests) will not receive or retain any property on account of such Interests, and as such, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  *Id.* at §§ 4.8, 4.9.  Holders of Claims in Class 6 (Intercompany Claims) are either (i) Unimpaired and such Holders are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or (ii) Impaired and such Holders are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  *Id.* at § 4.6.  Holders of Interests in Class 7 (Intercompany Interests) are Impaired and such Holders are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  *Id.* at 4.7.

119.    As discussed more fully below, the Debtors have satisfied the "cram down" requirements under section 1129(b) of the Bankruptcy Code and may obtain confirmation of the Plan notwithstanding the deemed rejection by Holders of Claims in Class 6 (Intercompany Claims), Class 7 (Intercompany Interests), Class 8 (Subordinated Claims) and Class 9 (Parent Interests).

I.    ***Section 1129(a)(9):  Plan Provides for Payment in Full of All Allowed Priority Claims***

120.    Section 1129(a)(9) of the Bankruptcy Code provides that claims entitled to priority under section 507(a) of the Bankruptcy Code be paid in full in cash unless the holders thereof agree to a different treatment with respect to such claims.  11 U.S.C. § 1129(a)(9).  Section

2.1 of the Plan provides that Allowed Administrative Expense Claims will be paid in full in Cash on the later of the Effective Date or on the first Business Day after the date that is thirty (30) calendar days after the date such Claims are Allowed.  Section 2.3 of the Plan Provides that Allowed Priority Tax Claims will be paid in full in Cash on the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the first Business Day after the date that is thirty (30) calendar days after the date such Claims are Allowed, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course.  Section 4.1 of the Plan provides that Allowed Other Priority Claims will be paid in full on the later of the Effective Date and the date that is thirty (30) calendar days after the date such Claims are Allowed. Accordingly, the Plan complies with section 1129(a)(9) of the Bankruptcy Code.

**J.        *Section 1129(a)(10):  At Least One Class of Impaired Claims Has Accepted Plan***

121.    Section 1129(a)(10) of the Bankruptcy Code requires, "[i]f a class of claims is impaired under the plan," the affirmative acceptance of the plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  Here, there are three Impaired accepting Classes at three (3) of the five (5) Debtor entities.  *See* Voting Declaration Ex. A.[50]

122.    Given that (i) Holders of Class 3 (First Lien Noteholder Secured Claims), Class 4 (Second Lien Noteholder Secured Claims), and Class 5 (General Unsecured Claims) hold Claims against three of five Debtors and (ii) there are no Impaired Claims against the other two Debtor entities, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

---

[50]    As set forth in the Voting Declaration, two Debtors did not have any Holders of Claims or Interests that were Allowed in an amount greater than zero for voting purposes in any of the Voting Classes.  Pursuant to section 3.4 of the Plan, any such Class shall be considered vacant, deemed eliminated from the Plan of such Debtor for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether such Debtor's Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.  *See* Voting Declaration, ¶ 15, Exhibit A.

K.      *Section 1129(a)(11):  Plan is Feasible*

123.    Section 1129(a)(11) of the Bankruptcy Code requires the Court to determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, ***unless such liquidation or reorganization is proposed in the plan***.

11 U.S.C. § 1129(a)(11) (emphasis added).

124.    In the context of a liquidating plan, some courts have interpreted section 1129(a)(11) of the Bankruptcy Code to mean that a plan that provides for liquidation automatically satisfies § 1129(a)(11).  *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 432 (Bankr. S.D. Tex. 2009) ("Some courts interpret [1129(a)(11)] to mean that a plan that provides for liquidation automatically satisfies § 1129(a)(11)"); *Heritage Organization*, 375 B.R. at 311 ("Several courts take a narrow approach and interpret the plain language of § 1129(a)(11) to say that feasibility need not be established when liquidation is proposed in the plan."); *In re 47th and Belleview Partners*, 95 B.R. 117, 120 (Bankr. W.D. Mo. 1988) (stating that "feasibility, under the literal wording of §1129(a)(11) of the Bankruptcy Code, is unnecessary to be shown when 'liquidation . . . . is proposed in the plan.'"); *In re Pero Bros. Farms, Inc.*, 90 B.R. 562, 563 (Bankr. S.D. Fla. 1988) ("The feasibility test has no application to a liquidation plan."); *see also In re SPC Seller*, No. 09-12647 (BLS), 2010 Bankr. LEXIS 5321, at *22 (Bankr. D. Del. Dec. 8, 2010) (finding that "[b]ecause the [p]lan is a plan of liquidation, pursuant to 1129(a)(11), the [p]lan is feasible"); *In re ie Corp.*, No. 10-11061 (PJW), 2010 Bankr. LEXIS 5867, at *17 (Bankr. D. Del. Oct. 27, 2010) (finding that the debtor's liquidation plan satisfied section 1129(a)(11) of the Bankruptcy Code and was feasible because the plan provided for liquidation and distribution of the debtor's assets).

125. Other courts hold that a liquidation plan does not automatically satisfy § 1129(a)(11). *See In re Holmes*, 301 B.R. 911, 914 (Bankr. M.D. Ga. 2003) (indicating that "a planned liquidation does not create an exception to the feasibility requirement"). However, courts recognize that the feasibility analysis differs when assessing a liquidating plan and inquire whether the liquidation proposed in the plan is itself feasible. *See In re Two Sts., Inc.*, 597 B.R. 309, 317 (Bankr. S.D. Miss. 2019) (stating that "[t]he focus of the analysis is whether the liquidation itself, as proposed in the plan, is feasible").

126. Certain other courts have evaluated feasibility under both approaches. *See, e.g.*, *In re Cypresswood*, 409 B.R. at 432 (explaining that some courts interpret the language of section 1129(a)(11) to mean that a plan that provides for liquidation automatically satisfies section 1129(a)(11) while others inquire whether the liquidation proposed in the plan is feasible and finding that the proposed liquidating plan satisfied both approaches); *In re PC Liquidation Corp.*, No. 05-89022-288, 2006 Bankr. LEXIS 4638, at *9 (Bankr. E.D.N.Y. Nov. 13, 2006) (finding that the plan was feasible under section 1129(a)(11) because "the conditions precedent to confirmation have been or will be satisfied, and the estate otherwise will have sufficient funds to meet the obligations under the Plan with respect to the payment of Allowed Claims pursuant to the terms of the Plan. Further, the Plan is a plan of liquidation so feasibility is not at issue"); *In re Nailite Int'l*, No. 09-10526 (MFW), 2009 Bankr. LEXIS 4878, at *12-13 (Bankr. D. Del. Dec. 8, 2009) (finding that, "[b]ecause the [plan] [is] a plan of liquidation, pursuant to 11 U.S.C.S. § 1129(a)(11), the [plan] [was] feasible," and that because certain articles of the plan provided for "the means for implementing the [plan] and demonstrate[d] the [d]ebtor's ability to make the payments anticipated [under the plan]," the plan "satisfie[d] the requirements of section 1129(a)(11) of the Bankruptcy Code").

127.    To the extent applicable to liquidating plans, the feasibility test generally requires the Court to determine whether the Plan can be implemented and has a reasonable likelihood of success. To be clear, feasibility does not require guaranteed success. *See In re Pearl Res.*, 622 B.R. 236, 263 (Bankr. S.D. Tex. 2020) ("Under the feasibility standard, a debtor must demonstrate that its plan offers a reasonable possibility of success by a preponderance of the evidence. This court need not require a guarantee of success."). "To establish the feasibility of a plan, [a] debtor must present proof through reasonable projections that there will be sufficient cash flow to fund the plan." *In re Idearc Inc.*, 423 B.R. at 167.

128.    The Debtors must demonstrate satisfaction of § 1129(a)(11) by a preponderance of the evidence. *See Briscoe Enters.*, 994 F.2d at 1165. In the context of a liquidating plan, this is a relatively low threshold. *See In re Brotby*, 303 B.R. 177, 191 (B.A.P. 9th Cir. 2003) ("The Code does not require the debtor to prove that success is inevitable. . . [A] relatively low threshold of proof will satisfy § 1129(a)(11), so long as adequate evidence supports a finding of feasibility.") (citing *In re WCI Cable, Inc.*, 282 B.R. 457, 486 (Bankr. D. Or. 2002) and *In re Sagewood Manor Assocs. Ltd.*, 223 B.R. 756, 762 (Bankr. D. Nev. 1998)); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 202 (Bankr. S.D.N.Y. 2009), aff'd, No. 09 CIV. 10156 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), aff'd in part, rev'd in part, 627 F.3d 496 (2d Cir. 2010); *In re Applied Safety, Inc.*, 200 B.R. 576, 584 (Bankr. E.D. Pa. 1996) ("[I]t is not necessary for plan success to be guaranteed, nor is the feasibility requirement generally viewed as rigorous.").

129.    The determination of whether a liquidation plan is feasible requires a showing that the plan has a "reasonable assurance of commercial viability." *See T-H New Orleans*, 116 F.3d at 801 ("In determining whether a debtor's Chapter 11 plan of reorganization is feasible. . . .'the [bankruptcy] court need not require a guarantee of success. . . . [o]nly a reasonable

58

assurance of commercial viability is required.'") (quoting *In re Briscoe Enter., Ltd., II*, 994 F.2d at 1165-66; *In re Northbelt, LLC*, 630 B.R. 228, 279 (Bankr. S.D. Tex. 2020) ("The court need not require a guarantee of success.  Essentially, Debtor must be able to show that it can accomplish what it proposes to do, in the time period allowed, and on the terms set forth in the plan.").

130.    The Plan is a liquidating chapter 11 plan and, thus, satisfies the plain text of section 1129(a)(11) under the "automatic" feasibility approach.

131.    Under the alternative approach, the Plan also satisfies the feasibility requirements of section 1129(a)(11).  The evidence will show that the Plan can be implemented and has a reasonable likelihood of success, including that the Debtors will have sufficient funds to meet their post-Confirmation Date obligations to pay for the ongoing costs of administering and consummating the Plan (including satisfying all Allowed Priority Tax Claims, Other Priority Claims, and Administrative Expense Claims).[51]

132.    The Debtors have analyzed their ability to fulfill their obligations under the Plan and have taken into consideration their estimated costs of administration.  As set forth in the Chiu Declaration, the evidence shows that the Debtors expect to have sufficient funds in the Wind Down Reserve, pursuant to the Wind Down Budget, and the Senior Claims Reserve, First Lien Reserve, Second Lien Reserve, Liquidation Reserve, and GUC Reserve to administer and consummate the Plan, to effectively Wind Down the Debtors' Estates through the Liquidation Trust in accordance with the Plan and the Liquidation Trust Agreement, and to close the Chapter 11 Cases. *See* Chiu Declaration, ¶ 54.  Furthermore, to account for any unexpected Administrative Expense Claims filed prior to the Administrative Expense Claims Bar Date, the Plan includes a mechanism to ensure deficiencies, if any, in the Senior Claims Reserve are remedied.  *See*

---

[51]    *See* Chiu Declaration, ¶ 53.

Plan § 1.188. Further, the Plan is straightforward and provides for the payment in full of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Professional Fee Claims, as well as for distributions to certain Holders of Claims pursuant to the Plan and the disposition of the Debtors' remaining Assets. The Plan provides various mechanisms for accomplishing all of these objectives, including the appointment of the Liquidation Trustee and the Liquidation Trust Oversight Board, if any, and the establishment of separate segregated accounts for each of the Senior Claims Reserve, Wind Down Reserve, First Lien Reserve, Second Lien Reserve, and GUC Reserve. Accordingly, the information in the Disclosure Statement, the Chiu Declaration, and the evidence proffered or adduced at the Confirmation Hearing (i) are persuasive and credible, (ii) have not been controverted by other evidence, and (iii) establish that the Plan is feasible and provides adequate and appropriate means for its implementation and an orderly wind down and liquidation of the Debtors' estates, as contemplated by the Plan, thereby satisfying the requirements of section 1129(a)(11) of the Bankruptcy Code.

### L.    *Section 1129(a)(12):  All Statutory Fees Have Been or Will be Paid*

133.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan." 11 U.S.C. § 1129(a)(12). Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded priority as administrative expenses. *Id.* § 507(a)(2). In accordance with these provisions, Section 13.1 of the Plan provides that all Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors in full on the Effective Date. On and after the Effective Date, the Liquidation Trustee shall pay any and all Statutory Fees when due and payable. *Id.* The Plan therefore complies with section 1129(a)(12) of the Bankruptcy Code.

60

**M.** *Sections 1129(a)(13)–(16) and 1129(e): Inapplicable Provisions*

134.   Section 1129(a)(13) of the Bankruptcy Code is applicable only to debtors that maintain "retiree benefits," as that term is defined in section 1114 of the Bankruptcy Code. The Debtors will not maintain any such retiree benefits and, as such, section 1129(a)(13) does not apply. *See* Chiu Declaration, ¶ 57.

135.   Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations. The Debtors are not subject to any domestic support obligations and, as such, section 1129(a)(14) does not apply. *See* Chiu Declaration, ¶ 57.

136.   Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code). The Debtors are not "individuals" and, accordingly, section 1129(a)(15) does not apply. *See* Chiu Declaration, ¶ 57.

137.   Section 1129(a)(16) of the Bankruptcy Code applies to transfers of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust. Each Debtor is a moneyed, business, or commercial corporation, and, accordingly, section 1129(a)(16) does not apply. *See* Chiu Declaration, ¶ 57.

138.   The provisions of section 1129(e) of the Bankruptcy Code apply only to "small business case[s]" as defined by that section. These Chapter 11 Cases are not "small business cases" and, accordingly, section 1129(e) of the Bankruptcy Code does not apply.

**N.** *Plan Satisfies "Cram Down" Requirements under Bankruptcy Code Section 1129(b) for Non-Accepting Classes*

139.   Section 1129(b) of the Bankruptcy Code provides a mechanism (known colloquially as "cram down") for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims or interests. Under section 1129(b), the court

may "cram down" a plan over the dissenting vote of an impaired class of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes. *See In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 862 (Bankr. S.D. Tex. 2001).

140.   The only Classes to which cramdown is relevant are the Classes that have been deemed to reject the Plan: Class 6 (Intercompany Claims), Class 7 (Intercompany Interests), Class 8 (Subordinated Claims), and Class 9 (Parent Interests) (collectively, the "**Deemed Rejecting Classes**").[52]   The Plan satisfies the cramdown requirements with respect thereto.

### 1.   Plan Does Not Discriminate Unfairly

141.   Under section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly-situated classes are treated differently without a reasonable basis for the disparate treatment. *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) (noting that the "'hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination.'") (quoting *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003), *aff'd*, 308 B.R. 672 (D. Del. 2004)).  As between two classes of claims or two classes of interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests, or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment.[53]

---

[52]   *See supra* ¶ 95.  The Deemed Rejecting Classes are junior to the Voting Classes, as the Deemed Rejecting Classes consist of either Subordinated Claims (Class 8), Intercompany Claims or Interests (Classes 6 and 7), or Parent Interests (Class 9).

[53]   *See, e.g.*, *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *In re Drexel Burnham Lambert Grp.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).

142.    The Bankruptcy Code does not set forth the standard for determining when "unfair" discrimination exists.  *See In re Idearc Inc.*, 423 B.R. 138, 171 (Bankr. N.D. Tex. 2009), *subsequently aff'd sub nom. In re Idearc, Inc.*, 662 F.3d 315 (5th Cir. 2011); *In re Tribune Co.*, 972 F.3d 228, 24–43 (3d Cir. 2020) (summarizing the various standards applied to unfair discrimination and affirming under *de novo* review the Delaware Bankruptcy Court's application of the rebuttable presumption test); *In re Sea Trail Corp.*, No. 11-07370 (SWH), 2012 WL 5247175, at *7 (Bankr. E.D.N.C. Oct. 23, 2012) ("Courts have developed different tests for determining whether a reorganization plan unfairly discriminates against a class in violation of Section 1129(b)(1). . . . These tests range from a rigid, mechanical approach in which almost any form of discriminatory treatment violates Section 1129(b)(1) to a broad, flexible one in which the outcome depends heavily on the facts and circumstances of each case.").

143.    The Plan does not discriminate unfairly with respect to any Class of Claims. As stated above, with respect to the Deemed Rejecting Classes, no other classes of equal priority are provided a recovery under the Plan.  Specifically, Class 8 claims (Subordinated Claims) are subordinated pursuant to the Plan and sections 510(b) and 510(c) of the Bankruptcy Code. Accordingly, it is not unfair discrimination for other unsecured creditors to be paid ahead of them. The Debtors have a reasonable and permissible basis for the differing classification of the two Classes of Interests—Class 7 (Intercompany Interests) and Class 9 (Parent Interests)—because each of these Classes are at different Debtor entities and are comprised of dissimilar Interests, given that Class 7 contains Interests held by another Debtor or an affiliate of a Debtor while Class 9 contains Interests held by third parties.  Moreover, neither Holders of Parent Interests nor Holders of Intercompany Interests are expected to receive distributions under the Plan.  Accordingly, there is no presumption of unfair discrimination with respect to these Classes and the Plan does not

"discriminate unfairly" with respect to any impaired classes of claims or interests. *See* Chiu Declaration, ¶ 59.

### 2. Plan Is Fair and Equitable.

144. To be "fair and equitable" as to holders of unsecured claims, section 1129(b)(2)(B) of the Bankruptcy Code requires a plan to provide a holder of a claim or interest that is junior to the claims of the nonaccepting class will not receive or retain any property under the plan. See 11 U.S.C. § 1129(b)(2)(B). Here, the "fair and equitable" rule is satisfied because distributions under the Plan are made in the order of priority prescribed by the Bankruptcy Code. *See* Chiu Declaration, ¶ 61. The Plan does not skip or otherwise favor any creditor Class at the expense of a "priority" unsecured creditor Class or senior Class. With respect to the Deemed Rejecting Classes no holder of a junior Claim or Interest at that Debtor will receive or retain property under the Plan. *See* Chiu Declaration, ¶ 61. Accordingly, the Plan complies with the absolute priority rule, including with respect to the Class 6 (Intercompany Claims), Class 7 (Intercompany Interests), Class 8 (Subordinated Claims), and Class 9 (Parent Interests).

### O. *Section 1129(c):  Plan is Only Plan on File*

145. The Plan is the only plan currently on file in these cases and, accordingly, section 1129(c) of the Bankruptcy Code does not apply.

### P. *Section 1129(d):  Principal Purpose of Plan is Not Avoidance of Taxes*

146. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of section 5 of the Securities Act, and no party has objected on any such grounds. The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

### Q. *Modifications to the Plan Do Not Require Resolicitation*

147. Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan satisfies the

requirements of sections 1122 and 1123 of the Bankruptcy Code.[54]  Further, when the proponent

of a plan files the plan with modifications with the court, the plan as modified becomes the plan.[55]

Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed

accepted by all creditors and equity security holders who have previously accepted the plan if the

court finds that the proposed modifications do not adversely change the treatment of the claim of

any creditor or the interest of any equity security holder.[56]  Interpreting Bankruptcy Rule 3019,

courts have consistently held that a proposed modification to a previously accepted plan will be

deemed accepted where the proposed modification is not material or does not adversely affect the

way creditors and stakeholders are treated.[57]

148.    Contemporaneously herewith, the Debtors have filed an amended version

of the Plan, which, among other things, revises the release, exculpation, and injunction provisions

to comply with *Container Store* and *Pine Gate*.  The modifications are not adverse to creditors or

equity holders and thus comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule

3019.  Accordingly, the Debtors submit that no additional solicitation or disclosure is required on

---

[54]    *See* 11 U.S.C. § 1127(a) ("The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title."); *In re ASARCO LLC*, 420 B.R. 314, 340 (Bankr. S.D. Tex. 2009) ("The Bankruptcy Code addresses plan amendment prior to confirmation, and provides as a general proposition that such modification is permitted so long as the modifications do not render the plan unconfirmable." (citations omitted)).

[55]    *See* 11 U.S.C. § 1127(a) ("After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.").

[56]    *See* Fed. R. Bankr. P. 3019(a) ("In a Chapter 9 or 11 case, after a plan has been accepted and before confirmation, the plan proponent may file a modification. The modification is considered accepted by any creditor or equity security holder who has accepted it in writing.").

[57]    *See, e.g.*, *In re Fieldwood Energy LLC*, No. 20-33948 (MI), 2021 WL 2853151, at *16 (Bankr. S.D. Tex. June 25, 2021) *aff'd*, 93 F.4th 817 (5th Cir. 2024) ("The modifications to the Plan since the commencement of solicitation . . . do not materially adversely affect or change the treatment of any Claims. Accordingly, pursuant to Bankruptcy Rule 3019 . . . such modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or re-solicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that holders of Claims be afforded an opportunity to change previously cast acceptances or rejections of the Plan."); *In re 4 West Holdings, Inc.*, 593 B.R. 448, 460 (Bankr. N.D. Tex. 2018) ("The Court also notes that Bankruptcy Rule 3019 looks to the adversity of changes in treatment of claims rather than the materiality of changes to a plan.").

account of the modifications, and that such modifications should be deemed accepted by all creditors that previously accepted the Plan.

**R.**     *Request for Waiver of Bankruptcy Rules 3020(e), 6004(h), and 6006(d)*

149.    The Debtors respectfully request that the Court direct that the Proposed Confirmation Order be effective immediately upon its entry, notwithstanding the 14-day stay imposed by operation of Fed. R. Bankr. P. 3020(e), 6004(h), and 6006(d) as set forth in Section 13.10 of the Plan.  Fed. R. Bankr. P. 3020(e) provides that "[u]nless the court orders otherwise, a confirmation order is stayed for 14 days after its entry."  Fed. R. Bankr. P. 3020(e).  As such, and as the Advisory Committee notes to Fed. R. Bankr. P. 3020(e) state, "the court may, in its discretion, order that Rule 3020(e) is not applicable so that the plan may be implemented and distributions may be made immediately."  Fed. R. Bankr. P. 3020(e), Adv. Comm. Notes, 1999 Amend.  Similarly, Bankruptcy Rules 6004(h)[58] and 6006(d)[59] provide similar stays to orders authorizing the use, sale, or lease of property, (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 364(f) of the Bankruptcy Code, respectively.

150.    Good cause exists for waiving the stay under the circumstances.  It is appropriate for the Court to exercise its discretion to order that Fed. R. Bankr. P. 3020(e), 6004(h),

---

[58]    "Unless the court orders otherwise, an order authorizing the use, sale, or lease of property (other than cash collateral) is stayed for 14 days after the order is entered."  Fed. R. Bankr. P. 6004(h).  The Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) (when it was codified as subsection (g)) similarly state that "[t]he court may, in its discretion, order that Rule 6004(g) is not applicable so that the property may be used, sold, or leased immediately in accordance with the order entered by the court."  Fed. R. Bankr. P. 6004(h), Adv. Comm. Notes, 1999 Amend.

[59]    "Unless the court orders otherwise, an order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed for 14 days after the order is entered."  Fed. R. Bankr. P. 6006(d).  The Advisory Committee Notes to Fed. R. Bankr. P. 6006(d) similarly state that "[t]he court may, in its discretion, order that Rule 6006(d) is not applicable so that the executory contract or unexpired lease may be assigned immediately in accordance with the order entered by the court."  Fed. R. Bankr. P. 6006(d), Adv. Comm. Notes, 1999 Amend.

and 6006(d) are not applicable and to permit the Debtors to consummate the Plan and commence their implementation without delay after the entry of the Confirmation Order.  *See, e.g.*, *In re Energy Partners, Ltd.*, No. 09-32957 (JB), 2009 WL 2898876, at *19 (Bankr. S.D. Tex. Aug. 3, 2009) (waiving stay of confirmation order); *In re PHI, Inc.*, No. 19-30923 (HDH), 2019 WL 3539941, at *24 (Bankr. N.D. Tex. Aug. 2, 2019) (same); *In re Idearc*, 423 B.R. at 158 (stay of confirmation order waived since debtors needed to consummate their chapter 11 plan prior to December 31, 2009).  Each day the Debtors remain in chapter 11, they incur additional, unnecessary administrative costs relating to employee wages and professionals' fees.  Indeed, the Debtors are prepared to go effective very shortly after the entry of the Confirmation Order.  If the Debtors are not permitted to go effective as promptly as possible, the Debtors will be forced to continue paying employee wages until the Debtors are permitted to go effective.  Even so, there is no guarantee that employees will continue to remain around to help facilitate a smooth transition to the Liquidating Trustee at the conclusion of the stay period.  The Debtors are in a position to quickly and smoothly transition the administration of the wind down of the Estates to the Liquidation Trustee promptly after the Confirmation Order is entered.  Waiver of the stays will minimize costs, facilitate a smooth transition, and allow the Liquidation Trustee to begin maximizing the value of the estates sooner rather than later; for all these reasons, waiver of the stays is therefore in the best interests of the Debtors' estates and creditors and will not prejudice any parties in interest.

## III.  Bankruptcy Court Should Overrule the UST Objection and Confirm the Plan

151.  As set forth herein, and as will be demonstrated at the Confirmation Hearing, the Debtors have resolved all but one of the Objections to confirmation of the Plan and the Plan satisfies all the requirements for confirmation set forth in the Bankruptcy Code.  The U.S. Trustee's Objection is not supported by the facts nor applicable law and should be overruled.

### A.       *Objections to the Third-Party Releases Should be Overruled*

152.    The Debtors' amended Plan brings the Third-Party Releases into compliance with *Container Store*.[60]   Yet the U.S. Trustee raises the same arguments in its Objection[61] with respect to the Plan's Third-Party Releases that this Court has repeatedly rejected (*i.e.*, that state law, rather than bankruptcy law, should govern third-party releases and that opt outs are insufficient to confer consent), including in a written decision in *Robertshaw*.  *See Robertshaw*, 662 B.R. at 322-24 (overruling U.S. Trustee's objection to opt-out third-party releases); *In re Nine Energy Service, Inc.*, No. 26-90295 (CML) (Bankr. S.D. Tex. March 4, 2026) (Docket No. 189) (same); *PosiGen, PBC*, No. 25-90787 (CML) (Bankr. S.D. Tex. Feb. 24, 2026) (Docket No. 613) (same); *Pine Gate*, No. 25-90669 (CML) (Bankr. S.D. Tex. Feb. 19, 2026) (Docket No. 1483) (same); *In re Everstream Solutions LLC*, No. 25-90144 (CML) (Bankr. S.D. Tex. Nov. 11, 2025) (Docket No. 594) (same); *In re DocuData Solutions, L.C.*, No. 25-90023 (CML) (Bankr. S.D. Tex. June 23, 2025) (Docket No. 834) (same); *In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. Apr. 17, 2025) (Docket No. 237) (same); *In re Indep. Cont. Drilling Inc.*, No. 24-90612 (ARP) (Bankr. S.D. Tex. Jan. 24, 2025) (Docket No. 124) (same); *In re The Container Store Group, Inc.*, No. 24-90627 (ARP) (Bankr. S.D. Tex. Jan. 9, 2025) (Docket No. 181) (same). There, as here, the U.S. Trustee "want[ed] to use the *Purdue* holding as an opportunity to advance

---

[60]    The Debtors' amended Plan is also consistent with this Court's rulings in *Nine Energy*, *Pine Gate* and *PosiGen*.

[61]    *See* UST Objection, ¶ 1.  In addition, the U.S. Trustee incorporates by reference the arguments previously raised in his *United States Trustee's Objection to Approval of Disclosure Statement for Amended Chapter 11 Plan of Liquidation of Luminar Technologies, Inc. and Its Affiliated Debtors and Related Solicitation Procedures* (Docket No. 332) (the "**UST Disclosure Statement Objection**").  The Debtors and the U.S. Trustee consensually resolved two objections within the UST Disclosure Statement Objection with Plan revisions ahead of the Disclosure Statement Hearing by agreeing to: (i) modify the Third-Party Releases, with respect to Claims against the Debtors, to apply only to Claims arising from any act or omission, transaction, agreement, event, or other occurrence taking place from and including the Petition Date through the Effective Date and (ii) include language noting that nothing in the Plan or the Confirmation Order shall grant the Debtors a discharge pursuant to section 1141(d) of the Bankruptcy Code.  Both resolutions are reflected in the Plan.  *See* §§ 11.5(b), 11.12.

its long-held position that consensual third-party releases in a plan should require an opt-in feature, rather than an opt-out." *See Robertshaw*, 662 B.R. at *322. The Court should deny such an attempt to undermine settled law in this jurisdiction that opt-out releases *are* permissible.

153.   Moreover, the District Court recently held that federal law, not state law, should apply to determining whether third-party releases are consensual. *Container Store*, 2026 WL 395898, at *9 ("The court concludes that there are two separate and independent bases of federal authority that require the application of federal law, rather than state contract law, to the question of whether claimants have 'consented' to third-party releases contained in a bankruptcy reorganization plan"). Indeed, the District Court acknowledged that even if state law did apply, opt out releases would still be permissible. *Id.* at *17 ("A rule that permits opt-outs on a case-by-case basis also complies with the 'general rules' of contract law.") (citing *Elec. Reliability Council of Tex. v. May (In re Tex. Com. Energy)*, 607 F.3d 153, 158 (5th Cir. 2010)). The Debtors submit that the reasoning adopted by *Container Store* is sound and consistent with historical practice in this Circuit.

154.   Although the Supreme Court in *Purdue* held that ***non-consensual*** releases by third-parties are impermissible, it did not say that all third-party releases are impermissible, and the Supreme Court was careful to be clear that it was not expressing a view on what qualifies as a "consensual" release:

> As important as the question we decide today are ones we do not. ***Nothing in what we have said should be construed to call into question consensual third-party releases*** offered in connection with a bankruptcy reorganization plan; those sorts of releases pose different questions and may rest on different legal grounds than the nonconsensual release at issue here. ***Nor do we*** have occasion today to ***express a view on what qualifies as a consensual release*** or pass upon a plan that provides for the full satisfaction of claims against a third-party nondebtor.

*Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 226 (2024) (emphasis added) (internal citations omitted). Accordingly, the Supreme Court (i) preserved consensual releases and (ii) did not restrict the ability of courts to determine what constitutes consent.

155. In the Southern District of Texas, a process where third parties have the opportunity to opt-out of granting releases is sufficient to render a release consensual and has been for some time, as "[h]undreds of chapter 11 cases have been confirmed in this District with consensual third-party releases with an opt-out." *Robertshaw*, 662 B.R., at 323. That is because, as the Court found in *Robertshaw*, "[t]here is nothing improper with an opt-out feature for consensual third-party releases in a chapter 11 plan," when parties giving such releases receive a "meaningful opportunity to opt out." *Id.* Importantly, as this Court recognized, "*Purdue* did not change the law in this Circuit." *Id.*[62] Nor does *Container Store*.

156. When analyzing whether third-party releases are consensual, courts in the Fifth Circuit largely focus on the facts and circumstances of the specific process, including whether "notice has gone out, parties have actually gotten it, they've had the opportunity to look over it [and] the disclosure is adequate so that they can actually understand what they're being asked to do and the options that they're being given." Conf. Hr'g Tr. 47:7–11, *In re Energy & Expl.*

---

[62] *See also In re DocuData Sols., L.C.*, No. 25-90023 (CML) (Bankr. S.D. Tex. June 23, 2025) (Docket No. 834) (approving chapter 11 plan with opt-out third-party releases); *In re Nine Energy Service, Inc.*, No. 26-90295 (CML) (Bankr. S.D. Tex. March 4, 2026) (Docket No. 189) (same); *PosiGen, PBC*, No. 25-90787 (CML) (Bankr. S.D. Tex. Feb. 24, 2026) (Docket No. 613) (same); *Pine Gate*, No. 25-90669 (CML) (Bankr. S.D. Tex. Feb. 19, 2026) (Docket No. 1483) (same); *In re Everstream Solutions LLC*, No. 25-90144 (CML) (Bankr. S.D. Tex. Nov. 11, 2025) (Docket No. 594) (same); *In re Wellpath Holdings, Inc.*, No. 24-90533 (ARP) (Bankr. S.D. Tex. May 1, 2025) (Docket No. 2596) (same); *In re MLN US Holdco LLC*, No. 25-90090 (CML) (Bankr. S.D. Tex. April 17, 2025) (Docket No. 263) (same); *In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. April 15, 2025) (Docket No. 227) (same); *In re DRF Logistics, LLC,* No. 24-90447 (CML) (Bankr. S.D. Tex. Nov 25, 2024) (Docket No. 530) (same); *In re Mobileum, Inc.*, No. 24-90414 (CML) (Bankr. S.D. Tex. Sept. 11, 2024), (Docket No. 194) (same); *In re Core Sci., Inc.* No. 22-90341 (CML) (Bankr. S.D. Tex. Jan. 16, 2024) (Docket No. 1749) (same); *see also In re GOL Linhas Aéreas Inteligentes S.A.*, No. 24-10118 (MG) (Bankr. S.D.N.Y. May 22, 2025) (Docket No. 1658) (approving chapter 11 plan with opt-out third-party releases based upon a reading of *Purdue* and case law from the Fifth Circuit).

*Partners, Inc.*, No. 15-44931 (Bankr. N.D. Tex. Apr. 21, 2016), (Docket No. 730) (approving third-party releases as consensual, over objection of U.S. Trustee, in light of sufficient notice and opportunity to object); *see also* Conf. Hr'g Tr. 91:15-92:5, *In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. Apr. 16, 2025) (Docket No. 251) (analyzing the facts and circumstances surrounding opt-out third-party releases before determining such releases were appropriate).

157.    Here, the Plan, Disclosure Statement, Ballots, Notice of Non-Voting Status, and Release Opt-Out Form provide a similar "meaningful opportunity" in compliance with the long-standing practice in this district and the Complex Case Procedures.    Exhibit D of the Disclosure Statement clearly sets forth the releases contained in the Plan and adequately describes both the entities and claims being released.    The Ballots, Notice of Non-Voting Status, and the Release Opt-Out Form each conspicuously disclose (in **bolded** text) the proposed releases in the Plan, the procedures for opting out, and the consequences of failing to do so.    These provide ample notice and information regarding the releases, what the Releasing Parties are being asked to do, and benefits they would forego should they choose to opt out.    The Plan allows any party the option to opt-out of the third-party release provision, including those creditors that vote to accept the Plan.[63]

158.    The Release Opt-Out Form has also already been expressly approved and ordered by this Court in the Disclosure Statement Order.    *See* Disclosure Statement Order ¶ 22.

---

[63]    Only the following Holders of Claims and Interests will be deemed to have released the Released Parties pursuant to the Plan:  those (i) whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth in the Plan; (ii) that vote to accept or reject the Plan, are deemed to reject the Plan, or are presumed to accept the Plan, but in each case do not opt out of granting the releases set forth in the Plan; (iii) that were given notice of the opportunity to opt out of granting the releases set forth in the Plan but did not opt out.  For the avoidance of doubt, and notwithstanding anything in the Plan to the contrary, (i) no Holders of Claims or Interests in Class 8 (Subordinated Claims) or Class 9 (Parent Interests), solely in their capacities as such, and (ii) no Persons on the Non-Released Parties Schedule, in each case, shall be or shall be deemed to be Releasing Parties.

This Court determined that the Release Opt-Out Form "complies with the Bankruptcy Code, applicable Bankruptcy Rules, and the applicable Bankruptcy Local Rules and Complex Case Procedures and . . .provide[s] due, proper, and adequate notice to Holders of Claims and Interests in the Non-Voting Classes and comport with due process.  No further notice is required or necessary." *Id.* ¶ 23.  Accordingly, the issue of whether the Release Opt-Out Form complies with the Bankruptcy Code and is valid, has already been determined in the affirmative by this Court and is binding in these Chapter 11 Cases.

159.    As detailed above, the UST Objection asserting that the Plan provides for non-consensual third-party releases is without merit and should be overruled, consistent with long-standing law in this District.

### B.    *The U.S. Trustee's Request to Expand Container Store Should Be Denied*

160.    The U.S. Trustee's attempt to expand *Container Store* beyond its holding should similarly be overruled.  *See* UST Objection, ¶ 5.  The U.S. Trustee contends that the recovery for Holders of General Unsecured Claims is "so nominal" as to be analogous to those receiving no recovery with no ability to vote in *Container Store*.  *Id.*  But such argument lacks merit and rehashes what this Court has previously rejected.[64]

161.    Specifically, the U.S. Trustee recently asked the Court to expand *Container Store* in a similar situation.  In *Pine Gate*, holders of general unsecured claims were, like the Holders of General Unsecured Claims here, projected to receive a minimal recovery.  *In re Pine Gate Renewables, LLC*, No. 25-90669 (CML) (Bankr. S.D. Tex. Feb. 18, 2026) Conf. Hr'g Tr.

---

[64]    The U.S. Trustee also argues that Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests) should not be bound by the Plan's Third-Party Releases simply by their failure to opt out because they will receive no recovery.  However, Holders of Claims in Classes 6 and 7 did not receive Release Opt-Out Forms, and thus the U.S. Trustee's argument with regard to the use of opt-outs for those classes is moot.  Moreover, any releases provided by a Debtor to another Debtor are entirely consensual, and such releases are included in the Settlements, which, among other things, embody a resolution of all inter-Estate issues.

33:5–10. And despite the U.S. Trustee's urging for the Court to broaden *Container Store*'s ruling, the Court held that the class of general unsecured claims was bound by the consensual third-party releases and that the releases at that class were consistent with the ruling in *Container Store*. *Id.*, 70:24–25, 71:1–3.

162.     In contrast to the deemed-to-reject classes addressed in *Container Store*— and consistent with the general unsecured claim holders in *Pine Gate*—the Holders of General Unsecured Claims in these Chapter 11 Cases (i) are anticipated to receive distributions under the Plan (and here, will have assets transferred to the Liquidation Trust for their sole benefit, including potentially valuable real estate, claims and causes of action, and access to D&O Policy proceeds relating thereto), (ii) were eligible to vote on the Plan (and here, voted overwhelmingly to accept it), and (iii) benefited from the active and diligent representation of the Creditors' Committee, which was specifically constituted to advocate for the interests of the Debtors' general unsecured creditors in these Chapter 11 Cases.  Importantly, the Creditors' Committee played a central role in negotiating the Settlements and construct of the Plan and supports the Plan, including the releases contained therein.[65]  And as was the case in *Pine Gate*, the Holders of General Unsecured Claims in these Chapter 11 Cases have greatly benefited from the Creditors' Committee's diligent involvement throughout the process.  After several weeks of tireless negotiations between the Debtors, the Ad Hoc Noteholder Group, and the Creditors' Committee, the parties entered into the Global Settlement, which improves recoveries for all creditors—including general unsecured creditors.  In addition to an active Creditors' Committee, individual Holders of General Unsecured Claims were also directly engaged in—and supportive of—these proceedings.  The vast majority

---

[65]     As reflected in the Disclosure Statement, which each voter received, "[t]he Creditors' Committee (i) believes that the Plan is in the best interests of the Debtors' general unsecured creditors, (ii) supports confirmation of the Plan and (iii) recommends that all general unsecured creditors in Class 5 submit a ballot to accept the Plan."

of Holders of General Unsecured Claims voted to approve the Plan: of the over 200 valid votes submitted by such Holders, five (5) votes were cast to reject the Plan, and 91 elections were made to opt out of the Plan's Third-Party Releases.

163.   Accordingly, the U.S. Trustee's request to expand *Container Store* to voting classes entitled to distributions should be denied.

### C.   *Objections to the Injunction Provisions To the Extent Not Already Resolved Should be Overruled*

164.   The U.S. Trustee also objects to the Plan's Injunction and Gatekeeper Provisions, arguing that issuance of the injunction would exceed this Court's authority under the Bankruptcy Code.[66]  The Injunction Provisions and Gatekeeper Provisions, in the amended Plan, however, are consistent with the Bankruptcy Code, applicable Fifth Circuit precedent, including *Highland II*, and the District Court's ruling in *Container Store*.  As detailed above, the Plan's Injunction Provision permanently enjoins any Entity from commencing or continuing in any manner any claim that was released or exculpated under the Plan.[67]  Moreover, as described above, the Debtor's amended Plan brings the Gatekeeper Provisions into compliance with the District Court's ruling in *Container Store*[68] and this Court's ruling in *Pine Gate,*[69]

165.   There is no precedent to support the U.S. Trustee's assertion that the Bankruptcy Code itself does not permit the issuance of an injunction to enforce a Plan's release and exculpation provisions.[70]  On the contrary, such an injunction is permissible under prevailing

---

[66]   *See* UST Disclosure Statement Objection, ¶ 1.

[67]   *See* Plan § 11.5(a).

[68]   *In re Container Store Grp., Inc.*, 2026 WL 395898.

[69]   *In re Pine Gate Renewables, LLC*, No. 25-90669.

[70]   In fact, the U.S. Trustee cites two cases that analyze the Patent Act (*eBay*) and the Federal Water Pollution Control Act (*Weinberger*), but do not analyze the Bankruptcy Code.  *See* U.S. Trustee Disclosure Statement Obj. ¶ 69.

Fifth Circuit law so long as such injunction is consensual.  *See, e.g.*, *In re Camp Arrowhead*, 451 B.R. 678, 701-02 (Bankr. W.D. Tex. 2011) ("[T]he Fifth Circuit does allow permanent injunctions *so long as there is consent* . . . [w]ithout an objection, this court was entitled to rely on . . . silence to infer consent at the confirmation hearing . . . .") (citations omitted).  Because, as described above, the third-party releases are consensual, a Holder who consents to such releases is also consenting to the corresponding injunction enforcing such release, including the Gatekeeper Provision.

166.    Accordingly, objections with respect to the Plan's Injunction Provisions and Gatekeeper Provisions are without merit and should be overruled.

**D.    *Objections to Request for Waiver of 3020(e) Should be Overruled***

167.    The U.S. Trustee argues that a waiver of the 14-day stay imposed by Rule 3020(e) is not appropriate in these Chapter 11 Cases.[71]  However, as set out in section II.R. herein, waiver of the Rule 3020(e) stay is appropriate.  The Debtors and their stakeholders have worked tirelessly throughout these cases to build consensus around a value-maximizing plan of liquidation and bring these Chapter 11 Cases to as swift a resolution as possible.[72]  As described above, a waiver of the Rule 3020(e) stay is necessary to (i) curtail the administrative costs of these Chapter 11 Cases to preserve the value of the Debtors' Estates,  (ii) allow the Liquidation Trustee to promptly commence the Wind Down, and (iii) avoid delaying distributions to creditors. Therefore, the U.S. Trustee's objection to the waiver of the Rule 3020(e) stay should be overruled.

---

[71]    *See* UST Disclosure Statement Objection, ¶ 1.

[72]    *See* Chiu Declaration, ¶ 65.

**RESERVATION OF RIGHTS**

168.    The Debtors reserve all of their rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this reply, to seek discovery, or to introduce evidence and to raise additional arguments at any hearing to consider confirmation of the Plan.

**CONCLUSION**

169.    The Plan satisfies all of the applicable requirements of section 1129 of the Bankruptcy Code and should be confirmed.  The Debtors respectfully request that the Court confirm the Plan, overrule the outstanding Objections, and grant such other and further relief as is just and appropriate.

Dated:  March 30, 2026
        Houston, Texas

    */s/  Stephanie N. Morrison*

**WEIL, GOTSHAL & MANGES LLP**
Stephanie N. Morrison (24126930)
Austin B. Crabtree (24109763)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Stephanie.Morrison@weil.com
        Austin.Crabtree@weil.com

-and-

**WEIL, GOTSHAL & MANGES LLP**
Ronit J. Berkovich (admitted pro hac vice)
Jessica Liou (admitted pro hac vice)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:    Ronit.Berkovich@weil.com
        Jessica.Liou@weil.com
*Attorneys for Debtors*
*and Debtors in Possession*

## Certificate of Service

I hereby certify that on March 30, 2026, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

_/s/  Stephanie N. Morrison_
Stephanie N. Morrison